1  Dan Stormer, Esq. (CA Bar # 101967)*
   Cindy Pánuco, Esq. (CA Bar #266921)*
2  HADSELL STORMER & RENICK LLP
   128 N. Fair Oaks Avenue
3  Pasadena, California 91103
   Telephone: (626) 585-9600
4  Facsimile: (626) 577-7079
   Emails: dstormer@hadsellstormer.com
5          cpanuco@hadsellstormer.com

6  Joshua Piovia-Scott, Esq. (CA Bar #222364)*
   HADSELL STORMER & RENICK LLP
7  4300 Horton Street, #15
   Emeryville, CA 94608
8  Telephone: (626) 585-9600
   Facsimile: (626) 577-7079
9  Email: jps@hadsellstormer.com

10 Attorneys for Plaintiffs

11 [Additional counsel cont. on next page]

12                **UNITED STATES DISTRICT COURT**

13                **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| 14  Puente, an Arizona nonprofit corporation; Poder in Action, an Arizona nonprofit corporation; Ira Yedlin; Janet Travis; Cynthia Guillen; Jacinta Gonzalez Goodman, individually and as class representatives,<br><br>        Plaintiffs,<br><br>v.<br><br>City of Phoenix, a municipal corporation; Jeri L. Williams; Benjamin Moore; Douglas McBride; Robert Scott; Christopher Turiano; Glenn Neville; John Sticca; Lane White; Jeffrey Howell; George Herr, individually and in their official capacities; and Does 1-20.<br><br>        Defendants. | Case No.:<br><br>**CLASS ACTION FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; DEMAND FOR JURY**<br><br>1. **EXCESSIVE FORCE (42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENTS)**<br>2. **FREEDOM OF SPEECH AND ASSOCIATION (42 U.S.C. § 1983 FIRST AND FOURTEENTH AMEDMENTS)**<br>3. **DUE PROCESS (42 U.S.C. § 1983 FOURTEENTH AMENDMENT)**<br>4. **EQUAL PROTECTION (42 U.S.C. § 1983 FIRST AND FOURTEENTH AMENDMENTS)** |

[Additional counsel cont. from first page]

Kathleen E. Brody (Bar No. 026331)
Darrell L. Hill (Bar No. 030424)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: 602-650-1854
Emails: kbrody@acluaz.org
        dhill@acluaz.org

Daniel J. Pochoda (Bar No. 021979)
c/o ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: 602-532-0486
Email: danpoc@cox.net

* *Pro hac vice* application pending

Attorneys for Plaintiffs

**INTRODUCTION**

1.  This is a class action to enforce Plaintiffs' fundamental constitutional rights of speech and association, and to be free from excessive police force and from discrimination and harm by law enforcement based on the content of their speech. On the night of August 22, 2017, a force of close to 900 officers of the Phoenix Police Department ("PPD") conducted an unannounced attack on Plaintiffs and hundreds of others who had gathered outside the Phoenix Convention Center to protest in connection with a speech by President Trump; the goal of this assembly was to demonstrate strong disagreement with President Trump's and his supporters' racist and anti-immigrant policies and views. Defendants knew that most, if not all, of those the police attacked were acting in a peaceable manner, but disregarded the well-being of these anti-Trump protestors as well as well-established constitutional mandates and police policies. PPD personnel indiscriminately fired harmful pepper spray, gas, pepper bullets, and flash-bang cannisters into the assembled crowd, which included children, elderly people, disabled people, and pregnant women. The failure of the Phoenix Police to warn the peaceably assembled crowd of the coming attack, as is required by the Constitution, and to provide for a safe dispersal route for the protesters to avoid the police onslaught, guaranteed the ensuing widespread panic and fear amongst those assembled and resulted in physical and emotional injuries, as well as constitutional violations.

2.  Defendant Chief of Phoenix Police Jeri L. Williams predictably had fulsome praise for the Phoenix Police personnel at the scene of the attack on the assembled crowd; as then-Mayor Greg Stanton stood by, she wholeheartedly endorsed and ratified the actions taken by Phoenix Police officers. City Manager Ed Zuercher also praised the police for their conduct at the gathering. Despite a significant increase in the Phoenix Police Department's use-of-force incidents against civilians, including the events of August 22, 2017, and many other police-on-civilian shootings, City officials, including the Police Chief, the Mayor, the City Manager, and the City

1   Council members have failed to condemn this police violence and to take any
2   meaningful steps to stop it, reduce it, or address the trauma that police violence causes
3   to individuals, families, and communities in the City of Phoenix. To date in 2018, there
4   have been thirty-seven officer-involved shootings by the Phoenix Police resulting in
5   eighteen deaths (plus another death by taser), more than during the entire year of 2017.

6       3.      This action seeks injunctive relief to restrain the Phoenix Police
7   Department's use of excessive force against civilians and to prohibit future disruptions
8   of the peaceable exercise of First Amendment rights. Absent the Court's intervention,
9   those who wish to gather and speak will continue to experience understandable fear of
10  police retaliation when participating in protests, demonstrations, and marches,
11  particularly when expressing anti-Trump views. This action also seeks damages to
12  compensate Plaintiffs and the class they represent for the denial of their First
13  Amendment rights on August 22, 2017, and for the physical injuries and emotional
14  harms resulting from the Phoenix Police Department's excessive use of force.

15                    **JURISDICTION AND VENUE**

16      4.      This action arises under 42 U.S.C. § 1983 and the laws and
17  Constitution of the United States. Jurisdiction lies under 28 U.S.C. §§ 1331, 1343, and
18  1367. The Court has jurisdiction to issue declaratory and/or injunctive relief pursuant
19  to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57. The Court has
20  authority to award attorneys' fees under 42 U.S.C. § 1988(b).

21      5.      Venue properly lies within this District under 28 U.S.C. § 1391(b). The
22  Defendants are all public officials or other employees or agents of the City of Phoenix,
23  as well as the City itself. Each of the Defendants resides within this District and/or
24  performs official duties within the State of Arizona. This Court, accordingly, has
25  personal jurisdiction over each of the Defendants.

26      6.      The named Defendants perform their official duties in this District, and
27  a substantial part of the events or omissions giving rise to Plaintiffs' claims have
28  occurred or will occur in this District.

## PARTIES

***Organizational Plaintiffs: Injunctive Class Representatives and Damages Plaintiffs***

7.     Plaintiff Puente is a grassroots nonprofit membership organization based in Phoenix, Arizona. Puente's mission is to develop, educate, and empower migrant communities through lobbying, advocacy, and activism. Puente provides free English classes, media trainings, know-your-rights workshops, health and wellness trainings, educational programs for children, and other services. As part of their efforts to support migrant communities, Puente members frequently organize and participate in community events and demonstrations in Phoenix. Puente members believe that the Phoenix Police Department's continued unlawful use of force against organizers and protesters will deter and dissuade members and the public from participating in Puente and community organized Phoenix demonstrations in the future. Members and supporters of Puente have been chilled from participating in political expressive activities by the PPD's improper, excessive, and unconstitutional uses of force. Puente expended significant time and resources to organize and participate in the protest on August 22, 2017, to convey the message that the racist and anti-immigrant policies of the Trump administration must end; Defendants' actions stopped this message from reaching its intended audience. Puente members and supporters believe that they will be targeted for violent PPD retaliation if they attend future demonstrations, especially when espousing anti-Trump messages. Puente also suffered out-of-pocket damages as a result of the PPD's unlawful actions on August 22, 2017, including for lost equipment employed at demonstrations and other events. Members were violently denied their rights to speech and association.

8.     Plaintiff Poder in Action ("Poder") (formerly the Center for Neighborhood Leadership) is a grassroots nonprofit organization based in Phoenix, Arizona. Poder's mission is to build power with people impacted by injustice through leadership development, civic engagement, and policy advocacy. Poder's work includes advocacy on immigration, education, and police brutality. Poder regularly

organizes and participates in protests and political expressive activities in Phoenix to raise awareness on issues impacting black, brown, and migrant communities, including police violence. Poder representatives believe that the PPD's continued unlawful use of force against organizers and protesters will deter and dissuade their supporters and the public from participating in such Phoenix protests in the future. Members and supporters of Poder are chilled from participating in political expressive activities by the PPD's demonstrated improper, excessive, and unconstitutional uses of force against protesters. Poder expended significant time and resources to organize and participate in the protest on August 22, 2017, to convey the message that the racist and anti-immigrant policies of the Trump administration must end. Defendants' actions stopped this message from reaching its intended audience, which included President Trump and his supporters.

### *Injunctive and Damages Class Representatives*

9.      Plaintiff Janet Travis is, and was at all relevant times, a resident of downtown Phoenix. Ms. Travis attended the protest to witness first-hand and join the opposition to Trump, to document the protest, and to express her own views critical of Trump's policies to Trump supporters. PPD gassed Ms. Travis causing her to inhale pepper spray, and brutally shot her multiple times with unidentified projectiles in the upper back, lower back and buttocks, causing her injuries and emotional trauma so severe she could not continue her expressive activities and had to seek medical attention. Ms. Travis wants to continue to be active in political rallies and protests in her community, but is concerned that the PPD will continue to target peaceful protesters. Ms. Travis is chilled from participating in future protests and politically expressive activities in Phoenix without significant reform to the Phoenix Police Department's policies, practices ,and procedures concerning the use of force against peaceful protesters and protecting speech and associational rights.

10.      Plaintiff Ira Yedlin is a resident of Bisbee, Arizona, and a strong critic of President Trump's politics, policies, and leadership. Mr. Yedlin has attended

numerous protests since the Vietnam War and considers it his civic duty to participate in protests when he disagrees with government action. Mr. Yedlin and his wife attended the August 22, 2017 protest in Phoenix to express to Trump and his supporters their dissatisfaction with how President Trump governs the country. PPD gassed Mr. Yedlin causing him to inhale pepper spray, and violently shot him multiple times with unidentified projectiles in the face, upper torso, and leg area. PPD injured Mr. Yedlin's face so severely that he could not continue to protest and had to seek treatment for his injuries in a hospital emergency room. Mr. Yedlin desires to continue to be active in political rallies and protests in Phoenix, but believes that the PPD will continue to target peaceful protesters. Mr. Yedlin is chilled from participating in future protests and politically expressive activities in Phoenix without significant reform to the Phoenix Police Department's policies, practices, and procedures concerning the use of force against peaceful protesters and protecting speech and associational rights.

11. Plaintiff Cynthia Guillen is a resident of Mesa, Arizona, and an active participant in demonstrations in the Phoenix metropolitan area. Ms. Guillen participated in the demonstration against President Trump on August 22, 2017, to make her objections to this policies to his supporters. PPD gassed Ms. Guillen causing her to inhale pepper spray, and senselessly shot her in the lower stomach and hip with unidentified projectiles. The impact of PPD's projectiles caused Ms. Guillen external and internal injuries that required her to leave the protest and seek medical attention; she has had ongoing medical treatment. Ms. Guillen is chilled from participating in future protests and politically expressive activities in Phoenix without significant reform to the Phoenix Police Department's policies, practices, and procedures concerning the use of force against peaceful protesters and protecting speech and associational rights.

12. Plaintiff Jacinta Gonzalez Goodman is a resident of Phoenix, Arizona, and a long-time activist and organizer. Ms. Gonzalez Goodman volunteers with Puente and works with Mijente, a national civil rights organization focused on building

leadership and social change in the Latinx community. Ms. Gonzalez Goodman participated in the demonstration against President Trump on August 22, 2017, to express her disagreement with the President and his supporters' vision for the country, to peacefully show solidarity with her community, and to demonstrate to Trump and his supporters the intense public opposition to the President's policies and goals. Ms. Gonzalez Goodman participated in the planning of the protest, and during the protest served as a liaison between the protesters and PPD. PPD gassed Ms. Gonzalez Goodman, causing her to inhale pepper spray, which caused injuries to her lungs and eyes that lingered for a day, and forced Ms. Gonzalez Goodman to leave the protest before she could deliver her message to her intended audience. Ms. Gonzalez Goodman is chilled from participating in future protests and politically expressive activities in Phoenix without significant reform to the Phoenix Police Department's policies, practices, and procedures concerning the use of force against peaceful protesters and protecting speech and associational rights.

### *Defendants*

13.     Defendant City of Phoenix is a municipal corporation, organized and existing under the laws of the State of Arizona. The Phoenix Police Department is an agency of the City of Phoenix, and all actions of the PPD are the legal responsibility of the City.

14.     Defendant Jeri L. Williams is, and was at all relevant times, the Chief of Police for the City of Phoenix. As such, Chief Williams is the final policy maker for the City of Phoenix in the area of law enforcement and in setting and implementing the policies and practices of the PPD including but not limited to the development, implementation, and the training of PPD personnel in these and all PPD areas, including the procedures, policies, regulations, and practices related to the proper use of force and the need for prior warnings, in response to political protests, and public demonstrations, and marches. At all relevant times, Chief Williams was responsible for the development of policies concerning protests and the protection of participants' basic rights of speech

8

and association, for making these policies known to all PPD personnel, and for ensuring that all members of the PPD were adequately and consistently trained in their meaning and implementation, as well as in all relevant constitutional requirements and police best practices. Chief Williams was responsible for the training and preparation of PPD personnel with respect to the events of August 22, 2017, and she approved and/or ratified the PPD's plans for that event including the unconstitutional acts complained of herein. As set out below, Chief Williams failed to establish sufficient guidelines and regulations governing the PPD in the situation presented on August 22, 2017, and did not ensure adequate training before the event, or properly supervise and monitor the actions of PPD personnel during the protest. As set out below, after becoming aware of the events and the actions of PPD on the scene, Chief Williams praised the members of the PPD with then-Mayor Stanton by her side, and fully ratified the actions of PPD personnel. City Manager Ed Zuercher also praised and ratified the PPD's decisions and actions complained of herein. Chief Williams is sued in her official and individual capacity.

15.     Defendant Benjamin Moore is a Lieutenant with the PPD. On August 22, 2017, he was designated as the "Alpha Leader" and "Field Force Commander" in charge of all PPD units working the night of the Trump rally and protest. Lt. Moore gave the initial improper orders for PPD officers to use force against anti-Trump protestors that resulted in indiscriminate attacks against hundreds of peaceable protesters without warnings and before any unlawful assembly had been declared. Plaintiffs sue Lt. Moore in his official and individual capacity.

16.     Defendant Douglas McBride is a Sergeant with the PPD. On August 22, 2017, he was assigned as the "Grenadier Team Leader" for the Trump rally and protest. According to PPD, grenadiers are "specialty trained officers on deployment of chemical munitions." Plaintiffs sue Sgt. McBride in his official and individual capacity.

17.     Defendant Robert Scott is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein,

Officer Scott indiscriminately fired on and injured Plaintiffs without warning. Plaintiffs sue Officer Scott in his official and individual capacity.

18. Defendant Christopher Turiano is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer Turiano indiscriminately shot and injured Plaintiffs without warning. Plaintiffs sue Officer Turiano in his official and individual capacity.

19. Defendant Glenn Neville is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer Neville indiscriminately shot and injured Plaintiffs without warning. Plaintiffs sue Officer Glenn in his official and individual capacity.

20. Defendant John Sticca is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer Sticca indiscriminately shot and injured Plaintiffs without warning. Plaintiffs sue Officer Sticca in his official and individual capacity.

21. Defendant Lane White is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer White indiscriminately shot and injured Plaintiffs without warning. Plaintiffs sue Officer White in his official and individual capacity.

22. Defendant Jeffrey Howell is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer Howell indiscriminately shot and injured Plaintiffs without warning. Plaintiffs sue Officer Howell in his official and individual capacity.

23. Defendant George Herr is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer Herr indiscriminately shot and injured Plaintiffs without warning. Plaintiffs sue Officer Herr in his official and individual capacity.

24. Plaintiffs are ignorant of the true names and/or capacities of Defendants sued herein as Does 1 through 20, inclusive, and therefore sue said

Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe Defendants is legally responsible and liable for the incident, injuries, and damages hereinafter set forth, and that each of said Defendants proximately caused said incidents, injuries, and damages by reason of their failure to supervise, train, manage, or control staff, violation of constitutional rights, violation of public policy, or based on agency, employment, ownership, entrustment, custody, care, or control, or upon any other act or omission. Plaintiffs will seek leave to amend this complaint to insert further charging allegations when such facts are ascertained.

25. Each of the above individual Defendants participated in and has responsibility for the unlawful conduct and resulting injuries to Plaintiffs and putative damages class members described herein, by, among other things, personally participating in the unlawful conduct, or acting jointly or conspiring with others who did so; authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing and refusing, with deliberate indifference to Plaintiffs' rights, to initiate and maintain adequate training and supervision; and ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

26. In doing the acts alleged herein, Defendants, and each of them, acted within the course and scope of their employment for the City of Phoenix.

27. In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under color of law. In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, employee, and/or in concert with each of said other Defendants herein.

## STATEMENT OF FACTS

28.     The election of Donald J. Trump in November 2016, and his harmful policies and attitudes related to migrants, police misconduct, discrimination, women, education, health care, foreign affairs, and gun control, to name a few, have invigorated millions of Americans to join anti-Trump protests and demonstrations in record numbers across the nation. Overwhelming numbers of protestors, many newly motivated by the cruel and unjustified policies of the present administration, are participating in demonstrations for the first time to express their criticism. Arizonans found themselves the target of Trump's racist and anti-immigrant politics when, in the summer of 2017, he publicized his intent to pardon former Sheriff Joe Arpaio, who had been convicted of criminal contempt of court after disobeying a federal judge's order to end the practice of racial profiling and detaining persons suspected of being in the United States unlawfully solely based on their perceived Latino race. When Trump announced plans to speak in Phoenix just before his anticipated pardon of Arpaio (who is widely known for visiting indignities on prisoners and terrorizing immigrant communities in Maricopa County), Arizonans planned to take to the streets.

### *Plans to Demonstrate in Quintessential Public Fora*

29.     On August 16, 2017, Trump's campaign announced that he would deliver a speech at a campaign-style rally at the Phoenix Convention Center less than a week later. This announcement came on the heels of a violent clash between two groups of demonstrators in Charlottesville, Virginia, one group consisting of white supremacists and one group consisting of pro-social-justice advocates. One woman was killed by the intentional act of a white supremacist, and several were injured in the clashes in Charlottesville. Trump reacted to the events in Charlottesville by proclaiming that there were "good people" on both sides.

30.     With the events of Charlottesville in mind, Plaintiffs Puente and Poder in Action, and other activists and groups, mobilized to plan a safe protest before and after Trump's rally scheduled for early evening on August 22, 2017 ("Trump Protest").

PPD liaisons communicated with organizers about the details of the planned demonstrations. Puente and Poder also met, and otherwise communicated with PPD liaisons to discuss logistics for the demonstration to ensure that all who gathered would be able to safely exercise their free-speech and assembly rights, and make their opposition to Trump's actions known to his supporters. Puente, Poder, and other organizations exchanged phone calls, emails, and text messages with the PPD and other City representatives leading up to the demonstration. The ACLU of Arizona also reached out to representatives of the City of Phoenix and PPD to request that the City and the PPD put in place measures to prevent the devastation that befell protestors in Charlottesville and ensure that all could exercise their speech rights safely. City and PPD representatives assured the ACLU of Arizona that the PPD was prepared and was much more experienced in managing crowds and large demonstrations than the police in Charlottesville.

31.     During the planning communications, PPD made it clear to Puente, Poder, and other organizers that anti-Trump protesters would be relegated to assembling in an outdoor but confined space in the downtown area which it euphemistically called the "free-speech zone." PPD defined this area as follows: its southern boundary was Monroe Street, between Second and Third Streets, in front of the Herberger Theater, directly north of the Convention Center's northern entrance. The northern boundary of the "free-speech zone" was marked by a barrier which stretched, in part, across Third Street between Monroe and Van Buren Streets. PPD restricted anti-Trump protesters to assembling, chanting, and holding signs in this zone, north of Monroe Street and south of the barrier. The streets and sidewalks of downtown Phoenix slated for use by anti-Trump protesters were traditional public fora regularly used by demonstrators for expressive events and activities.

32.     Puente and Poder shared with PPD that, based just on responses on social media, their groups alone expected upwards of 500 protestors including children and persons with disabilities, and that total attendance would far exceed that. Puente

and Poder organized a staging and fallback area for demonstrators at the Civic Space Park, two blocks north and three blocks west of the main protest area. They communicated to PPD that volunteers would begin gathering at the Civic Space Park by 1 P.M. or earlier and that demonstrators would arrive at the Civic Space Park by 3 P.M. or earlier. Puente and Poder expected that the demonstration would continue through the time that Trump's rally ended and he and his supporters exited the Convention Center, so that protesters could reach the intended audience and express their views to Trump and his supporters. PPD was aware of proposed protest plans.

### *PPD Used Excessive Force to Unlawfully Disperse Anti-Trump Protestors in Violation of the Fourth Amendment*

33.     PPD officers were present from the beginning of the demonstration. As early as 2:30 P.M., despite the absence of any indication of violence, PPD officers obscured their identities by face shields and vests and other equipment covering their badges. Many officers had weapons drawn despite the peaceful and lawful assembly as anti-Trump protesters convened throughout the afternoon, and later waited for the speech to end and the many Trump supporters to leave the Convention Center and travel close enough to hear the protesters' chants and see their many anti-Trump signs.

34.     PPD officers, including "grenadiers," were equipped with several types of chemical and projectile weapons including:

a. Pepper bullets;

b. 40 mm foam impact rounds, which travel at speeds pf 89 miles per hour and contained "CS" (irritant) powder and cayenne pepper to deliver both blunt trauma and the effects of an irritant powder;

c. Flash-bang grenades, which are devices that produce loud explosive noises and bright flashes of light;

d. Smoke grenades, which are explosive devices that release smoke;

e. "Stingers," which are explosive devices that release smoke, rubber, pellets, and a chemical irritant within a radius of approximately 50 feet; and

14

f. Canisters containing "CS," or tear gas.

The manufacturers' specifications describe these munitions as designed to incapacitate subjects, and to inflict pain to compel compliance. Despite PPD's presence, including many officers in riot gear with weapons powerful enough to incapacitate and cause serious and lethal injuries, anti-Trump protestors remained peaceful throughout the day.

35. On information and belief, Trump's presence meant that PPD coordinated regarding plans for crowd control with officers from the Secret Service and other federal agencies.

36. Officers from many other law enforcement agencies in Arizona were also present to provide support and assistance during the demonstrations. Among those forces present were representatives of federal agencies and mounted police from the Tempe and Scottsdale police departments, with experience and expertise in dispersing large crowds. The PPD had the primary crowd-control role throughout the demonstration, and made the decision to use the incapacitating weaponry indiscriminately against hundreds of peaceably assembled anti-Trump protestors without warning.

37. President Trump arrived at the Convention Center at approximately 6:32 P.M.

38. Without provocation, at approximately 7:00 P.M., PPD officers in riot gear formed a line ("Police Line") on Monroe Street in the "safety zone" in front of anti-Trump protestors who assembled during the afternoon directly across from the north entrance of the Convention Center. Anti-Trump protestors were awaiting the end of Trump's rally inside the Convention Center, and his and his supporters' exit from the building.

39. Despite there being no provocation or dangerous acts by anti-Trump protestors, at approximately 7:03 P.M. and 7:13 P.M., the PPD increased its already

forceful presence in that area as several additional police units arrived to join the growing Police Line on Monroe Street.



40.     Without any precipitating conduct by the anti-Trump protestors, at 7:19 P.M., the Police Line of officers (all wearing helmets and masks obscuring their faces and badges), took several steps forward in a northern direction, in unison, towards the anti-Trump protestors. Ex. 1.

41.     On information and belief, PPD removed its officers stationed in the designated "free-speech zone" nearby the anti-Trump protestors at approximately 8:20 P.M., without explanation or notice to protest organizers, including the Puente and Poder contacts who had previously been in communication with some of those officers.

42.     As the Trump rally inside the Convention Center was ending, several dozens of officers filed out of the Convention Center in riot gear heading west towards Second Street to join the Police Line. By 8:29 P.M., the number of PPD officers in the Police Line forcefully confronting anti-Trump protestors had grown significantly. The only attempted excuse for this increased show of force was that a few individuals had thrown plastic water bottles; none of the officers were injured.

43.     PPD did not attempt to identify or separate from the gatherings of anti-Trump protesters any individuals they considered to be problematic or possibly engaged in improper conduct. As later events revealed, PPD instead opted for a "let's fire on all" tactic that endangered the rights and well-being of hundreds of peaceable persons, including children and the elderly; PPD personnel were apparently trained in the tactic of firing on all in a crowd as the best method for shaking out one or two persons of concern, if even present at all.

44.     At approximately 8:30 P.M., Trump and other federal officials began exiting the Convention Center. After hours of assembling and gathering in Phoenix's sweltering heat all day, anti-Trump protesters were about to have their opportunity to chant and display their signs to express their views to Trump and his supporters as they exited the Convention Center.

45.     At 8:32 P.M. hundreds of anti-Trump protesters were assembled behind the pedestrian fencing along Monroe Street. As a result, a twenty-foot portion of the fence was shaken. PPD gave no warnings that either force would be used, or that the crowd would be dispersed if the fence continued to shake. Without first ordering officers to warn protestors about touching the fence, and with no warning or clear instruction about how to avoid the attack and where to disperse, Defendant Lieutenant Benjamin Moore and Defendant Sergeant Douglas McBride ordered officers to fire pepper balls.

46.     At no time between 2:00 P.M. to 8:32 P.M. did PPD announce to the assembled protesters that any force would be used against them or that an attack by PPD personnel was imminent. Nonetheless, Lt. Moore ordered officers to shoot gas, projectiles, and munitions, but never ordered them to warn protestors prior to opening fire. As later acknowledged, PPD had insufficient megaphones, sound magnifying devices, or plans to effectively communicate to a large crowd. No declaration of an unlawful assembly or order to disperse was made between 2:00 P.M. and 8:32 P.M. when Defendants Lt. Moore and Sgt. McBride gave the order to use force.

47.    Defendant Officer Robert Scott was the first to deploy pepper bullets. Scott shot the first pepper bullets, impacting the ground in front of the anti-Trump protesters closest to the fence. Other PPD officers immediately joined him, and together officers shot at least another ten pepper bullets in rapid succession towards anti-Trump protesters in the same general area. Ex. 2 (screen shot of first pepper bullet rounds). The crowd in the immediate vicinity dispersed. Ex. 3 (screen shot of "free-speech zone" nearly clear of anti-Trump protestors). Despite this, Officer Scott continued to fire pepper bullets at protestors who were dispersing. Scott was apparently trained that he could ignore the PPD policy prohibiting firing pepper bullets above a person's waist when he reported that he "deployed multiple rounds of pepper ball," while "aiming at the torso of the subject."

48.    At 8:33 P.M., one minute after officers fired the initial rounds of pepper bullets at protestors, two plastic water bottles were thrown from the crowd. One landed several feet in front of the Police Line, and another landed over their heads. No PPD officers were injured by the plastic bottles. No protestor was engaged in any violent or threatening conduct. At this time, anti-Trump protesters were chanting, "Hands up! Don't shoot!" and other anti-Trump and social justice messages.

49.    At 8:35 P.M., without any provocation, warning, or declaration of an unlawful assembly, an officer along Monroe Street threw the first visible tear gas canister towards the anti-Trump protesters standing along the pedestrian fencing. Ex. 4. That canister erupted in yellow smoke, harming protesters who had been peacefully assembled. Again without warning, a second officer threw another gas canister toward protestors. Ex. 4. Utter chaos ensued. Protestors, including children and elderly people, ran from the gas, screaming, coughing, and crying. The gas and fumes were unexpected and persons with mobility issues required assistance to retreat and get to safety. Anti-Trump protesters who remained in the area acted to kick and clear the gas canisters away from the protestors to protect them from the chemicals. PPD fired three more gas canisters, two of which were kicked or thrown in directions away from the anti-Trump

protesters. None of the gas canisters thrown or kicked away by the anti-Trump protesters originated from Plaintiffs.

50.     PPD officers launched three more gas canisters toward the anti-Trump protesters and violently attacked them with other chemical weapons and projectiles. Protesters continued running away, screaming, confused, terrified, dodging rubber bullets, gas canisters, and unidentifiable projectiles launched at their torsos and heads in violation of PPD policy. Anti-Trump protesters fled while holding their shirts or cloths over their noses and mouths to block the gas and pepper spray that burned their eyes, throats, and lungs. Still at this point in time, the PPD had not declared an unlawful assembly and had given no dispersal order.

51.     PPD then escalated its use of force on protesters by deploying flash-bang grenades on the ground and in the air, which emitted loud booms and clouds of green and grey gas. PPD had not yet declared an unlawful assembly, given any dispersal instructions to protesters, or directed protesters to an area where they could continue their peaceful assembly. At no point before 8:32 P.M., when force was first used, did any person from PPD give Puente, Poder, or any anti-Trump protesters warning that force would be used, or information about where to go for safety or to continue their assembly.

52.     Anti-Trump protesters reacted to the indiscriminate police violence and resulting physical injuries and great fear by clearing the area as of 8:42 P.M. Nonetheless, PPD officers continued shooting pepper bullets at close range toward one remaining anti-Trump protester, who posed no threat and was filming the police response, hitting his upper torso in violation of department policy. Exs. 5, 6 (screen shot of anti-Trump protester being shot while recording officers).

53.     At 8:44 P.M., PPD still had not declared an unlawful assembly, or issued an order to disperse or warnings that officers would continue to use violent force. Yet, Lt. Moore next ordered PPD officers to use force against anti-Trump protesters by "mov[ing] into the crowd and clear[ing] the area all the way to Van Buren," without

19

warning or direction to anti-Trump protesters that the area should be cleared before force was used. As ordered, PPD officers with riot helmets on, shields drawn, and rifles aimed to shoot chemical munitions and projectiles advanced on the anti-Trump protesters and breached the pedestrian gate on Monroe Street, at the location where Puente and Poder had positioned much of the water for protesters at PPD's direction. Officers in the Police Line continued to fire tear gas and pepper balls into the crowd as they marched in unison towards Plaintiffs, effectively corralling them away from the designated demonstration area and water station.

54. The riot-gear-clad officers moved into the areas of assembly designated for anti-Trump protesters while firing projectiles indiscriminately and without prior, or even simultaneous, warnings. Anti-Trump protesters had no opportunity to collect their personal property and signs containing their political messages. Puente was forced to leave behind equipment it uses for demonstrations and other events, including a large inflatable screen and amplifiers. PPD also shoved the anti-Trump protesters with their shields even as the protesters were moving out of the area. As PPD advanced north, PPD trapped Plaintiffs within the barricades of the zone, forcing them to climb, jump, or otherwise find a way over the barricades to escape PPD's attack. PPD's actions took no considerations for the elderly or persons with limited mobility, some of whom were in wheelchairs and had to unexpectedly, and without warnings, flee PPD's advancing violence.

55. Through all of this, PPD gave no instructions to protestors about where to disperse. All day, organizers of the demonstration had cooperated with PPD to ensure that the peaceful and lawful assembly would continue. Indeed, at the request of PPD, earlier that day, organizers were asked to move collections of water bottles to a different area, and organizers complied.

56. PPD gave no instructions to disperse in the minutes before the first projectiles were shot by police at 8:32 P.M., through the next 30 minutes. As of 9:00 P.M., no unlawful assembly had been declared and no dispersal orders had been given

despite the violent actions of PPD officers using their weapons to disperse the anti-Trump protesters.

57.     Between 8:32 and 9:00 P.M., the Police Line continued to move north on both Second and Third Streets, forcefully driving anti-Trump protesters out from the area by indiscriminately shooting them with gas canisters and pepper bullets at close range in the head, face, upper back, stomach, and groin areas. PPD officers shot anti-Trump protesters who were taking photos or video. Ignoring department policy, as they advanced, PPD sprayed Plaintiffs in the face with pepper spray from just inches away even as they were following orders and retreating. Exs. 7, 8, 9. PPD never warned these protestors that force would be used based on any conduct they were engaging in. PPD sprayed at least one member of the media who was documenting her retreat from the violence on video, in the face and camera lens – even as she was moving away from the Police Line. Exs. 10, 11. PPD never warned her that an officer would directly spray her face if she kept recording.

58.     The first instructions to disperse were finally heard from a helicopter at approximately 9:00 P.M. PPD's own "After-Action Report" confirms that it was not until around 9:00 P.M. that an air unit was used "to make announcement to disperse." The dispersal orders from the helicopter were in English only, ignoring that some of the participants may not have understood English. For nearly 30 minutes prior, PPD had rained pepper bullets, gas canisters, and pepper spray without warnings on anti-Trump protesters. These after-the-fact helicopter announcements never warned anti-Trump protesters that they would be shot with projectiles, gas, or other munitions.

59.     After the dispersal order was given from the helicopter, PPD continued indiscriminately using chemical and impact munitions, pepper spray, and their shields as weapons against anti-Trump protesters in the assembly, including children, persons with disabilities and mobility issues, and the media. Dozens of individuals were shot at close range as officers unloaded their weapons at anti-Trump protesters. Fleeing protesters were trapped with PPD advancing violently from the south and barricades

erected by PPD blocking their escape to the north. Individuals were forced to climb or jump over the barricades, with some people falling over them in flight and some with mobility issues requiring assistance from others to breach the barricades. While breaking up the lawful demonstration, PPD officers shouted obscenities at the peaceful protesters. Contemporaneous with firing chemical and impact munitions at anti-Trump protesters, PPD officers yelled: "stun bag that guy, oh yeah, yep that'll teach him," and "that's right motherfuckers, you just smoked yourself, dumbasses."

60.     At 9:14 P.M., several "grenadiers" continued to "target anyone who aggressively approaches the police line with pepper balls." As the officers moved north, they targeted anti-Trump protesters in their path with projectiles and other force as the officers continued to fire chemical and impact munitions, gas, and pepper spray at persons with no evidence that any of the persons who were shot had engaged in any improper conduct.

61.     Defendant officers were aware that they were targeting protestors despite their peaceful status. PPD acknowledged in an after-action report dated August 28, 2017, "***It is important to note that the vast majority of participants on August 22 in both the campaign rally and the protests outside were peaceful, prepared and civil.***" (Emphasis added.)

62.     Despite knowing that anti-Trump protesters were "peaceful, prepared and civil," PPD officers indiscriminately used unlawful and excessive force as follows:

a.    ***Defendant Officer Scott*** was a grenadier and the first to fire chemical weapons at the anti-Trump protesters. According to Scott, he shot at anti-Trump protesters to "make the immediate area unpleasant to be in because of irritant in the pepper balls." Without warning, Scott "began attempting to directly impact[] the legs of the subjects that remained" in the area. Still giving no warning, Scott also shot the torso of an "older male" who was touching the pedestrian fence with "direct impact" weapons. With no unlawful assembly declared, Scott "deploy[ed] pepper ball to clear out the remaining people at the pedestrian fence." On orders from Moore and without

22

any warnings, Scott erratically fired "multiple rounds of pepper ball using the area saturation method." Officer Scott continued to fire projectiles and chemical weapons indiscriminately at anti-Trump protesters without warning throughout the night.

b. **Defendant Officer Turiano** was among the grenadiers working at the Trump rally and protest. He saw a man in blue shorts running toward the Police Line, and despite his knowledge that an OC canister (pepper spray) reaches temperatures of 800 degrees Fahrenheit, Turiano nonetheless fired an "OC impact round at the male's lower torso" hitting his groin from about 20 yards away. This protestor collapsed and was dragged off for medical assistance. Officer Turiano alone fired at least 40 rounds of impact weapons, tear gas, and smoke bombs.

c. **Defendant Officer Neville** was a grenadier on detail to the Trump rally and protest. He fired chemical munitions and weapons at the anti-Trump protesters without warning. On information and belief, Officer Neville continued to fire projectiles and chemical weapons indiscriminately at anti-Trump protesters without warning throughout the night.

d. **Defendant Officer Sticca** was also assigned as one of the "grenadiers." Officer Sticca heard protesters chanting "Hands up! Don't Shoot!" and other anti-Arpaio, and law enforcement related messages just before he was ordered to and did deploy "smoke canisters," "CS Canisters," pepper bullets, and projectiles toward the crowd without first warning them. Officer Sticca continued to fire projectiles and chemical weapons indiscriminately at anti-Trump protesters without warning throughout the night.

e. **Defendant Officer White** was another one of PPD's "grenadiers" who arbitrarily used excessive force against anti-Trump protesters. After Lt. Moore gave the order to "smoke," Lane began throwing smoke munitions in the direction of peaceful participants along the north curb of Monroe Street without warning. Additionally, when Lt. Moore ordered officers to deploy CS gas, he deployed CS grenades and CS munitions, also without warnings.

23

f. ***Defendant Officer Howell***, another "grenadier," began to deploy pepper balls to the ground directly in front of protestors who had been touching the pedestrian gate along Monroe Street after Lt. Moore gave the order. Additionally, against policy, and without warnings, Officer Howell deployed multiple pepper balls "at the torso areas of the [protestors'] bodies," and carried out "mid-torso direct impacts." Officer Howell continued to fire projectiles and chemical weapons indiscriminately at anti-Trump protesters without warning throughout the night.

g. ***Defendant Officer Herr*** is a "grenadier" who was teamed with Defendant Sgt. McBride at the time officers were ordered to begin using force on anti-Trump protesters. Without warning or declaration of an unlawful assembly, Herr and Sgt. McBride fired pepper ball munitions at the ground to disperse anti-Trump protesters near the area where a pedestrian fence was shaking. Officer Herr next shot 2-3 pepper ball munitions without any warnings at an individual protester who "was directly impacted by the pepper ball munitions and ran towards the back of the crowd." Officer Herr also indiscriminately shot pepper balls into the crowd, "target[ing] individuals who were physically grabbing the fencing" for "direct impact of the pepper ball." Herr also loaded a single round of the "super sock" munition, or a bean bag round, into his shotgun and against policy he shot a "light skinned male, with no shirt" in the "upper torso area causing him to fall to the ground."

h. ***Defendant Sgt. McBride*** was in charge of the actions of all of these officers. Sergeant Mc Bride was on Monroe Street with his team of grenadiers when Lt. Moore ordered PPD officers to use "smoke and gas grenades" on anti-Trump protesters without warning, and took no action to stop this conduct. After Lt. Moore improperly ordered the lawful assembly to be cleared, Sgt. McBride ordered the team of grenadiers to "support the skirmish line," move into the crowd, and on his orders grenadiers fired chemical and other projectiles indiscriminately without warning to "clear[] the area all the way to Van Buren." Sgt. McBride did nothing to intervene in the use of excessive force and violations of PPD policy.

24

63. The Phoenix Police Department had approximately 882 police officers on hand at the Trump rally and protest, yet made no attempt to isolate any individuals or groups that may have been engaging in improper or unlawful conduct. Instead, PPD used unwarranted and unlawful indiscriminate force against all anti-Trump protesters.

64. PPD officers advanced towards hundreds of anti-Trump protesters assembled north of the Convention Center, regardless of whether they had engaged in any unlawful activity – shooting them with so-called "less lethal" munitions designed to incapacitate, and which did knock Plaintiffs to the ground. PPD officers did not use such force to effectuate arrest, overcome resistance to arrest, or in self-defense. The anti-Trump protesters did not resist arrest, attempt to escape arrest, use force upon any person, or threaten to use force upon any person. Yet, without regard to whether anti-Trump protesters were engaged in unlawful activity, PPD officers fired their dangerous weapons indiscriminately, aiming at and striking the upper torsos and heads of Plaintiffs—in violation of manufacturer's warnings and PPD policy.

65. As a result, Plaintiffs and putative members of the injunctive class are understandably hesitant to engage in further speech, assembly, demonstrations, and gatherings in Phoenix, particularly when expressing criticism of Trump and his supporters. As it was on August 22, 2017, the PPD will be the primary law enforcement agency at future demonstrations in Phoenix.

66. PPD injured Plaintiffs by this violence as follows:

a. ***Plaintiff Puente*** planned, organized, and participated in the August 22, 2017 Phoenix Trump protest to express its and its members' and supporters' opposition to President Trump's treatment of migrants, his immigration policies, and his anticipated pardoning of former Maricopa County Sheriff Joe Arpaio. In planning the protest, Puente had communicated with the PPD to ensure the safety of its members, other protesters, and the community. Despite Puente's efforts, after Trump's rally ended, PPD did not communicate with Puente that it intended to end the Trump Protest or that force would be used against the anti-Trump protesters. PPD deprived Puente

members of their First Amendment rights to criticize Trump by violently attacking them. PPD has previously used excessive force during First Amendment protected activities planned and organized by Puente, against Puente members and supporters.

b. ***Plaintiff Poder*** also assisted, organized, planned, and participated in the August 22, 2017 Trump Protest to express its opposition to President Trump's treatment of migrants and his immigration policies. During the protest, Poder representatives and supporters were peaceful. Likewise, after Trump's rally ended, PPD did not communicate to Poder that it was dispersing the assembly. Despite having Poder's contact information, PPD did not warn Poder that its members and supporters would be subjected to the indiscriminate use of force by PPD officers. PPD viciously attacked Poder members just as they intended to express their anti-Trump views to Trump and his supporters. PPD has previously used excessive force during First Amendment protected activities planned and organized by Poder, against its supporters.

c. ***Plaintiff Janet Travis*** was walking home, observing, and photographing the protest and police response, when PPD gassed her, caused her to inhale pepper spray, and shot her in the upper part of her back just inches from her head, with unidentified projectiles at close range. Ms. Travis had no warning she would be gassed or shot and was not engaged in any conduct to justify the use of force against her. A PPD projectile struck Ms. Travis's back with such force that it knocked her to the ground. Exs. 12-13. As concerned protesters aided Ms. Travis and attempted to help her to her feet, PPD struck her again with another unidentified projectile shot from close range. The second projectile struck her upper torso in the lower part of her back, and upper glute. Exs. 12-13. Ms. Travis suffered difficulties breathing, and such significant trauma and bruising along her back, buttocks, and leg that she was forced to seek medical attention for her injuries. Before opening fire on Ms. Travis and other anti-Trump protesters, PPD gave no warnings that officers were planning to use force. Since being shot, Ms. Travis is fearful and distrusting of the PPD. For Ms. Travis, it has been a source of angst to see on the internet, in newspapers, and on television reports across

the world photos and videos of her being shot because it feels like an extreme invasion of privacy.

d. ***Plaintiff Ira Yedlin*** was peacefully protesting outside the Phoenix Convention Center when PPD officers gassed him, caused him to inhale pepper spray, and shot him with unidentified projectiles five times in the legs, once in the back, and once in the face. Before opening fire on Mr. Yedlin and other anti-Trump protesters, PPD gave no dispersal instructions or warnings that officers were planning to use force. Mr. Yedlin was not engaged in any conduct that justified the use of force against him. After being shot, Mr. Yedlin quickly ran from the protest area. As Mr. Yedlin and his wife drove home, they became so overcome with the fumes from the chemical agents that remained on his clothes that they had to hang his clothes out of the window of their car as they drove away. Mr. Yedlin was forced to go to an emergency room for treatment of the injuries caused by the PPD's indiscriminate use of force. Mr. Yedlin remains distrustful that the PPD will violently react in future protests.

e. ***Plaintiff Cynthia Guillen*** was peacefully chanting and filming the protest and police response, when PPD gassed her, and shot her in the upper torso on her breast and near her stomach and hip, with an unidentified projectile. Ms. Guillen had no warning that she would be gassed or shot, and was not engaged in any conduct justifying the use of force. PPD's projectile struck with such force it knocked the wind out of Ms. Guillen, requiring other anti-Trump protesters to help her limp away from the assembly area in severe pain as she inhaled gas and coughed. PPD's use of force caused Ms. Guillen substantial injuries, including pancreatitis triggered by the high-impact force with which PPD hit her. Since the August 22, 2017 protest, Ms. Guillen has experienced continuing medical problems, problems working, trouble sleeping, and anxiety.

f. ***Plaintiff Jacinta Gonzalez Goodman*** was peacefully protesting and coordinating public safety for anti-Trump protesters when PPD gassed her and other protesters, prematurely ending the planned event. Despite working as a liaison between

PPD and protest organizers, and being in direct contact with PPD Officer Brockman in person and by text message just before the attack, Ms. Gonzalez Goodman received no dispersal instructions or warnings that officers were planning to use force. Ms. Gonzalez Goodman was not engaged in any conduct that justified the use of force against her. PPD's use of force caused Ms. Gonzalez Goodman to lose the opportunity to exercise her First Amendment rights as she planned. Despite participating in dozens of protests, Ms. Gonzalez Goodman had never seen officers act so aggressively towards peaceful protesters without cause or warning. Ms. Gonzalez Goodman remains concerned and fearful that the PPD will react violently in response to future protests.

67. PPD officers deliberately fired at these Plaintiffs and at the upper torsos of anti-Trump protesters, based on their training and with the approval of PPD command staff. But even if the officers had done nothing more than shoot indiscriminately at the lower torso area of the adults, that put them in direct range of the upper torsos and heads of children and persons in wheelchairs who were participating. It was sheer luck that (to Plaintiffs' knowledge) no child was struck in the head with a projectile given the indiscriminate deployment of over 590 munitions at the peaceful, fleeing assembly, especially with the use of weapons intended to incapacitate and having the potential to cause death or great bodily injury when used as the PPD did on this occasion—at close range and to the upper torso, head, and face areas of protestors.

68. There was no probable cause or reasonable suspicion to believe that anti-Trump protesters posed an immediate or credible threat of injury to police or any other person.

69. The PPD never attempted to disperse the demonstrators with less violent measures, including making announcements directing the crowd to disperse, or calling in the mounted police forces from the Tempe and Scottsdale police departments who were trained in crowd control measures and deployed to the demonstration for the purpose of assisting the PPD in this very task. Nor did PPD attempt to insulate the

28

overwhelming majority of the protestors, who they knew had been peaceable throughout the demonstration, from unnecessary attack, injuries, and loss of basic rights, by separating from the crowd the handful of persons PPD claims had acted wrongly.

70.     Many hundreds (and perhaps thousands) of peaceful protestors including men, women, and children who had been engaged in no criminal activity—and who were attempting to disperse after PPD's attack began—were physically injured as they were shot with munitions, gas, pepper spray, and/or assaulted by the advancing Police Line.

### Using Violence, PPD Violated the First Amendment Rights of Anti-Trump Protesters to Assemble and Speak Their Views Critical of Trump

71.     Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

72.     Trump's visit received significant publicity because he had announced that he would deliver remarks that might include the pardon of former Sheriff Arpaio. On August 22, 2017, when temperatures hit 108 degrees, record numbers of anti-Trump protesters began arriving in downtown Phoenix. Some gathered downtown, while others participated in marches and demonstrations nearby in advance of the main demonstration near the Convention Center set to begin around 4 P.M.

73.     The PPD segregated those gathering in downtown into two groups: those who were there to support Trump and anti-Trump protesters. PPD ordered anti-Trump protesters to limit their activities to the assigned "free speech zone."

74.     Near the only area PPD made available for the anti-Trump protesters to assemble, the so-called "free-speech zone," PPD set up fence barricades lining the north and south sides of Monroe Street between 2nd and 3rd Streets for the purpose of keeping Trump supporters and anti-Trump protesters separated. The street between the two groups created a "safe zone" for PPD in between the two factions. There was no barricade, however, on the south side of Monroe Street, crossing 2nd Street. PPD's

leaving this gap in the barricades left the Trump supporters who were exiting the Trump rally around 8:30 P.M. free to harass anti-Trump protesters.

75.     Trump supporters attending Trump's rally entered the Convention Center through the south entrance. About 15,000 Trump supporters ended up inside the Convention Center for the Trump rally, while another 4,000 to 5,000 gathered at the south end of the Convention Center.

76.     Over 6,000 peaceful anti-Trump protesters assembled in the designated area north of the Convention Center, along the northern sidewalks of Monroe Street, and along Second and Third Streets.

77.     Given Trump's policies and his anticipated pardon of Arpaio, anti-Trump protesters had a strong First Amendment interest in having their messages heard by Trump supporters. Protestors included young children, students, elderly people, people with disabilities, and people of various races, ethnicities, and socio-economic backgrounds. Spurred by a desire for civic engagement after Trump's election, many anti-Trump protesters were exercising their First Amendment speech and assembly rights for the first time. These protestors marched, calmly gathered, displayed signs, set up water stations, and peacefully chanted as early as 1:00 P.M. Throughout the day anti-Trump protesters chanted the following messages: "Don't Pardon!"; "No Trump no KKK, no fascist USA!"; and "This is what democracy looks like!" Trump Protestors also held posters with similar political messages. *See* Ex. 1.

78.     As a result of PPD's unjustified and violent termination of the Trump Protest, PPD silenced anti-Trump protesters at the precise moment that they sought to have their opinions heard by the intended audience—President Trump and his supporters as they left the Convention Center.

### *Defendants' Violence Was Directed at Anti-Trump Protestors; the Trump Supporters Were Spared*

79.     Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

80.     Despite the overwhelmingly "peaceful, prepared, and civil" nature of the group assembled and the discussions before with organizers, the police came dressed in full riot gear and armed with weaponry to confront anti-Trump protesters. Before the Trump Protest, PPD officials had "coordinated multiple group meetings" with Secret Service staff. Indeed, the PPD's "Dignitary Protection Branch of Operations" orchestrated the movements of all of the high-level officials participating in the rally inside the Convention Center: the President, Vice President, President's Chief of Staff, and the Secretary of Housing and Urban Development. PPD managed their movements "in partnership with federal . . . law enforcement agencies."

79.     PPD limited the area where anti-Trump protesters could assemble to engage in their First Amendment activities to a small area north of the Convention Center.

80.     Throughout the day, PPD showed clear antagonism to the First Amendment rights of the anti-Trump protesters in this area, and preference for Trump supporters. For instance, one PPD officer advised other officers to "stay on this side. They're more pro-police on this side than that side," encouraging police to stay away from anti-Trump protesters and near Trump supporters. Later, another PPD officer describing Trump supporters said, "There's just a different look about [the Trump supporters]. They're so calm on this side," and said without basis that the anti-Trump protesters who oppose Trump's politics were paid to be there.

81.     On information and belief, PPD officers who dispersed the anti-Trump protesters are members of the Phoenix Law Enforcement Association ("PLEA"). PLEA is an organization whose president has accused organizations like Plaintiffs Puente and Poder of being "radical community groups" "whose disrespect for law enforcement is total." A PLEA publication expressed that its law enforcement members view Puente and Poder as "aggressive radical groups [that] make noise in the interest of hurting the men and women who serve daily on the frontlines of Phoenix public safety."

82.     PPD's violent dispersal of anti-Trump protesters was at the exact time that Trump and his supporters would be exiting the Trump rally inside of the Convention Center. PPD command staff told its officers that it would end the Trump Protest by 9:00 P.M. One PPD officer told another, "Boss said we'll be out of here by nine." To ensure officers were "out of [t]here by nine," without justification, PPD violently dispersed anti-Trump protesters around 8:30 P.M.

83.     Prior to the launch of the first pepper bullet and tear gas canisters by PPD, the Trump Protest was carried out by the thousands assembled in a lawful manner. Assuming some isolated incidents of throwing plastic water bottles by a few, these did not justify firing and harming the many. No Trump protester threw any dangerous objects, nor initiated use of the weapons used by the PPD; they did kick the gas canisters thrown by police away from anti-Trump protesters, or were near the shaking fence. Rather than isolating and dealing with the small number of people whose conduct it viewed as improper, PPD resorted to violence against all. There was no lawful justification for this police action as the few persons who had been near the shaking the fence and threw plastic water bottles and kicked gas away from the protestors at around 8:32 P.M. had immediately dispersed. Exs. 3-6. There was no need for the PPD to continue to escalate their demonstration of force by moving the Police Line through downtown, assaulting everyone in their path.

84.     As they swept through downtown, removing everyone in sight, PPD officers deliberately targeted anti-Trump protesters and persons who were chanting and holding anti-Trump posters expressing their views critical of Trump.

85.     The conduct complained of herein was undertaken pursuant to policies, practices, and customs of the PPD, an agency of the City of Phoenix, and the City of Phoenix. At all relevant times, Defendants City of Phoenix and Chief Jeri L. Williams ratified the unlawful conduct of PPD officers and command staff.

## MUNICIPAL LIABILITY

***Defendant City of Phoenix Is Responsible for the Illegal Policies, Procedures, and Practices Utilized by by the PPD at the Trump Protest.***

86.      Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

87.      The City of Phoenix has vested final decision making authority in its police chief, Defendant Williams, in the area of law enforcement and setting and implementing the policies and practices of the PPD including but not limited to the development, implementation and/or ratification of the PPD's procedures, policies, regulations, practices, and/or customs related to its use of force in response to political protests, the proper handling of large political protests, demonstrations, and marches, and the use of weapons against civilians including gas and projectiles.

88.      On August 22, 2017, PPD officers engaged in an inordinate use of force, unnecessarily injuring thousands of people at the precise moment they intended to express their views critical of Trump, without warnings. Immediately following this violent display of force, and despite acknowledging that anti-Trump protesters were "peaceful, prepared, and civil," the procedures and violence used by PPD were ratified and found well within accepted City practices by the key policy makers for the City of Phoenix in these areas—Chief Williams and City Manager Zuercher.

89.      In a press conference the same night (following the PPD assault of hundreds and possibly thousands of anti-Trump protesters without legal justification, with officers shouting obscenities at the protesters and indiscriminately using dangerous weapons to disperse without warning, in violation of the constitutional protections of speech and to be free from excessive force and PPD policy), Defendant Williams stated that she was "just so proud to be the police chief of men and women who literally showed that professionalism—under contentious scenarios and situations—they demonstrated it flawlessly." Chief Williams also repeatedly stated that on August 22, 2017, the night of Trump's rally, she "believe[s] the actions of our

officers reflected the direction I gave them," and that "our community members went home safely."

90.     Then-Mayor Stanton stood by Chief Williams in this press conference as she praised the PPD officers for displaying "professionalism" as they violently silenced the views of anti-Trump protesters viewed as "radical" and harmful to law enforcement by PPD officers.

91.     City Manager Ed Zuercher issued a memorandum on August 28, 2017, to Chief Williams stating,

> What all members of the Phoenix Police Department accomplished on August 22 was notable. In an emotional atmosphere, our police officers showed professionalism in ensuring the safety and First Amendment rights of the community. There were no serious injuries or property damage and only four related arrests. . . .

92.     The City of Phoenix has a "strong" City Manager form of government, with a "weak" Mayoral role; Zuercher has the authority to hire and fire the Chief of Police. Zuercher's praise of Chief Williams, and the PPD's assaults on anti-Trump protesters under her leadership as "notable and "professional" further demonstrate after-the-fact ratification by the relevant Phoenix officials of the above-described PPD unconstitutional violent and indiscriminate acts on August 22, 2017.

***As a Matter of Policy and Practice Defendant Williams Allowed Defendant City of Phoenix to Maintain Inadequate Equipment to Peacefully and Lawfully Control Protests and Demonstrations.***

93.     Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

94.     Defendant Williams and her delegated command staff were aware prior to August 22, 2017, that the City did not possess the proper equipment, and in

34

sufficient amount, to adequately deliver warnings and dispersal messages to protestors prior to and after commencing of the use of force.

95. The only verbal dispersal order that was given on August 22, 2017, was made about 9:00 P.M. in English only, despite PPD's knowledge that a significant number of the protestors were Spanish speakers. In a report after the protest, City Manager Ed Zuercher, and Defendant Williams admitted that in the future the City needed to "increase the number and use" of bullhorns and megaphones, and other means for crowd communication and direction.

96. Moreover, after the events of August 22, 2017, Defendant Williams and Defendant City of Phoenix conceded that:

> Several large protests and demonstrations have confirmed the need to upgrade the Police Department's communication capabilities for safety and legal requirements. The current communication equipment, LRAD-100X, is a backpack system that was purchased in 2010.

Ex. 14 at 18.

97. It was not until June 13, 2018, that Defendant Williams submitted a procurement request to the Phoenix City Council for a new long range acoustic device "specifically designed to address large crowds."

98. Given the demonstrated lawless actions by the PPD under the direction of Defendant Williams, use of the particular LRAD device Williams has requested must be subjected to great scrutiny. It has been found in other jurisdictions that, when used at the volume levels intended by PPD, the LRAD itself becomes a weapon of excessive force and great harms, including irreversible damage to the hearing of protesters.

***As a Matter of Policy, Practice, and Custom, Defendant City Through Defendant Williams Failed to Adequately Train PPD Officers in Lawful Crowd Control Techniques.***

99. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

35

100.     Defendant Williams and her delegated command staff were aware that the unlawful use of dangerous weapons in violent and unlawful ways to break up peaceful associations and speech is a regular practice of PPD personnel, and a custom ingrained in the marrow of the PPD. It was therefore critical to take all steps necessary to ensure that official policy was changed and officers were trained in a manner sufficient to address the practice and custom to violate First and Fourth Amendment rights.

101.     PPD policy directs that bean bags should not be fired at closer than five feet and that the lower torso, legs, and buttocks should be the primary targets. The PPD policy on bean bags prohibits hitting the head, neck, and spine and warns that "shots to non-target areas" (head, neck, spine, thorax, and spine) "can result in fatal or serious injury."

102.     As for the use of pepper spray, PPD policy specifically orders, "**Do not** use within three (3) feet of a subject as soft tissue damage could occur." (Emphasis in policy.)

103.     PPD policy is silent on what officers and command staff must do to ensure that police warnings prior to dispersal are given and heard. Despite the legal necessity of prior warnings, the policy provides no guidance on what warnings or dispersal instructions must be given to protestors exercising their First Amendment rights.

104.     Additionally, PPD policy does not restrict the use of less-lethal munitions on already dispersing crowds or individuals, and crowds that are retreating, nor or on persons who are using recording devices to lawfully document public police actions.

105.     The failure to maintain adequate policies, and to regularly train PPD personnel on these and proper crowd control, led to the injuries suffered by Plaintiffs. The need for training in this instance was obvious.

106.    Defendant Williams and Defendant City have known of the deficiencies in PPD policies and training since at least 2010 when its officers violently shot pepper spray at protesters marching for immigration reform from Falcon Park to Tent City.

107.    In October 2014, at demonstration in downtown Phoenix to protest police brutality, PPD officers indiscrimately and without warning fired pepper bullets at protestors.

108.    Similarly, at a rally at Phoenix City Hall in response to the fatal shooting of Alton Sterling in July 2016, PPD repeatedly pepper sprayed protestors without warning as a "crowd-control measure."

109.    In all of the above actions, the City has acted with deliberate indifference to the rights of the public to engage in lawful expressive activity in traditional public fora within the City, and to be free from excessive force.

110.    Despite the long history of unlawful PPD conduct at demonstrations, and the longstanding deficiencies in the training of PPD line and command staff on proper law enforcement conduct at demonstrations and regarding the use of force at peaceful demonstrations, the City failed to adequately train its officers and command staff prior to August 22, 2017, in the rights of demonstrators, lawful crowd control, dispersal orders, separating those engaged in unlawful conduct from those engaged in lawful conduct, the permissible use of "less-than-lethal" weapons in crowd control/demonstration situations, and the permissible use of force and circumstances justifying it in such situations. This failure amounted to deliberate indifference to the rights of persons with whom the police come into contact.

111.    Defendant Williams had and delegated final responsibility and authority to persons within her command staff to act as the final policy maker at the Trump Protest to decide whether to declare the assembly unlawful, whether to give warnings or instructions to disperse, and whether to use force. Defendant Williams has stated that at all times during this protest the PPD officers and command staff on the

scene were acting at her direction. The persons who made these decisions acted as the delegated policy maker for the City of Phoenix on these issues. There was no time, opportunity, or procedure for anyone to review or revise the decisions made by these delegated policy makers prior to their final implementation.

## CLASS ALLEGATIONS

112.    The proposed damages class is defined as those persons who were present on August 22, 2017, at the Trump Protest area north of the Convention Center which was designated as the "free-speech zone" (the area for anti-Trump protestors bounded to the south by Monroe Street, 2nd Street to the west, and 3rd street to the east) and forced by PPD onto adjacent streets at any point between 8:25 and 10:00 P.M., who did not engage in any conduct justifying the Defendants' use of force against them, and who were subjected to the PPD's dispersal by the use of force, or other unlawful police activity arising from the police response to anti-Trump protesters. The proposed damages subclasses are defined as:

      a.  All persons who were unlawfully dispersed by the use of gas, pepper spray, pepper bullets, or other chemical agents;

      b.  All persons who were unlawfully dispersed by PPD by being struck with projectiles of any type.

113.    The proposed injunctive relief class is defined as all persons who have in the past, including those present at the anti-Trump protest on August 22, 2017, between 8:25 and 10:00 P.M., or may in the future, participate in, or be present at, demonstrations within the City of Phoenix in the exercise of their rights of free speech and assembly without engaging in any conduct justifying the use of force.

114.    In accordance with Federal Rule of Civil Procedure 23(a), the class and subclasses are so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact number of class members. Defendants' After-Action Report documents that more than 500 projectiles of some type were deployed, and this figure does not include pepper spray or tear gas deployed by PPD officers. Further, PPD

38

counted over 6,000 anti-Trump protesters assembled outside of the Convention Center. Thus, Plaintiffs are informed and believe and thereon allege that there are in excess of 500 members of the class.

115. In accordance with Federal Rule of Civil Procedure 23(a), the claims that the class members' Fourth, First, and Fourteenth Amendment rights were violated raise common questions of law and fact.

116. In accordance with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the class they represent. Each representative Plaintiff was present in or about the area north of the Convention Center designated for assembly by anti-Trump protesters on August 22, 2017, between the hours of 8:25 P.M. and 10:00 P.M. Each representative Plaintiff was subjected to force in the streets north of the Convention Center or as he or she attempted to disperse from the assembly area, or as she or he attempted to disperse along Second, Third, Fourth, or Fifth Streets, or in the vicinity of those streets. No representative Plaintiff did anything to attack or threaten to attack any person, or interfere with any lawful action of anyone, or resist arrest, or escape. Except for their presence in the assembly area north of the Convention Center, and peaceful, verbal, non-violent protests, and observing Defendants, Plaintiffs did nothing to justify dispersal by the use of violent force. Defendants had no legal justification for ordering any representative Plaintiff to disperse and no legal justification for using force against any representative Plaintiff.

117. Each representative Plaintiff has the same interests and suffered the same type of injuries as the class members. The claims of each representative Plaintiff arose because of PPD's unlawful dispersal orders and use of force against the anti-Trump protesters. The claims of the representative Plaintiffs are based upon the same legal theories as the claims of the class members. Each representative class member suffered actual physical injuries as a result of Defendants' unlawful dispersal and use of force.

118.    In accordance with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

119.    In accordance with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the class would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

120.    In accordance with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

121.    In accordance with Federal Rule of Civil Procedure 23(b)(2), the Defendants have acted, threatened to act, and will continue to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

122.    In accordance with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

123.    In accordance with Federal Rule of Civil Procedure 23(b)(3), this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. The interest of members of the class in individually controlling the prosecution of a separate action is low, in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe and thereon allege that the amounts at stake for individuals are so small that separate suits would be impossible or impracticable. Plaintiffs are informed and believe

40

and thereon allege that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe that Defendants have no records, or virtually no records or evidence of any kind, justifying any use of force against individual anti-Trump protesters, and that Defendants' only justifications for any use of force against anti-Trump protesters is based on facts which apply to all anti-Trump protesters equally.

124.     Plaintiffs are informed and believe that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, date, and time, *i.e.*, in the vicinity of the streets and areas north of the Convention Center on August 22, 2017, between 8:25 P.M. and 10:00 P.M., and it will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

125.     Plaintiffs do not know the identities of all of the class members. Plaintiffs are aware of the identities of approximately 200 class members. Plaintiffs are informed and believe and thereon allege that the identities of most class members may be obtained from organizations which sponsored, organized, and participated in the anti-Trump protesters including Puente, Poder, and other organizations. Plaintiffs are informed and believe and thereon allege that the identities of class members may be obtained from calls for assistance made to Puente, Poder, and other organizers.

126.     In accordance with Federal Rule of Civil Procedure 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs contemplate notice through organizational "hotlines" devoted to the events of August 22, 2017, distribution of leaflets in the downtown Phoenix area, social media, and at gatherings of the groups which organized the anti-Trump protesters, as well as calls to Plaintiffs' counsel's office in Arizona. Plaintiffs contemplate that the class notice will inform class members of the following:

     a. The pendency of the class action, and the issues common to the class;

b. The nature of the action;

c. Their right to "opt out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

d. Their right, if they do not "opt out," to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

e. Their right, if they do not "opt out," to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

127. Plaintiffs are represented by counsel with extensive class-action experience in civil rights cases. Attorneys Stormer, Piovia-Scott, Pánuco, Pochoda, Brody, and Hill have successfully litigated a number of civil rights and class actions including protester cases that have resulted in multi-million-dollar settlements and injunctive relief.

128. As a result of the conduct of Defendants described above, Plaintiffs and class members have been denied their constitutional rights. Defendants' policies, practices, conduct, and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiffs, including but not limited to further violations of their constitutional rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. Plaintiffs therefore seek injunctive relief restraining Defendants from continuing to engage in and enforce the unconstitutional and unlawful policies, practices, conduct, and acts described herein.

**FIRST CLAIM FOR RELIEF**
**EXCESSIVE FORCE**
**(Fourth and Fourteenth Amendments, 42 U.S.C. § 1983)**
**(All the class representatives, individually, and on behalf of the class they seek to represent, against all Defendants)**

129. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

42

130.     The conduct of each Defendant violated the rights of Plaintiffs and class members to not be subjected to the use of excessive force, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and entitles Plaintiffs to bring suit and recover damages pursuant to 42 U.S.C. § 1983.

131.     As a proximate result of the wrongful, malicious, and violent acts of Defendants, and the fright caused Plaintiffs, Plaintiffs and each of them, suffered physical injuries including being hit by projectiles and inhaling gas and pepper spray, experienced shock and injury to the nervous system, and were injured in their health, strength, and activity, suffering extreme and severe mental anguish and physical pain, anxiety, humiliation, and/or emotional distress.

132.     By reason of the aforementioned acts and omissions of Defendants, Plaintiffs, and each of them, have incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and/or other special and general damages, in an amount according to proof, but in excess of the jurisdictional limits of this Court.

133.     In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiffs. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious.

**SECOND CLAIM FOR RELIEF**
**FREEDOM OF SPEECH AND ASSOCIATION**
**(First and Fourteenth Amendments, 42 U.S.C. § 1983)**
**(All the class representatives, individually, and on behalf of the class they seek to represent, against all Defendants)**

134.     Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

135.     The actions of the Defendants, as set forth above, violated Plaintiffs' rights to freedom of speech and association guaranteed by the First Amendment to the Constitution of the United States. Defendants acted to eliminate any possibility of

43

Plaintiffs' exercise of their rights to speech and association by the unnecessary and violent acts described above. Further, Defendants discriminated against protestors based on their viewpoint only ending the ability of those who had an anti-Trump message to speak, and provided no alternative means for continuing speech and assembly.

136. As a proximate result of the wrongful, malicious, and violent acts of Defendants, Plaintiffs and each of them, suffered compensable and irreparable injuries including having their rights to engage in the constitutionally protected activities of political speech and assembly truncated, extinguished and/or deprived them.

137. In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiffs. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious.

**THIRD CLAIM FOR RELIEF**
**DUE PROCESS**
**(Fourteenth Amendment, 42 U.S.C. § 1983)**
**(All the class representatives, individually and on behalf of the class they seek to represent, against all Defendants)**

138. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

139. The actions of the Defendants including but not limited to targeting anti-Trump protesters and using excessive force without warning or declaring an unlawful assembly without regard to legitimate law enforcement objectives, were deliberately indifferent to the rights and well being of anti-Trump protesters as set forth above. The level of force and violence employed by Defendants shocks the conscience and violates Plaintiffs' right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution.

140. As a proximate result of the wrongful, malicious, and violent acts of Defendants, and the fright caused Plaintiffs, Plaintiffs and each of them, suffered

44

physical injuries including being hit by projectiles and inhaling gas and pepper spray, experienced shock and injury to the nervous system, and were injured in their health, strength, and activity, suffering extreme and severe mental anguish and physical pain, anxiety, humiliation, and emotional distress.

141.    By reason of the aforementioned acts and omissions of Defendants, Plaintiffs, and each of them, have incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and/or other special and general damages, in an amount according to proof, but in excess of the jurisdictional limits of this Court.

142.    In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiffs. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious.

**FOURTH CLAIM FOR RELIEF**
**EQUAL PROTECTION**
**(First and Fourteenth Amendments, 42 U.S.C. § 1983)**
**(All the class representatives, individually, and on behalf of the class they seek to represent, against all Defendants)**

143.    Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

144.    The actions of the Defendants, as set forth above, violated Plaintiffs' Fourteenth Amendment rights to equal protection of the laws of the United States. The PPD discriminated against protestors based on their viewpoint, made no lawful declaration of unlawful assembly, dispersed protestors without warning or justification, and provided no alternative means for continuing speech and assembly.

145.    The actions of Defendants impermissibly treated the Trump supporters better than other persons assembled for the Trump Protest in violation of both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by granting the Trump supporters, whose views it found acceptable, the use of a public forum, while

denying the same public forum to those wishing to express views less favored by Defendants.

146.     As a proximate result of the wrongful, malicious, and violent acts of Defendants, and the fright caused Plaintiffs, Plaintiffs and each of them, suffered physical injuries including being hit by projectiles and inhaling gas and pepper spray, experienced shock and injury to the nervous system, and were injured in their health, strength and activity, suffering extreme and severe mental anguish and physical pain, anxiety, humiliation, and emotional distress.

147.     By reason of the aforementioned acts and omissions of Defendants, Plaintiffs, and each of them, have incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and other special and general damages, in an amount according to proof, but in excess of the jurisdictional limits of this Court.

148.     In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiffs. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A. Declaratory relief concerning the unconstitutionality of Defendants' actions as described herein;

B. A preliminary and permanent injunction prohibiting Defendants from engaging in any of the unconstitutional behaviors as described herein and to put into place safeguards sufficient to ensure that they do not continue in the future;

C. Compensatory, general, statutory, and special damages for themselves and the class they represent in an amount according to proof;

46

D. Exemplary damages against each of the individual Defendants in an amount sufficient to deter and make an example of those Defendants;

E. Attorneys' fees and costs, and costs of suit, as provided by 42 U.S.C. 1988 and any other applicable authority; and

F. Such other and further relief as this Court deems just and proper.

DATED this 4th day of September, 2018.

ACLU FOUNDATION OF ARIZONA

By *Kathleen E. Brody*
    Kathleen E. Brody
    Darrell L. Hill

HADSELL STORMER & RENICK LLP

    Dan Stormer
    Josh Piovia-Scott
    Cindy Pánuco

DANIEL J. POCHODA

    Daniel J. Pochoda

*Attorneys for Plaintiffs*