Dan Stormer (*pro hac vice*)
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com

Joshua Piovia-Scott (*pro hac vice*)
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15 b
Emeryville, CA 94608
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Email: jps@hadsellstormer.com

Attorneys for Plaintiffs

[Additional counsel cont. on next page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente, an Arizona nonprofit corporation; Poder in Action, an Arizona nonprofit corporation; Ira Yedlin; Janet Travis; Cynthia Guillen; Jacinta Gonzalez Goodman, individually and as class representatives, | Case No.: CV 18-2778-PHX-JJT |
| Plaintiffs, | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| v. | |
| City of Phoenix, a municipal corporation; Jeri L. Williams; Benjamin Moore; Douglas McBride; Robert Scott; Christopher Turiano; Glenn Neville; John Sticca; Lane White; Jeffrey Howell; George Herr, individually and in their official capacities; and Does 1-20. | |
| Defendants. | |

1    [Additional counsel cont. from first page]

2    Kathleen E. Brody (Bar No. 026331)
3    William B. Peard (Bar No. 033831)
     ACLU FOUNDATION OF ARIZONA
4    3707 North 7th Street, Suite 235
     Phoenix, AZ 85014
5    Telephone: 602-650-1854
6    Emails: kbrody@acluaz.org
            bpeard@acluaz.org
7
8    Barrett S. Litt (*pro hac vice*)
     KAYE, MCLANE, BEDNARSKI & LITT, LLP
9    975 E. Green St.
     Pasadena, California 91106
10   Telephone: (626) 844-7660
11   Email: blitt@kmbllaw.com

12   Neel Chatterjee (*pro hac vice*)
13   Julia W. Zhang (*pro hac vice*)
     GOODWIN PROCTER LLP
14   601 Marshall Street
     Redwood City, CA 94063
15   Telephone: 650 752 3100
16   Emails: nchatterjee@goodwinlaw.com
            jzhang@goodwinlaw.com
17
18   Mia C. Khatcherian (*pro hac vice*)
     GOODWIN PROCTER LLP
19   620 Eighth Avenue
     New York, NY 10018
20   Telephone: 212 813 8800
21   Email: MKhatcherian@goodwinlaw.com

22   Paul L. Hoffman (*pro hac vice*)
23   SCHONBRUN DESIMONE SEPLOW HARRIS &
     HOFFMAN, LLP
24   11543 W. Olympic Blvd.
     Los Angeles, CA 90064
25   Telephone: 310-396-0731
26   Email: hoffpaul@aol.com

27   Attorneys for Plaintiffs

28   _____

     PLTFS' REPLY ISO MTN FOR
     CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................i

I.     DEFENDANTS' ADMISSIONS AND PLAINTIFFS' EVIDENCE
       PROVIDE MORE THAN SUFFICIENT SUPPORT FOR CLASS
       CERTIFICATION...........................................................................................1

       A.     Defendants violated the First Amendment rights
              of "several thousand" lawful protestors by ending
              their protest and assembly unnecessarily and
              with unreasonable force .......................................................................1

       B.     Centralized command made the critical decisions
              impacting the proposed class ...............................................................1

       C.     Before any warning or dispersal order, Defendants
              fired 8-12 tear gas grenades at the crowd,
              dispersing thousands of lawful protesters............................................2

       D.     PPD should have at least considered isolating
              and arresting the small group of troublemakers so
              that the larger group of lawful protestors could
              continue to exercise their First Amendment rights.............................3

       E.     Defendants' unlawful assembly order was insufficient......................4

II.    THE RULE 23 CRITERIA ARE MET.........................................................5

       A.     The proposed damages class is definite and, in any event,
               can be modified to address any definiteness concerns .......................5

       B.     Defendants misconstrue Plaintiffs' legal theories ..............................8

       C.     Common, not individual, issues predominate.....................................10

       D.     The authorities Defendants rely on are inapposite. ...........................13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.    Rule 23(c)(4) provides for certification of
      issue classes such as those here .........................................................13

F.    The numerosity standard has been met..............................................14

III.   PLAINTIFFS HAVE STANDING FOR INJUNCTIVE RELIEF. .............14

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abdeljalil v. Gen. Elec. Capital Corp.*,
  306 F.R.D. 303 (S.D. Cal. 2015)....................................................................7

*Aichele v. City of Los Angeles*,
  314 F.R.D. 478 (C.D. Cal. 2013) .................................................................7

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001)...............................................................7, 15

*Baldwin v. Cate*,
  C-08-03516 RMW, 2009 WL 482283
  (N.D. Cal. Feb. 25, 2009).............................................................................15

*Barham v. Ramsey*,
  434 F.3d 565 (D.C. Cir. 2006) ......................................................................9

*Brown v. Hain Celestial Group, Inc.*,
  No. C 11-03082 LB, 2014 WL 6483216
  (N.D. Cal. Nov. 18, 2014)..............................................................................7

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ......................................................................................16

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014)........................................................................11

*Dellums v. Powell*,
  566 F.2d 167 (D.C. Cir. 1977) ......................................................................9

*Edrei v. Maguire*,
  892 F.3d 525 (2d Cir. 2018)..........................................................................9

*Felarca v. Birgeneau*,
  891 F.3d 809 (9th Cir. 2018).......................................................................10

*Fogarty v. Gallegos*,
  523 F.3d 1147 (10th Cir. 2008).....................................................................9

-i-

*Frlekin v. Apple Inc.*,
   309 F.R.D. 518 (N.D. Cal. 2015) .................................................. 11

*Gomez v. Vernon*,
   255 F.3d 1118 (9th Cir. 2001) ...................................................... 15

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014) ...................................................... 11

*Jones v. Parmley*,
   465 F.3d 46 (2d Cir. 2006) .............................................. 9, 10, 13

*Kirkpatrick v. J.C Bradford & Co.*,
   827 F.2d 718 (11th Cir 1987) ...................................................... 11

*In re Linerboard Antitrust Litig.*,
   305 F.3d 145 (3d Cir. 2002) ........................................................ 12

*Lyall v. City of Los Angeles*,
   2010 WL 11549565 (C.D. Cal. May 18, 2010) ............................... 7

*Melgar v. CSK Auto, Inc.*,
   681 Fed. App'x 605 (9th Cir. 2017) ............................................ 6, 7

*Melgar v. CSK Auto, Inc.*,
   No. 13-cv-03769-EMC, 2015 WL 9303977
   (N.D. Cal. Dec. 22, 2015) ............................................................. 7

*Miranda B. v. Kitzhaber*,
   328 F.3d 1181 (9th Cir. 2003) (per curiam) ................................. 13

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
   311 F.R.D. 590 (C.D. Cal. 2015) ................................................. 11

*Moss v. U.S. Secret Serv.*,
   2015 WL 5705126 (D. Or. Sept. 28, 2015) ................................... 13

*Nelson v. City of Davis*,
   685 F.3d 867 (9th Cir. 2012) ......................................................... 9

*Nevarez v. Forty Niners Football Co.*,
   326 F.R.D. 562 (N.D. Cal. 2018) ................................................... 7

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016) ................................................. 11

-ii-

*Rahman v. Mott's LLP*,
   693 F. App'x 578 (9th Cir. 2017) .................................................. 12

*In re Rodriguez*
   695 F.3d 360 (5th Cir. 2012)......................................................... 7

*Thomas v. Cty. of Los Angeles*,
   978 F.2d 504 (9th Cir. 1992),
   *as amended* (Feb. 12, 1993) ......................................................... 16

*In re Toll Roads Litig.*,
   2018 WL 4945531 (C.D. Cal. Oct. 3, 2018) .............................. 6, 7

*Torres v. Mercer Canyons, Inc.*,
   835 F.3d 1125 (9th Cir. 2016)..................................................... 11

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ......................................................... 10, 11

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir.2013)......................................................... 11

*United States v. Johnson*,
   256 F.3d 895 (9th Cir. 2001)....................................................... 13

*Universal Calvary Church v. City of New York*,
   177 F.R.D. 181 (S.D.N.Y. 1998) ................................................ 13

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996)....................................................... 13

*Victorino v. FCA US LLC*,
   326 F.R.D. 282 (S.D. Cal. 2018).................................................... 7

*Vodak v. City of Chicago*,
   639 F.3d 738 (7th Cir. 2011)......................................................... 9

*Wolph v. Acer Am. Corp.*,
   272 F.R.D. 477 (N.D. Cal. 2011) ................................................... 5

-iii-

1

2          **FEDERAL STATUTES, REGULATIONS AND OTHER**
                         **AUTHORITIES**
3

4    Federal Rules of Civil Procedures

5        § 23 ............................................................................................. 5, 7, 14
         § 23(b)(3) ....................................................................................... 11, 14
6        §23(c)(4) ............................................................................................ 13

7

8    *Newberg on Class Actions* § 3:6 (5th ed.) ................................................. 6, 7, 12, 13

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-iv-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   DEFENDANTS' ADMISSIONS AND PLAINTIFFS' EVIDENCE PROVIDE MORE THAN SUFFICIENT SUPPORT FOR CLASS CERTIFICATION.

### A.   Defendants violated the First Amendment rights of "several thousand" lawful protestors by ending their protest and assembly unnecessarily and with unreasonable force.

Defendants concede (Opp. at 3 (hereafter referenced only by page number)), and have repeatedly documented in their reports, that the "protestors were generally peaceful." Several centralized decisions, criticized by both sides' police practices experts, violated the First Amendment rights of the entire proposed class of thousands of lawful protestors.

PPD first fired chemical weapons at 8:33 pm (the pepper ball "saturation" ostensibly directed at 10-20 individuals who shook the fence). (*See* Mot. at 12) Then PPD deployed smoke grenades at 8:35 and tear gas grenades at 8:36. PPD gave no warnings before deploying these weapons. Then, between approximately 8:36 and 8:47 pm, PPD fired 8-12 tear gas grenades at the protestors, still before any warning or unlawful assembly decision. (*See* Mot. at 13, 16) Although PPD determined that there was an unlawful assembly sometime between 8:42 and 8:47 pm, the first order to disperse did not come until 8:52 pm. PPD was firing chemical weapons into the crowd of peaceful protestors for 19 minutes before issuing any warnings or dispersal orders, and there was a delay of 5-10 minutes between PPD's decision to declare the assembly unlawful and its giving any orders or warnings to the crowd. No directions of how and where to leave were provided.

Defendants state there were "several thousand" protestors in front of the Herberger Theater at approximately 8:30 pm when 10-20 individuals allegedly engaged in unlawful conduct. (Ex. 50 at 131:8-22) Defendants concede (at 6), and video evidence confirms, that PPD's actions, particularly its initial deployment of chemical weapons, "prompted nearby members of the crowd to leave," and that by 8:39 pm this area "was mostly empty." (Ex. 33; Ex. 34; Ex. 38 (Exhibits 1-49 were filed with Plaintiffs' Motion))

### B.   Centralized command made the critical decisions impacting the proposed class.

Defendants confirm (at 10-11) that, "[a]lthough Chief Williams was in charge, after 8:32 p.m., general decisions regarding use of force were made by the duly authorized Field

-1-

Force Commander." Specifically, he personally "ordered the initial deployment of pepperball in the Antifa area" (Opp. Ex. 65, at 4:16-17), and "directed the grenadiers to deploy smoke" and "OC (pepper spray) and CS grenades (tear gas)." (*Id.* at 5:1-2; 5:15-16, *see also* Opp. at 5-6) These initial command decisions to use force predictably set off a series of events, over the course of approximately 30 minutes, that prematurely ended the First Amendment activity of thousands of lawful protestors.[1]

### C. Before any warning or dispersal order, Defendants fired 8-12 tear gas grenades at the crowd, dispersing thousands of lawful protesters.

Between 8:36 and 8:47 pm, Defendants fired 8-12 tear gas grenades into a confined area containing thousands of lawful protestors. (*See* Mot. at 13) Defendants' police practices expert (Michael Hillman) testified that tear gas "is a dispersal weapon" and concluded in his report that PPD used tear gas to "disperse" protestors on August 22, 2017. (Ex. 50 at 114:25-115:20, 207:6-208:1; Opp. Ex. 38 at 12) Hillman conceded that PPD's use of tear gas "was indiscriminate" and impacted the lawful protestors. (Ex. 50 at 217:2-17) Hillman also undermined Defendants' claim that they "targeted" their tear-gas attack at the 10-20 troublemakers who were surrounded by thousands of peaceful protestors, admitting that he (1) has never tried to use tear gas against a small group of unlawful individuals within a larger group of lawful protestors, (2) is unaware of any materials documenting the propriety or effectiveness of using tear gas against a small group of unlawful individuals within a larger group of lawful protestors, and (3) has never trained officers to do this. (Ex. 50 at 215:11-216:3) Finally, Hillman testified that law enforcement *should* declare an unlawful assembly, give appropriate dispersal orders, and give protestors time to leave before using chemical weapons like tear gas. (Ex. 50 at 115:25-116:17)[2]

---

[1] The Field Force Commander, in consultation with Forwards Operations, also made the eventual decision to declare an unlawful assembly. (Opp. Ex. 65 at 6:12-13)

[2] Defendants claim (at 5) that the three minutes between their deploying the first pepper balls and deploying tear gas gave the peaceful "protestors an opportunity to leave the area," but never explain how thousands could do so, especially without warning or direction. Defendants also fail to explain (at 5) how a text message from one officer to a single member of the crowd sent at the very same time PPD first fired chemical weapons could have been an adequate warning to thousands of protestors.

-2-

1    Defendants' claim (at 6 n.4) that "[m]uch of the crowd was either unaffected [by the

2    tear gas] or voluntarily remained" is contradicted by substantial evidence. First, Defendants

3    themselves concede (at 6) that their deployment of tear gas "prompted nearby members of

4    the crowd to leave" and that by 8:39 the area in front of the Herberger Theater "was mostly

5    empty." Further, video evidence clearly shows both that the tear gas and other chemical

6    weapons affected many people, and that people, including PPD officers, felt the impact

7    even with no visible smoke or chemical agents around them. (Ex. 30; Ex. 31; Ex. 33 (at

8    2:30-3); Ex. 34; Ex. 51) Plaintiffs have submitted 60 declarations from people whose First

9    Amendment rights were violated, and identified approximately 200 additional, specific

10   individuals whose First Amendment rights were also violated. Peard Decl. ¶ 8.

11       **D.**     **PPD should have at least considered isolating and arresting the small**
12       **group of troublemakers so that the larger group of lawful protestors**
    **could continue to exercise their First Amendment rights.**

13       Defendants' expert Hillman refutes their claim (at 4 n.2) that they could not address

14   the 10-20 troublemakers without violating the First Amendment rights of thousands of

15   lawful protestors. Hillman evaluated LAPD's conduct at the *MIWON* protest case that

16   Plaintiffs rely on. (*See* Mot. at 21 n. 7, 30-33) That protest also involved a small group of

17   troublemakers within a much larger group of lawful protestors, and Hillman found that

18   LAPD made a "significant error" because it "did not consider isolating and arresting those

19   engaging in unlawful conduct." (Ex. 52 at 11, 49, 80)[3] Hillman opined here and in his

20   *MIWON* report that "the decision to disperse a crowd should be made only after careful

21   consideration of the ability to isolate and arrest those responsible for the unlawful conduct."

22   (Ex. 52 at 49, Ex. 50 at 64:23-65:18)[4] (Note that Plaintiffs' expert opines it was practicable

23   

24   [3] Hillman also testified that having to address a small group of troublemakers within a
25   larger group of lawful protestors "is a common issue" that law enforcement has been
dealing with "for hundreds of years." (Ex. 50 at 49:11-50:10)

26   [4]  Hillman explained that a team of plain clothes officers in the crowd would locate
unlawful individuals and work with a team of uniformed officers to extract them and pass
27   them through the police line to waiting officers. (Ex. 52 at 11, 49; Ex. 50 at 96:6-97:15) In
this case, PPD had a clear opportunity to do this because, before PPD fired the initial pepper
28   balls, the small group of troublemakers were concentrated in one place right next to the

-3-

1   to do so.).

2       Defendants engaged in no such consideration here. (Ex. 50 at 79:2-80:4; Ex. 53 at

3   135:20-138:8, 144:9-15) Moreover, PPD was not prepared for this situation, even though

4   it knew that Antifa was likely to be present. (Ex. 11 at COP008601) Hillman testified that

5   this tactic would have required training and preparation (Ex. 50 at 99:16-100:12), but that

6   he saw no evidence that PPD's planning included such preparation, or that PPD conducted

7   any training specifically for this event. (*Id.* at 87:22-88:7) Nor did PPD arrest **any** of the

8   alleged Antifa members, even though Antifa was observed at 8:07 pm pushing protestors

9   who told them to stop throwing things, which Hillman testified would have warranted

10  arrest. (*Id.* at 107:6-8, 97:17-99:8; *see* Mot. at 11)

11      Crucially, Hillman opined that arresting the few troublemakers in a large crowd

12  could prevent any chain reaction that would disrupt the lawful First Amendment activity

13  of thousands of protestors:

14      Perhaps, if an arrest had been made, those attempting to incite a disturbance
        would have been less likely to continue their unlawful actions . . . . [T]he
15      crowd may have reacted differently if they had seen people committing
        unlawful acts being isolated from the crowd and arrested. Moreover,
16      arresting and removing those violating the law would have reduced the need
17      to declare an unlawful assembly, offering a greater level of protection for
        First Amendment rights."[5]
18
19  (Ex. 52 at 53; *see also* Ex. 50 at 110:2-13)

20      **E.    Defendants' unlawful assembly order was insufficient.**

        The Field Force Commander decided to declare an unlawful assembly sometime
21
22  between 8:42 and 8:47, after a 45-second discussion with other command staff. (*See* Mot.

23  police line and scores of PPD officers.
    [5] Hillman also found in the *MIWON* protest that "the tactics employed to move the unlawful
24  individuals were flawed, in that a small group of unlawful individuals were pushed into a
    larger group of peaceful, law abiding individuals." (Ex. 52 at 49, 51, Ex. 50 at 107:9-16)
25  This is exactly what PPD's initial pepper ball deployment did here. Hillman concluded in
    the *MIWON* protest that "the movement of a small number of disruptive individuals into
26  an area filled with peaceful demonstrators resulted in a chaotic situation which inhibited
27  the ability of those present to peacefully exercise their First Amendment rights." (Ex. 52 at
    52) The same is true here.
28                                              -4-

at 16) Defendants' expert Hillman opined in his report that "once the decision was made to declare an unlawful assembly, it would have been optimal to have delivered unlawful assembly announcements via multiple amplified devices in multiple languages." (Opp. Ex. 38 at 11) According to Hillman, unlawful assembly orders should (1) be made in a way that can be heard by everyone in the crowd, so that people know that they need to leave (Ex. 50 at 119:24-120:8); (2) identify the location of the unlawful assembly (*id.* at 121:24-122:4, 134:1-15); (3) be made in Spanish when people in the crowd may speak only Spanish (*id.* at 120:9-15); (4) include clear instruction on how to leave the area (*id.* at 132:12-23, 133:13-24); and (5) give the crowd sufficient time to disperse. (*id.* at 133:4-6)[6] PPD's unlawful assembly orders on August 22, 2017 failed in each respect.[7]

## II.     THE RULE 23 CRITERIA ARE MET.

In close cases, "any doubts regarding the propriety of class certification generally should be resolved in favor of certification." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 481 (N.D. Cal. 2011). This does not conflict with the obligation to conduct a "rigorous analysis"; it simply recognizes that there ***may*** be close cases (although this is not one).

### A. The proposed damages class is definite and, in any event, can be modified to address any definiteness concerns.

Defendants contend that the proposed class definition—essentially protestors exercising their First Amendment rights whose actions did not justify the use of chemical weapons or an unlawful assembly declaration—requires a merits determination of each class member's claim (known as a fail-safe class). That misperceives Plaintiffs' claims: PPD used indiscriminate force against the whole protest (as opposed to individual

---

[6] Hillman criticized LAPD for making these same "significant errors" at the *MIWON* protest in 2007. (Ex. 52 at 49-51)

[7] Hillman testified that, "in today's environment, social media, obviously, is a very preferred way to communicate" with large groups of protestors. PPD made no announcements, warnings, or orders using social media; LAPD started doing this in 2008. (Ex. 50 at 156:13-157:5). Moreover, PPD relied on an air unit to give the unlawful assembly orders, and Hillman testified that "air units using their sound system to make announcements to a crowd [in a protest] have historically proved ineffective." (Ex. 50 at 154:12-155:9)

1   protestors against whom such force was justified), and declared an unlawful assembly
2   based on the conduct of a few individuals who could and should have been isolated. This
3   undifferentiated use of force and wholesale crowd dispersal violated the protestors' rights.
4   Because PPD might have been justified in using force or finding an unlawful assembly
5   against this handful of people, the class definition excludes them. This is not a fail-safe
6   class. *See* 1 *Newberg on Class Actions* § 3:6 (5th ed.) (hereinafter "*Newberg*") (23(b)(3)
7   fail-safe class definition assumes merits of individual's claim); *Melgar v. CSK Auto, Inc.*,
8   681 Fed. App'x 605, 607 (9th Cir. 2017) (defining fail-safe class as one "limiting
9   membership to plaintiffs described by their theory of liability in the class definition such
10  that the definition ***presupposes*** success on the merits") (emphasis added).

11      Defendants' argument is fundamentally flawed in two respects. First, the proposed
12  class definition does not presuppose liability or success on the merits "because the liability
13  standard [Plaintiffs assert] . . . require[s] class members to prove more facts to establish
14  liability than are referenced in the class definition." *Melgar*, 681 F. App'x. at 607. Many
15  ultimate liability questions are nowhere in the proposed class definition (e.g., whether the
16  wholesale force used was legal under the circumstances, whether PPD could use such force
17  before finding or announcing an unlawful assembly, and whether the unlawful assembly
18  declaration was proper or adequate) The class definition merely excludes the 10-20
19  troublemakers against whom force may have been individually justified.

20      Second, the Ninth Circuit "appears to disapprove of the premise that a class can[not]
21  be fail-safe." *Id.*[8] (citing *Vizcaino v. U.S. Dist. Ct.*, 173 F.3d 713, 721–22, 23 (9th Cir.
22  1999)), *as amended*, 184 F.3d 1070 (9th Cir. 1999) (rejecting claim that class definition
23  defining plaintiffs as common law employees assumed their contested legal status and was
24  therefore "circular")). *Melgar* certified a class of persons who "used a personal vehicle(s)

---

26  [8] It is obvious from the context that *Melgar*'s use of "can" was intended to be "cannot,"
27  which is why *Newberg* § 3:6 inserted "[not]" to clarify the opinion's intent. *See also In re*
    *Toll Roads Litig.*, No. SACV 16-00262 AG (JCGx), 2018 WL 4945531, at *7 (C.D. Cal.
28  Oct. 3, 2018) (similarly modifying *Melgar*'s language).

PLTFS' REPLY ISO MTN FOR
CLASS CERTIFICATION

to make a bank deposit on behalf of Defendant and were not reimbursed for incurring that business expense." *Melgar v. CSK Auto, Inc.*, No. 13-cv-03769-EMC, 2015 WL 9303977, at *8 (N.D. Cal. Dec. 22, 2015). The class definition here no more presupposes liability than that definition.[9] Further, while the Ninth Circuit has not expressly held that fail-safe classes are permissible (although *Melgar* strongly suggests it), at least the Fifth Circuit has because such a rule would "preclude certification of just about any class of persons alleging injury from a particular action." *In re Rodriguez* 695 F.3d 360, 369–70 (5th Cir. 2012) (quoting *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1105 (5th Cir. 1993)).

Defendants' reliance on *Lyall v. City of Los Angeles*, CV 09-7353 PSG (MANx), 2010 WL 11549565 (C.D. Cal. May 18, 2010), is misplaced. First, *Lyall* predates *Melgar*, which undermines its reasoning; *Lyall* conflicts with the class definition found acceptable there. Second, when "necessary to enhance the usefulness of the class-action device," Rule 23 "evinces a policy to allow modification of a class throughout litigation." *Aichele v. City of Los Angeles*, 314 F.R.D. 478, 485 (C.D. Cal. 2013).[10] Thus, courts concerned that language is fail-safe routinely modify the language to address the concern. *See Newberg* § 3:6 (citing *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 800 (7th Cir. 2017) ("[T]he problem of a fail-safe class 'can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.'")).

---

[9] Cases post-dating *Melgar* have certified classes far closer to qualifying as fail-safe than this class. *See Nevarez v. Forty Niners Football Co.*, 326 F.R.D. 562, 592 (N.D. Cal. 2018) (23(b)(3) class of disabled persons "denied equal access" to stadium facilities, services etc. and citing several similar certifications); *In re Toll Roads Litig.*, 2018 WL 4945531, at *8 (C.D. Cal. Oct. 3, 2018) (23(b)(3) class subjected to certain types of transfers that plaintiffs alleged were illegal).

[10] *See also, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2001) (trial court has wide range of Rule 23 tools, including modifying proposed class definition); *Brown v. Hain Celestial Group, Inc.*, No. C 11-03082 LB, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014) ("Courts, including those in the Ninth Circuit, regularly allow class definitions to be adjusted over the course of a lawsuit."); *Victorino v. FCA US LLC*, 326 F.R.D. 282, 301–02 (S.D. Cal. 2018) (modifying class definition from that proposed in class certification motion); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 308 (S.D. Cal. 2015).

-7-

1       If the Court is concerned with the proposed class definition, it can be modified; the

2   Court could change the language Defendants find problematic (at 13) to "did not push the

3   police fence bordering Monroe or throw objects at police," or simply remove the language

4   at issue. The foregoing substitute language clearly does not presuppose liability. Removing

5   the language altogether would not, as Defendants contend (at 13 n.5), defeat predominance

6   because Defendants could assert that their conduct was justified as to a handful of

7   individuals.

8       **B.  Defendants misconstrue Plaintiffs' legal theories.**

9       Whether common issues predominate is based on Plaintiffs' legal theories, not

10   Defendants' version of them. Defendants focus on instances well into the night when

11   grenadiers made individual force decisions and then claim that individual issues

12   predominate. But Plaintiffs' theories are that Defendants' central command (led, approved,

13   endorsed, and ratified by Chief Williams) violated both the Fourth and First Amendments

14   by (1) dispersing thousands of lawful protestors by indiscriminately unleashing a

15   "complete saturation" of the area with chemical filled pepper balls and then tear gas, rather

16   than engaging in targeted activity against the tiny troublemaking Antifa group; (2)

17   determining that the whole demonstration was an unlawful assembly although only a small

18   number of protestors were engaged in unlawful activity; (3) failing to provide timely and

19   audible unlawful assembly announcements and time to leave the area before using

20   indiscriminate force against the crowd; (4) failing to provide audible and clear direction on

21   how to leave the area after announcing an unlawful assembly; and (5) making centralized

22   decisions that created a scene of complete chaos, with people wandering and running

23   around not knowing what was happening, where to go, or what to do. All of this occurred

24   between approximately 8:30 and 9 pm, and any later individual uses of force flowed

25   directly from these violations. Understood this way, common questions predominate

26   because the answers to these questions will resolve class liability.[11]

---

27   [11] Defendants contend (at 20-21) that some of the questions Plaintiffs pose are questions of

28   municipal liability that are unrelated to the elements of their claims and secondary. First,

-8-

It is well-established that neither force nor arrest against a group of people is appropriate before a warning and the opportunity to disperse. *See, e.g., Dellums v. Powell*, 566 F.2d 167, 184 (D.C. Cir. 1977) (inadequate dispersal notice before arresting anti-war protestors ); *Vodak v. City of Chicago*, 639 F.3d 738, 745–46 (7th Cir. 2011) (lawfulness of mass arrest at issue where "police were numerous . . . [, t]he crowd was just milling about, predominantly peaceably"; police could "could not lawfully . . . arrest people who the police had no good reason to believe knew they were violating a police order"); *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (in "compelling circumstances . . . police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order"); *Fogarty v. Gallegos,* 523 F.3d 1147 (10th Cir. 2008) (no qualified immunity for officer who shot protestor with a pepperball where the protestor did not hear or understand any orders to disperse prior to the use of force); *Edrei v. Maguire*, 892 F.3d 525, 541 (2d Cir. 2018) (denying motion to dismiss when plaintiffs alleged improper use of force to disperse crowd; absent "imminent harm," police must inform protestors to disperse); *Nelson v. City of Davis*, 685 F.3d 867, 886 (9th Cir. 2012) (no qualified immunity for attempting to clear an apartment complex of partying students by shooting pepperball projectiles in the direction of students standing outside apartment).

*Jones v. Parmley*, 465 F.3d 46, 58–59 (2d Cir. 2006) (Sotomayor, J.), is very close to this case. There, some protestors stepped into the highway, which the police claimed was criminal conduct (although that conduct ended before the police actions at issue). The "defendants issued no dispersal order and instead stood in a 'skirmish line,' waited thirty-five seconds, and then charged into the crowd, arresting protesters indiscriminately." *Id.* at 60. The parties disputed whether crimes had been committed and whether dispersal of the

---

they are not secondary because ratification or custom and policy can establish a centralized basis for municipal liability that may not otherwise exist, including for otherwise individualized acts. Second, they, at a minimum, reinforce that common questions predominate when there is evidence of underlying constitutional violations.

crowd was justified. *Id.* at 59. Defendants conceded that most demonstrators did not enter the highway and that they could identify those who had. The court concluded that the plaintiffs had "an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law." *Id.* at 60. "[A]bsent imminent harm," defendants "could not simply disperse them without giving fair warning." *Id.*

Defendants contend that no "magic words" are required before dispersing a crowd. (at 17, n.9) Magic words or not, whether Defendants gave adequate notice of an unlawful assembly and adequately provided the opportunity and information needed to disperse are common questions on which Plaintiffs have provided substantial evidence (e.g., attacking the crowd with pepper balls and then tear gas ***before*** making an unlawful assembly decision or dispersal announcement, and dispersal announcements deficient in several respects).

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018), cited by Defendants for the proposition that warnings are only one factor in the analysis, was not an unlawful assembly case or a class action; it was an excessive force claim by individual plaintiffs who police struck while removing Occupy Wallstreet tents at UC Berkeley "***[a]fter*** reading a dispersal order," after which protestors set up more tents and "formed a human chain to block officers from reaching" them; police again "gave several bullhorn warnings" ordering that the tents be taken down and to disperse (although some protestors could not understand the warnings). *Id.* at 815 (emphasis supplied). The officers then used force to get to the tents, which some protestors resisted. This is not remotely comparable to the instant case.

## C. Common, not individual, issues predominate.

The predominance inquiry determines if the common issues are "more prevalent or important" than the non-common ones. *See* Mot. at 18-19 (discussing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). Even when a class definition encompasses non-injured individuals, 23(b)(3) certification is appropriate so long as there is ultimately a mechanism to cull uninjured class members. That problem was solved in *Tyson* because liability and damages were bifurcated. *Id.* at 1049–50. Rebuffing the contention that class certification was appropriate only if plaintiffs could identify "some mechanism to identify

-10-

1    the uninjured class members," the Court remanded on the method of determining damages

2    and identifying class members, but upheld class certification. *Id.* The same analysis applies

3    here for identifying those who may not meet the class definition.

4          *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125 (9th Cir. 2016), upheld a Rule

5    23(b)(3) class definition encompassing class members exposed or subjected to a challenged

6    practice. The existence of a class wide common policy or practice established

7    predominance even though it encompassed "some individuals who have suffered no harm"

8    where class members were "exposed to" the policy (in contrast to where "large numbers of

9    class members . . . were never *exposed* to the challenged conduct to begin with"). *Id.* at

10   1136 (original emphasis). The district court was "well situated to winnow out those non-

11   injured members at the damages phase." *Id.* at 1137.

12         Predominance exists "[al]though other important [individualized] matters will have

13   to be tried separately, such as damages or some affirmative defenses," *Tyson Foods*, 136

14   S. Ct. at 1045, if "resolution of some of the legal or factual questions . . . [in] controversy

15   . . . are more substantial than the issues subject only to individualized proof," and can be

16   "achieved through generalized proof." *In re U.S. Foodservice Inc. Pricing Litig*., 729 F.3d

17   108, 118 (2d Cir.2013). Predominance exists where individual issues involve only a

18   comparatively small number.[12]

19         Defendants' list of issues (at 16-17) relate to individual officers' actions after the

20   initial force, unlawful assembly and dispersal command decisions. Given Plaintiffs'

21   contention that these centralized decisions violated their rights (and created the conditions

22

23   [12] *See, e.g.*, *Nitsch v. Dreamworks Animation SKG Inc*., 315 F.R.D. 270, 312 (N.D. Cal.
     2016) ("[T]he relatively small number of individual inquiries [63 out of 10,0000] which
24   might be required do not defeat predominance."); *Moore v. Ulta Salon, Cosmetics &
     Fragrance, Inc*., 311 F.R.D. 590, 612 (C.D. Cal. 2015) ("minor deviations" from company
25   policy); *Frlekin v. Apple Inc*., 309 F.R.D. 518, 525 (N.D. Cal. 2015) ("minor, localized
     instances" of deviation from company policy); *Kirkpatrick v. J.C Bradford & Co*., 827 F.2d
26   718, 724-25 (11th Cir 1987) (where common issues were numerous, "presence of . . .
     individual reliance" did not defeat predominance); *In re Deepwater Horizon*, 739 F.3d 790,
27   810–17 (5th Cir. 2014) (certification of a settlement class for those harmed by the an oil
28   spill) (cited favorably in *Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1168 (9th Cir. 2014)).

PLTFS' REPLY ISO MTN FOR
CLASS CERTIFICATION

1    for later individualized force), resolution of those issues would "materially advance [case]

2    resolution." *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017).[13]

3          Defendants' selective discussion of the named Plaintiffs (at 18-19) is similarly

4    flawed (barring Mr. Yedlin, whom we address separately). Ms. Guillen, according to

5    Defendants, saw smoke at 8:39 pm and did not run away, which is of no consequence given

6    the absence of a dispersal order or direction where to go; at 8:50, she was struck by a

7    grenadier's muzzle blast *before* the first unlawful assembly announcement at 8:52. Ms.

8    Travis, according to Defendants, heard an instruction to leave and was taking a picture in

9    front of a police line when she was struck, which ignores that PPD had caused chaos by its

10   unlawful force and dispersal orders, which Ms. Travis was documenting. Again, Plaintiffs'

11   theory is that any subsequent individualized force flowed directly from PPD's centralized

12   force and dispersal decisions (and in any event would not negate the initial force and

13   dispersal claims). Similarly, that Ms. Goodman, a seasoned protestor, may have received

14   individual notice of the pepper balls (at the same time they were fired) and walked toward

15   the commotion (before any unlawful dispersal order or exit direction), ignores that Ms.

16   Goodman felt a responsibility to determine what was happening and to help others escape.

17   None of these facts bear on the lawfulness of Defendants' centralized decisions.

18         As to Mr. Yedlin, he will withdraw as a class representative to avoid any dispute

19   over whether he is a typical class member (although Plaintiffs dispute Defendants'

20   contention (at 18) that he "joined with Antifa in forcefully pushing a police fence"). There

21   are ample class representatives without him. As to those class representatives, Defendants

22   wrongly contend (at 19 n.12) that none is typical due to differing injuries, allegedly

23   different courses of conduct, or unique defenses. Typicality exists, however, where, as

24   here, the representative's claim "arises from the same event, practice, or course of conduct"

---

25
26   [13] *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) ("statute of
     limitations, fraudulent concealment, releases, causation, or reliance [challenges] . . . will
27   not bar predominance satisfaction because those issues go to the right of a class member to
     recover, in contrast to underlying common issues of the defendant's liability."
28   (quoting *Newberg* § 4:26 (3d ed.))); *Newberg* § 4:53.

as the class claims and is "based on the same legal theory." *Newberg* § 22:71.

**D. The authorities Defendants rely on are inapposite.**

Defendants rely on only two cases (at 21-22) to support their contention that "on these facts, case law supports denial of certification." But neither case helps them. *Moss v. U.S. Secret Serv.*, No. 1:06-cv-3045-CL, 2015 WL 5705126 (D. Or. Sept. 28, 2015), drew the very distinction on which Plaintiffs rely—whether "command decision[s]" were the central inquiry. *Id.* at 5; *see* Mot. at 30-31). And *Universal Calvary Church v. City of New York*, 177 F.R.D. 181, 183 (S.D.N.Y. 1998), was not a protest case and not a centralized command case. Defendants also summarily ignore Plaintiffs' cases (Mot. at 20-21 and n.8), which involved either dispersal orders or centralized decision making (whether or not the cases involved use of force or mass arrest). *See Jones*, 465 F.3d at 58–59.

Defendants also misleadingly cite (at 21) the Advisory Committee Notes for the proposition that, ordinarily, a "mass event resulting in many personal injuries is not appropriate for a class action." In fact, the note says "mass ***accident***," not mass event, and is inapplicable here because there is a "single common event" at the "core" of the case which "giv[es] rise to common questions of liability and causation." *Newberg* § 4:62.

**E. Rule 23(c)(4) provides for certification of issue classes such as those here.**

Defendants state (at 21) that the Ninth Circuit has endorsed Rule 23(c)(4) certification only in dicta, citing *Newberg* § 4.91 (which also states that the Ninth Circuit has "expressly" taken a position favoring the "broad" view of 23(c)(4)). But the discussion in *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996), is not dicta because it was "germane to the eventual resolution of the case . . . [and] resolve[d]" . . . after reasoned consideration in a published opinion.'" *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (per curiam). Further, "[w]ell-reasoned dicta is the law of the circuit." *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc).[14]

---

[14] *See also* Mot. at 31-32; Alon Klement & Robert Klonoff [academic member of the Advisory Committee on Civil Rules], *Class Actions in the United States & Israel: A Comparative Approach*, 19 Theoretical Inquiries L. 151, 161 (2018) ("[a]lthough the circuits were at one time in conflict, there now appears to be *universal agreement* that the

-13-

### F.  The numerosity standard has been met.

Defendants contend that numerosity has not been met, especially for Subclass #2. For the class as a whole and for Subclass #1, it is undisputed that at least hundreds, and likely thousands, of people were still gathered in peaceful protest and assembly when Defendants forcefully dispersed the crowd with pepper balls and tear gas, a substance that, according to Defendants' own expert, cannot be used in a targeted way, and was used "indiscriminate[ly]." (Ex. 50 at 217:2-17, 114:25-115:20, 207:6-208:1; Opp. Ex. 38 at 12)[15]

For Subclass #2, Defendants assert (at 24) that "Plaintiffs only know of 'more than 20 people,'" but do not say how they arrived at that number." In fact, Defendants have information (from Plaintiffs' disclosures and court filings) about 21 people (not including the named Plaintiffs) who state they were hit by projectiles and 18 people who saw others hit by projectiles, including 11 who saw multiple people struck. Peard Decl. ¶¶ 5-6. Moreover, Defendant Turiano testified that he recalls personally shooting and striking with impact projectiles *at least* thirteen or fourteen protestors. *Id.* ¶ 7. This cumulative evidence establishes well over 40 Subclass #2 class members.[16]

### III.   PLAINTIFFS HAVE STANDING FOR INJUNCTIVE RELIEF.

Plaintiffs have established a realistic threat of future injury sufficient to seek injunctive relief. First, Plaintiffs' injury "stems from" Defendants' deficient written policies—Operations Order 1.5 (use of force), Operations Order 9.3 (crowed control), and the Downtown Operations Manual—which were in place at the time of the Trump protest.

---

predominance requirement of Rule 23(b)(3) does not apply when certification is only for an issues class") (emphasis added); Rule 23 Subcomm., Notes of Conference Call, July 15, 2015, at 8, in Advisory Comm. on Civ. Rules, Agenda Book, Nov. 5–6, 2015, at 248, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf) ("the seeming split in the courts of appeals on the availability of (c)(4) certification without satisfying (b)(3) ha[s] largely disappeared").

[15] Plaintiffs also submitted 40 declarations from people who were personally impacted by the chemical weapons fired by PPD on August 22, 2017. Peard Decl. ¶ 8.

[16] Forty may be a general rule for numerosity, but courts have certified classes between 20 and 40 based on factors such as judicial economy, class member geographic dispersion, small size of individual claims, individual class member financial resources, and ability to file individually, all of which apply here. (*See* Mot. at 15-16)

PLTFS' REPLY ISO MTN FOR
CLASS CERTIFICATION

*Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (citing *Hawkins v. Comparet–Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001)). No PPD policy in place at the time of the event, including Operations Order 1.5, addressed the appropriate use of tear gas or other chemical agents, a deficiency that directly caused Plaintiffs' injuries. *See* Ex. 19 at 219:2-221:9; Ex. 12 at COP017565-70 (no provisions regarding tear gas or other chemical weapons in sections identified by PPD's designated person most knowledgeable). Moreover, although PPD found that "[e]stablish[ing] a protocol . . . regarding the type of munitions allowable and identify[ing] circumstances [when] they may be deployed" as an "Opportunity for Improvement," no changes were made to the relevant policies as part of PPD's so-called "comprehensive review" (Opp. at 25), and PPD apparently believes that their current policies on these topics are adequate.[17] Ex. 1 at COP014864; Ex. 54 at COP017697; *see Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (when "no investigation, no discipline, and no corrective action followed" constitutional violations, "district court . . . found little comfort" in the government's claim that conduct would not be repeated "because no policy or mechanism is in place to back up that promise"). In addition, Defendants' trainings and preparation were insufficient. (Ex. 50 at 87:22-88:7, 99:16-100:12) *Baldwin v. Cate*, C-08-03516 RMW, 2009 WL 482283, at *3 (N.D. Cal. Feb. 25, 2009) (failure to train can be basis for injunctive relief). Because Plaintiffs' "harm . . . is directly traceable to [PPD's deficient] written polic[ies], there is an implicit likelihood of its repetition in the immediate future." *Armstrong*, 275 F.3d at 861 (internal citation omitted).

Second, contrary to Defendants' argument (at 25-26), Plaintiffs have established that Defendants' conduct on August 22, 2017, is "part of a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights." *Armstrong*, 275 F.3d at 861 (citation and internal marks omitted). Multiple declarations from putative class members and Puente

---

[17] Moreover, Defendants' expert testified that PPD should have included the issue of how to address a small group of troublemakers within a larger group of lawful protestors in its "Opportunities for Improvement." (Ex. 50 at 45:2-24, 80:15-81:22)

PLTFS' REPLY ISO MTN FOR
CLASS CERTIFICATION

members show that PPD routinely disrupts peaceful protests and uses unwarranted force against demonstrators. *E.g.*, Ex. 28, Sandra M. Cornejo Ojeda Decl. ¶ 5 (PPD used tear gas against her, and pepper sprayed her family and others); Diane Ovalle Decl. ¶ 5 (PPD used tear gas, sprayed people in the face with pepper spray, and made it feel like a "battle zone"); Erika Ovalle Decl. ¶ 5 (PPD used pepper spray on innocent bystanders and knocked down tents of hunger strikers); Manual Saldana Decl. ¶ 5 (PPD arrested his sister as she was trying to go home and slammed another teenager to the ground); Julia Zuniga Decl. ¶ 5 (PPD pushed women and children to the ground with no warning). In fact, Defendants' training materials on crowd control prominently feature Plaintiff Puente's Executive Director as a leader of "riots" in Phoenix, strongly suggesting that Puente and demonstrators aligned with its causes are likely to suffer similar future harms at PPD's hands. Ex. 55 at 7-8 (picturing Carlos Garcia of Puente and listing 9 "riots" in Phoenix, including the August 22, 2017 demonstration) *See Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (injunctive relief standing where police misconduct was "purposefully aimed" at proposed class and "condoned and tacitly authorized by department policy makers").

Indeed, Chief Williams's ratification of PPD's actions is strong evidence of a "a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The 2020 presidential election campaigns are underway, making Trump's return to Phoenix at least once in the next eighteen months almost certain. Given PPD command's wholehearted ratification of its officers' plainly unconstitutional conduct on August 22, 2017, and its failure to address the most glaring problems from that night, what happened then realistically will be repeated without the Court's intervention. Plaintiffs are not asking the Court to micromanage PPD—only to ensure that Plaintiffs may demonstrate in the city of Phoenix peacefully without PPD attacking them and other peaceful protestors.

/ / /

/ / /

-16-

1

2    Dated: April 12, 2019                    Respectfully submitted,

3                                              Hadsell Stormer & Renick LLP
                                              ACLU Foundation of Arizona
4                                              Kaye, McLane, Bednarski & Litt, LLP
                                              Goodwin Procter LLP
5                                              Schonbrun Desimone Seplow Harris &
                                              Hoffman, LLP
6

7
                                              By: /s/ Joshua Piovia-Scott
8                                               Joshua Piovia-Scott

9
                                              By: /s/ Barrett S. Litt
10                                              Barrett S. Litt

11
                                              By: /s/ Kathy Brody
12                                              Kathy Brody

13                                              Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-17-