CV-18-02778-PHX-JJT, June 12, 2019

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                     _____

4

5    **Puente, an Arizona nonprofit**      )
     **corporation, et al.,**             )
                                          )
6                        Plaintiffs,      )
                                          )
7              vs.                        ) CV-18-02778-PHX-JJT
                                          )
8    **City of Phoenix, a municipal**      )
     **corporation, et al.,**             )
9                                         ) Phoenix, Arizona
                         Defendants.      ) June 12, 2019
10   _____) 1:44 p.m.

11

12

13         **BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE**

14         <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

15                  <u>**ORAL ARGUMENT**</u>

16

17

18

19

20

21   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
     Sandra Day O'Connor U.S. Courthouse
22   401 West Washington Street
     Suite 312, SPC 35
23   Phoenix, Arizona  85003-2150
     (602) 322-7245

24

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

CV-18-02778-PHX-JJT, June 12, 2019

1                        **APPEARANCES**

2

3    For the PlaintiffS:
           **JOSHUA PIOVIA-SCOTT, ESQ.**
4          Hadsell, Stormer & Renick, L.L.P.
           128 N. Fair Oaks Ave., Ste. 204
5          Pasadena, CA  91103
           626.585.9600/(fax) 626.577.7079

6    For the PlaintiffS:
7          **KATHLEEN E. BRODY, ESQ.**
           ACLU - Phoenix, AZ
8          P.O. Box 17148
           Phoenix, AZ  85011
9          602.650.1854/(fax) 602.650.1376

10   For the Plaintiffs:
           Kaye, McLane, Bednarski & Litt
11         **BARRETT S. LITT, ESQ.**
           975 E. Green Street
12         Pasadena, CA  91106
           626.844.7660/(fax) 626.844.7670

13   For the Defendants:
           **DAVID B. ROSENBAUM, ESQ.**
14         **MARY RUTH O'GRADY, ESQ.**
           **JOSHUA M. WHITAKER, ESQ.**
15         Osborn Maledon, P.A.
           2929 North Central Avenue
16         21st Floor
           Phoenix, AZ  85012-2794
17
     For the Defendants:
18         **NISHAN J. WILDE, ESQ.**
           Manning & Kass Ellrod Ramirez Trester, L.L.P.
19         3636 N. Central Ave., 11th Fl.
           Phoenix, AZ  85012
20         602.313.5469/(fax) 602.313.5499

21

22

23

24

25

                  United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

**MISCELLANEOUS NOTATIONS**

Item                                                        Page

  Plaintiffs' argument                                       5
  Defendants' argument                                      42
  Plaintiffs' rebuttal                                      83


**RECESSES**

                                              Page   Line

(Recess 2:56; resumed at 3:05.)                  42     11

United States District Court

4

CV-18-02778-PHX-JJT, June 12, 2019

**P R O C E E D I N G S**

1

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 1:44.)

4          COURTROOM DEPUTY:  This is civil case 18-2778,

5   *Puente, et al. v. City of Phoenix, et al.*                     01:44:42

6          This is the time set for oral argument.

7          Counsel, please announce.

8          MS. BRODY:  Good afternoon, Your Honor.  Kathy Brody

9   from the ACLU of Arizona on behalf of plaintiffs.  Here with me

10  today are my co-counsel, Barry Litt and Josh Piovia-Scott.   In     01:44:54

11  addition, our client plaintiff Janet Travis is in the courtroom

12  today.

13          THE COURT:  Very good.  All welcome.  Ms. Brody, Mr.

14  Litt, Mr. Piovia-Scott, all, welcome.

15          MR. ROSENBAUM:  Good afternoon, Your Honor.  David          01:45:05

16  Rosenbaum, Mary O'Grady, and Josh Whitaker from the Osborn

17  Maledon firm.  And Nishan Wilde from our co-counsel, Manning &

18  Kass, representing the defendants.

19          We, too, have one of our clients in the courtroom,

20  Lieutenant Ben Moore, the Field Force Commander, is here this       01:45:21

21  afternoon.

22          THE COURT:  All right, sir.  Good afternoon

23  Mr. Rosenbaum, Ms. O'Grady, Mr. Whitaker, and Mr. Wilde and

24  all, welcome.

25          We're here today for Court to hear oral argument on         01:45:33

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    the plaintiffs' motion for certification of classes.  The Court   01:45:39

2    has absorbed all of the material that has been filed, written

3    as well as the video.  Both myself and several members of

4    chambers staff have watched every minute and read everything in

5    preparation for today, and I will have a good number of   01:45:58

6    questions for you which I'll try to hold until the end of your

7    presentations.

8           As a preliminary matter, let me just remind everyone

9    here that pursuant to Local Rule of Civil Procedure 43.1, there

10    is no recording, electronic recording or otherwise, of matters   01:46:12

11    while in the courtroom so please be aware of that.  And all

12    cell phones have to be turned off so that they don't cause any

13    kind of a distraction.

14           Ms. Brody, will you be arguing for plaintiffs today?

15           MS. BRODY:  Mr. Litt will be arguing.   01:46:31

16           THE COURT:  All right.  Then if you would like to

17    proceed.

18           MR. LITT:  Thank you, Your Honor.  Before I begin, I

19    know that you said you had questions that you would hold.  But

20    are there particular areas that you would like me to   01:46:52

21    particularly discuss initially or not?

22           THE COURT:  No.  I'll try not to interrupt you too

23    much.  If something is just too tempting for either counsel

24    that's arguing, I'll jump in then but I'll make sure that I get

25    them addressed before we're done.   01:47:09

1        MR. LITT:  Okay.                                                01:47:11

2        So let me start with what, from our perspective, are

3  the key factual issues because they inform the class

4  certification analysis, because part of what's happened here is

5  the defendants fundamentally approach the facts from a          01:47:24

6  different perspective than we do.

7        And what I mean by that is that defendants, it looks

8  to me, like sort of worked backwards.  They say, well, all of

9  these people were doing things and we used force.

10        Our analysis and the class certification is based on    01:47:41

11  some key initial events.  So the first key initial event, which

12  is a common issue for the class, is when the PepperBalls® were

13  sprayed on the basis that some people were shaking the fence,

14  was that a lawful use of force?  Did there have to be before

15  you were going to use force against the crowd, did you have to   01:48:10

16  inform the crowd in a meaningful and audible way that this was

17  now an unlawful assembly?

18        The timeline is that, basically, at 8:07 in the

19  evening, some police officers saw some people from Antifa

20  shoving other protesters which -- and I should note that coming  01:48:34

21  into the demonstration, the police were fully aware and

22  supposedly prepared and knowledgeable about Antifa tactics and

23  the potential presence of Antifa.

24        Antifa arrives at the fence at 8:20 and the shaking

25  of the fence, which the defendants call a breach, but when you   01:49:02

1   look at the videos, there's actually not a breach.  People were          01:49:06

2   shaking the fence.  Nobody crossed the fence.  Nobody broke

3   through the fence.  Nobody jumped over the fence.  There were a

4   handful of people who shook the fence.

5        At that point force was undifferentiated force          01:49:23

6   because by definition, using PepperBalls®, which were aimed at

7   the ground in the general area, could not be restricted to what

8   the defendants agree is, at most, 10 to 20 disrupters out of a

9   crowd of, again, defendants' estimate, 6,000.

10       So whether or not that initial use of force was          01:49:49

11  lawful and appropriate, whether or not means were available

12  which both sides' experts agree is the appropriate tactic of

13  isolating and removing the troublemakers, all of those are

14  common issues as well as the fact that they then followed up

15  with tear gas.  Their rationale is, well, a handful of people          01:50:19

16  threw something.  Again, we think it's a common issue of

17  whether or not the tear gas was justified based on what had

18  happened, especially because whatever reaction the crowd had

19  was to the fact that basically they were shot at and people

20  didn't know what was happening because the actions of the          01:50:40

21  defendants created mass confusion.

22       And as soon as you have that, you get semi-panic.

23  People don't know what to do, people are at cross-purposes all

24  because there's a failure on the part of law enforcement to

25  follow the appropriate procedures.          01:50:59

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    The lawful assembly decision is not made until
2    somewhere, the estimate is by the defendants, between 8:42 and                01:51:05
3    8:47 which is now 10 to 15 minutes after they've used
4    undifferentiated force against the crowd and even though the
5    decision is made then, it's not until 8:52 that the first                    01:51:24
6    unlawful assembly announcement is made.  And that unlawful
7    assembly announcement, there are numerous common issues about
8    whether even at that point the unlawful assembly announcement,
9    if you take it on its own terms, forget everything that
10   happened before and you have say, okay, you're going to                       01:51:47
11   announce an unlawful assembly, whether or not it was
12   sufficiently audible.  It's very clear that in order to have a
13   lawful -- unlawful assembly order, you've got to inform people
14   that it's unlawful assembly and that it has to be something
15   that can be heard by the crowd.                                               01:52:03

16   And the second component is that you have to tell
17   people what to do.  Saying this is an unlawful assembly in a
18   crowd of 6,000 without even having police to direct people
19   which in demonstrations where it does happen is common.  I
20   mean, I've handled several protest cases and this is the first                01:52:26
21   one I can remember where there wasn't anything like that as
22   well as a way to actually get out of the crowd.

23   So from our perspective, this is the key for the
24   class certification analysis of the common issues.  There may
25   be questions of later in the evening individualized force.  But              01:52:51

CV-18-02778-PHX-JJT, June 12, 2019

1    that's not the gravamen of our claim at all.  The gravamen of          01:52:57

2    our claim is that half-hour period and the way that the police

3    conducted themselves and whether that was justified.  And all

4    of those, because for our purposes, the question here is not

5    are we right or are the defendants right?  The question here          01:53:16

6    is, are these common issues that can be answered based on

7    generalized proof?

8            And from that perspective, I don't think any of those

9    initial activities are not subject to common proof and a common

10   answer to common questions, which is what the Supreme Court has       01:53:33

11   said is the critical inquiry for purposes of class

12   certification.

13           THE COURT:  I understand your point, Mr. Litt, and I

14   do think I understand how essentially it is necessary to cabin

15   the question that is before the Court today.  I don't think          01:53:47

16   that there's a dispute either that to some extent the merits of

17   the case creep in on some of these things when the Court has to

18   look essentially behind the allegations.

19           But we're not here to decide the merits.  We're here

20   to decide whether or not commonality and the other Rule 23           01:54:07

21   requirements are met.

22           Before we move on, I have a couple of questions about

23   what I shorthand in all of my notes as the dispersal order.

24   Your terminology is the unlawful assembly declaration that came

25   sometime after the first deployments.                                01:54:25

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    You indicate in the motion itself on page 26 or refer        01:54:31

2  to it as an unlawful dispersal order.  I want to make sure I

3  understand that because I didn't read anywhere in the complaint

4  that the allegation was that it was unlawful.  It was --

5  according to the complaint, it was late and that it was after   01:54:44

6  the initial dispersals of PepperBalls® and other things and

7  that it was inadequate in that it was not heard by or

8  sufficient to be heard.  But did you mean something beyond the

9  inadequacy and the process there when you refer to it in your

10  motion as unlawful, the order being unlawful?                   01:55:07

11    MR. LITT:  In part, yes, because, in effect, what

12  they are doing is, without an announcement, they are dispersing

13  the crowd once they shoot undifferentiated PepperBalls® into

14  the crowd.  So it's not a verbal order.  But they've argued

15  that sort of their actions communicated that, you know, they    01:55:33

16  were making an unlawful assembly determination.

17    So our point is that it was unlawful for them to do

18  that.  We don't need to answer the -- and I do think that it

19  was unlawful at that point when they had made no attempt to

20  isolate people.  When you look at the videos, there are police  01:56:00

21  within a few feet.  Nobody walks up to the fence and says,

22  "Stop shaking the fence."  Nobody goes into the crowd.  There

23  are no plain clothes police officers in the crowd which is a

24  standard technique, especially if you're expecting trouble.  So

25  we think that it would have been illegal to at that point       01:56:19

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   announce an unlawful assembly order even at that stage.  But,                01:56:25
2   in fact, that's not what happened.  But we think it all relates
3   back because the order that comes, what the defendants want to
4   do is say, well, the order that came, by that time, all of
5   these events had happened.  We dispute that all of these events   01:56:46
6   had happened but in any event, you can't look at it that way.

7           The police initiated activity that, by definition,
8   was inevitably going to cause chaos among the crowd and then
9   that becomes a post hoc justification for an unlawful assembly
10  order.                                                            01:57:10

11          So our view is that the means of communicating and
12  those other things, but the unlawful assembly order that was
13  announced can't be analyzed separately from the events
14  undertaken by the Phoenix Police Department preceding that
15  that, in our view, were -- did not provide the basis for an       01:57:26
16  unlawful assembly determination.

17          THE COURT:  My related question with regard to the
18  unlawful assembly order, is it the plaintiffs' position that an
19  unlawful assembly order must precede any use of the
20  PepperBalls® or other?                                            01:57:44

21          MR. LITT:  It is our position that under the
22  circumstances here -- I don't want to make a generalized
23  statement that in all circumstances that would be true.  In the
24  circumstances here whereby the description of the defendants,
25  there were a handful of people in an isolated physical area.      01:58:02

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   They knew what that physical area was.  They had hundreds, I          01:58:07

2   think the number is 900 or more police officers on the scene

3   and we do not think that they could use the PepperBalls®

4   without at least having first tried to extrapolate or extract

5   the troublemakers from the crowd.                                     01:58:28

6         Because if you use those PepperBalls®, you are using

7   force, by definition.  When you look at the videos, hundreds of

8   people, like, physically moved in reaction to the PepperBalls®.

9   The PepperBalls® cannot target an individual or a handful of

10  individuals.  That's not how they work.  They spread out.  They       01:58:51

11  affect all sorts of people who, by the Phoenix Police

12  Department's description, were peaceful protesters, were not

13  doing anything wrong.

14        So our view is you could not use the PepperBalls® at

15  that stage.  I'm not saying that you could never use it.  We          01:59:08

16  quoted at some length the *Jones v. Parmley* case to the Court

17  written by then Judge, now Justice Sotomayor, and that case

18  talks at length about the fact that you can't -- the fact that

19  there are a handful of disrupters is not a basis to take action

20  against the whole crowd, whether it be force or dispersing the        01:59:34

21  crowd.  You've got to have more.

22        Now, maybe that more would have been that they tried

23  and they weren't able to do it but they didn't try.

24        THE COURT:  All right, sir.  I follow you, Mr. Litt.

25  To try and avoid straight to pure merits, you've answered my          01:59:50

CV-18-02778-PHX-JJT, June 12, 2019

1   question which was as I read the briefing, it suggested to my      01:59:55

2   that plaintiffs' position was that no dispersal of any of these

3   chemical agents or other would be proper until the warning had

4   been given or the order to disperse had been given.  That's not

5   your position.  It's circumstantial and your argument is that      02:00:11

6   under the circumstances, that initial use was not justified.

7   That's what I needed to clarify for today on that point.

8          Please go ahead.

9          MR. LITT:  All right.  So the defendants challenged

10  basically as a failsafe class definition the class definition.     02:00:35

11  I don't know to what extent that's a concern for the Court so

12  I'll just make a few points.  One, the Ninth Circuit -- a

13  failsafe class definition is a class definition that

14  presupposes that you won the case and they challenge our

15  component of the class definition that says did not use -- did     02:01:02

16  not engage in activity justifying the use of force.

17         So the first point I want to make is by the

18  definition of a failsafe class, that is not a failsafe class

19  definition.  That does not presuppose that we win the issue.

20  All it says is that individual, those class members did not        02:01:24

21  engage in it.  Doesn't answer or presuppose the answer to all

22  of the questions we were just discussing.  Was the initial

23  force justified?  Were the First Amendment rights violated?

24  Did they have to try to extract people from the crowd, et

25  cetera, that we just discussed.  So it does not meet the           02:01:43

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   definition of a failsafe class.  And even if it did, the *Melgar*     02:01:47

2   case, which we cited to the Court, makes fairly clear -- I

3   wouldn't say it's 100 percent clear because it says "it

4   appears" -- that the Ninth Circuit's view -- and the Fifth

5   Circuit is explicit -- that there's nothing wrong with a       02:02:08

6   failsafe class.  So that the notion that even if you had a

7   failsafe class that would defeat class certification is

8   rejected by the Ninth Circuit.

9          And lastly, as we cited and I think it was the

10  *McMaster* case from the Seventh Circuit and other courts,     02:02:27

11  when -- if do you have a failsafe class and you think that's a

12  problem, the Court has the authority and the responsibility to

13  refine the class definition at any point.

14         So we propose some ways to address that if the Court

15  thought that was an issue.  We don't think it is.  And the     02:02:48

16  *MIWON* case that we cited, we took that class definition from

17  that case.  So on multiple grounds we don't think that really

18  should be a concern for the Court.

19         So then the defendants also raised some issues about

20  the adequacy of our class representatives.                     02:03:22

21         Before I go there, are there any questions the Court

22  wants to ask about the definition or failsafe class.

23         THE COURT:  Not about the failsafe.  I do have a

24  couple of questions at least about the class definition as

25  proposed.                                                      02:03:47

United States District Court

1    MR. LITT:  Okay.  So I want to spend a minute on the    02:03:48

2  adequacy.  The defendants seem to talk about it as typicality

3  but I think it's really an adequacy analysis.  I don't think --

4  given how we framed that we just discussed the analysis, I

5  don't think there's any question that the class    02:04:09

6  representatives' claims are typical of the class.  They

7  basically -- there's no allegation that before the defendants

8  engaged in the activity that we've said was illegal that any

9  class representative, with the exception of Mr. Yedlin, whom we

10  indicated that we've withdrawn, engaged in any activity that    02:04:31

11  under any theory could be problematic.  So their claims are

12  typical.

13    It seems that more what their argument is, is that

14  they are not adequate class representatives and they try to go

15  through a recitation about each class representative.    02:04:50

16    So in some ways this brings us back to where we

17  started which is the defendants' contention is all based on the

18  notion that once the defendants use force, people should have

19  known that now it was an unlawful assembly and you have to

20  leave and here's how you're supposed to leave.    02:05:19

21    We disagree with that because our argument is, and

22  our common issue is, that's not true, that basically you

23  violated people's rights so let's take, for example -- and I'm

24  not sure I'm pronouncing the name right -- Ms. Guillen, so she

25  saw smoke at 8:39.  That's what defendants say.  This is long    02:05:51

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    after they have used this force before they have announced an          02:05:54

2    unlawful assembly order and then she is struck by a grenadier's

3    muzzle at 8:50 so all of this happens beforehand.

4             And our position is that -- and, again, it's a common

5    issue -- when the defendants did this, the fact that people           02:06:15

6    didn't leave when they weren't given instructions to leave,

7    when there was no unlawful assembly announcement, there were no

8    dispersal instructions, it was not audible even when they did

9    do it, that the -- that individual plaintiffs remaining around

10   has nothing to do with the common issues.                             02:06:37

11            Unless the Court wants me to, I won't go through the

12   others but it's similar in each case.  The defendants are

13   trying to say, well, you know, people should have known.  They

14   shouldn't have stayed around.  One of the people, Ms. Goodman,

15   was, you know, partly responsible for the March.  She went to         02:06:58

16   see if people needed help.  She wouldn't have had to do that if

17   the police had conducted themselves properly.  So, you know,

18   our view is that none of these issues matter.  I would note

19   that if they were concerns for the Court, I don't remember

20   whether we cited cases for this proposition because it didn't         02:07:17

21   seem necessary.  But I will point out that it is

22   well-established that when you're at the class certification

23   stage, if the Court finds that a particular class

24   representative is inadequate, then an opportunity is given to

25   substitute class members.  So it's to substitute new class            02:07:35

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   representatives.                                                            02:07:42

2           So then the defendants spent a fair amount of time on

3   numerosity.  I'm going to assume that for damages class, it's

4   general damages class and damages Class #1, that's not an

5   issue.  I would point out that the class definition in damages    02:08:14

6   Class 1 that uses subjected to unlawful force, we cited -- I

7   don't think it was exactly in this section the brief.

8           We cited *Torres v. Mercer Canyons* decision from the

9   Ninth Circuit.  It specifically talks about predominance being

10  met where there is a policy or pattern and practice that         02:08:37

11  subjects a whole number of people to that pattern and practice

12  even if some people weren't injured by it.

13          And *Tyson Foods* also talks about that.  So I'm

14  assuming that -- and it certainly seems to be where the

15  defendants focused their argument on Subclass #2 is the only     02:09:00

16  numerosity issue at least.

17          So on that there seem to have been some confusion

18  because the defendants objected to the Peard declaration, but

19  all the Peard declaration did was summarize information that

20  was filed in the case in declarations and pointed out which      02:09:23

21  ones showed that people had identified themselves as not having

22  done anything and being hit by some projectile.

23          And through that we establish that 21 individuals

24  said that and we had about a dozen declarations from people who

25  said that they saw at least two people who weren't doing         02:09:53

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   anything who got hit and then another 11 who saw one person.        02:09:58

2   Now there, may be some overlap among those --

3          THE COURT:  And I think it was 18 that saw one

4   person.  That was my question to you.  How do you assume that

5   all of those are mutually exclusive?  Because when you write in   02:10:12

6   your brief to me you have made that assumption.

7          MR. LITT:  No.  We're not making the assumption.  But

8   the likelihood of given what we -- 590 projectiles, numerous

9   descriptions of people being hit, 21 self-identified people and

10  then other people identifying 30 or 40, some of whom may          02:10:37

11  overlap and some of whom may not.

12         But until we get to the stage where class notice is

13  given and if for this subclass, you would define within the

14  notice people self-identifying, self-identification in the

15  Ninth Circuit is perfectly acceptable.                           02:11:01

16         THE COURT:  I accept that on this point, your

17  argument on this point, that given the numbers of people

18  involved, the numbers of discharges that everybody agrees, that

19  there is a very decent probability that the numerosity

20  requirement, if measured that way, is met.                       02:11:16

21         My point was simply that I expect, and will expect in

22  the future, great care from all of the litigants here to be

23  absolutely accurate, not sloppy, with the language that they

24  use.  I'm going to have more to say about that on some other

25  things later, but I'm just trying to set the expectations now.    02:11:33

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1        MR. LITT:   Okay.                                          02:11:37

2        So injunctive relief, defendants also argued

3    strenuously that there was not standing for injunctive relief.

4    I think simplest answer to that is that I would suggest that

5    the *Lyons* case definitively answers that question.  The *Lyons*   02:12:00

6    case, which was a choke hold case in Los Angeles, and the

7    Supreme Court found that there wasn't standing there but it's

8    important to understand the context.  The context was that

9    there was not a likelihood that the plaintiff would be faced

10   with the same issue again or engage in similar conduct because   02:12:25

11   it was criminal conduct, and there was a choke hold.  And the

12   Court went on at some length about not assuming that people

13   were going to engage in criminal conduct.

14       Here on the other hand, people engaging in

15   demonstration, which is lawful constitutionally protected      02:12:44

16   conduct, is both appropriate and we have established class

17   representatives who will do that.

18       So then the question is, what do you need in addition

19   to that?  And you need one of two things.  Either you need some

20   indication of a pattern and practice.  We've submitted         02:13:04

21   information which I recognize is disputed regarding that.

22   However the alternative of what you need is you need a policy.

23   We presented substantial evidence that all of the activity here

24   was commenced, that activity directed and headed by Chief

25   Williams, and then subsequently approved and ratified by Chief   02:13:32

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    Williams which makes state policy and, therefore, under the        02:13:35

2    *Lyons* standard, we've established all of the elements of

3    standing.

4           THE COURT:  Let me change things up just a little

5    bit.  Let's assume that I don't agree with you that the policy   02:13:51

6    is sufficient for this point in terms of standing and you need

7    to rely on the other sort of alternative course which is a

8    pattern.  Defendants have noted in their response, and you have

9    acknowledged here today, that the pattern evidence that has

10   been submitted to the Court so far comes in the form of         02:14:12

11   declarations of people who have witnessed other incidents

12   before involving protesters and interaction with the Phoenix

13   Police Department.  You have acknowledged that that's disputed.

14          Do you have case law for me that supports the

15   proposition that the conclusions, non-legal conclusions, of a   02:14:32

16   witness in that circumstance, an affiant or a declarant, are

17   sufficient for that purpose when -- the wording I'm looking for

18   is the characterization or the classification of the police

19   actions at these prior incidents has not been either

20   adjudicated in a court or by an administrative body to be       02:15:04

21   unlawful but they are being characterized as such in the

22   declaration.

23          Do you see what my question is?

24          MR. LITT:  I understand your question.

25          So I think -- I do not have, off the top of my head,     02:15:16

United States District Court

 1   any case law to clear that up initially.  But I would say that          02:15:24
 2   people's experiences, even if they are characterizations
 3   because it wasn't just a characterization of unlawful.  There
 4   were more -- there was more descriptive information than that
 5   and I think that it's lay opinion.  You know, a layperson can           02:15:48
 6   say, "I was standing there and the police attacked."  Now, is
 7   that like a legal conclusion and nobody did anything that I
 8   saw.  We could argue that it's a legal conclusion but it's also
 9   the kind of conclusion that a percipient witness is in a
10   position to make.  And the Court then can determine or the             02:16:08
11   trier of fact what credence to give it.  But it's the kind of
12   information that is commonly presented by lay witnesses.

13           I'm not sure I have more to say to answer your
14   question for that.

15           THE COURT:  Thank you.                                         02:16:29

16           MR. LITT:  So I think I've adequately covered what
17   our legal theory is.  So let me just go to predominance
18   quickly.  We cited -- it is, I would say, very standard in a
19   case like this, and I've done several of them similar, cited in
20   the briefing that we provided the Court, that the common issues        02:17:06
21   predominate for the reasons that I explained which is that
22   you've got action against a crowd or a large group of people
23   and the question of whether or not that group action was lawful
24   or not is and has consistently been found to be predominant.
25   It goes back to the *Dellums* case, which is an anti-Vietnam War       02:17:36

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    case from the seventies.  This has been very consistent in the          02:17:41
2    case law and there are very few cases that don't do that.

3           The case that -- the class case that the defendants
4    seem to rely on, which we actually think supports us more than
5    the defendants, is the *Moss* case.                                    02:17:57

6           In the *Moss* case, the Court relying on *MIWON*, said
7    that the arrests were a common issue.  But the use of force was
8    not a common issue but its reasoning is very informative which
9    is it said that it's not a common issue because it was not a
10   command decision that led to the use of force.                        02:18:21

11          Here it's undisputed that the group force were
12   command decisions directed by Chief Williams.  So the one class
13   case that the defendants rely on does not -- when you analyze
14   it, it did find that in that case but that's because it found
15   that there was no evidence that the command decision is what           02:18:47
16   drove the actions that were being challenged which is exactly
17   what we have here.

18          So -- and the Supreme Court has been very clear in
19   *Tyson Foods* and I think *Tyson Foods* is probably the most
20   informative, that it's expected that there are a large number         02:19:11
21   of individual issues.  That's not really the inquiry.  The
22   inquiry is whether or not there are critical common issues, the
23   resolution of which would advance the litigation to which there
24   are common answers.  And under that framework, regardless of
25   whether or not the defendants can challenge whether individual        02:19:36

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    A or individual B engaged in some kind of conduct, it made                    02:19:38

2    certain actions later in the evening justified or not, we

3    predominate.

4           And in *Tyson Foods*, in fact, the class included

5    people who were not injured at all.  And the Court said that is    02:19:52

6    not a problem as long as you figure out a way to, like,

7    distinguish them because you can't compensate people who

8    haven't been injured but it's ultimately for purposes of class

9    certification.  That's not a problem.

10          Here it is standard in cases like this that what            02:20:12

11   happens is the liability issues and we'll get to whether any

12   class-wide damages but liability is certified and then at that

13   stage, the Court figures out, okay, how are we going to proceed

14   now?  And the Court has a number of tools available to it to do

15   that.  The *Carnegie* case by Judge Posner is probably the best    02:20:39

16   on this in that it talks about the Court has the ability to use

17   a special master.  It has the ability to decertify the class,

18   settlement normally follows from a class-wide liability

19   determination.

20          And the Ninth Circuit's been crystal clear that there       02:21:04

21   can -- your individual damages issue can be all over the place

22   and that really doesn't matter.  And I will tell the Court I've

23   done numerous strip search and protest cases, all of which have

24   been certified for liability with a recognition that leaving

25   aside class-wide general or presumed damages -- you'll deal        02:21:25

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   with the damages later -- but the fact that they are individual       02:21:31

2   damages is really of no consequence.

3           And as I did mention earlier, the *Torres* case

4   specifically discussed predominance applies where a large group

5   was exposed regardless of whether they actually were injured to      02:21:52

6   a certain practice or policy which is precisely what we have

7   here.

8           So this brings me -- I don't know that I need to

9   spend a lot of time on Rule 23(c)(4).  Really the rule that

10  individual damages do not defeat predominance is a form of          02:22:17

11  analyzing 23(c)(4).  23(c)(4) is most commonly used for

12  liability issues where there may be individualized damages.

13  The defendants -- and the *Valentino* case from the Ninth Circuit

14  makes it very clear.  The defendants claim that that is *dicta*

15  to which I would respond I don't actually think it is *dicta*.      02:22:44

16  But we cited a case -- I forget the name of it at the moment --

17  that says, well, the reason *dicta* from the Ninth Circuit is the

18  law of the circuit.  And this is the law -- this is uniformly

19  the law.  At this point there's really not much dispute about

20  it.  We have a footnote -- I think it was 14 but I may be wrong     02:23:07

21  about that -- that cites a law review article that says at a

22  point there seemed to be a split in the circuits about this but

23  at this point, there really isn't.

24          So I don't think there's any issue about the Court's

25  ability to certify for liability only and determine how to         02:23:30

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    handle damages, including damages discovery for a later stage        02:23:35

2    when and if liability is determined and if settlement does not

3    occur.

4           So this brings me to the last issue which is the

5    general damages issue.  And we've cited numerous cases to the       02:23:55

6    Court.  I, having argued this issue on several occasions and

7    prevailed at times and not prevailed at times, there's not a

8    uniform view on this as to how to handle it.

9           But I would suggest that especially in a case like

10   this where, with relatively few exceptions, the damages are        02:24:25

11   exactly the kind of damages that fit into the framework of

12   general damages which is where there is injury.  There has been

13   a deprivation of a right but measuring the injury is difficult;

14   that this is exactly the kind of case where it's appropriate.

15   It has been done in protest cases.  It has been done in            02:24:56

16   over-detention cases.  It has been done in First Amendment

17   cases.  It has been done in strip-search cases.  We cited the

18   *Batances* case.  I don't want to get in for this purpose the

19   distinction between presumed and general damages in part

20   because, frankly, a lot of the case law is not very clear on        02:25:18

21   the distinction.  But what I would say is that it is an

22   appropriate way to handle damages like this.

23          The most recent case that I have been involved in

24   which was cited to the Court is the *Roy* case in the Central

25   District of California.  That case involved where the Los          02:25:41

CV-18-02778-PHX-JJT, June 12, 2019

1    Angeles Sheriff's Department was holding people on an ICE hold.    02:25:47

2    ICE holds are requests, they are not lawful orders to detain,

3    but they were being detained on the basis of that.  And the

4    Court ruled that that was a situation in which class-wide

5    damages were appropriate.    02:26:06

6           The other case that I would highlight for the Court

7    is the *Barnes* case, which we cited, and I highlight that case

8    because that case does in some ways the best job that I've seen

9    describing how you handle these kinds of damages.  And the way

10   that you handle these kinds of damages is that the people --    02:26:26

11   the general presumed damages are not emotional distress

12   damages.  They are damages for either injury to dignity or

13   basically the kind of damage that is inherent in the violation.

14          And so what Judge Lamberth did in that case was he

15   said, okay, we're going to have that but neither class members    02:26:54

16   called by plaintiffs or defendants can talk about sort of how

17   they felt.  They describe what happened.

18          Now, in this case that could include the -- you know,

19   the physical manifestations of, like, tear gas, for example,

20   but it wouldn't include -- this brought back memories of things    02:27:21

21   and such-and-such.  The *Barnes* case does a good job of

22   describing how it would be presented.  Actually, it's a pretty

23   streamlined procedure and actually in a case like this, it

24   provides a very meaningful mechanism for compensation in what

25   otherwise could be a difficult process.    02:27:42

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1      I think I've covered everything.  So I don't know       02:27:48
2  whether the Court has other questions.
3      THE COURT:  I have a few.  We touched on some issues.
4  I thought I might wait on those and then let's go back to the
5  issue of the certification of a class for injunctive relief.   02:28:04
6  My first question to you is, what is gained by having a class
7  for injunctive relief here?  My sense of how any injunctive
8  relief would play out in a case like this would be that the
9  result, if granted, would be that the Phoenix Police Department
10 must take certain actions in certain situations or must refrain   02:28:38
11 from taking certain actions in certain situations, let's say
12 protest situations, then that would be the result whether there
13 were a single plaintiff, 20 named plaintiffs or a class.

14     MR. LITT:  So I understand what you're saying but
15 technically I don't think that's correct.  The reason is, if   02:29:02
16 you have an injunction -- let me take a case that is sort of
17 concrete as an example that I'm involved in presently involving
18 towing vehicles for people who don't have a license or have
19 their license suspended.

20     And in the case that I'm thinking of, the individual   02:29:29
21 plaintiff sought injunctive relief.  But if the individual
22 plaintiff had gotten an injunction, the injunction would say
23 you can't do this to plaintiff A because that plaintiff doesn't
24 have the ability to say you have to adopt a policy for -- so
25 the reason that you have a class in situations like this is   02:29:46

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   that that's the procedural mechanism to get to the point that        02:29:52

2   you're making which is that --

3          THE COURT:  Mr. Litt, is a police officer supposed to

4   ask somebody at a protest if they are a class member or not

5   from this litigation before they decide which procedures they       02:30:04

6   are going to follow?

7          MR. LITT:  No.  But the class definition says

8   people -- it gives a generic description of people who are

9   engaged in protest activity including in the future.  So it's

10  not limited to the people who participated in the Trump             02:30:18

11  protest.

12         THE COURT:  Well, let me read the definition because

13  it strikes me that it encompasses pretty much anybody that

14  wishes to protest in the future and is lawful in their behavior

15  at that protest.                                                    02:30:33

16         MR. LITT:  Well, I agree with that.  I think it does

17  do that.

18         THE COURT:  So who doesn't that cover that plaintiff

19  would be concerned about if there were no class established?

20  Doesn't that still cover the universe, though, population of        02:30:48

21  the entire world if they happen to be in the District of

22  Arizona or within the jurisdiction of the Phoenix police?

23         MR. LITT:  Well, the issue is, can the Court enter an

24  order and would the defendants agree that the Court can enter

25  an order that basically says without certifying an injunctive       02:31:11

CV-18-02778-PHX-JJT, June 12, 2019

1    relief class, that the Phoenix Police Department can no longer    02:31:13

2    do A, B, C, D, or E in protest or must do A, B, C, D, or E in

3    protest?  I've always seen it handled that way in order to

4    avoid the issue that it only applies to the individual

5    plaintiff.  I've always seen it handled as an injunctive relief    02:31:34

6    class.  The *MIWON* case is an example but there are numerous

7    other examples.

8         THE COURT:  Were any of the same sex marriage cases

9    against County Recorders brought as class actions?  They were

10   individual plaintiffs; right?    02:31:52

11        MR. LITT:  They were individual plaintiffs.

12        THE COURT:  And the result of that was that the

13   County Recorder can no longer refuse to record the marriage of

14   the same sex couple, whether plaintiff or anyone else.

15        MR. LITT:  The result of that was at a certain point,    02:32:05

16   the law became established that they couldn't and they stopped,

17   although they didn't have any court order requiring that.

18        THE COURT:  All right.  The last question I suppose

19   having to do with class for injunctive relief.  The complaint

20   states that as to each of the individual plaintiffs, some of    02:32:40

21   them there's some variation but at minimum, each of the

22   paragraphs dealing with the plaintiffs in the complaint

23   indicated that those individual plaintiffs were chilled from

24   attending or participating in future protest events and that

25   was specifically for the purpose of addressing the issue we're    02:33:02

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1  at now.                                                             02:33:05

2          In defendants' response brief, they note individual

3  instances where most or all of those plaintiffs have, since the

4  events of August of 2017, attended and participated in

5  protest-type activities including, in most cases, within the      02:33:24

6  ambit of the Phoenix Police Department.

7          Number one, can I consider that information coming to

8  me as it does in that posture, in a response brief, and, two,

9  if I can, isn't that problematic for purposes of standing or

10 class injunctive relief?  In other words, what's the harm,        02:33:49

11 then?

12         MR. LITT:  I guess to answer the first question.  I

13 think technically it's improper that it's in a response brief.

14         Having said that, my experience is that if courts

15 want to consider it, then they will say to the plaintiffs,        02:34:06

16 well, you can respond or whatever.

17         So let me go to the substance.  And I think the

18 substance is that chill, which is a term of art, is not the

19 same as prevent so the fact it can chill you in numerous ways.

20 It can make you reluctant if you're not feeling well because      02:34:29

21 you don't know whether you're going to have to run.  It can

22 make you concerned about whether you would bring a patient or a

23 child if there's a -- you know, a meaningful threat that

24 something might happen and you're not able to do it.  Chilling

25 can -- has many more manifestations than whether or not the       02:34:47

United States District Court

 1   individual will participate in a particular protest.  It might     02:34:53

 2   mean that they decide for some where they think it's, you know,

 3   more volatile that they would not.  Then at others they would.

 4           So I think the answer is that on the merits, the fact

 5   that they participated later really doesn't speak to whether or    02:35:14

 6   not their activities were chilled.

 7           THE COURT:  All right.  Thank you, sir.

 8           Next question that I have for you, moving on to a

 9   different subject.  I want to take a step back.  I indicated to

10   you previously I had a question or two on the proposed damages     02:35:29

11   class definition or definitions and sub definitions I suppose.

12           One of the class definitions would be limited or

13   delimited to persons that were, among other things, subjected

14   to the Phoenix Police Department's use of gas, pepper spray,

15   PepperBalls® or other chemical agents.  So my question is, who     02:35:58

16   is subjected to those things?  I'll set it up.  We've got --

17   pick your number -- 5,000, 6,000 people within what has been

18   delineated as the Free Speech Zone.  That Free Speech Zone

19   essentially surrounds the Herberger Center.  And I know you're

20   not from Phoenix, Mr. Litt, but I'm very well aware of that        02:36:25

21   real estate.  It's essentially the exterior of a very large

22   complex of buildings that cover an entire city block so there's

23   four blocks we're talking about.  The focal point is the block

24   of Monroe Street between Second and Third Streets.  But it also

25   includes Second and Third Streets themselves between Monroe up     02:36:48

1    to Van Buren and then the other side of Van Buren from Second    02:36:51

2    to Third.

3             So there are 6,000 people at any point in that area,

4    some of whom are 400, 300 feet away from each other with a

5    large building in between them.  Taking, for example, the    02:37:09

6    initial the discharge of the PepperBalls® at the purported

7    Antifa area, which is essentially the southeast corner of that

8    quadrant that I've just described.  I am a non -- if it is

9    Antifa, I am a non-Antifa person standing in the Free Speech

10   Zone right next to the black banner, right next to the section    02:37:32

11   of the fence that's being shaken and I get hit by something

12   coming off of a PepperBall®, I would understand that I am

13   subjected to the police force's use of gas.

14            I am a person standing on the corner of Third Street

15   and Van Buren 300 feet and a whole lot of concrete were between    02:37:56

16   at the time that goes off.  I'm expecting that you're not going

17   to tell me that person was subjected to that particular use of

18   force or am I getting your theory -- am I squeezing your theory

19   too much?

20            MR. LITT:  I think some of both.  I would say that    02:38:21

21   the PepperBalls® don't have as far a radius but they do have a

22   substantial radius impact.  The tear gas has very substantial

23   radius and radiates much the farther out.  Our class definition

24   encompasses both.

25            So I think -- but where there is a potential    02:38:46

CV-18-02778-PHX-JJT, June 12, 2019

1  distinction is taking if you're on the other side of Monroe and    02:38:51

2  you weren't -- you didn't feel the impact at all of the pepper

3  spray or the tear gas is then perhaps you weren't subjected to

4  it.  But you still fit within the main class definition because

5  the main class definition stands independently of whether you    02:39:13

6  were a subject of force because it also encompasses the First

7  Amendment.  And regardless of whether you were subjected to

8  force, as a member of the main class, your First Amendment

9  rights were violated.

10       So this distinction is largely to ensure that we're    02:39:32

11  covering everybody.  Look, there's an argument that the initial

12  class definition does cover everybody and the rest is a

13  question of damages, but the main basis of the distinction is

14  to make sure that the Fourth and First Amendment are understood

15  as independent violations.  And for the Fourth for damages,    02:40:04

16  Class 1 to basically encompass anybody who was subjected to the

17  force.  And if the defendants want to argue that some people

18  weren't, then, you know, you deal with that later.  But that's

19  the underlying reasoning for the distinction that we've made.

20       THE COURT:  The problems that I'm having with it are    02:40:30

21  degrees upon degrees of what you just mentioned.  So actually,

22  to me, if you're on the south side of Monroe, that's easy

23  because you're not in the defined area; but if you're on the

24  north side, you are.  But you still have the issue of I've got

25  the person right next to the discharge of the PepperBalls®    02:40:49

United States District Court

34

CV-18-02778-PHX-JJT, June 12, 2019

1    versus the person that is as far geographically as far away and      02:40:51

2    then everybody in between.  And at what point does the law

3    get -- does the line get drawn in terms of subjected to?  Is it

4    physical distance?  Is it I saw the smoke but it didn't

5    irritate me.  It did irritate me but not that much?  These to      02:41:10

6    me sort of speak to the point that the defendants' making which

7    is that they are individualized questions on top of something

8    else I haven't gotten to yet, which is -- well, there are two

9    interlaced questions.  One of them is don't I have to make a

10   determination as to class certification with regard to each of     02:41:42

11   the claims?

12         MR. LITT:  No.  At least that's in my experience.  In

13   fact, I can't think of a case where the class definition has

14   been tailored to the claim because the idea is to define the

15   impacted group and the question of what rights were violated.      02:42:10

16   Because even if we didn't identify in the complaint a violated

17   right, if the complaint-stated facts give rise to that

18   violation under federal pleading standards, you still stated a

19   claim for that.  So that the class definition stands as a

20   definition of a group of people who were subjected to certain      02:42:34

21   conditions or treatment, not what of those conditions or

22   treatment violated what rights.

23         So I would suggest that you do not have to and it is

24   not standard that the class definition is tailored to the

25   particular violation.                                              02:42:56

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1          Take the *MIWON* case which is a good example.  It          02:43:00

2   involved both First Amendment and Fourth Amendment claims.

3   There was a single class definition.  In the *Aichele* case,

4   which is a protest arrest case, which also involved similar

5   accusations, there was a single class definition.  It's pretty          02:43:17

6   standard, in my experience, because what you're trying to do is

7   objectively define a group that is covered by your claim in the

8   generic sense, not by your individual claims but by the

9   complaint.

10          Did that answer your question?          02:43:47

11          THE COURT:  Yes.  Thank you.

12          Somewhat related.  There is the potential that what

13   you just laid out for me, if Court ultimately concludes that,

14   as a matter of law, that's correct, it might obviate this next

15   question but I need to ask it now so that I have an          02:44:16

16   understanding of your position.

17          When I'm looking at the claims as against the

18   individual officers as opposed to the -- and I'm talking about

19   the excessive force claim, as opposed to the excessive force

20   claim against the Phoenix Police Department as a whole or at          02:44:39

21   somebody at command level through whom all either policy or

22   directives flowed.  But as I look at the individual grenadiers

23   that were named, how in that situation does the plaintiff meet

24   the common question requirement given that Officer Turiano, for

25   example, is taking described actions in one place at one time          02:45:02

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    that impact individuals but not other individuals who might          02:45:05

2    have been impacted by something that Officer Sticca did

3    somewhere else along the line or at a different time?

4          MR. LITT:  Well, so I would answer that in two ways.

5    The Ninth Circuit has this doctrine -- I don't think we've           02:45:26

6    discussed it anywhere -- of integral participation and so our

7    argument that the class certification encompasses the

8    individuals is based on the fact that they were all integral

9    participants in this activity; and regardless of which

10   individual action they participated in, they were part of a         02:45:51

11   larger group activity.

12         THE COURT:  That's problematic for me because it

13   means if I accept it, individual officers are being held

14   responsible to a class for acts that they did not take.  It's a

15   different question and there's not a dissatisfaction from a          02:46:12

16   logical standpoint with this Court that the police department

17   itself or someone in command could theoretically be in that

18   position because, again, everything flowed through them.  But

19   as to the individual officers, that is a hard pill for me to

20   swallow without real clear law telling me yeah, that's okay.         02:46:31

21         If officers had individually been named as defendants

22   in a failure to intervene claim or something like that -- but

23   we don't have that.  Here, as I've said before, Officer Sticca

24   may be held responsible to a class for something that happened

25   at the far end of the quadrant that he had nothing to do with.       02:46:54

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    MR. LITT:  Look.  I understand.  I will cite one

2  other case.  I don't remember if it's in a brief.  I think it's

3  a Fifth Circuit case.  The *Grandstaff* case.  If we didn't cite

4  it, we can provide to it the Court which was a situation in

5  which officers were involved in, like, an evening of attacks, a

6  whole bunch of officers against a variety of people and

7  basically they used the analysis that also provided the basis

8  for Monell.

9           Having said that, I wanted to make clear that I do

10  think there is a legitimate issue about whether or not the

11  class certification should run to the individuals.  The key

12  defendant for the class is the City.  This is -- this is

13  essentially a Monell claim.  There are -- there are individual

14  actions.  But what I think is relevant for those people and why

15  it makes sense for them to be included at least at this stage

16  is that the liability determination of whether or not -- let me

17  take one theory of -- one of our theories is that the initial

18  conduct, which we contend was illegal, basically caused the

19  reaction of the crowd.  And so it's not -- it's not a

20  legitimate use of force for individual grenadiers to engage in

21  follow-up actions against individuals because basically the

22  initial action was the catalyst for whatever followed and they

23  can't use their initial unlawful action as a defense.  So there

24  are going to be class issues that then impact any determination

25  regarding individuals.

02:47:01

02:47:16

02:47:42

02:48:12

02:48:39

02:49:09

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    Having said that, it's also our position that the
02:49:15

2    Monell claim runs throughout because it was the City that was

3    responsible for these decisions and, therefore, the City is

4    responsible for the subsequent individual interactions that the

5    defendants attempt to justify.
02:49:33

6    So I guess in summary, I would say the best that I

7    can offer the Court and if the Court wants, we can provide some

8    follow-up briefing, is the integral participant doctrine.  But

9    in any event, it doesn't impact the core class claim which is

10   against the City.
02:49:56

11   THE COURT:  All right.  Thank you.  I understand your

12   position now, Mr. Litt.

13   Just one or two more things for you.  There was an

14   Exhibit 28 to the motion for certification and the exhibit is a

15   collection of declarations from individuals who were present at
02:50:17

16   the August 2017 gathering laying out their experiences.

17   The declarations appear to be identical or near

18   identical in terms of text right down to in every single

19   paragraph 13 of everyone of these multiple declarations there's

20   a statement that says, "I did not heat a warning."  My point is
02:50:48

21   not with typographicals.  I understand.  My concern, though, is

22   that no one corrected that or anything else in any of these

23   declarations, and there are many of them.  They just signed

24   them.  And so my concern is, how much weight is the Court to

25   put on these declarations that were, obviously, drafted
02:51:10

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    uniformly by someone else?  And, again, I understand attorneys        02:51:16

2    do that in cases; but where I have no sense of comfort that

3    anybody individually looked at these and said, "Yeah, this is

4    accurate as to me, as to what I experienced, as to what I felt,

5    as to what I feel now," because those are the questions being        02:51:31

6    asked.  And if I credit them, they would go to the weight of a

7    point or an argument that plaintiffs are trying to make here,

8    perhaps unfairly if the documents were really not read,

9    policed, and endorsed by the signers.

10          MR. LITT:  So -- well, leaving aside the                       02:51:54

11   typographical error, my understanding -- and I will confess I

12   was not involved in this part of the process is that there was

13   intentional efforts to have criteria for who would file the

14   declarations, the idea being to make certain key points.  This

15   was not the place to describe the whole of their experience.         02:52:20

16   It was to basically identify a checklist of issues that were of

17   significance to the class certification motion and then

18   identify those class members with whom the lawyers were in

19   touch to ensure that this applied to them.

20          And so in that sense, it was a uniform declaration by         02:52:43

21   design.  It was intended not to describe the whole of their

22   experience.  It was really intended to meet certain standards

23   about whether they engaged in or saw violence, participation in

24   other events, things like that.

25          So I don't think in the circumstances for our                 02:53:14

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    purposes, there's any negative inference to be drawn from the      02:53:21

2    fact that by design, these declarations will read -- they don't

3    all read the same but most of them read very similarly, you

4    know, basically said pretty much the same thing for the

5    experiences, because that was what they were designed to do.       02:53:43

6              THE COURT:  All right.  Thank you.

7              Last thing I have for you, Mr. Litt, I'm going to

8    take you back to the complaint for a moment.  This is something

9    I need to address now.

10             In paragraph 43 we're in the section of the complaint     02:53:59

11   where the plaintiff is stating allegations pertaining to

12   excessive force by the police department and the paragraph

13   essentially alleges that the police department did not attempt

14   to identify or to separate from the gatherings of any Trump

15   protesters any individuals they considered to be problematic or    02:54:18

16   possibly engaged in improper conduct.

17             As later events revealed, the police department

18   instead opted for a, quote/unquote, let's fire on all tactic

19   that endangered the rights and well-being of hundreds of

20   peaceable persons, including children and the elderly, and then    02:54:35

21   it closes with PPD personnel were apparently trained in the

22   tactic of firing on all in a crowd as the best method for

23   shaking out one or two persons of concern even if present at

24   all.

25             Is that to be understood as actually the allegation      02:54:50

CV-18-02778-PHX-JJT, June 12, 2019

1   or was that sarcasm, that last?                                02:54:55

2        MR. LITT:  I didn't participate in writing the

3   complaint.  I would say that last is extraneous.

4        THE COURT:  Mr. Litt, I understand that you did not

5   participate in writing the complaint.  I accept your avowal   02:55:12

6   here.  The attorneys are responsible for the product.  Without

7   putting too fine a point on it, because it happens again in

8   paragraph 47 with regard to what I would characterize and took,

9   again, as to a sarcastic comment regarding Officer Scott who it

10  says was apparently trained that he could ignore the PPD        02:55:37

11  policies.  My point is this:  This Court will always draw a

12  very bright line around the function of the third branch and

13  the rules that are in place and the requirements to make sure

14  that that function is strictly adhered to and we don't go

15  anywhere else.                                                  02:56:06

16       There are other aspects of Government and other

17  entities where sarcasm, ridicule, political statements,

18  otherwise may be appropriate but here my expectation with

19  regard to all litigants is that they show the respect to this

20  process and to the participants by following the rules.  And    02:56:28

21  the allegations are allegations of fact and argument of law and

22  nothing more, and I'm not going to say anything else about that

23  at this time.

24       Mr. Litt, thank you.  I will -- because you have the

25  burden here, allow you a brief rebuttal after I've heard from   02:56:46

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   defendants.                                                        02:56:49

2            Mr. Rosenbaum or Ms. O'Grady, who will be arguing?

3            MR. ROSENBAUM:  Your Honor, it will be me, Dave

4   Rosenbaum.

5            THE COURT:  Okay.  Mr. Rosenbaum, we're going to take   02:56:56

6   a quick break before we do.  Everybody has been in their seats

7   for an hour and a half.  Let's take until five after.

8            Julie, is that enough?

9            All right.  Five after we'll resume.

10           COURTROOM DEPUTY:  All rise, please.                     02:57:08

11           (Recess 2:56; resumed at 3:05.)

12           THE COURT:  Thank you.  Please be seated.

13           And Mr. Rosenbaum, you can proceed whenever you're

14   ready.

15           MR. ROSENBAUM:  Thank you, Your Honor.                   03:06:03

16           May it please the Court, plaintiffs have failed to

17   meet their burden under *Dukes* to show, after a rigorous

18   analysis by this Court, that any class should be certified, the

19   injunctive relief class or the proposed damages class.

20           I want to start with the proposition that is            03:06:24

21   axiomatic that we all understand and that is that class

22   certification in personal injury cases, which this is, is

23   almost always inappropriate.

24           In fact, if you look at the notes to the rule

25   amendments from 1966 where Rule 23(b)(3) was added to add the   03:06:45

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    predominance element, the Advisory Committee says that in mass          03:06:48

2    tort accident cases, and I'll quote, resulting in injuries to

3    numerous persons is ordinarily not appropriate for class action

4    because the likelihood of significant questions not only of

5    damages but of liability and defenses to liability.                      03:07:11

6           That's why, on the sixth floor in the MDL action that

7    Judge Campbell is handling, there have been a series of

8    individual trials, individual trials on liability, individual

9    trials on damages, even though they are common issues that are

10   decided at the MDL level.  When the MDL is over, hundreds, if            03:07:31

11   not thousands -- I don't know how many there are -- of

12   individual cases will be remanded to the district courts from

13   which they came for individual trials because they are personal

14   injury cases, notwithstanding same product, command level

15   decisions presumably, how they were designed, what was known.           03:07:57

16          So there are rare, rare exceptions to that axiomatic

17   rule and some of them are a handful of mass arrest cases or

18   detention cases.  That's not this case.

19          And if you read the *Moss* case, for example, where the

20   Court certified a class, it was for the mass roundup all at             03:08:23

21   once of a group of people -- and that was a command level

22   decision, right, to round them up.  As a result, many of the

23   protesters were injured.  The Court declined to certify a

24   class.

25          We don't have one mass roundup of individuals unlike             03:08:46

United States District Court

1    the other cases.  What we have is a series of events in          03:08:51

2    different locations that transpired over the course of the

3    evening with different deployments of different munitions

4    directed at different individuals by different officers.

5            THE COURT:  Well, let me stop you there for a second       03:09:10

6    and ask you, starting point and it goes exactly to that issue.

7            Don't I have to take at face value all of the factual

8    allegations in the complaint for purposes of evaluating this

9    motion on class certification?

10           MR. ROSENBAUM:  No.  *Dukes* says exactly the opposite.    03:09:30

11   The plaintiff can no longer stand on allegations.  Court is

12   allowed to look, is required as part of the rigorous analysis

13   to look behind those allegations.

14           And what the *Haliburton* cases says, which we cite, is

15   that what matters are the underlying elements of the claim, not   03:09:49

16   what plaintiffs' theory is.  What do they have to prove to

17   actually win at trial?  And let me talk about the excessive

18   force claims.  This comes right out of the joint proposed case

19   management submission, docket 43.  Both sides agree what are

20   the elements of the fourth amended claim; that officers seized    03:10:17

21   the plaintiffs by excessive force; that officers acted

22   intentionally, each one of these defendants, including command

23   level officers, and that the force was unreasonable.

24           And what is unreasonable force?  Force that is

25   unreasonable given the totality of the circumstances.  Each       03:10:37

CV-18-02778-PHX-JJT, June 12, 2019

1    action has to be investigated separately no matter what their          03:10:41

2    theory is.  That is what the trial has to be about, looking at

3    each deployment.

4              And Mr. Litt said it's almost uncontested that these

5    were all command decisions.  Well, of course not only is it          03:11:02

6    contested, but the record shows that that is wrong.  We have

7    the deposition testimony and the declaration from the Field

8    Force Commander, Lieutenant Moore, who said:  I made certain

9    orders.  For example, I made the first order to deploy

10   PepperBall®, but I gave authorization to the grenadiers to make      03:11:21

11   their own independent judgments about other uses of force.

12             Your Honor referenced Officer Turiano in his

13   deposition which we submitted in our supplemental brief

14   submission.  Thank you for reading it, Your Honor.  He made a

15   series of individual decisions as he saw protesters throwing        03:11:42

16   chemical agents back at the police.  He made the decision to

17   throw, not -- to deploy, not Chief Williams, not Field Force

18   Commander Moore.  He made that decision.  And at a trial, that

19   is what matters, not a, I would say, farfetched intenible

20   proximate causation theory.                                         03:12:13

21             And if you listen to Mr. Litt, read their briefs,

22   they are really saying two things caused everything to happen

23   and individual decisions later don't matter.  One thing was you

24   should have gone in and arrested Antifa before anything

25   happened.  Little bit ironic that these plaintiffs are saying       03:12:32

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   that the police should have gone in and arrested individuals          03:12:35
2   because of the way they looked, because of the signs they held
3   before they committed any crime -- but that's their theory --
4   and nothing would have happened.

5          Or you shouldn't have deployed PepperBall® because         03:12:51
6   without PepperBall®, nothing else that evening would have
7   happened.  That's not true because what the record shows -- and
8   I know Your Honor looked at video.  But in a moment, if Your
9   Honor would permit, I have a few snippets of video --

10         THE COURT:  I'm going to see a rerun, is that what        03:13:12
11  you're telling me?  No, that's fine.  Go ahead.

12         MR. ROSENBAUM:  And I'm happy to skip it but I know
13  we transmitted I think collectively hundreds of hours of video.
14  So I want to focus on this.  But the testimony from
15  Lieutenant Moore is that after deployment of PepperBall®, his    03:13:28
16  objective was to allow the free speech to continue.  That's an
17  individualized issue, not only on the excessive force claim but
18  the First Amendment claim because what was the primary purpose?
19  Was it to stifle free speech or was it to legitimately stop
20  behavior?                                                         03:13:54

21         The only evidence is that it was the latter.  He
22  wanted to stop this attempt to breach the fence.  We never said
23  the fence was breached.  We said it was an attempt to breach
24  the fence at precisely the moment of the Vice President of the
25  United States, Vice President, Cabinet members are leaving the   03:14:11

CV-18-02778-PHX-JJT, June 12, 2019

1   Convention Center.  And they are attempting to breach the fence          03:14:13
2   into this safety corridor, right, which is there for, as the
3   name suggests, safety access, emergency vehicles.

4           So he had to stop the breach and the attempted breach
5   and it appeared to have worked.  There was no intention to               03:14:31
6   deploy smoke, any further munitions, tear gas at that point.

7           What happened next was chemical agents thrown at the
8   police from the crowd, clearly depicted on the video, no
9   dispute about that.  So what caused a later response from the
10  police was that tear gas from the crowd.  How did they first            03:14:54
11  respond?  With inert smoke, then a spear is thrown from the
12  crowd, continuing bottles and rocks.  So these are all
13  individualized decisions that predominate.  But my point is
14  that they can't overlook those individualized issues that
15  predominate by saying their theory is that it don't matter.            03:15:23
16  The theory is the PepperBall® caused it all.

17          What if this case was against the weathering bureau
18  had a monsoon storm caused a deluge at 8:25, none of this would
19  have happened.  I don't think that's a viable cause of action.
20  More importantly, more importantly is that is not what the jury        03:15:45
21  will be asked to decide.  That's why they named these
22  individual defendants.  And I suggest, Your Honor, that's why
23  they defined the class to exclude individuals against whom
24  force was not necessary; right?  If their theory could hold
25  water, it doesn't matter.  Everything had occurred because             03:16:15

United States District Court

1   there wasn't a monsoon storm.  Everything occurred because          03:16:17

2   there was no mass arrest of lawfully protesting Antifa members.

3   Nothing would have happened had PepperBall® not been fired and

4   succeeded against those members of Antifa.

5        It's not a viable theory under *Haliburton*.  It's          03:16:36

6   irrelevant to the Court's determination of whether

7   individualized issues predominate.  We know they predominate

8   because this is a case involving a series of different actions

9   over the course of the evening by different officers, not under

10  a command decision against different individuals who, evidence    03:16:59

11  shows, at least in many cases there's a serious fact question

12  about whether the use of force, in fact, was authorized against

13  them.

14       THE COURT:  Before you move away from this too far, I

15  don't want to forget this question.  If the Court is to look      03:17:20

16  behind the allegations, what is your best case or argument that

17  plaintiff is incorrect when they allege that defendants use

18  generalized force against the whole protest?

19       MR. ROSENBAUM:  Every minute of video that has been

20  submitted there is not a piece of evidence submitted by either    03:17:49

21  party in support or opposition to class certification that

22  supports that statement.  It's simply wrong.  It's simply

23  wrong.

24       Maybe the best place to start is video and I can give

25  some examples.  I was --                                          03:18:06

CV-18-02778-PHX-JJT, June 12, 2019

1        THE COURT:  You can but I would like you to address      03:18:08

2   this.  I'm happy to watch the video and I'm not dissuading you

3   from playing it.  But if I use one of the snippets as an

4   example, every time I watched the deployment of the first

5   PepperBalls® to the westernmost quadrant of the Free Speech      03:18:22

6   Zone where the Antifa banners were, yes, it is clear they are

7   within a radius once they get to the fence of about 20 feet, no

8   more, approximately.  But plaintiffs' argument is, if I have it

9   correctly, that that's generalized force against the whole

10  protest, not because the PepperBalls® necessarily affected      03:18:51

11  every single person directly; but they caused a wave or a swell

12  or whatever, putting people at risk, causing people to run.

13  Not enough?

14        MR. ROSENBAUM:  Not at all.  Not at all.  Right

15  there, their class is of -- depending on which class they are      03:19:05

16  trying to define, not just the handful of people who were right

17  next to that Antifa group at 8:32.  And what the video shows to

18  me is a couple of things.  One, it's PAVA powder that's in the

19  PepperBalls® has individually no impact to anybody at the

20  sides.  If it did, they would be running away.  They would be      03:19:28

21  choking.  They would be tearing.  It doesn't have that effect.

22        The effect it has is that Antifa people back off of

23  the fence.  They come back a second time, Mr. Yedlin shakes the

24  fence violently.  They back off.

25        If you look at whether it's hundreds or thousands of      03:19:46

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    people to the right and the left to the east and the west, they    03:19:48

2    are not moving.  They are not moving.  And, again, the question

3    of whether the deployment of force was reasonable has to be

4    judged by the totality of the circumstances at 8:32 p.m.  And,

5    for First Amendment purposes, what was the intent of those who    03:20:11

6    fired of Field Force Commander Moore?  The intent, undisputed,

7    was not to stop the protest.  The intent was to drive back

8    Antifa from the fence so that the protest could continue.

9        So that the deployment of force is entirely

10   different.  It's individualized.  To the extent anybody claims    03:20:37

11   that they may have been impacted by a poof of PAVA powder,

12   because they are right next to it, their claims are very

13   different than somebody who was there an hour later and hears

14   the lawful assembly announcement and decides to stay and is

15   exposed to tear gas.    03:21:00

16       So what's the next deployment that we see on the

17   video?  I do want to show this.  It convinces me more and more

18   that perhaps we would both benefit from this.  The next

19   deployment from Phoenix PD, after the use of PepperBall®, comes

20   in response to tear gas from the crowd.  So what's the first    03:21:20

21   use of tear gas which is going to have some level of

22   indiscriminate impact on bystanders?  It's from the crowd.

23       THE COURT:  Yes.  Let me ask you about that.  There

24   are references in at least defendants' brief and maybe both

25   about a bluish-green gas.  Is that not a product that the    03:21:42

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

```
 1    defendant officers deployed at any time?                        03:21:46

 2              MR. ROSENBAUM:  No.

 3              THE COURT:  So white and yellow yes, but not blue or

 4    green or gray?

 5              MR. ROSENBAUM:  Gray, yes.  That blue smoke          03:21:55

 6    clearly -- you can see it come from the crowd, was not in the

 7    Phoenix PD possession.  If you see yellow emissions, that's in

 8    our smoke.  The record is Phoenix PD doesn't possess any CS gas

 9    in any color other than white but they do have smoke in a white

10    or gray color.                                                 03:22:26

11              And the record is also clear, the first deployment of

12    any grenades which are rolled to the ground, they are not

13    thrown indiscriminately to the crowd -- you can see them rolled

14    to the front of the crowd -- was just inert gas.

15              What I would like to do just to show this point, if  03:22:44

16    Your Honor wouldn't mind, is play a snippet.  This is from

17    Defendants Exhibit 52.  This is the video portion of it.

18              Ms. Burns, don't hit "play" until I give the

19    background.

20              So if I may approach this sign just to give you a    03:23:10

21    perspective.  So this is a bird's eye view from the east.

22              THE COURT:  Hang on just a second, Mr. Rosenbaum.

23              Counsel, if you need to move to view it, you have

24    free reign to move about the well.

25              MR. ROSENBAUM:  So the Exhibit 52 is a video camera  03:23:25
```

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   taken from I believe the Civic Center wall.  You can see it's          03:23:27

2   looking slightly north but mostly to the west down Monroe.  And

3   you will see the first deployment of smoke, the yellow color in

4   this video.  And my intent was to show, number one, the

5   localized effect of the smoke which doesn't cause any injury,          03:23:49

6   it's just smoke.  It is a warning.  Move out.

7           To be clear, I wanted to talk a little bit about

8   unlawful assembly declarations but the testimony from

9   Lieutenant Moore is once there's tear gas being thrown from the

10  crowd and spears, right, the PepperBall® didn't do its thing,          03:24:07

11  the police have no choice but, number one, to put on their own

12  gas masks and clear this area.  And that's the purpose of the

13  smoke, no opportunity to call in a helicopter or to bring

14  unprotected officers out to use the LRAD and make an

15  announcement.                                                          03:24:32

16          The smoke is the announcement and it works and that's

17  the point of this video.  Number one, you can see the localized

18  nature of where the smoke is, but how the crowd -- not in panic

19  but very slowly -- they know which way to go.  Don't go against

20  the pedestrian fencing, go north.  They are leaving on Third.          03:24:51

21  Whether it's hundreds or thousands, I don't know.  They are

22  captured in the proposed damage class, depending on how you

23  define it.  They heed the warning.  They are uninjured, they

24  leave.

25          (Video played.)                                                03:25:26

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1      MR. ROSENBAUM:  I think that video is pretty clear.   03:25:37

2  You can see, by the way, that yellow smoke has now been kicked

3  from members of the crowd at the police.  But those people are

4  feeling no adverse effect of any chemical agents.  The smoke

5  hasn't reached them.  They are all leaving calmly in one   03:25:50

6  direction to the north.

7      That the deployment of smoke has to be assessed.  Was

8  it reasonable under the circumstances?  To the extent that any

9  of these people calmly leaving up Third are members of a First

10  Amendment class, they want nominal damages.  The individualized   03:26:15

11  question at that moment in time was, was that the deployment of

12  smoke an intent to deprive them of their First Amendment rights

13  or an attempt to clear the plaza from the people who were

14  throwing their own tear gas at the police?

15      I suspect any jury would side with us and, yes, of   03:26:35

16  course you're going to deploy smoke at that point in time.  But

17  that is an individualized question, not a command decision.

18  Chief Williams didn't give instructions about when to deploy

19  smoke.  That based on the individual's training and the police

20  policies and procedures.   03:26:57

21      Lieutenant Moore gave general instructions to use

22  smoke and then to use CS gas, but it was up to each individual

23  grenadier when to deploy, where to deploy.

24      This is of -- they say over 500 deployments but be

25  clear most of the 500 are rapid fires out of a PepperBall® gun,   03:27:26

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   so that initial Antifa probably accounts for, I don't know, a         03:27:31

2   couple hundred.  So the notion that -- I'm jumping ahead to

3   numerosity -- that because there were 500, that you've got to

4   have at least more than 20, maybe 40 who were hit with impact

5   munitions, nonsense, not at all.                                      03:27:46

6        And of course anybody impacted by PAVA smoke is not

7   part of that Subclass #2.  Those are impact munitions.  The

8   fight over whether it's as high as 21 or much smaller, and

9   certainly not 40, has nothing to do with PepperBall® PAVA being

10  released.  If it's Mr. Yedlin who is hit with PepperBall®, then       03:28:11

11  he's no long area class representative but they would still put

12  him in Subclass #2 because he was actually hit with

13  PepperBall®.

14       So if Your Honor has the patience to see a little bit

15  more of this and maybe I'll narrate, play a small portion of         03:28:34

16  Defendants' Exhibit 42, which is what's been called on the

17  record the compilation video.  It was actually a compilation

18  made up by the City of Phoenix after the event to help explain.

19  But it's nice because it has built-in circles and arrows so you

20  can see what's coming from the crowd and how the police              03:28:56

21  respond.

22       So Mr. Litt said that there were no plain clothes

23  officers trying to talk to Antifa, directly contrary to the

24  record.  In fact, if you see the gentleman in the white khaki

25  pants -- that's my arrow -- and the bald head, my arrow, he is       03:29:23

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    not a TRU officer, he's not a grenadier.  He's with the                    03:29:28
2    Community Relations Board.  You will sees these men and women
3    walking up and down the corridor here throughout the evening,
4    up until 8:32.

5         He is -- and if you look at earlier video, he's, in              03:29:47
6    fact, trying to talk to Antifa.  The record on what Antifa said
7    in response to those attempts is, if I were to quote it,
8    wouldn't be suitable for this courtroom, but something like,
9    you know, F, F you.  But at this point in time, plain clothes
10   officers are still there.  The TRU officers, they have got        03:30:14
11   their helmets up.  Nobody is wearing gas masks.  It's the
12   insertion of the poles from their signs by Antifa into the
13   fence.  They are hiding behind their signs, taking things out
14   of the backpacks and then their attempt to -- the perception of
15   the police at the time, the reasonable perception to breach the   03:30:36
16   fence at the moment the President is leaving the Civic Center,
17   that is what justifies it's PepperBall®, nothing to do with
18   terminating First Amendment rights, certainly an individualized
19   inquiry as to anybody impacted by this PAVA.

20        Let's continue to play.                                      03:30:56
21        (Video played.)
22        MR. ROSENBAUM:  Observe the crowd to our right of the
23   big black sign.  Do you see people choking, running away?  No.
24   That smoke has not impacted them.  What did happen is the
25   people with the black masks and the black signs mostly back       03:31:34

1   off.  Their backing off may have caused other people to move        03:31:39

2   out of the way but that had nothing to do with an effort by the

3   Phoenix police to stop the demonstration.  Their intent was

4   just the opposite, allow it to continue.

5          And that appears to be working.  Things keep being          03:32:00

6   thrown by the crowd.  Police still don't have tear gas masks

7   on.  They still have their shields up, their face shields up.

8          What changes everything is tear gas thrown at the

9   police from the crowd.  That can't be allowed to happen for the

10  safety of the police, for the safety of the public.             03:32:25

11         Here we are a full minute later.  Most of that crowd

12  is still standing there.  They are not choking or running away

13  from the PAVA.

14         Do we win that liability question?  I think so, hands

15  down.  But it's an individualized question.  Very different      03:32:45

16  than what happens to other individuals, proposed class members,

17  throughout the evening.

18         And this is what they say is the common issue that

19  allows certification, this event.  Of course it doesn't.

20  That's their theory but it's not what the jury will be asked to  03:33:13

21  decide.

22         (Video continues to be played.)

23         MR. ROSENBAUM:  That's what came in from the crowd

24  and then there's another canister later that we'll see.  This

25  is after the canister.  Boy, has that crowd thinned out a        03:33:53

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   little bit more in that area.  I suspect it's tear gas, the          03:33:58

2   blue smoke from the crowd.

3           This will show the other tear gas coming from the

4   crowd.  This is the gray smoke that lands behind the police

5   officers who are now putting on their own tear gas masks.        03:34:20

6   There it is.  And you see the masks going on and I assume we'll

7   see if -- this image, the first deployment of smoke.  Here it

8   is.  First police smoke.  This thing gets kicked back at

9   police, a violent action by somebody in the crowd.  Here it is.

10          You see they are not running away choking, tearing.        03:35:07

11  Clearly that's smoke and the same thing with that whitish-gray

12  grenade that's being thrown back to the police at the left.  I

13  think --

14          Is that the end of that video?

15          So that's why the plaza was cleared.  Nothing to do        03:35:32

16  with an unlawful assembly announcement.  Let me just make clear

17  why an unlawful assembly announcement is a red heron.  What

18  matters is the decision by the police to clear the area using

19  smoke, using PepperBall®, right, and what warnings may or may

20  not have been given that may be relevant.  Nobody was arrested     03:35:57

21  for violating an unlawful assembly order.

22          You need the unlawful assembly order in order to make

23  mere presence a crime and arrest somebody, but police have full

24  authority to take action against violent protesters to clear

25  this area.  And the record reflects that there were multiple       03:36:20

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    warnings given in multiple ways.  There was smoke.  We've seen    03:36:27

2    how that worked.  There were aerial flash bangs.  That worked.

3    The helicopter comes over.  You can see it in other videos, you

4    see the light shining shortly after this and you can hear on

5    some of the open source video the helicopter saying, "Leave the    03:36:44

6    area or you will be pepper sprayed."

7             So there are warnings.  It's not until about 8:52

8    that an official unlawful assembly announcement is made from

9    the Chevy Tahoes.  That doesn't matter.  The question is, were

10   the officers' actions reasonable under the circumstances?  Part    03:37:09

11   of that is what kind of warnings were given.  Nobody was

12   arrested for violating the unlawful assembly order.

13            So we agree that at any given place and time what

14   warnings were given is an individualized fact issue.  The

15   official unlawful assembly announcement is a heron.  It has    03:37:28

16   nothing to do with these First Amendment and Fourth Amendment

17   claims.

18            What I would like to do now is show a portion from

19   Exhibit 53.  Focus on it but in that first video, the

20   compilation video, the plaintiff, Ira Yedlin, is the man in the    03:37:52

21   blue who has the misfortune perhaps of standing next to Antifa.

22   Was that a reasonable use of force?  This is not a negligence

23   case, right.  This is a 1983 case.  If somebody is even

24   negligently hit because of the proper action taken against

25   somebody else, that's not a 1983 claim, it's a negligence    03:38:17

CV-18-02778-PHX-JJT, June 12, 2019

1   claim.  But he then comes back to the fence and violently          03:38:20

2   shakes the fence all by himself and that's when he's actually

3   struck.

4           But that is an individualized question as to

5   Mr. Yedlin when he comes back at the fence, violently shakes it   03:38:31

6   in an attempt to open it according to one of the plaintiff's

7   own testimony, looking at the video, was it a reasonable use of

8   force under the circumstances with the President leaving the

9   Civic Center, with Antifa just having tried to breach the

10  fence, was that an appropriate use of force against him?  We      03:38:51

11  think yes, but that's an individualized determination that

12  needs to be made.

13          So I want to show the video of plaintiff Guillen from

14  Exhibit 53 and the video you'll see is from this northwest

15  corner of Third and Monroe so she's over at Third.  This is       03:39:11

16  about at 8:50 I believe, but well after the activities that are

17  down here.  She has seen the smoke.  She may or may not have

18  actually experienced some CS gas but she decides to stay and

19  she's taking videos.

20          She has the misfortune -- and by now the Phoenix PD       03:39:38

21  have crossed the pedestrian fencing to form their lines, they

22  are moving one line towards the east and then the other line

23  towards the west to meet up with a line that is then going to

24  go up Second Street to clear the area.  But she has the

25  misfortune of standing next to an individual who had eventually   03:40:06

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   tried to kickback some munitions at the police and they respond   03:40:10

2   in her direction with a muzzle blast, 40 millimeter muzzle

3   blast.  What is a muzzle blast?  It comes from a 40

4   millimeter -- we'll call it a shotgun but it's powder.  There's

5   no impact, unlike some of the other impact munitions that you   03:40:30

6   read about from Officer Turiano.  It's just powder.  It's like

7   getting sprayed with pepper spray.

8           So let's look at that video.

9           (Video played.)

10           MR. ROSENBAUM:  She's in this area.  The toll -- I   03:40:58

11   don't know if you saw that muzzle blast.  There she is walking

12   away with the taller gentleman in the blue who was her friend

13   who came with her.  In her deposition she says she had to be

14   carried away.  She claims she has a big welt from that, which

15   is simply not possible, but those are fact issues with respect   03:41:16

16   to damages.

17           But with respect to that deployment, she's still

18   there at 15, 20 minutes after most people have the good sense

19   to leave.  She has the misfortune of standing next to a

20   wrongdoer.  The officer who fired that muzzle blast to deal   03:41:36

21   with that wrongdoer, was that a reasonable use of force under

22   the totality of the circumstances?  We think plainly yes,

23   particularly at this time people know the police have crossed

24   the line.  It's time to leave.  Clearly an individualized

25   question as to liability and as to damages.   03:41:59

United States District Court

1    Next we have two videos that focus on -- and if Your
2    Honor wants to relook at that again, I know it happens real
3    fast.  I can replay it.                                          03:42:09

4    THE COURT:  No.  I remember it from previous.  Go
5    ahead.                                                           03:42:20

6    MR. ROSENBAUM:  So plaintiff Travis is impacted by
7    munitions at about 9:06 over here north of Monroe and on Second
8    Street.  Some of the video you can see is from what I still
9    call the Chase Bank parking garage.  What is it?  I still call
10   it the Valley Bank parking garage but that's the Chase parking   03:42:49
11   garage.

12   As the testimony we cited shows, by this point in
13   time, Ms. Travis has heard the helicopters saying, "Leave or
14   you'll be pepper sprayed."  She's right by the Chevy Tahoe that
15   is announcing it's unlawful assembly, that she has heard all of  03:43:13
16   that.  Of course she's seeing smoke, tear gas, flash bangs, and
17   this is the point in time where the TRU line starts advancing
18   up Second Street.  She is somebody who could have been arrested
19   for violating the unlawful assembly declaration.  She had heard
20   it.  It had been given.  That was not the intent of the police,  03:43:40
21   to be mass arresting people.  This is not a mass arrest case
22   unlike some of the cases plaintiffs rely on.  It's the
23   opposite.  It was a decision to clear the area and to the
24   extent possible, not arrest people.

25   So her testimony is, "Why did you stay?  The police     03:44:08

CV-18-02778-PHX-JJT, June 12, 2019

1   line is advancing towards you."                                          03:44:10

2        "I wanted a good picture."

3        Okay.  So nothing wrong with that I suppose.  She

4   later said maybe she should have made a different decision.  It

5   may have been an unfortunate foolish decision but was the        03:44:24

6   deployment of force after all of those warnings where she's

7   stationary and the Phoenix police are advancing, was that

8   reasonable under the totality of the circumstances?  That has

9   nothing to do with the PepperBall®ing of Antifa a half an hour

10  earlier.                                                          03:44:46

11       So there are actually two videos.  You can see two

12  aspects of this from different perspectives.

13       (Video played.)

14       MR. ROSENBAUM:  That's her.  It looks like a scroll

15  but it's a turtle.  She's just got -- she's still there.         03:45:09

16       THE REPORTER:  Excuse me.  I can't hear you with that

17  running.

18       MR. ROSENBAUM:  You saw the first muzzle blast goes

19  past her apparently, not aimed at her, and she doesn't even

20  notice it.  She continues to stand there with the line           03:45:32

21  advancing and then appears to be hit by a second muzzle blast.

22  What we'll see in the next video is that causes her to fall.

23  People rush towards her and one of the officers uses pepper

24  spray towards the people who are rushing towards here, right.

25  Fact question, why did they use pepper spray at that time?  One  03:45:59

CV-18-02778-PHX-JJT, June 12, 2019

 1  of the individuals you'll see is a gentleman named Josh Cobin       03:46:03

 2  who later is hit with an impact round and I'll show you that if

 3  you have time.  But let's play this video.

 4           (Video played.)

 5           MR. ROSENBAUM:  That's Mr. Cobin who, over the course    03:46:30

 6  of the evening, had been throwing things at police.  He's got

 7  his own gas mask.  He came to this party with his own gas mask.

 8  Why is he still there?  Why are other people still there this

 9  late in the evening after hearing the unlawful assembly

10  announcements?  Maybe some of them are curious.  Maybe some of    03:46:50

11  them are in the media.  Maybe some of them are wearing tear gas

12  masks because they want to throw things back at police.  But

13  those munitions that impacted Ms. Travis, a jury has to decide

14  whether the individual who fired either the muzzle shot or who

15  used the pepper spray, whether these actions were reasonable     03:47:16

16  under the totality of the circumstances.

17           The last example I want to show, and then I think I'm

18  done with video, is, in fact, that same Josh Cobin.  This is

19  defendants' Exhibit 50.

20           (Video played.)                                         03:47:33

21           MR. ROSENBAUM:  Okay.  That's Mr. Cobin.  You read

22  about that in the excerpts from Mr.-- Officer Turiano's

23  deposition.  He took that shot.  It was in the lower abdomen

24  and he asked if it was in the private parts.  It wasn't and

25  that's confirmed later.  But was that a reasonable use of        03:48:12

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    force.  He's a proposed class member presumably and others like      03:48:15

2    him.

3         You read Officer Turiano talk about each of his

4    deployments of impact of munitions.  It wasn't a rubber bullet.

5    It was a 40 millimeter either a foam round or OC round.  I        03:48:30

6    forget which.

7         THE COURT:  So, Mr. Rosenbaum, at least with regard

8    to Mr. Cobin, I take it your point is that he is exemplary of a

9    situation where the finder of fact must individually consider

10   liability questions?                                             03:48:50

11        MR. ROSENBAUM:  Well, yes.  It's really -- this is

12   plaintiffs' whack-a-mole game.  And I mean that in a friendly,

13   not terribly sarcastic way.  So they define the class, the two

14   subclasses for damages as persons who were present, subjected

15   to use of gas, pepper spray, bullets, et cetera, and who did     03:49:14

16   not engage in any conduct justifying such use of force against

17   them.

18        Well, as we cite in the *Lyall* case and others, that

19   is an invalid class definition because in order to determine

20   mere membership in the class, one needs to make an               03:49:36

21   individualized determination.

22        So why I suggest did they put it in the class

23   definition?  Because if it's not in the class definition, then

24   that's built into the liability determination that

25   predominates, that predominates.  And that's what the *Moss* case  03:49:54

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   says with respect to individualized damages, the *Lyall* case,          03:49:59

2   the *Universal Calvary Church* case.

3           In a case like this with individual actions taken

4   over a course of time by different officers exercising their

5   own judgment, the question is with respect to each of those          03:50:18

6   impacts, was that use of force, based on the totality of

7   circumstances at that time by that decision-maker, was that a

8   reasonable use of force?  If not, it's not a 1983 violation,

9   before you even get to damages.

10          So the briefs talk about the damage problem, and          03:50:41

11  that's another reason that a class shouldn't be certified, but

12  we don't even get there because on the liability questions,

13  individualized issues predominate.

14          So the *Moss* case, President Bush, 2004 goes to

15  Jacksonville, Oregon.  He's dining at a restaurant.  The          03:51:03

16  protesters find out where he's dining and they go there.  And

17  the protesters were encircled by the police and arrested all at

18  once.  The Court in *Moss* determined, well, that's a common

19  issue.  Everybody was treated the same.  Every member of the

20  class was surrounded at once and arrested.          03:51:28

21          But in some instances, this is a quote, officers were

22  violent striking some individuals with clubs, firing pepper

23  spray bullets at them.  I don't know what a pepper spray bullet

24  is.  I assume it's a PepperBall®.  And so the Court denied

25  certification of the excessive force claims because, and I'll          03:51:50

United States District Court

1    quote again, it would require individualized determinations          03:51:54

2    into both the extent of the force used against each individual,

3    the reason why each officer decided to use said force which

4    predominate over any common issues shared by the class.

5          Plaintiffs effort to avoid what has clearly, just          03:52:12

6    from these handful of examples, an individualized question with

7    respect to every use of force is to propose their intenible

8    theory that in a sense, none of this would have happened had

9    there been a mass arrest of Antifa.

10         THE COURT:  So let me follow up with a line of          03:52:38

11   questioning that I started with Mr. Litt.  Let's move out of

12   the context of excessive force and move to the context of the

13   First Amendment, the interference with the right of speech.

14         The Court -- I see the consideration of the elements

15   of that offense to be far less concerned with individual          03:53:08

16   deployments of force, whether it's PepperBalls® or smoke or gas

17   or anything else.  There it is did the action interfere with

18   somebody's right to speech and what was the intention of the

19   action when it was taken.

20         MR. ROSENBAUM:  Actually, plaintiffs disagree in the          03:53:37

21   joint proposed case management plan.  This is page eight.  We

22   all agree that the proof of First Amendment claim, this is what

23   the jury will be asked.  Plaintiffs were engaged in protected

24   speech, element one.  Well, that may or may not have been true

25   for some of the class members.  Where was Antifa engaged in          03:53:55

CV-18-02778-PHX-JJT, June 12, 2019

1  protective speech?  Was Mr. Yedlin when he was shaking the                    03:53:59

2  fence.  Two, officers took action against the plaintiffs that

3  deterred their speech that would chill the speech of a person

4  of ordinary firmness.  Is that what happened with the

5  deployment of PepperBall®?  Is that what happened with                       03:54:13

6  deployment of smoke?

7          But the third is I think the most individualized

8  where you have to look at each and every event and that is that

9  such deterrence was a substantial or motivating factor in the

10 officers' conduct.                                                           03:54:30

11         Well, the undisputed testimony is with respect to the

12 deployment of PepperBall® against Antifa, in fact, the motive

13 was exactly the opposite.  Exactly the opposite.  It was to

14 allow the rest of the demonstrators to continue to enjoy their

15 First Amendment rights, as the police had been protecting that              03:54:55

16 right over the course of the entire day.

17         THE COURT:  Well, maybe, right.  This is to be

18 determined by a finder of fact.  But your point here is that

19 decision has to be decided separately from the decision, the

20 intent behind the next deployment and the next deployment.  Is              03:55:10

21 that it?

22         MR. ROSENBAUM:  Well, that plus it's plaintiffs'

23 burden now to show that at least there's some evidence

24 supporting that theory where all of the evidence shows exactly

25 the opposite; right?  And we see it all in the video; right?                 03:55:26

CV-18-02778-PHX-JJT, June 12, 2019

1   After the deployment of PepperBall® --                          03:55:30

2          THE COURT:  But I don't need to decide that now.

3   That's the merits.  I just need to figure out is there a

4   commonality between cause and effect here with regard to First

5   Amendment.                                                     03:55:43

6          MR. ROSENBAUM:  Right.  And then the next deployment

7   of smoke where we say the effect on people over at Third Street

8   going up, Third Street, was the motivation for that to deter

9   the First Amendment rights of the people who were leaving or

10  was to it stop the onslaught of chemical agents and objects    03:56:06

11  from the crowd right in front of the police?

12         THE COURT:  So what is wrong with the Court looking

13  at this as in the collective?  In other words, all of these

14  things together eventually, eventually resulted in the block,

15  the free speech area being cleared?                            03:56:21

16         MR. ROSENBAUM:  Because that's not what the jury

17  needs to be asked and that is the same as my weather

18  hypothetical.  Had a violent thunderstorm come, none of this

19  would have happened.  The crowd would have thinned for

20  independent reasons.                                           03:56:37

21         Every use of force, whether in the First Amendment

22  context or the Fourth Amendment context, has to be evaluated

23  individually; and as we've seen from videos, the composition of

24  the class changes place by place, time by time.

25         So let's say some class members decided it's time to    03:57:01

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1  go, I'm leaving, as soon as they saw the PepperBall®.  Their          03:57:04

2  First Amendment claims are different than somebody who didn't

3  see that; right?  They are reacting to a response by the police

4  not to stop First Amendment expression but to stop violence by

5  Antifa at the fence.                                                  03:57:25

6         What about the people that then decide to leave on

7  Third Street when they see the smoke; right?  That's a

8  different group.  Not everybody got encircled and arrested,

9  right.  It's not a mass arrest case.  That's a different group.

10 They are responding to one the deployment of yellow smoke           03:57:42

11 designed to deal with the immediate threat to the crowd and the

12 police officers on Monroe closer to second.  Their First

13 Amendment argument is different than, let's say, Ms. Travis who

14 stayed and protested even up until the time that the police

15 officers were lined up and marching towards her.                     03:58:09

16        So that didn't deter her speech until she is hit with

17 munitions and we talked about the fact issues there.

18        So this was an ever-evolving scene, very different

19 than the *MIWON* case.  The *MIWON* case was based on an

20 uncontested finding by the Court.  Apparently plaintiffs did        03:58:33

21 not contest that everything was a command level decision to

22 clear the park and then they were arrested and it's an arrest

23 case which has, as plaintiffs concede, has this unfortunate

24 class definition that builds into it the individualized fact

25 question that apparently was never contested by the parties,        03:59:06

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

```
 1    but that the Lyall Court, a couple of years later in the same     03:59:08
 2    district of California said:  No, no, you can't do that.  You
 3    can't do that.
 4              THE COURT:  Mr. Rosenbaum, I'm going to ask you a
 5    question.                                                         03:59:17
 6              And, Mr. Litt, I'm going to ask you to answer the
 7    same when you get up on rebuttal.
 8              Because as I was reading all of the briefing, and now
 9    hearing your arguments both again today, although I can't quite
10    put my finger on it, it strikes me -- well, I would like to      03:59:31
11    know both of your positions as to whether there is something
12    qualitative about the difference between arrests as opposed to
13    deployment of dispersal mechanisms that would make irrelevant
14    or not on point the arrest cases in the situation of the
15    dispersal -- pure dispersal case.                                03:59:57
16              MR. ROSENBAUM:  Well, Your Honor, I think the Moss
17    case answers that because it had both and certified as to the
18    mass arrest.  But what happened there, similar to what happened
19    in MIWON, the May Day riots, was encirclement of the entire
20    crowd.  Every member of the class gets arrested.  They all       04:00:19
21    suffer the same injury from presumably the same alleged
22    wrongful act.  That didn't happen here.
23              And as we've seen, the deployment of chemical agents
24    were very specific to a time and place.  PepperBall®, yes, it's
25    a chemical agent.  But very different than the deployment of     04:00:43
```

CV-18-02778-PHX-JJT, June 12, 2019

pepper spray directed at one individual as we saw or at least
the crowd of three individuals as we saw with Ms. Travis.  That
is not impacting the other probably hundred people that were
still -- 50 to 100 people that were still left on the street.
That's not causing them to leave.  It's different than smoke.
It's different than tear gas.  And they quote from our expert,
Michael Hillman, who was the author of the May Day report and
was highly critical of the Los Angeles Police Department and he
says, yes, tear gas is indiscriminate but that he was very
clear.  The deployment of tear gas isn't and wasn't here and he
contrasted the May Day events with what he concluded was a very
thoughtful and successful operation by City of Phoenix.

THE COURT:  I'm not sure I captured the point behind
the question I asked you before.

If you go to the model rules for the Ninth Circuit
and the section that pertains to 1983 actions and in particular
those 1983 actions dealing with excessive force, you'll find
that there is a different instruction for arrest as opposed to
a violent act or a physical act against somebody.  There's a
reason for that.  I'm trying to put my finger on that or the
need for the two instructions or the need for that difference
pertains here.

MR. ROSENBAUM:  Whether an arrest is lawful or not
depends on completely different factors than the use of force
was --

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1          THE COURT:  Which gets me back to -- maybe I close          04:02:35

2     the loop this way.  Do the arrest cases apply here?

3          MR. ROSENBAUM:  We think they don't or they do as a

4     distinction.  Again, *Moss* it's a hybrid.  Proves the point.  A

5     mass arrest is a unified event, presumably a unified decision     04:02:56

6     that everybody here protesting in this area or everybody who is

7     in this church or everybody who is here is going to be

8     arrested, was arrested.

9          THE COURT:  Isn't that because precisely or almost

10    precisely the same thing happens to all of them?  They are all    04:03:14

11    arrested.  No more, no less with regard to that analysis.

12         MR. ROSENBAUM:  Exactly.  And some of those cases

13    also contained elements of wrongful detention, how long, you

14    know, were you detained.  So some of the so-called nominal

15    damages cases involve can you put a dollar value on a day or an   04:03:36

16    hour in detention?  It's measurable.  Any distinctions there

17    are sort of actively measurable by time.  That is not the case

18    here.

19         I can talk about damages for a moment if Your Honor

20    will hear me on it, if you had more questions on predominance.    04:04:04

21         Again, I don't think we get to damages because

22    individualized issues predominate with respect to liability.

23         But the *Chua* case that they rely on was a mass arrest

24    case.  Chua against the City of Los Angeles is just two years

25    old.  The Court denied a class on damages.  The plaintiffs        04:04:30

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1  there argued that even though it was a mass arrest case, you                04:04:37

2  can award general damages to everybody.  And the *Chua* court

3  said no, it's the Supreme Court's decision in *Comcast*.  It's

4  the burden of the plaintiff at the class certification stage to

5  articulate what those damages would be to articulate a          04:04:57

6  methodology.  They haven't done that.

7       But let me explain what's really going on and I think

8  why class certification in a case like this where individual

9  circumstances vary so differently.  Somebody like Cobin hit

10 with an impact munition, somebody like plaintiff Travis who is    04:05:17

11 hit by a muzzle blast and then pepper spray.  If there's

12 liability, presumably her damages are very different than

13 somebody who went up Third Street and may have felt some unease

14 because they saw yellow smoke.

15      What the Supreme Court said in the *Stachura* case,         04:05:46

16 which they cite, was nominal damages for First Amendment

17 violations are available but they are not in addition to.  They

18 may not supplement compensatory damages.  You can't get both.

19 *Stachura* was an individual case.  They cite about a half a

20 dozen cases on page 34 about the availability of nominal          04:06:13

21 damages.  Those are all individual cases.  This is not an

22 individual case.

23      But what *Stachura* tells us is if Your Honor were to

24 certify a class for nominal or general damages, it wipes out

25 the right of somebody like Mr. Cobin, who is hit with an impact   04:06:36

United States District Court

1   munition, who if he could prove liability, has damages very          04:06:42
2   different than somebody who was just walking up Third Street.
3   Maybe they got a whiff of CS gas.  If they had an individual
4   case, perhaps a Court would say nominal damages are
5   appropriate.  *Stachura* said when you measure nominal damages,       04:06:58
6   it can't be based on the abstract value of the First Amendment
7   right.

8           So the Court reversed, remanded because damages were
9   both overlapping.  There was general and nominal.  But the
10  instructions on how to calculate nominal damages were wrong.         04:07:17

11          So what that suggests is even the nominal damage
12  calculation needs to be individualized.  You're wiping out this
13  person's right to receive general damages.  And if you're going
14  to come up with some arbitrary number that applies class-wide,
15  that doesn't fairly reflect what happened here.  So we think         04:07:41
16  it's inappropriate to certify any of these excessive force
17  classes because on liability, individual issues predominate but
18  also because there's no appropriate and fair method of
19  assessing damages and plaintiffs failed their burden under
20  *Comcast* to present to the Court what that method would be.         04:08:10

21          Can I talk about numerosity for a second because I
22  know I've probably gone longer than I should have?

23          THE COURT:  Go ahead.

24          MR. ROSENBAUM:  Again, we're just challenging
25  numerosity with respect to the proposed Subclass B, which is        04:08:28

CV-18-02778-PHX-JJT, June 12, 2019

1   those who were hit with impact munitions.  So forget about the   04:08:32

2   deployment of 500 PepperBalls® mostly into the ground.  That

3   doesn't tell us anything about how many people would be in the

4   class.  So we have Mr. Peard's declaration and of course

5   plaintiffs concede, as they must, that 40 is generally the   04:08:51

6   threshold, sometimes you can go as low as 20, and maybe there

7   has been an outlier in the history of Rule 23 that has gone

8   lower than 20.  But Peard counts 21.  Only 11 of those come

9   from anything that's in the record from declarations.

10         Two of those 11 -- I looked at them all -- they are   04:09:10

11   actually pepper spray, not impact munition, so I think pepper

12   spray people are part of that subclass, too, but -- so that's

13   11.  Then you have 18 people who said they saw somebody else

14   getting hit.  We have no reason to think that that's anybody

15   other than those 11, right?  And then we have Mr. Turiano's   04:09:33

16   deposition testimony where he describes instant by instant each

17   deployment of munitions that -- at least each deployment that

18   he was asked about.  And in every one of those deployments, the

19   individual who was struck was engaged in unlawful conduct, was

20   throwing something back at Phoenix police.   04:10:01

21         Those people are not part of the proposed class

22   because the proposed class is those whose conduct did not

23   justify the use of force.  So whether it's 11 or 21, that's the

24   outer range; but then you have to reduce it by the evidence in

25   the case that a substantial number of those, if not all, are   04:10:25

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1  outside the class, because their conduct, in fact, justified           04:10:33
2  the use of force.  So we think not only on predominance grounds
3  but on numerosity grounds that impact class should be denied.

4       The briefs talk about a failsafe class.  I think it's
5  a nonissue.  The law is clear.  The *Lyall* case says so, that         04:10:53
6  what you can't have is a class definition that builds into it
7  the same individualized issue that, if you didn't have a
8  failsafe class, would preclude certification in the first
9  place.

10      They cite the *Melgar* case.  It doesn't hold what they           04:11:20
11 say at all.  I don't know if Your Honor read it.

12      Can we turn on the document camera?

13      So this is it.  It's a one-page mem op unpublished,
14 says right at the bottom this position is not appropriate for
15 publication and it is not precedent except as provided in             04:11:44
16 Circuit Rule 36.3.  A great panel; right?  It has got Canby,
17 Hurwitz and a visiting judge.  But the pertinent part, it says:
18 Nor did the District Court abuse its discretion by certifying a
19 failsafe class.  What it goes on to say is, that's because this
20 wasn't a failsafe class.                                              04:12:08

21      The next sentence reads:  A failsafe class is
22 commonly defined as limiting membership to plaintiffs described
23 by their theory of liability in the class definition such that
24 is the definition presupposes success on the merits.  Here the
25 class definition did not presuppose its success.                      04:12:30

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   So they weren't approving a failsafe class.  They      04:12:34

2   were saying, this isn't one.  And then the line that plaintiffs

3   rely on in this not-for-publication mem op is the next one

4   where they build in a typo.  Maybe it was a typo.  I don't

5   know.                                                    04:12:50

6        We further note, though, that we do not hold that our

7   circuit's case law appears to disapprove of the premise that a

8   class can be failsafe.  They say the Ninth Circuit meant to say

9   "appears not to disapprove."

10       Well, it seems to me in light of *Lyall* and the other    04:13:02

11  cases, it's a pretty thin read to stand on a one-page mem op

12  that's not precedent that says this is not a failsafe class and

13  that holds what plaintiffs want it to hold only by adding the

14  word "not" to.

15       So leave aside the kerfuffle over failsafe.  The          04:13:32

16  problem here is the ritualized issue predominates, either at

17  the class membership stage if you accept their class

18  definition, or if you take that out, this is the whack-a-mole

19  to include people whose conduct was unlawful, then it's part of

20  the liability phase at trial that has to be decided anyway.    04:13:56

21       I haven't said anything about injunctive relief.

22  Maybe I incorrectly took some comfort from Your Honor's

23  questions of Mr. Litt.  But I want to talk about the

24  *Hodgers-Durgin* case for a minute because it hits on the

25  declaration question that Your Honor asked Mr. Litt.  So       04:14:21

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   *Hodgers-Durgin, en banc*, Ninth Circuit case, affirming Judge     04:14:23

2   Roll from Tucson where he declined to certify a class of

3   persons who were improperly stopped by the Border Patrol.  And

4   Judge Roll held, and the Ninth Circuit affirmed, that the named

5   plaintiffs didn't meet their burden under *Lyons* to show         04:14:53

6   substantial and immediate irreparable harm.  This is not likely

7   to occur to them again.

8          But the plaintiffs had declarations from other

9   individuals just like we have here who allegedly were stopped

10  many more times than the named plaintiffs.  And the Ninth        04:15:16

11  Circuit held that at the class certification stage,

12  declarations from unnamed absent class members, unnamed in the

13  sense that they are not named in the complaint, are

14  inappropriate for consideration.

15         So I think you can ignore those declarations.  All         04:15:40

16  that -- and I agree if you were to look at them, they don't

17  carry much weight.  They certainly don't satisfy plaintiffs'

18  burden under *Dukes* of the class certification stage.  They

19  don't survive the rigorous analysis that the Court should

20  subject them to.                                                  04:15:57

21         So what do we know about the likelihood of this

22  happening again?  Is there going to be -- this was an

23  incredibly unique event.  We know this.  It's in the briefs,

24  but the country was at knife's edge.  Ten days earlier in

25  Charlottesville a White Nationalist plowed his car into a        04:16:23

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   peaceful crowd and killed somebody.                          04:16:31

2          The President then said there were good people on

3   both sides, inflaming not just his opponents but many of his

4   strong supporters, and then it's announced that he's coming to

5   Phoenix for a campaign-style event.  And it's reported in the   04:16:50

6   papers that he's considering pardoning Sheriff Joe Arpaio who

7   had recently been convicted in this very courthouse.  And then

8   it turns out the Vice President is coming and Cabinet level

9   officials.  So the opportunity for an explosion was here.

10          Phoenix PD planned incredibly well.  Up until the       04:17:22

11   Antifa approach to the fence there had been no serious

12   injuries, no mass arrests, no property damage.  There were

13   confrontations between members of the crowd that the police

14   managed to calm down.  And even after, even after the events of

15   later in the evening, there were no mass arrests, there was no   04:17:54

16   serious injury.  There was no property damage.  Everybody went

17   home with life and limb intact.

18          So I'm not asking the Court to opine today on whether

19   this was the success that the Phoenix Police Department and the

20   City feel it was but just to point out how unique this event    04:18:17

21   was.

22          I don't know what kind of injunction they would want,

23   to have a Court official stand by a pedestrian fencing the next

24   time there's a Presidential visit.  But the point is, if you

25   look at the record of what Phoenix PD had done in the past and   04:18:38

CV-18-02778-PHX-JJT, June 12, 2019

1    has done since, it doesn't meet the test of *Lyons* and                   04:18:42

2    *Hodgers-Durgin* that there's a likelihood of substantial and

3    immediate irreparable injury.  CS gas, Lieutenant Moore's

4    declaration establishes, has been used just once prior and that

5    was to keep I-10 open during the Black Lives Matter protest.          04:19:03

6    Your Honor might remember the attempt to block I-10 freeway

7    creating a serious risk but entirely different event.

8         And then since the Trump rally of 2017 Phoenix police

9    have been involved in over 50 mass demonstrations and protests

10   including the Red for Ed marches which Your Honor I'm sure is       04:19:34

11   aware of that were larger in magnitude and duration than this

12   and did not deploy a tactical chemical agent at any one of

13   them.

14        And of course the record shows that the Phoenix

15   police have made some improvements since this event including       04:19:54

16   purchasing a larger LRAD than the one that they had.

17        Ironically, over the opposition at City Council by

18   some of the same plaintiffs who say the LRAD could be used as a

19   weapon, it's too loud.  But maybe that will be another lawsuit

20   some day.                                                           04:20:16

21        But there's nothing in this record showing that

22   there's any likelihood of repetition.  So there's no standing,

23   no standing, period, in the case.  Now, we haven't brought a

24   summary judgment on that issue yet but at the class

25   certification stage, it's their burden to show that the point       04:20:33

CV-18-02778-PHX-JJT, June 12, 2019

1  Your Honor asked earlier, even if there's standing -- we don't        04:20:37

2  think there is -- there's no injunction that this Court might

3  issue, even if it's staging a federal court official at police

4  barricades from now on, that is not available to be awarded to

5  the named plaintiffs.  There's no reason to certify the class.        04:20:56

6       And there is harm to certifying a class.  The mere

7  administrative burden and cost.  And I can't imagine we're not

8  arguing what any injunction should say but a class-wide

9  injunction of everybody on earth whoever in the future might

10 protest anything, not just a Presidential visit in the City of        04:21:20

11 Phoenix, it would be bad enough to have an injunction like that

12 issued on behalf of the named plaintiffs but on behalf of a

13 class of presumably millions of unknown people, not

14 appropriate.  I don't know how you give Class notice to such a

15 class.                                                                04:21:38

16       I think that's all I had, Your Honor.

17       Do you have any further questions for me?

18       THE COURT:  I do have one at least, Mr. Rosenbaum,

19 and it's a question that I asked Mr. Litt earlier and I

20 intended to get your view on as well and that was, what does          04:21:57

21 the Court do if it determines that the requirements are met for

22 class certification under the analysis of one or more claims

23 but not other claim or claims?

24       Mr. Litt responded that that doesn't matter, that

25 once the certification has been met for one, it's met and that        04:22:18

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

 1   is how it goes forward.  I want to know, number one, if you            04:22:21

 2   agree with that; number two, if you have any case law to

 3   support your agreement or disagreements; and number three, if

 4   that is true, mechanically how, then, would it work?

 5          MR. ROSENBAUM:  I think Your Honor may certify              04:22:39

 6   classes for only those claims that meet the standards of Rule

 7   23, and our briefs are full of cases showing exactly that,

 8   where courts have carved a proposed class eliminating, for

 9   example, in *Moss* the excessive force claims.

10          In the *Augustin* case that they rely on the Court          04:23:02

11   denied a class for special damages.

12          So, I mean, it seems to me the answer to the question

13   is obvious.  We didn't specifically brief it in that sense; the

14   standards of Rule 23 apply to each claim.  We don't think any

15   of them are certifiable; but just because they have asked for      04:23:29

16   an injunctive relief class that includes every person living

17   and breathing on the earth doesn't mean that you should certify

18   that class even if you think that the class should be certified

19   for impact emissions.  Your Honor pointed out something that

20   was in my outline but for lack of time I didn't get to it,          04:23:53

21   which is the reason they named the individual defendants is

22   because they understand that's the burden of proof at trial.

23   And it really, I think, sheds a light on what's really going on

24   with their proposed theory of the case that rests on common

25   issues.  This is not a common issue -- a common issue case, so      04:24:15

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    I don't know what Your Honor has in mind in terms of            04:24:21
2    potentially certifying a narrow trimmed-down class.  But I
3    think if Your Honor doesn't deny the motion entirely, Your
4    Honor should deny as much of it as Your Honor believes should
5    satisfy Rule 23.                                                04:24:43
6              THE COURT:  I think that's all the questions that I
7    had for you now, Mr. Rosenbaum.  Thank you.
8              All right.  If anybody has a cell phone, I think my
9    staff might have heard it, please turn it off now.
10             And Mr. Litt, whenever you're ready, sir.            04:25:09
11             MR. LITT:  All right.  I will attempt to get through
12   these quickly.  I just want to make sure that the question that
13   you had asked I have right which is, is there a qualitative
14   distinction between certifying an arrest case and a dispersal
15   class.  Do I have that right?                                   04:25:37
16             THE COURT:  Yes.
17             MR. LITT:  So I think the answer is, obviously, they
18   are different in certain respects but the fundamental issue,
19   there's no qualitative distinction which is, does it meet the
20   criteria of Rule 23?                                            04:25:55
21             And our contention is that with respect to both
22   Fourth and the First Amendment claims, we do for reasons that
23   we already discussed.
24             I do want to spend a minute on some of the cases that
25   the defendants appear to rely on that they cited in response to  04:26:14

United States District Court

1  this question.  So they relied on *Moss* but they really                    04:26:19

2  misconstrue *Moss*.

3          So it's important to understand exactly what *Moss* did

4  and didn't do.  *Moss* found that there was no centralized

5  command decision about force and because of that, the use of   04:26:39

6  force was not a common issue.

7          Here it is undisputed that the decisions that we're

8  challenging, both the decision to use the PepperBalls®, the

9  decision to use the tear gas were command force decisions and

10 were ratified subsequently if not at the time by Chief         04:27:04

11 Williams.

12         The *MIWON* case -- and so *Moss* adopts the *MIWON* case.

13 *Moss* totally embraces the *MIWON* case but says that our

14 circumstances here are different in *Moss*, but the point is that

15 our circumstances here are exactly what *MIWON* described.      04:27:27

16         And then Mr. Rosenbaum indicated that the *MIWON* case

17 was an arrest case.  I was one of the lawyers in the *MIWON* case

18 and it was the last thing from an arrest case.  It was

19 described in the press as an LAPD police riot because what

20 happened was the police literally attacked the crowd with no   04:27:51

21 warning and chased people through the crowd, hit people,

22 including press.  If there were any arrests, they were a

23 handful.

24         The certification from Judge Matts was that was --

25 that was the central claim by far in the case and that's what  04:28:14

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   it certified.                                                    04:28:20

2          The *Chua* case, in which I was also counsel, and the

3   case is in the process of being settled for a class.  So where

4   Mr. Rosenbaum gets that there was no class determination in

5   favor of plaintiffs I'm not quite sure.                          04:28:34

6          What did happen was that there were two classes in

7   that case and there was a small class that was detained for a

8   while and the Court found that the proposed class

9   representative was not adequate because he was a legal observer

10  and so he wasn't typical.  And we ended up not redoing that.    04:28:53

11  But the other class, the downtown class, so it was an arrest

12  class in that case.  But the *MIWON* case is very clearly not.

13  And the *Moss*, case although it doesn't certify, makes very

14  clear that it would certify if you had centralized command

15  decisions, which is exactly what we have here.                  04:29:19

16         Mr. Rosenbaum spent a lot of time arguing what I

17  think are more the merits but there's some insight there

18  because he basically organizes that the initial use of force is

19  justified and talks about all of these things being justified.

20  He didn't really say that they weren't acts against the crowd.  04:29:47

21  He just tacked on, well, these are individual use-of-force

22  issues but they are at least -- and under the evidence that

23  we've presented, the whole point is that they weren't, that the

24  use of PepperBalls® was not justified.

25         Now, there's a common question there and there's a       04:30:13

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

 1    common answer.  Mr. Rosenbaum gets to argue that it was          04:30:17
 2    justified.  That's not the issue for class certification.  The
 3    issue for class certification is, is that a common question?
 4    It is.

 5            The same thing with respect to the tear gas about       04:30:29
 6    three minutes later which is that they claim, well, one or
 7    maybe two individuals threw tear gas or some kind of gas at the
 8    police.  The videos don't show it impacting any of the police
 9    but I can't answer for certain whether there's evidence I'm not
10    aware of.  But, again, the question is, was that -- is that the  04:30:59
11    legitimate basis to send tear gas into a crowd of thousands?
12    These are common issues.  And Mr. Rosenbaum's own description
13    going through it shows that they are common issues because,
14    really, he just asked the common questions and then said but
15    it's individualized.                                             04:31:27

16            Mr. Rosenbaum talked about mass accidents.  So mass
17    accidents and the case law about mass accidents generally not
18    being suitable for class determination are just that,
19    accidents.

20            Civil rights cases involving a centralized decision      04:31:54
21    or a centralized policy or a failure to have a policy are all
22    classic situations in which classes are routinely certified.
23    Classes are certified in jails for failure to have policies
24    regarding certain conditions or allowing certain conditions.
25    They are certified for strip searches.  They are certified for  04:32:22

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    protest cases, both First Amendment and arrest.                04:32:25

2            So this is not a mass accident case.  The reason that

3    mass accidents are not generally considered appropriate for

4    class certification is because they are accidents and so they

5    can be individualized, although there are exceptions, but      04:32:46

6    generally mass accidents are not considered suitable.

7            But things that flow in the 1983 context, things that

8    flow from a centralized decision-making process to act against

9    a group of people is your paradigmatic class 1983 claim.  And

10   it happens in all kinds of contexts.  And the individual claim 04:33:12

11   is not really the driving consideration.  The driving

12   consideration is whether or not you've got the centralized

13   determination or policy or other things that makes there be a

14   common issue for resolution.

15           I want to talk about intent for a moment.  Now, I      04:33:41

16   will say I'm not up to date on what agreements were reached

17   about certain language in some of the documents that

18   Mr. Rosenbaum was talking about.  What I will say is a

19   use-of-force claim does not require any intent other than the

20   intent to do the act; that it wasn't accidental.  There's no   04:34:05

21   claim here that it was accidental.  The same is true for the

22   First Amendment.  The issue is, was the conduct intentional

23   conduct?  Did it interfere with peoples' First Amendment

24   rights?  The question of whether or not they were intending to

25   interfere with First Amendment rights is really not a component 04:34:29

United States District Court

1   of the claim.                                                          04:34:33

2            So under the facts that we've presented which,

3   obviously, the Court doesn't resolve at this stage, there was

4   interference.  Then Mr. Rosenbaum spent some time saying, well,

5   they gave notice by using force.  They gave a dispersal notice    04:34:51

6   by using force.  I have never heard of anybody, and I am

7   familiar with no case that has ever said that it is an

8   appropriate dispersal order to use force to let people know you

9   shouldn't be there.  That's just -- and the *Jones* case has it

10  exactly the opposite.  You can't do that.  You can't use force,  04:35:17

11  unless it -- unless it basically meets the clear and present

12  danger test.  That's what *Jones* case says.

13           So on the numerosity just for a moment, I believe --

14  I think I'm quoting this right, that in the after-action

15  report, PPD itself said there were too many people shot to       04:36:07

16  count.  So there's -- there's -- there appears to be some

17  indication that the PPD thinks it was a fair number of people.

18           On the class definition, I just wanted to make clear

19  that it is true that -- because I might not have answered the

20  Court's question the way I intended it.  It's true that a Court  04:36:35

21  can find that certain claims don't meet the standard for class

22  certification.  Other claims do.  That's different from the

23  class definition.  The class definition is objective describing

24  people but then there still could be a question like in *Moss*

25  that the class definition would include certain kinds of claims  04:36:55

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1    and not other kinds of claims.                                    04:37:01

2         Our point here is that the class definition that we

3    proposed is an objective one leaving aside sort of the disputes

4    over engaged in justified conduct or not and it would apply to

5    both.  I didn't mean to imply by that that the Court wouldn't    04:37:17

6    have the discretion to say I don't think, as in *Moss*, that

7    you've met the standard for certifying an excessive force

8    claim.  It's just that we have met the standard here.  But --

9         THE COURT:  All right.  I appreciate the

10   clarification.  I follow you now.                                 04:37:37

11        MR. LITT:  So -- and then on injunctive relief, I

12   guess the thing that I would emphasize, one is there's a whole

13   issue of lack of policies, which the PPD itself identified and

14   then just said -- they called them something like room for

15   improvement or something like that.  The use of tear gas, the    04:38:02

16   rules of engagement, how and when to use munitions, so there

17   are a whole series of things that injunctive relief would

18   clearly target as a remedy.  I do want to mention that the

19   defendants ignore the policy component.  The defendants like

20   jump to this issue of how strong a pattern have you proven.  So   04:38:33

21   I just want to emphasize we do claim that we've established

22   enough for that but that's -- but really the central basis is

23   that the Phoenix Police Department has said what they did was

24   fine and this was an appropriate way to act.  That, under

25   *Lyons*, is sufficient.  You don't need anything more than that.  04:38:59

United States District Court

CV-18-02778-PHX-JJT, June 12, 2019

1   If you have policy and you have people who are going to engage        04:39:03

2   in conduct at whom that policy is aimed, you've met the

3   standard under *Lyons*.

4           I don't know if I've covered everything but unless

5   the Court has a question, I will stop.                                04:39:21

6           THE COURT:  Give me one moment just to make sure.

7           I do not have any other questions for either counsel.

8   Thank you, both.  The Court will take the matter under

9   advisement and I will render a ruling as soon as I possibly

10  can.  If I could see both Mr. Litt and Mr. Rosenbaum at              04:40:23

11  sidebar.  We're adjourned.

12          Good day to everyone.  And I'll be staying in the

13  courtroom for a while so please feel free to move about the

14  well.

15          (Whereupon, these proceedings recessed at 4:40 p.m.)         04:40:37

16                      *  *  *  *  *

17

18

19

20

21

22

23

24

25

United States District Court

91

CV-18-02778-PHX-JJT, June 12, 2019

1        C E R T I F I C A T E                          04:40:37

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of      04:40:37

6   Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled     04:40:37

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15       DATED at Phoenix, Arizona, this 26th day of June,          04:40:37

16  2019.

17

18

19

20                          s/Elaine M. Cropper                    04:40:37

21                     _____

22                      Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                 04:40:37

                    United States District Court