**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente, *et al.*, | No. CV-18-02778-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, *et al.*, | |
| Defendants. | |

At issue is Plaintiffs' Amended Motion for Class Certification (Doc. 101, Mot.), to which Defendants filed a Response (Doc. 113, Resp.) and Plaintiffs filed a Reply (Doc. 127, Reply). The Court heard oral argument on the Motion on June 12, 2019. (Docs. 160, 165.) In this Order, the Court will also resolve Defendants' Motion for Leave to Supplement the Class Certification Record (Doc. 138), Motion to File Exhibit under Seal (Doc. 141), and Motion for Leave to File a Sur-Reply (Doc. 144), as well as Plaintiffs' Motion to Strike Portions of Defendants' Supplements or Alternatively for Leave to Respond to Defendants' Filings (Doc. 146).

**I. BACKGROUND**

On August 22, 2017, President Donald Trump held a rally at the Phoenix Convention Center, and approximately 6,000 demonstrators—both pro-Trump and anti-Trump—gathered outside the Convention Center.[1] The Phoenix Police Department

---
[1] The background facts summarized here are a synthesis of the parties' proffered video evidence (Doc. 90 Exs. 29–39; Resp. Exs. 42–64), testimony, and reports. Certain discrepancies exist within this evidence, but the Court is satisfied that its synthesis is sufficiently accurate for the purpose of resolving Plaintiffs' Amended Motion for Class Certification.

("PPD") had about a week's advance notice of the rally, during which it made preparations to try to ensure the safety of the downtown area during the expected demonstrations. The preparations included setting up a "free speech zone" designated for anti-Trump demonstrators on the north side of the Convention Center, across Monroe Street. The free speech zone was bordered by 2nd Street to the west, 3rd Street to the east, and Monroe Street to the south, and demarcated by a three-foot high pedestrian fence. PPD anticipated that certain groups of demonstrators would be present, including Antifa—a national, militant political protest movement opposing fascism and right-wing ideology whose groups had disrupted several other demonstrations in the weeks preceding President Trump's Phoenix visit—as well as Plaintiff Puente—a Phoenix grassroots organization representing migrant communities through lobbying, advocacy, and activism—and Plaintiff Poder in Action ("Poder")—a Phoenix grassroots organization with a mission of empowering victims of injustice through leadership development, civic engagement, and policy advocacy.

In a Presidential Visit After-Action Report (Doc. 101-3 at 2–35, Bates Nos. COP014832–014865, "PPD Report"), Defendant PPD Chief Jeri Williams stated that, on the day of the rally, PPD deployed approximately 985 officers around the Convention Center. According to the report, large crowds of demonstrators began arriving by 11:00 a.m. and, although PPD officers observed minor altercations and a few water bottles being thrown at rally attendees lining up to enter the Convention Center, the demonstrations proceeded generally without incident during the day.

The rally inside the Convention Center began at 6:30 p.m. At approximately 8:15 p.m., after PPD officers around 2nd Street and Monroe reported that water bottles were being thrown at them, PPD used a Long Range Acoustic Device ("LRAD") to make announcements instructing individuals to stop throwing objects. At 8:23 p.m., 15 to 20 individuals PPD had identified as Antifa put up large banners near the fence along Monroe, which concealed their activities from PPD officers. PPD deployed Tactical Response Unit ("TRU") personnel, including grenadiers trained in the deployment of chemical munitions,

in the area where Antifa had gathered. Just after 8:32 p.m., President Trump began to leave the rally, and PPD officers observed Antifa pushing or shaking the fence.

PPD deployed its first munition in front of Antifa just before 8:33 p.m. in the form of pepper balls on the ground, which cleared most individuals from the immediate vicinity. Thereafter, PPD officers reported that rocks and bottles were being thrown and, at 8:34, officers reported that canisters of some kind of tear gas were thrown at them. At that point, PPD officers donned gas masks and, at 8:35, the grenadiers deployed inert smoke bombs. Large numbers of demonstrators began to clear the area.

After officers noted that some smoke canisters were being kicked back and a spear-like object and an incendiary device were thrown at them, the grenadiers deployed CS gas—a type of tear gas—in what they perceived to be a focused location to target specific individuals. Plaintiff Gonzalez Goodman alleges she inhaled gas. The grenadiers also deployed aerial flash bangs intended to act as auditory warnings. Demonstrators began to run away and, by 8:39, the area where individuals had been throwing projectiles was mostly empty, although demonstrators remained to the east and west of the area.

From 8:36 to 8:45, PPD used additional smoke cannisters and pepper balls to clear an area so that officers could form lines to begin dispersing the crowd. Helicopters from the PPD Air Unit began arriving at 8:40, and they started making announcements directing the crowd to disperse at 8:52. In this time period, the grenadiers deployed smoke canisters, pepper balls, and OC bullets—bullets filled with pepper spray—one of which hit Plaintiff Guillen. Lines of PPD officers with riot shields began marching to move the crowd at 8:56. At some point between 8:42 and 8:47, PPD made the determination that the crowd was unlawfully assembled, and at 9:02, an official unlawful assembly announcement was made via a public address system from a marked police vehicle on the ground.

Thereafter, the grenadiers deployed munitions in the form of pepper balls, OC bullets, and CS gas canisters at anyone who approached a police officer, and Plaintiff Travis was hit several times. PPD officers told the press to leave the area at 9:20 p.m. The crowd was dispersed and gone from the free speech area by 9:56 p.m.

Over the course of the evening, PPD documented eight Incident Reports—for criminal damage, disorderly conduct, aggravated assault on Police, and unlawful assembly—and made five individual arrests. After the rally, Chief Williams publicly acknowledged that she directed PPD's actions against the protestors and that the actions were appropriate.

On September 4, 2018, Plaintiffs filed suit against PPD and certain PPD members—including Chief Williams, Field Force Commander Moore, Grenadier Team Leader McBride, and Grenadiers Scott, Turiano, Neville, Sticca, White, Howell, and Herr—raising four claims: (1) a claim under 42 U.S.C. § 1983 for excessive use of force during a search or seizure under the Fourth and Fourteenth Amendments; (2) a § 1983 claim for infringement of Plaintiffs' freedom of speech and association rights under the First and Fourteenth Amendments; (3) a § 1983 claim for due process violations under the Fourteenth Amendment; and (4) a § 1983 claim for equal protection violations under the First and Fourteenth Amendments. (Doc. 1, Compl.) Plaintiffs now move to certify this suit as a class action.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) provides that a class action—that is, an action in which one or more members of a class sue on behalf of all members of the class—may proceed only if four prerequisites are met:

(1) Numerosity: "the class is so numerous that joinder of all members is impracticable;"

(2) Commonality: "there are questions of law or fact common to the class;"

(3) Typicality: "the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and

(4) Adequacy of Representation: "the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a).

In addition, under Rule 23(b), a court may only certify a class action if there is at least one of the following:

    (1)    Risk of Inconsistency: the prosecution of separate actions by individual class members would create a risk of inconsistent adjudications or adjudications that would be dispositive of non-party class member interests; or

    (2)    Appropriate Class-Wide Injunctive Relief: injunctive or declaratory relief is appropriate respecting the class as a whole because the conduct of the opposing party applies generally to the class; or

    (3)    Predominance and Superiority: "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Fed. R. Civ. P. 23(b).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, "'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). Class certification "is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,'" which will frequently "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 350–51 (quoting *Falcon*, 457 U.S. at 161).

**III. ANALYSIS**

In the Complaint, Plaintiffs propose a "damages class" consisting of

> those persons who were present on August 22, 2017, at the Trump Protest area north of the Convention Center which was designated as the "free-speech zone" (the area for anti-Trump protestors bounded to the south by

> Monroe Street, 2nd Street to the west, and 3rd street to the east) and forced by PPD onto adjacent streets at any point between 8:25 and 10:00 P.M., who did not engage in any conduct justifying the Defendants' use of force against them, and who were subjected to the PPD's dispersal by the use of force, or other unlawful police activity arising from the police response to anti-Trump protestors.

(Compl. ¶ 112.) Plaintiffs propose two damages subclasses: (a) "All persons who were unlawfully dispersed by the use of gas, pepper spray, pepper bullets, or other chemical agents;" and (b) "All persons who were unlawfully dispersed by PPD by being struck with projectiles of any type." (Compl. ¶ 112.) Plaintiffs Janet Travis and Cynthia Guillen are proposed class representatives for damages subclasses (a) and (b), and Plaintiff Jacinta Gonzalez Goodman is a proposed class representative for only subclass (a).[2]

Plaintiffs propose an "injunctive relief class" consisting of

> all persons who have in the past, including those present at the anti-Trump protest on August 22, 2017, between 8:25 and 10:00 P.M., or may in the future, participate in, or be present at, demonstrations within the City of Phoenix in the exercise of their rights of free speech and assembly without engaging in any conduct justifying the use of force.

(Compl. ¶ 113.) Plaintiffs' proposed injunctive relief class representatives are Travis, Guillen, and Gonzalez Goodman as well as the two Plaintiff organizations, Puente and Poder.

### A.  Proposed Damages Class
#### 1.  Failsafe Class Definition

Defendants argue that Plaintiffs' proposed damages class definition fails, somewhat ironically, because it is "failsafe"—that is, it limits "membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits." *Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017). Put another way, Defendants argue that, by limiting class membership to those "who did not engage in any conduct justifying the Defendants' use of force against them," the class

---
[2] The Complaint also named Plaintiff Ira Yedlin as a class representative, but Plaintiffs withdrew him as a class representative in their Reply. (Reply at 12.)

definition requires that the Court examine the merits of each individual's claim before it can determine whether the individual is a member of the class, which Defendants contend is unacceptable. (Resp. at 12–15.)

As Defendants point out, "'Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule 23(b)(3) action.' Thus, a class definition 'must be precise, objective, and presently ascertainable' before a class action can proceed." (Resp. at 12 (quoting *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 121 (N.D. Cal. 2014) (internal quotations omitted)).) In *Lyall v. City of Los Angeles*, another District Judge declined to certify a class defined as individuals "who did not engage in any conduct justifying their detention by [Los Angeles Police Department] officers or the officers' forced entry over objection to the artists' space" because the class was not presently ascertainable and therefore "unmanageable virtually by definition." 2010 WL 11549565, at *2–3 (C.D. Cal. May 18, 2010) (internal quotations omitted).

Plaintiffs and Defendants interpret the proposed damages class definition differently. Plaintiffs represent that they intended to define a class not by presupposing that they win the legal question at issue, but rather by limiting the class to individuals who did not engage in certain conduct. (Reply at 5–6; Doc. 165, June 12, 2019, Hearing Transcript ("Hr'g Tr.") at 13.) Defendants focus not on the conduct of the class members, but rather the conclusion that must be drawn from that conduct—that it did not justify Defendants' use of force against them. (Resp. at 13.)

The Court is not entirely convinced that a failsafe class definition must fail in every instance. But Plaintiffs' proposed damages class definition can be read to require that a legal conclusion be reached as to whether individuals' conduct justified the force used against them before determining if they are members of the class, which the Court agrees is inconsistent with the goals of precision, objectivity, and present ascertainability in class definition. *See Hagen v. City of Winnemucca*, 108 F.R.D. 61, 63–64 (D. Nev. 1985).

A court "may construct a definition of the class or may modify a proposed definition where the original is inadequate." *Id.* at 64 (internal quotations and citations omitted). Here, the Court finds the defect in Plaintiffs' proposed damages class definition to be somewhat akin to a defective complaint in which a claim relies on allegations couched as legal conclusions instead of non-conclusory allegations of fact. If the class definition were to focus on the individuals' conduct, as Plaintiffs intended, concerns about having to reach the merits of Plaintiffs' claims in identifying class members would no longer be present. Moreover, the conduct Defendants have identified as justifying their use of force was only two-fold: individuals attempting to breach the free speech zone barrier and individuals throwing objects (including CS gas cannisters) at PPD officers. Thus, a more precise, presently ascertainable, non-conclusory class definition that is consistent with the class definition Plaintiffs have chosen would be as follows:

> those persons who were present on August 22, 2017, at the Trump Protest area north of the Convention Center which was designated as the "free-speech zone" (the area for anti-Trump protestors bounded to the south by Monroe Street, 2nd Street to the west, and 3rd street to the east) and forced by PPD onto adjacent streets at any point between 8:25 and 10:00 P.M., <u>who neither threw objects nor attempted to breach the "free speech zone" barrier along Monroe Street</u>, and who were subjected to the PPD's dispersal by the use of force, or other unlawful police activity arising from the police response to anti-Trump protestors.

(Compl. ¶ 112 (altered provision emphasized).) Indeed, Plaintiffs propose alternative language along these very lines in their Reply. (Reply at 8.) The Court finds this language would alleviate concerns about conducting merits inquiries in forming the class.

### 2. Numerosity, Commonality, Predominance, and Damages

Plaintiffs generally describe their theory of liability as follows: "PPD used indiscriminate force against the whole protest (as opposed to individual protestors against whom such force was justified) and declared an unlawful assembly based on the conduct of a few individuals who could and should have been isolated. This undifferentiated use of force and wholesale crowd dispersal violated the protestors' rights." (Reply at 5–6.)

Plaintiffs allege that large numbers of individuals were subject to PPD's use of force, that common issues of law and fact apply to those individuals' claims, and that the common issues predominate over individual issues, thus satisfying the requirements of Rules 23(a)(1), (2), and 23(b)(3).

In contrast, Defendants contend that the evidence shows that Plaintiffs' claims "are riddled with individualized inquiries that cannot be answered on a classwide basis." (Resp. at 14.) Defendants point in particular to evidence that the PPD deployments of munitions, whether in the form of gas and chemical agents (Plaintiffs' proposed damages subclass (a)) or bullets and projectiles (Plaintiffs' proposed damages subclass (b)), were targeted at certain individuals and spread out over time and space. The Court now examines whether Plaintiffs have sufficiently demonstrated numerosity, commonality, and predominance with respect to each proposed damages subclass.

### a. Proposed Damages Subclass (a) – Gas/Chemical Agents

Plaintiffs contend the evidence shows that the individuals exposed to gas or chemical agents "number at least in the hundreds" out of the estimated 6,000 protestors. (Mot. at 25.) They further argue that these individuals' claims for relief require resolving central, common questions as to Defendants' liability and that these common questions predominate over individual issues, satisfying Rules 23(a)(2) and 23(b)(3). (Mot. at 27–30.) Plaintiffs also argue that the individuals' damages for deprivation of their First and Fourth Amendment rights, which resulted from centralized command decisions, are sufficiently common, and even if they are not, individualized damages should not defeat class certification. (Mot. at 30–31.)

A review of the video and other evidence reveals that a large number of individuals—more than 40—appear to have been exposed to gas or chemical agents, even if in some instances it was inert smoke, and Plaintiffs therefore satisfy the numerosity requirement.

As for commonality, the Court need not find that all questions of fact and law be common to the individual class members; "[t]he existence of shared legal issues with

divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. at 338. Plaintiffs' First Amendment claim requires they demonstrate that Defendants' actions deterred or chilled their political speech and that such deterrence or chilling was a "substantial or motivating factor" in Defendants' conduct.[3] *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotations omitted). Such intent can be demonstrated by showing that Defendants' acts "would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (internal quotations omitted). Plaintiffs' Fourth Amendment claim requires they show that Defendants' use of force was not "reasonable" under the "facts and circumstances" of the case.[4] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Defendants argue that their use of gas and chemical agents was by different grenadiers exercising individual judgment in response to certain actions by protestors, and each use was targeted at certain groups of individuals. As a result, Defendants contend, the factual questions arising from their use of force are too individualized for class certification. In support, they rely on cases in which courts denied class certification such as *Moss v. United States Secret Service*, 2015 WL 5705126, at *1–2 (D. Or. Sep. 28, 2015), in which officers struck certain individuals or hit them with pepper spray bullets in attempting to move them from their location; *Lyall*, 2010 WL 11549565, at *2–3, in which officers subjected certain individuals at a musical and cultural event to searches; and *Universal Calvary Church v. City of New York*, 177 F.R.D. 181, 182 (S.D.N.Y. 1998), in which officers used mace on certain individuals to prevent them from leaving a church over a period of more than twelve hours.

---

[3] Plaintiffs' Equal Protection claim will "rise and fall with the First Amendment claim." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).

[4] In contrast, Plaintiffs' Fourteenth Amendment claim—the excessive use of force claim where there was no "seizure"—requires they show the officers' conduct "shock[s] the conscience." *See Darrah v. City of Oak Park*, 255 F.3d 301, 305–06 (6th Cir. 2001) (comparing Fourth and Fourteenth Amendment excessive use of force claims).

The Court disagrees with Defendants that this case is similar to those and that the factual and legal questions as to PPD's use of gas/chemical agents are too individualized for class certification here. While the grenadiers report that they intended to target certain groups of individuals with their use of force, the very nature of the use of gas is that it is not contained to a certain individual or a small area. The video evidence shows that PPD's use of pepper balls, tear gas, and inert smoke caused large numbers of protestors to disperse. The Court also disagrees with Defendants' argument that even if inert smoke appears to have had an impact on the larger number of people, it was "just inert smoke" and likely caused at most minimal injury. A jury could find the smoke had the effect PPD intended—dispersal of the crowd—and that is squarely at issue in Plaintiffs' claims.

The Court also finds that Plaintiffs have satisfactorily demonstrated for the purposes of their Motion that Defendants' actions were likely command decisions, from the initial authorization to use gas and chemical agents, to the unlawful assembly and dispersal announcements, to the later ratification of PPD's actions by its Chief.[5] Plaintiffs thus have shown that both factual and legal questions as to the propriety of Defendants' use of gas and chemical agents are common among the proposed class members and predominate over any individual questions. *See Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*, 246 F.R.D. 621, 634–35 (C.D. Cal. 2007) ("*MIWON*").

Finally, Defendants contend that determining the amount of damages each class member is entitled to demands individual inquiries, which weighs against class certification. (Resp. at 17 n.11.) However, as Plaintiffs point out, if they can "show that their damages stemmed from the defendant's actions that created their legal liability," the "presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." (Mot. at 31 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013))); *see also Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount

---

[5] To the extent Defendants contend that common issues do not extend to each grenadier and his individual use of gas and chemical agents, Plaintiffs rely on the principle of "integral participation," which "does not require that each officer's actions themselves rise to the level of a constitutional violation" if the officer was aware of the decisions to use force and a participant in the concerted action to use it. *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004).

of damages is invariably an individual question and does not defeat class action treatment.") Plaintiffs have satisfactorily shown that any class-wide damages will arise from common proof regarding Defendants' liability to satisfy the requirements at the class certification stage. *See Chua v. City of Los Angeles*, 2017 WL 10776036, at *11 (C.D. Cal. May 25, 2017).

### b. Proposed Damages Subclass (b) – Projectiles

As for protestors hit with projectiles, Plaintiffs state they have uncovered 20 such individuals and point out that PPD has stated it fired 590 projectiles over the course of the evening. (Mot. at 25.) Thus, Plaintiffs argue they are likely to form a class of more than 40 individuals and, in any event, the Court should certify the subclass even if it is comprised of fewer than 40 individuals under *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 & n.10 (9th Cir. 1992) (identifying 8 cases certifying classes with fewer than 40 members). (Mot. at 25.) As with Defendants' use of gas and chemical agents, Plaintiffs argue that the individuals' claims for relief require resolving central, common questions as to Defendants' liability and that these common questions predominate over individual issues, satisfying Rules 23(a)(2) and 23(b)(3). (Mot. at 27–30.)

Here, the Court disagrees with Plaintiffs that the issues are sufficiently common. The video and other evidence shows that Defendants used bullets and other projectiles against individual protestors under varying circumstances in different locations and at different times. Thus, both the factual questions and the legal ones—such as whether each deployment of bullets was reasonable under the circumstances at the time—will differ for each individual. *See Moss*, 2015 WL 5705126, at *1–2; *Lyall*, 2010 WL 11549565, at *2–3. Because Plaintiffs have not demonstrated commonality and predominance under Rules 23(a)92) and 23(b)(3), the Court will decline to certify proposed damages subclass (b).

### 3. Typicality and Adequacy of Representation

Returning to the remaining damages class—proposed damages subclass (a)—Plaintiffs have satisfactorily demonstrated typicality and adequacy of representation with respect to the named Plaintiffs. Gonzalez Goodman, Guillen, and Travis all claim they were

exposed to Defendants' gas/chemical agents and subject to Defendants' dispersal order. Moreover, there is no argument before the Court that the named Plaintiffs have a conflict of interest or that counsel for Plaintiffs are not competent to represent the class. Plaintiffs have therefore shown typicality and adequacy of representation under Rules 23(a)(3) and (4). Because Plaintiffs have met the requirements of Rules 23(a) and 23(b)(3), the Court will certify Plaintiffs' proposed subclass (a) of the damages class for a class action.

### B. Proposed Injunctive Relief Class

#### 1. Standing

With regard to Plaintiffs' proposed injunctive relief class, Defendants argue that Plaintiffs do not have standing to seek injunctive relief because they have not demonstrated an actual and imminent repetition of Defendants' alleged violations. (Resp. at 24–27.) A plaintiff cannot properly represent a class if the plaintiff lacks individual standing. *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001). Moreover, a plaintiff "must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Article III standing has three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotations omitted). Second, there must be a causal connection between the injury and the alleged violation. *Id.* at 560. Third, it must be likely that the injury will be redressed by a favorable decision. *Id.* A plaintiff must allege sufficient, specific facts in the complaint to establish standing. *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002).

An organization has standing "to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization also has "associational standing" to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

To be a class representative seeking injunctive relief, a plaintiff "must demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005). A plaintiff "need not establish that future harm is certain, or even probable" but "must establish that recurrence is not 'conjectural' or 'hypothetical.'" *MIWON*, 246 F.R.D. at 628 (citing *Lyons*, 461 U.S. at 105–08).

Here, Plaintiffs contend that they suffered actual injuries as a result of deficient PPD policies and that Defendants' conduct at the protest was officially sanctioned behavior violative of Plaintiffs' federal rights. (Reply at 15–16.) Defendants frame their conduct at the protest by stating, "officers used types of force they rarely use, in response to sudden and specific threats, in an unusually tense high-security atmosphere," such that Plaintiffs are not realistically threatened by a repetition of the violations they allege occurred in response to the protest. (Resp. at 28.)

The Court notes that although the named Plaintiffs allege their First Amendment rights have been chilled by Defendants' conduct, the evidence shows they have attended demonstrations in Phoenix since PPD's use of force at issue in this lawsuit. The Court will accept Plaintiffs' position that "chilling" free speech rights is not equivalent to preventing Plaintiffs from protesting, but rather has made them more reluctant or fearful to do so—a proposition Defendants do not appear to challenge. (Hr'g Tr. at 29–31.)

With regard to whether Plaintiffs are realistically threatened by a repetition of Defendants' alleged violations, in *Armstrong*, the Ninth Circuit stated there are at least two ways to demonstrate that an injury is likely to recur for the purposes of standing to seek injunctive relief. 275 F.3d at 861.

> First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy. In other words, where the harm alleged is directly traceable to a written policy, there is an implicit likelihood of its repetition in the immediate future. Second, the plaintiff may demonstrate that the harm is part of a pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights. Thus, where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the realistic repetition requirement.

*Id.* at 861 (internal quotations and citations omitted).

As for the second of these ways of demonstrating a realistic likelihood of recurrence, the parties dispute whether PPD's past conduct is sufficient to indicate that PPD will engage in a use of force in the future similar to that alleged by Plaintiffs in this case. But the Court finds that Plaintiffs have provided enough policy evidence to meet the first of the two tests set forth in *Armstrong*. Specifically, Plaintiffs point to evidence that PPD had no policy in place at the time of the protest regarding the use of tear gas/chemical agents, which is directly related to Plaintiffs' alleged injuries. (Reply at 15.) Moreover, Plaintiffs provide evidence that PPD did not change its procedures or implement corrective actions after the protest, and indeed its Chief ratified PPD's conduct after the event. (Reply at 15–16.) Because the harm Plaintiffs allege is traceable to PPD's policies, or lack thereof, the Court can infer a realistic repetition of PPD's course of action sufficient for standing purposes.

### 2. Rule 23(a) Elements

The parties do not raise new arguments regarding whether Plaintiffs' proposed injunctive relief class meets the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, as applied to the individual Plaintiffs and the organizational Plaintiffs in vindicating their own interests and those of their members. Instead, Defendants point out that a class action is not necessary to obtain injunctive relief when an individual plaintiff can obtain the same relief (Resp. at 27)—a proposition with which, as a practical matter, the Court agrees. However, because Plaintiffs' damages class

will be certified and the issues involved in seeking damages and injunctive relief largely intersect, allowing the injunctive relief class to proceed will not result in substantial unfairness or inefficiency. The Court will thus certify Plaintiffs' proposed injunctive class.

### C. Other Motions

Defendants filed a Motion for Leave to Supplement the Class Certification Record (Doc. 138), which Plaintiffs opposed with a Motion to Strike (Doc. 146). The Court reviewed the deposition transcripts provided by Defendants (Docs. 139, 140) together with their Motion and did not find Defendants' summaries to be akin to additional briefing. The Court will therefore grant Defendants' Motion for Leave to Supplement (Doc. 138), grant Defendants' associated Motion to Seal (Doc. 141), and deny Plaintiffs' Motion to Strike (Doc. 146).

Defendants also filed a Motion for Leave to File a Sur-Reply (Doc. 144), which Plaintiffs opposed (Doc. 148). Because the Court did not rely on Defendants' proposed Sur-Reply in resolving Plaintiffs' Amended Motion for Class Certification (Doc. 101), the Court will deny Defendants' Motion for Leave to File a Sur-Reply (Doc. 144) as moot.

**IT IS THEREFORE ORDERED** granting in part and denying in part Plaintiffs' Amended Motion for Class Certification (Doc. 101). The Court certifies Plaintiffs' proposed subclass (a) of the damages class with the modification to the class definition described in this Order, as well as Plaintiffs' proposed injunctive relief class. The Court denies certification of Plaintiffs' proposed damages subclass (b).

**IT IS FURTHER ORDERED** granting Defendants' Motion for Leave to Supplement the Class Certification Record (Doc. 138) and directing the Clerk of Court to file on the docket the documents currently lodged at Docs. 139 and 140.

**IT IS FURTHER ORDERED** granting the Motion to File Exhibit under Seal (Doc. 141) and directing the Clerk of Court to file under seal the document currently lodged under seal at Doc. 142.

**IT IS FURTHER ORDERED** denying as moot Defendants' Motion for Leave to File a Sur-Reply (Doc. 144).

**IT IS FURTHER ORDERED** denying Plaintiffs' Motion to Strike Portions of Defendants' Supplements or Alternatively for Leave to Respond to Defendants' Filings (Doc. 146).

Dated this 30th day of September, 2019.

_____
Honorable John J. Tuchi
United States District Judge