Dan Stormer, Esq. (CA Bar No. 101967) (*pro hac vice*)
Shaleen Ameeta Shanbhag (CA Bar No. 301047) (*pro hac vice*)
HADSELL STORMER & RENICK LLP
128 North Fair Oaks Avenue
Pasadena, CA 91103
Telephone: (626) 585-9600
Email:   dstormer@hadsellstormer.com
         sshanbhag@hadsellstormer.com

Kathleen E. Brody (AZ Bar No. 026331)
MITCHELL STEIN CAREY CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
Telephone: (602) 388-8958
Email: kathy@mscclaw.com

*Attorneys for Plaintiffs*

[Additional counsel cont. on next page]

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente, an Arizona nonprofit corporation; et al.,<br><br>  Plaintiffs,<br><br> v.<br><br>City of Phoenix, a municipal corporation; et al.,<br><br>  Defendants. | Case No.: 2:18-cv-18-2778-PHX-JJT<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

[Additional counsel cont. from first page]

Jared G. Keenan (AZ Bar No. 027068)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Email:   jkeenan@aculaz.org

Barrett S. Litt (CA Bar No. 45527) (*pro hac vice*)
KAYE, MCLANE, BEDNARSKI & LITT, LLP
975 E. Green Street
Pasadena, CA 91106
Telephone: (626) 844-7660
Email:   Blitt@kmbllaw.com

Paul Hoffman (CA Bar No. 71244) (*pro hac vice*)
John Washington (CA Bar No. 315991) (*pro hac vice*)
SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
200 Pier Avenue, Suite 226
Hermosa Beach, CA 90254
Emails: hoffpaul@aol.com
         jwashington@sshhlaw.com

Neel Chatterjee (CA Bar No. 173985) (*pro hac vice*)
Alexis Coll-Very (CA Bar No. 212735) (*pro hac vice*)
Daniel R. Mello, Jr. (CA Bar No. 325714) (*pro hac vice*)
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
Telephone: (650) 752-3100
Emails: nchatterjee@goodwinlaw.com
         acollvery@goodwinlaw.com
         dmello@goodwinlaw.com

*Attorneys for Plaintiffs*

Megan Bettles (CA Bar No. 328161) (*pro hac vice*)
GOODWIN PROCTER LLP
Three Embarcadero Center
San Francisco, CA 94111-4003
Telephone: (415) 733-6000
Email:   mbettles@goodwinlaw.com

Hong-An Vu (CA Bar No. 266268) (*pro hac vice*)
Stella Padilla (CA Bar No. 301590) (*pro hac vice*)
GOODWIN PROCTER LLP
601 S. Figueroa Street, Suite 4100
Los Angeles, CA 90017-5704
Telephone: (213) 426-2500
Emails: hvu@goodwinlaw.com
         spadilla@goodwinlaw.com

Sean M. Galvin (NY Bar No. 570313) (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Email:   seangalvin@goodwinlaw.com

Cindy Pánuco, Esq. (CA Bar No. 266921) (*pro hac vice*)
Nisha Kashyap, Esq. (CA Bar No. 301934) (*pro hac vice*)
Joanna Adler, Esq. (CA Bar No. 318306) (*pro hac vice*)
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Emails: cpanuco@publiccounsel.org
         nkashyap@publiccounsel.org
         jadler@publiccounsel.org

# TABLE OF CONTENTS

**Page**

ARGUMENT ....................................................................................................... 8

I.   As a matter of law, Defendants violated Plaintiffs' Fourth Amendment rights by indiscriminately firing hundreds of rounds of chemical and impact munitions into a peaceful crowd, based on the unlawful actions of a handful of individuals. ................................................................. 10

   A.   PPD's rampant use of chemical and projectile munitions substantially intruded on Plaintiffs' Fourth Amendment rights. ......... 12

   B.   PPD's interest in stopping the unlawful actions of a handful of people did not justify its use of indiscriminate and severe force against Plaintiffs and other peaceful protesters. .................................. 13

   C.   PPD's asserted interests did not justify the level of force used against Plaintiffs. ................................................................. 18

II.  As a matter of law, Defendants violated Plaintiffs' First Amendment rights of speech and assembly. ............................................................. 20

   A.   Defendants violated Plaintiffs' First Amendment rights by dispersing them without adequate justification. ................................. 21

   B.   Defendants also violated Plaintiffs' First Amendment rights by dispersing their peaceful protest without proper notice. .................... 23

III. The City of Phoenix is liable for Defendants' unconstitutional conduct. ...... 25

   A.   Chief Williams was the final policymaker for the City with respect to the conduct at issue. ..................................................... 26

   B.   Chief Williams delegated responsibility to Lieutenant Moore for the decisions at issue. ............................................................. 26

   C.   Chief Williams ratified PPD's unconstitutional conduct. .................. 27

IV.  Plaintiffs are entitled to summary judgment on their claim for injunctive relief. .................................................................................. 29

   A.   Plaintiffs have established they will suffer irreparable injury and have no adequate legal remedy. .................................................. 30

   B.   Plaintiffs have established that the balance of hardships and public interest support a permanent injunction. ................................ 31

CONCLUSION .................................................................................................. 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................8

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ...................................................29, 30, 31

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ......................................................................29

*Associated Press v. Otter*,
682 F.3d 821 (9th Cir. 2012) ......................................................................31

*Bailey v. Cty. of San Joaquin*,
671 F. Supp. 2d 1167 (E.D. Cal. 2009) ...................................................16

*Barham v. Ramsey*,
338 F. Supp. 2d 48 (D.D.C. 2004) ...........................................................24

*Barone v. City of Springfield*,
902 F.3d 1091 (9th Cir. 2018) ............................................................26, 27

*Boyd v. Benton Cty.*,
374 F.3d 773 (9th Cir. 2004) ..........................................................*passim*

*Bryan v. MacPherson*,
630 F.3d 805 (9th Cir. 2010) ...............................................................13, 18

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) .............................................................................20, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................................8

*Collins v. Jordan*,
110 F.3d 1363 (9th Cir. 1996) ............................................................20, 21

*Cox v. Louisiana*,
379 U.S. 536 (1965) .......................................................................................24

*Dellums v. Powell*,
566 F.2d 167 (D.C. Cir. 1977) .................................................................24

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001) ...................................................12, 13, 18, 19

*Dietzmann v. City of Homer,*
    2010 WL 4684043 (D. Alaska Nov. 17, 2010) .....................................16, 17

*Dinler v. City of New York,*
    2012 WL 4513352 (S.D.N.Y. Sept. 30, 2012) ...........................................24

*E*Trade Fin. Corp. v. Eaton,*
    305 F. Supp. 3d 1029 (D. Ariz. 2018) .......................................................30

*Edwards v. South Carolina,*
    372 U.S. 229 (1963) ...................................................................................21

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...................................................................................30

*Fogarty v. Gallegos,*
    523 F.3d 1147 (10th Cir. 2008) .................................................................12

*Gillette v. Delmore,*
    979 F.2d 1342 (9th Cir. 1992) ..............................................................26, 27

*Glenn v. Washington Cty.,*
    673 F.3d 864 (9th Cir. 2011) .....................................................................12

*Graham v. Connor,*
    490 U.S. 386 (1989) ...........................................................................*passim*

*Headwaters Forest Def. v. Cty. of Humboldt,*
    240 F.3d 1185 (9th Cir. 2000) ......................................................11, 14, 19

*Hulstedt v. City of Scottsdale,*
    884 F. Supp. 2d 972 (D. Ariz. 2012) ............................................11, 17, 18

*Jones v. Parmley,*
    465 F.3d 46 (2d Cir. 2006) .................................................................*passim*

*Lamb v. City of Decatur,*
    947 F. Supp. 1261 (C.D. Ill. 1996) ...........................................................21

*Larez v. City of Los Angeles,*
    946 F.2d 630 (9th Cir. 1991) ..........................................................26, 27, 28

*Lavan v. City of Los Angeles,*
    693 F.3d 1022 (9th Cir. 2012) ...................................................................30

*Lujan v. v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ........................................................................29

*Lytle v. Carl,*
   382 F.3d 978 (9th Cir. 2004) ......................................................26, 27

*McMillian v. Monroe Cty.,*
   520 U.S. 781 (1997) ........................................................................26

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ..........................................................30

*Monell v. Dep't of Social Servs. of N.Y.,*
   436 U.S. 658 (1978) ......................................................................25, 27

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ........................................................................29

*Mont. Shooting Sports Ass'n v. Holder,*
   727 F.3d 975 (9th Cir. 2013) ..........................................................29

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982) ........................................................................21

*Nelson v. City of Davis,*
   685 F.3d 867 (9th Cir. 2012) ..................................................*passim*

*Penley v. Eslinger,*
   605 F.3d 843 (11th Cir. 2010) ........................................................18

*Sammartano v. First Judicial Dist. Court,*
   303 F.3d 959 (9th Cir. 2002) ..........................................................31

*Schlossberg v. Solesbee,*
   2011 WL 2222063 (D. Or. June 7, 2011)......................................27

*Scott v. Harris,*
   550 U.S. 372 (2007) ..........................................................................1

*Shenfield v. City of Tucson,*
   443 P.2d 443 (Ariz. 1968) ..............................................................21

*Smith v. City of Hemet,*
   394 F.3d 689 (9th Cir. 2005) ..........................................................14

*Trevino v. Gates,*
   99 F.3d 911 (9th Cir. 1996) ............................................................26

*Trevino v. Lassen Mun. Util. Dist.*,
  2009 WL 385792 (E.D. Cal. Feb. 13, 2009) .................................................27

*Ulrich v. City & Cty. of San Francisco*,
  308 F.3d 968 (9th Cir. 2002) ....................................................................26

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ..................................................................30

*Vodak v. City of Chicago*,
  639 F.3d 738 (7th Cir. 2011) ..............................................................24, 25

*Winterrowd v. Nelson*,
  480 F.3d 1181 (9th Cir. 2007) ..................................................................19

*Young v. Cty. of Los Angeles*,
  655 F.3d 1156 (9th Cir. 2011) ..............................................11, 12, 13, 16

*Zion v. Cty. of Orange*,
  874 F.3d 1072 (9th Cir. 2017) ..................................................................14

**Statutes**

Ariz. Rev. Stat. § 13-3804 .............................................................................24

**Other Authorities**

U.S. Const. amend I ...............................................................................*passim*

U.S. Const. amend IV ............................................................................*passim*

Fed. R. Civ. P. 56......................................................................................1, 8

**"What value would the First Amendment carry if . . . demonstrators could be dispersed or intimidated by police brutality or unnecessary force?"**

*Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996). That is the question at the heart of this case.

It is undisputed that on August 22, 2017, the Phoenix Police Department ("PPD") dispersed hundreds of peaceful protesters based on the unlawful conduct of a handful of people using hundreds of rounds of chemical and impact munitions and without giving any notice or warning to the crowd until after most people had already dispersed. As a matter of law, PPD's actions that night violated Plaintiffs' First and Fourth Amendment rights.

Plaintiffs move the Court to grant partial summary judgment in their favor on liability for their First and Fourth Amendment claims, the liability of the City of Phoenix for Defendants' unconstitutional conduct, and Plaintiffs' entitlement to injunctive relief. Fed. R. Civ. P. 56. The events of August 22, 2017, were captured in many videos, Defendants produced numerous written reports regarding their actions, and Defendant Chief of Police Jeri Williams and other City officials made several public statements about PPD's conduct following the event, including statements by Chief Williams heaping praise on the department and its officers for their conduct that day. In addition to Defendants' deposition testimony, the factual account on which this Motion and its Separate Statement of Facts are based is taken largely from those sources. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (in summary-judgment posture, courts may rely on "videotape capturing the events in question" even if they contradict non-moving party's version of facts).

## <u>INTRODUCTION</u>

On August 22, 2017, PPD eviscerated the First and Fourth Amendment rights of hundreds of peaceful protestors when it grossly overreacted to a small group who appeared to be moving a fence toward a fully armed phalanx of PPD officers standing at the ready. That gross overreaction was not the result of split-second decision-making. During its week of planning for the presidential visit, PPD received information that disrupters, like the Antifa group, would attend the demonstrations. PPD was familiar with Antifa's tactics, including the

very tactic that PPD claims justified its initial deployment of so-called less-lethal weapons, which in reality can cause serious injury and even death. PPD planned all along that it would address that tactic with pepper balls, giving no thought to how such weapons would affect the thousands of other protesters expected to attend.

After a long, hot day of peaceful expression and assembly, PPD fired an arsenal of chemical and impact munitions into the crowd in response to the claimed threat, without warning, causing hundreds of protestors to disperse unnecessarily and to suffer needless injuries. It took PPD nineteen minutes after its barrage began to declare an unlawful assembly, after most of the crowd had already left the area.

From the night of these events through today, Chief Williams has insisted that "operationally, everything that happened was textbook perfect," making it clear that the City of Phoenix is liable for this unconstitutional conduct. SSOF 104.

## STATEMENT OF FACTS

PPD learned a week in advance that President Trump would hold a campaign-style rally at the Phoenix Convention Center on August 22, 2017. *Id.* at 3. Chief Williams headed the chain of command for the event, and both she and other members of her command staff were actively involved in the preparations for and management of the event. *Id.* at 4, 5. PPD anticipated that groups and individuals both supporting and opposing President Trump would attend the event, with thousands attending the rally inside the Convention Center and thousands more protesting outside. *Id.* at 6. As a safety measure, PPD planned a public-safety zone on Monroe Street, which would be blocked off to traffic and attendees, and a Free-Speech Zone north of Monroe Street, separated from the public-safety zone by pedestrian fencing, where anti-Trump protesters were expected to gather. *Id.* at 7.

PPD anticipated the possibility of civil unrest and other unlawful conduct during the event, as well as the possibility that officers might have to declare an unlawful assembly, disperse the gathered crowds, and deploy "riot agents," or chemical weapons. *Id.* at 8–10. In particular, PPD anticipated that members of Antifa would attend the protest and engage in unlawful conduct. *Id.* at 11, 12. PPD knew that Antifa had recently disrupted several

1    demonstrations across the country, and officers were familiar with Antifa's tactics, including
2    their tactic of using signposts to topple police barriers. *Id.* at 13–15. PPD had specific
3    experience with Antifa at previous demonstrations in Phoenix and knew that Antifa was
4    generally uncooperative with PPD officers. *Id.* at 16.

5           Despite this knowledge, PPD did not make plans in advance of the event about how its
6    officers would deal with Antifa. *Id.* at 17. Nor did PPD plan for how officers would isolate
7    and remove a small group of individuals acting unlawfully from the thousands of other
8    demonstrators expected to attend the event, a common issue that law enforcement has faced
9    for hundreds of years. *Id.* at 18, 19. PPD made no plans in advance about what circumstances
10   would trigger an unlawful-assembly declaration, how officers would announce to the
11   thousands of attendees that they were required to disperse, or how they would direct people
12   to disperse safely if necessary. *Id.* at 21.

13          Instead, PPD and its grenadiers planned in advance of the event that their "primary
14   response to fights, destruction of property, and breaching the no-go zone [public-safety zone
15   on Monroe Street] will be pepperball," which are chemical munitions delivered through a
16   high-pressure air system that irritate the eyes and nose like pepper spray. *Id.* at 22, 23. PPD
17   and its grenadiers also anticipated using other chemical and impact munitions during the
18   event, but PPD did not prepare rules of engagement for the event to guide officers on the
19   circumstances under which it would be appropriate to such weapons. *Id.* at 10, 25. Nor did
20   PPD have any policy at the time addressing the appropriate use of tear gas. *Id.* at 26. Chief
21   Williams delegated to Defendant Lieutenant Benjamin Moore, the Field Force Commander
22   for the event, the authority to order the use of chemical weapons and to declare an unlawful
23   assembly. *Id.* at 27.

24          PPD estimated that approximately 6,000 people gathered outside the Convention
25   Center north of Monroe Street, and throughout the day, PPD monitored the crowd for people
26   who were engaged in criminal conduct or who might threaten the safety of others. *Id.* at 29,
27   30. Until approximately 7:00 pm, the demonstrations remained overwhelmingly peaceful. *Id.*
28   at 32.

Around 7:00 pm, PPD observed water bottles being thrown from the north side of Monroe Street and deployed officers in Monroe Street between 1st and 5th Streets "to discourage any further projectiles from being thrown." *Id.* at 33. At 7:20 pm, officers walked along Monroe Street between 1st and 5th Streets using a Long-Range Acoustical Device ("LRAD"), an amplifier, to instruct attendees to remain peaceful and not to throw things. *Id.* at 34. At 7:23 pm, Lieutenant Moore ordered Tactical Response Unit ("TRU") officers in the public-safety zone to put on their helmets for protection from the water bottles. *Id.* at 35.

Lieutenant Moore had begun getting reports about Antifa in the late afternoon to early evening and received additional reports after 7:00 pm. *Id.* at 36. He knew he had to watch this group very closely, so he asked other PPD officers to continue to observe Antifa. *Id.* at 37, 38. Around 8:07 pm, Lieutenant Moore directed Defendant Sergeant Douglas McBride, the leader of PPD's grenadiers, to a group of ten to fifteen individuals dressed in black on the north side of Monroe, just east of 2nd Street, who Moore and McBride believed were associated with Antifa. *Id.* at 39. Around the same time, PPD observed Antifa pushing a protester who told them to stop throwing things, and officers approached the group to deescalate the situation. *Id.* at 40, 41. Consistent with PPD's previous experience, the Antifa members were extremely agitated, acting aggressively, shouting, and using profanity toward PPD officers. *Id.* at 16, 42. McBride made the grenadiers under his command aware of this group. *Id.* at 43.

Lieutenant Moore received intelligence that Antifa might attempt to breach the fence guarding the public-safety zone using their signs, a known Antifa tactic. *Id.* at 15, 44. By around 8:10 pm, Moore planned to stop any attempt by Antifa to breach the fence by using pepper balls—the same plan PPD had going into the event—and also to use smoke and tear gas. *Id.* at 22, 45. By 8:20 pm, Moore noted that Antifa had erected a large black sign at the fence line on Monroe between 2nd and 3rd Streets, and two minutes later additional signs at the same location. *Id.* at 46, 47. It was apparent to PPD that Antifa's movements were suspicious and required further investigation, so at 8:25 pm, officers approached the group

1   and saw Antifa hooking flags and banners to the fencing. *Id.* at 48, 49. By this time at the

2   latest, Moore believed that Antifa was going to try to breach the fence. *Id.* at 50.

3        Around 8:30 pm, there were several thousand people demonstrating in the Free-Speech

4   Zone north of Monroe Street, and the Antifa group was closely surrounded by peaceful

5   protesters. *Id.* at 52–54. By that time, Moore noted additional Antifa members gathering

6   behind the signs, and some were opening bags and handing out unidentified items, and he and

7   McBride instructed the grenadiers to deploy pepper ball rounds at the ground in front of Antifa

8   if the group tried to breach the fence. *Id.* at 51, 55. Despite surveilling Antifa for more than

9   twenty minutes by that time and observing them push another protester and hook their signs

10  to the fence, PPD considered no method other than pepper balls to stop Antifa from breaching

11  the fence. *Id.* at 36–51, 56.

12       At about 8:32 pm, Antifa began pushing the fence. *Id.* at 59. At 8:33 pm, on Moore's

13  order, PPD deployed pepper balls toward the ground in front of Antifa, and then again directly

14  at individuals who did not immediately disperse from the area. *Id.* at 60. No warning at all

15  was given to anyone in the crowd that PPD was about to use such force. *Id.* at 61, 63.

16       PPD's initial pepper ball deployment stopped the attempted breach of the fence, pushed

17  Antifa and others near them back from the fence, and sent Antifa to circulate anonymously

18  within the larger crowd of protesters. *Id.* at 64, 65. Rather than deescalate the situation, PPD's

19  deployment predictably exacerbated it, and the number of waters bottles and other objects

20  being thrown from the crowd noticeably increased. *Id.* at 66.

21       Within a minute of PPD's initial deployment, someone in the crowd threw a small gas

22  grenade into the street where PPD officers were standing. *Id.* at 67. Moore ordered TRU

23  officers to don their gas masks. *Id*. On Moore's command, at 8:35 pm, grenadiers deployed

24  smoke grenades toward the north curb of Monroe Street to disperse the crowd. *Id.* at 69. This

25  action, again predictably, caused the crowd to throw more objects at the police, including at

26  8:36 pm, another small pyrotechnical device. *Id.* at 70, 71. PPD was able to extinguish the

27  two pyrotechnical objects thrown from the crowd but did not identify who threw them. *Id.* at

28  68, 72.

1    Lieutenant Moore immediately ordered PPD officers to deploy tear gas grenades
2   toward the north curb of Monroe Street, which had its desired effect—both lawful and
3   unlawful demonstrators were dispersed from the Free-Speech Zone. *Id.* at 73–76. By its
4   nature, tear gas is a non-targeted weapon, so hundreds of people felt its effects, including
5   Plaintiffs, other demonstrators, members of the news media, and even PPD officers who had
6   to exit to the safety of a nearby hotel when the gas started to affect them. *Id.* at 74, 77, 79.

7    In the next ten minutes, PPD unleashed an astounding arsenal of weapons against the
8   crowd, including more pepper balls, smoke grenades, and gas grenades, some of which were
9   thrown back at officers by people who remained. *Id.* at 78. During this time, from 8:33 pm to
10  approximately 8:45 pm, PPD deployed hundreds of pepper ball rounds, more than ten tear gas
11  grenades, and at least eight smoke grenades. *Id*. PPD also fired at least five 40-millimeter OC
12  muzzle blast rounds above the crowd, which contain OC powder and have effects similar to
13  pepper spray, and one stun bag round or bean bag. *Id.* at 78, 80. In addition, PPD deployed a
14  bore thunder round and four aerial flash-bangs, which produce loud sounds and flashes and
15  are intended to disperse crowds. *Id.* at 78, 81.

16   By about 8:45 pm, numerous demonstrators, including the hundreds that had been
17  protesting peacefully, had been exposed to tear gas and other munitions, and the Free-Speech
18  Zone was mostly empty. *Id.* at 77, 78, 83. Still PPD had made no announcement of any kind
19  to those who had gathered. *Id*. at 86.

20   It was not until 8:42 pm at the earliest that Lieutenant Moore decided to declare un
21  unlawful assembly. *Id.* at 84. And it was not until ten minutes after that, at 8:52 pm, that PPD
22  finally began announcing to the remaining people that they were required to leave. *Id.* at 86.
23  By then, the majority of people had already left the area. *Id.* at 83. For the people remaining,
24  PPD's announcements gave no instruction about where to disperse or how to do so safely. *Id.*
25  at 87. By around 9:10 pm, PPD had dispersed most of the remaining individuals. *Id.* at 93. By
26  the end of the night, PPD had deployed more pepper ball rounds, more smoke and gas
27  grenades, more OC muzzle blasts, and more flash bangs. *Id.* at 94, 97. PPD had also deployed
28  eight 40-millimeter frangible impact OC rounds, which contain dry OC powder similar to

pepper balls, and ten 40-millimeter spin stabilized sponge rounds, which are impact rounds made of a foam sponge material. *Id.* at 94–97. Only five people were arrested in connection with the August 22, 2017 event. *Id.* at 99.

Later that night, City officials, including Chief Williams, briefed the press and praised PPD's conduct. *Id.* at 103. Later, Chief Williams stated publicly that "operationally, everything that happened was textbook perfect." *Id.* at 104. She also concluded that PPD acted within its policies in every respect during the August 22, 2017 event. *Id.* at 105. No PPD officer was disciplined in connection with their actions that day. *Id.* at 107.

Nor was any PPD officer disciplined in connection with the logo and "challenge coin" that officers produced and distributed to celebrate their conduct on August 22, 2017, even though Chief Williams and others within PPD admitted that it did not represent appropriate police conduct. *Id.* at 108, 110, 111, 117, 118, 119. Generally, challenge coins are produced by different law enforcement agencies to commemorate notable events and collected by officers. *Id.* at 109. In the days following the event, Lieutenant Moore and Sergeant McBride participated in the design and creation of the logo on the challenge coin and ███████████ ███████████████████████ *Id.* at 110, 111. On its front the challenge coin says, "GOOD NIGHT LEFT NUT," and depicts a man who was struck in the groin by one of PPD's munitions. *Id.* at 112, 115. On its back, the coin says, "PHOENIX, AZ, AUGUST 22, 2017," and "MAKING AMERICA GREAT AGAIN ONE NUT AT A TIME," coopting language from President Trump's campaign slogan. *Id.* at 113, 114. At least four of PPD's grenadiers admitted to possessing the challenge coin and at least one was involved in selling and distributing it. *Id.* at 116, 117.

PPD issued an After-Action Review ("AAR") of the August 22, 2017 event in January 2018, which noted that "the vast majority of participants were peaceful, organized and respectful." *Id.* at 120, 121. The AAR also noted various "opportunities for improvement," one of which was that PPD should "*[e]stablish a protocol* to account for munitions deployed prior to the incident, and if possible *regarding the type of munitions allowable and identify circumstances they may be deployed.*" *Id.* at 122, 124 (emphasis added). In other words, for

1    future protests, PPD should develop rules of engagement for using its arsenal of weapons,

2    which it did not do on August 22, 2017. *Id.* at 25, 123.

3           In August 2018, PPD conducted a follow-up review of the actions initiated in response

4    to the AAR's opportunities for improvement identified. *Id.* at 124. No action was taken in

5    response to the recommendation regarding rules of engagement for munitions. *Id.* at 125, 127.

6    The follow-up review noted only the existence of PPD policies under which "a Field Force

7    commander can authorize the use of chemical agents; chemical agents will only be used when

8    absolutely necessary and when other passive means have failed to restore order." *Id*. at 125.

9    In other words, PPD made no changes at all to its policies governing the arsenal of chemical

10   and other less-lethal weapons it deployed against protesters despite a recommendation from

11   within the department to do so (and even though PPD's own police-practices expert agreed

12   that PPD should have addressed the opportunities for improvement identified in the AAR).

13   *Id.* at 127, 128.

14          In short, PPD ended the peaceful First Amendment activities of hundreds of people on

15   August 22, 2017, by using chemical and impact weapons, without giving any warning at all

16   to the crowd and without even considering other ways to address the fifteen to twenty people

17   acting unlawfully. That day and to this day, PPD believes it did nothing wrong and has not

18   even made the relevant changes recommended from within the department.

19                                        **ARGUMENT**

20          Plaintiffs are entitled to partial judgment as a matter of law because, based on the

21   undisputed facts viewed in Defendants' favor, there is no genuine issue of material fact that

22   Defendants violated Plaintiffs First and Fourth Amendment rights, that the City of Phoenix is

23   liable for Defendants' unconstitutional conduct, and that Plaintiffs are entitled to a permanent

24   injunction to prevent PPD from committing similar constitutional violations in the future. Fed.

25   R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty*

26   *Lobby, Inc.*, 477 U.S. 242, 248 (1986).

27          Plaintiffs are entitled to judgment as a matter of law on their Fourth Amendment claims

28   because no reasonable officer acting under similar circumstances would employ the type and

amount of force that PPD used against Plaintiffs and other peaceful protesters on August 22, 2017. PPD deployed hundreds of rounds of chemical and impact munitions—weapons that are indisputably capable of causing serious injury—in less than an hour. PPD attempts to justify this force by pointing to the actions of at most twenty individuals acting unlawfully and, after its initial deployment, objects thrown from the crowd toward officers. But PPD failed to consider obvious alternatives to its astounding use of force, planning from the time it learned of the president's visit to use its chemical weapons in the case of disruption. PPD also failed to consider the harmful effects that its force would cause to lawful and peaceful protesters, instead making the deliberate decision to use chemical and impact munitions against them so they would exit the Free-Speech Zone. Nor did PPD give any warning to the crowd that it was going to unleash such force. No announcement to disperse was given until almost twenty minutes after PPD first deployed pepper balls, and by then, most people already had left the Free-Speech Zone.

Plaintiffs are entitled to judgment as a matter of law on their First Amendment claims for two reasons. First, PPD dispersed Plaintiffs and other peaceful protesters without adequate justification, basing their initial pepper ball deployment on the unlawful conduct of a handful of people, and then deciding to disperse the remaining peaceful protesters two minutes later. Second, PPD separately violated Plaintiffs rights by dispersing them without an adequate warning and opportunity to leave the area, which are required by the First Amendment even when police have an adequate justification for dispersal.

The undisputed facts also establish that the City of Phoenix is liable for Defendants' conduct as a matter of law. Chief Williams is unquestionably the final policymaker for the City with respect to police actions, including mass demonstrations like the August 22, 2017 event. She headed the chain of command for the event and actively participated in its preparation and management. Chief Williams delegated authority to Lieutenant Moore to decide when and whether to deploy chemical weapons and when and whether to declare an unlawful assembly. Defendants have maintained from the beginning that Lieutenant Moore made those decisions and that all PPD actions at issue in this case were taken based on orders

that came through PPD's chain of command. Consistent with that position, Chief Williams wholeheartedly ratified the unconstitutional conduct of PPD's officers, proclaiming that conduct "textbook perfect." No PPD officer was disciplined in connect with the event, even when officers unashamedly celebrated their violence against protesters that night.

Plaintiffs are also entitled to summary judgment on their claim for injunctive relief. In granting Plaintiffs' motion for class certification, the Court has already concluded that Plaintiffs have standing for injunctive relief because "PPD had no policy in place at the time of the protest regarding the use of tear gas/chemical agents," and "PPD did not change its procedures or implement corrective actions after the protest, and indeed its Chief ratified PPD's conduct after the event." Doc. 191 at 15. Those facts remain undisputed. In addition, Plaintiffs have suffered constitutional harm, including undisputed chill of their First Amendment rights, which remains irreparable in the absence of an order from this Court that will prevent a repeat of the police violence on August 22, 2017. There is no legal remedy that can adequately address that chill. No doubt an injunction is in the public interest here. Protecting constitutional rights, especially First Amendment rights, is always in the public interest, and the rights of thousands of people—past, present, and future peaceful demonstrators in the City of Phoenix—hang in the balance.

The Court should grant Plaintiffs partial summary judgment based on the undisputed facts and law outlined in this Motion.

I.    **As a matter of law, Defendants violated Plaintiffs' Fourth Amendment rights by indiscriminately firing hundreds of rounds of chemical and impact munitions into a peaceful crowd, based on the unlawful actions of a handful of individuals.**

As a matter of undisputed fact and law, Defendants' unannounced deployment of pepper balls into a packed crowd of demonstrators, including Plaintiffs and hundreds of other peaceful protesters, deployment of smoke and gas grenades into the crowd just minutes later, and continuous deployment of a wide range of munitions and chemical agents in the minutes following that, all without any warning, was excessive and objectively unreasonable under

1    the circumstances. Plaintiffs are accordingly entitled to summary judgment on their Fourth

2    Amendment claim.

3          Police officers violate the Fourth Amendment when they use force that is not

4    "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397

5    (1989). Determining reasonableness requires "careful balancing of the nature and quality of

6    the intrusion on the individual's Fourth Amendment interests against the countervailing

7    governmental interests at stake." *Id.* at 396 (citation and internal quotations omitted). Courts

8    apply a three-step process to evaluate the reasonableness of officers' use of force. First, courts

9    evaluate "the type and amount of force inflicted." *Headwaters Forest Def. v. Cty. of*

10   *Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000) ("*Headwaters I*"), *vacated and remanded on*

11   *other grounds sub nom. Cty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001)

12   (internal citations and quotations omitted), *reaffirmed in relevant part in Headwaters Forest*

13   *Def. v. Cty. of Humboldt* ("*Headwaters II*"), 276 F.3d 1125, 1129–30 (9th Cir. 2002). Second,

14   courts "assess the importance of the government interests at stake." *Young v. Cty. of Los*

15   *Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (citations and internal quotations omitted). The

16   third step requires "balance[ing] the gravity of the intrusion on the individual against the

17   government's need for that intrusion." *Id.*

18         Here, it is undisputed that PPD repeatedly and indiscriminately deployed chemical

19   agents and other munitions into a tightly packed crowd without any warning, injuring

20   Plaintiffs and other peaceful demonstrators. SSOF 52–54, 60, 61, 63, 69, 73–82, 94–97. It is

21   also undisputed that PPD's asserted interest in using force initially was to address the unlawful

22   conduct of at most twenty people, and then to stop people in the crowd from throwing water

23   bottles and other objects. *Id.* at 59, 60, 66, 67, 71, 73. As a matter of law, no reasonable officer

24   under similar circumstances would have acted in this way because it is objectively

25   unreasonable to violently disperse hundreds of peaceful protesters, without warning, based on

26   the unlawful conduct of just a few individuals. *See, e.g.*, *Hulstedt v. City of Scottsdale*, 884 F.

27   Supp. 2d 972, 990 (D. Ariz. 2012) (granting summary adjudication to plaintiffs on Fourth

28   Amendment claim).

**A.**      **PPD's rampant use of chemical and projectile munitions substantially intruded on Plaintiffs' Fourth Amendment rights.**

Courts measure the gravity of the intrusion on a person's liberty interest based on "the type and amount of force inflicted." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citation omitted). Here, the "type and amount of force" deployed by Defendants substantially intruded on Plaintiffs' liberty interests and thus can only be justified by a strong government interest. *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012).

Courts have repeatedly found that chemical agents and projectiles are "intermediate" uses of force that present "significant intrusion[s] upon an individual's liberty interests" and can be justified only by a strong governmental interest. *Young*, 655 F.3d at 1161–62; *see also Nelson*, 685 F.3d at 878 (pepper ball projectiles "encompass both the physical blow from the force of the projectile and the chemical effects of pepper spray" requiring substantial government interest); *Glenn v. Washington Cty.*, 673 F.3d 864, 871–72 (9th Cir. 2011) (bean bag rounds have "dangerous capabilities" and are used to induce compliance through "sudden, debilitating, localized pain," and must be justified by strong government interest); *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (officers' use of less lethal "pain-inflicting compliance technique[s]" including tear gas was objectively unreasonable); *Boyd v. Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) ("explosive flash-bang device . . . which the officers knew had the potential to cause injury." required strong governmental interest); *Deorle*, 263 F.3d at 1280 (beanbag round "has the capability of causing serious injury," including death if used at a range less than fifty feet).

It is undisputed that *hundreds* of lawfully present protestors and innocent third parties, including members of the news media, were harmed by PPD's extensive deployment of chemical agents and impact munitions. SSOF 77, 101, 102. Plaintiffs suffered intense physical, psychological, and neurological injuries as a result of PPD's use of force, including bruising, difficulty breathing, shortness of breath, burning and irritated skin and eyes, panic, and disorientation, injuries that PPD officers knew were possible, along with serious injury

1    or death. *Id.* at 98, 101; *see Nelson*, 685 F.3d at 879 ("The possibility of serious injury was

2    apparent to the officers at the time of the shooting [of pepper ball projectiles]").

3         It is also undisputed that PPD used an overwhelming amount of force by continuously

4    deploying various chemical agents and munitions over about a half hour. SSOF 60, 69, 73–

5    82, 94–97. From 8:33 pm to about 8:45 pm, PPD deployed hundreds of pepper ball rounds,

6    more than ten tear gas grenades, at least eight smoke grenades, at least five 40-millimeter OC

7    muzzle blast rounds, one stun bag round or bean bag, one bore thunder round, and four aerial

8    flash-bangs. *Id.* at 78, 97. Even more munitions were deployed in the minutes following. *Id.*

9    at 94, 98.

10        As a matter of law, the deployment of so many chemical and impact munitions must

11   be justified by a strong governmental interest. *See, e.g.*, *Young*, 655 F.3d at 1162–63 (use of

12   pepper spray and multiple baton strikes was "a significant amount of two forms of

13   intermediate force known to cause serious pain and to lead in some cases to serious

14   physiological consequences" and "a sufficiently serious intrusion upon liberty that it must be

15   justified by a commensurately serious state interest"); *cf. Nelson*, 685 F.3d at 885 (officers'

16   use of pepper balls, a weapon "that combined [two] forms of force amounted to a

17   constitutional violation").

18   **B.    PPD's interest in stopping the unlawful actions of a handful of people did
19          not justify its use of indiscriminate and severe force against Plaintiffs and
20          other peaceful protesters.**

21        Various factors can weigh on the government's interest in using force. *Graham*, 490

22   U.S. at 396; *Young*, 655 F.3d at 1163; *Nelson*, 685 F.3d at 883. In circumstances similar to

23   this case, courts have considered things like the availability of alternative methods to achieve

24   the government's goals, the potential harm to innocent bystanders, and whether officers issued

25   a sufficient warning before using force. *See Nelson*, 685 F.3d at 883 (officers' failure to give

26   plaintiff sufficient warning and availability of alternative tactics weighed against granting

27   officers summary judgment on excessive force claim); *Boyd*, 374 F.3d at 779 (excessive force

28   where officers blindly threw a flash-bang device into a room occupied by innocent bystanders

1   without warning); *Deorle*, 272 F.3d at 1284 (officers' failure to issue order or warn plaintiff

2   before using force was "strong" factor in concluding that force was excessive compared to

3   governmental interest at stake); *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)

4   ("[T]hat Officer MacPherson did not provide a warning before deploying the [taser] and

5   apparently did not consider less intrusive means of effecting [plaintiff's] arrest factor

6   significantly into our *Graham* analysis."). Further, police must stop using force when any

7   alleged threats are neutralized. *See Zion v. Cty. of Orange*, 874 F.3d 1072, 1075 (9th Cir.

8   2017) ("[Police] must stop using deadly force when the suspect no longer poses a threat.").

9       PPD's asserted interest in using force in the first instance was to protect the public-

10  safety zone against the unlawful conduct of twenty or fewer people whose presence they

11  anticipated, whose tactics they knew, and whose actions they were surveilling for twenty-five

12  minutes before officers unleashed their first volley of pepper ball rounds. SSOF 11–16, 36–

13  51, 59, 60. PPD's asserted interest in continuing its barrage of munitions was protecting

14  officers from the increased number of water bottles and rocks thrown from the crowd after its

15  deployment of pepper balls, and two incendiary devices also thrown toward them. *Id.* at 66,

16  67, 69–71, 73. In light of the undisputed facts, these asserted interests, as a matter of law, do

17  not justify the type and amount of force that PPD used against hundreds of peaceful protesters.

18          1.    It is undisputed that PPD did not consider alternative means to address

19                  its interest.

20      "'[T]he availability of alternative methods,' is a relevant factor in determining whether

21  the amount of force used in a particular instance was, in fact, reasonable." *Nelson*, 685 F.3d

22  at 882 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)). Plaintiffs have

23  identified at least two "clear, reasonable, and less intrusive alternatives" to PPD's inundation

24  of the Free-Speech Zone with chemical agents and impact munitions: (1) placing officers

25  closer to Antifa members to deter unlawful conduct with their presence, and (2) removing the

26  small group of unlawful individuals from the larger crowd. *See Boyd*, 374 F.3d at 779

27  (officers' decision to deploy flash-bang they "knew had the potential to cause injury" without

28  "considering alternatives such as a controlled evacuation followed by a search" was

1    unreasonable); *Headwaters I*, 240 F.3d at 1205 (plaintiffs submitted "evidence as to
2    alternatives that were available during the protests, including: (a) negotiation; (b) using the
3    Makita grinder or other tools to remove the lock-down devices; (c) physically removing the
4    protesters; (d) and 'waiting them out.'").

5         PPD indisputably did not consider any alternative means to address its interest in
6    protecting the public-safety zone from a breach by Antifa. SSOF 56. In fact, PPD planned all
7    along to use pepper balls against attendees if a breach were attempted—during its planning
8    before the day of the event, during a briefing on the day of the event, and in the half hour
9    before Antifa began shaking the fence. *Id.* at 22, 45, 55. It is also undisputed that PPD
10   anticipated thousands of attendees at the event, that "the vast majority of participants were
11   peaceful, organized and respectful," and that PPD knew Antifa was closely surrounded by
12   hundreds of peaceful protesters when it began firing pepper balls. *Id.* at 6, 52–54, 121. Despite
13   this knowledge, and despite the nearly one thousand City public safety workers manning the
14   event, including plain clothes officers within the crowd and dozens of officers lining Monroe
15   Street south of the Free-Speech Zone, PPD did not consider any alternatives to their
16   deployment of chemical agents and impact munitions. *Id.* at 28, 29, 31, 56, 57.

17        Here, Plaintiffs have identified two "clear, reasonable, and less intrusive alternatives"
18   that PPD could have used instead of inundating the Free-Speech Zone with chemical agents
19   and impact munitions. First, PPD could have placed officers near Antifa and maintained a
20   presence there to deter their known tactic of toppling police barriers with signposts and other
21   unlawful activity. *Id.* at 15, 56. It is undisputed that PPD saw one of the Antifa group shove
22   another protester twenty-five minutes before PPD deployed munitions. *Id.* at 40. PPD
23   continued observing the Antifa group at the same location for those twenty-five minutes,
24   approached the fence to communicate with Antifa at least two times, and observed Antifa
25   attaching their signposts to the fence more than five minutes before the first deployment. *Id.*
26   at 36–51. Yet, PPD never placed officers near the group as a deterrent, including any of the
27   plain clothes officers in the crowd or the dozens of officers in Monroe Street. *Id.* at 31, 56,
28   57.

Second, as police-practices expert Roger Clark stated: "The most obvious and reasonable method of control was to individually identify and arrest the small group of alleged Antifa members for individual criminal acts and allow the much larger group of peaceful protesters to continue to exercise their First Amendment rights." *Id.* at 58. PPD's own expert testified that isolating and addressing a small group of troublemakers within a larger group of lawful protestors is a "common issue" that law enforcement has been dealing with "for hundreds of years." *Id.* at 19. Thus, isolating and removing the few people who were not acting peacefully was a readily available, much less intrusive alternative.

PPD's decision to use force despite "the availability of other, less intrusive measures makes clear just how limited was the government's interest in the use of significant force." *Young*, 655 F.3d at 1165–66 (by choosing none of the "variety of less intrusive options" available, officer "bypass[ed] variety of less painful and potentially injurious measures that would have been both feasible and reasonable under the circumstances"); *Nelson*, 685 F.3d at 882 ("[O]fficers could have altered their tactics . . . which would have minimized the degree of force applied or eliminated the need for force altogether.").

2.   It is undisputed that PPD did not consider the potential harm to Plaintiffs and other peaceful demonstrators.

There is also no evidence that PPD considered the potential harm to the surrounding peaceful protesters, either from its first round of pepper balls or from its subsequent deployment of munitions. *Boyd*, 374 F.3d at 779; *see also Dietzmann v. City of Homer*, 2010 WL 4684043, at *24 (D. Alaska Nov. 17, 2010) (officers should have considered safety of two children in vehicle before shooting at suspect); *Bailey v. Cty. of San Joaquin*, 671 F. Supp. 2d 1167, 1173 (E.D. Cal. 2009) (jury could find officer used excessive force by firing weapon into house where he "had reason to believe a child was [present]" and "could not predict . . . who might be injured"). PPD knew all along that peaceful protesters would be and were surrounding Antifa, but nevertheless planned an attack by chemical weapons as their "primary response" to a potential breach of the public-safety zone. SSOF 22, 52–54. In addition, PPD had planned at least twenty minutes before the pepper ball deployment that its volley of pepper

balls would be followed by smoke and tear gas grenades. *Id.* at 45. It is undisputed that PPD's first deployment of munitions scattered Antifa into the larger crowd and exacerbated the situation, which PPD should have anticipated. *Id.* at 65, 66. It is also undisputed that PPD officers in Monroe Street were wearing helmets, face masks, and gas masks, and that PPD disarmed within minutes the two incendiary devices thrown from the crowd. *Id.* at 35, 67, 68, 72. Nevertheless, two minutes after the pepper balls, PPD began deploying smoke and tear gas, as well as other munitions, in an undisputed attempt to disperse the crowd. *Id.* at 60, 69, 73–76, 79–81. In other words, not only did PPD fail to consider the potential harm to innocent bystanders, they *intentionally targeted them* so that they would leave. *Id.* at 69, 73–76, 78–81.

In *Boyd*, the Ninth Circuit held that "[o]fficers must consider whether the circumstances justify imposing a risk of harm on innocent third parties." *Hulstedt*, 884 F. Supp. 2d at 1005 (citing *Boyd*, 374 F.3d at 779). There, the court reasoned that "given the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury." *Boyd*, 374 F.3d at 779.

Like the officers in *Boyd*, PPD officers blindly fired munitions into a crowd of hundreds of people. It was certain that innocent bystanders would be injured—and indeed, it was planned by PPD. It is undisputed that Plaintiffs, other peaceful demonstrators, and members of the news media were injured as a result of PPD's use of force. SSOF 76, 77, 101, 102. PPD's failure to consider the harm that it would inevitably subject on innocent third parties, along with other factors, makes its use of force unreasonable as a matter of law.

3.    It is undisputed that PPD gave no warnings for almost twenty minutes after it first deployed pepper balls.

According to its own reports, PPD gave no warnings to the crowd before its unleashed its barrage of munitions, and in fact, did not do so until almost twenty minutes after it fired the first pepper balls toward the crowd, when the majority of the crowd had already dispersed.

*Id.* at 61–63, 83, 86, 89–90. The Ninth Circuit has held that "warnings should be given, when feasible, if the use of force may result in serious injury." *Deorle*, 272 F.3d at 1284 (failure to warn made use of force more unreasonable under *Graham*); *see also Bryan*, 630 F.3d at 831 (concluding that "it was feasible to give a warning that the use of force was imminent" if individual did not comply); *Boyd*, 374 F.3d at 779 ("We have previously emphasized our concern with the unconstrained use of [] less-than-lethal devices in situations where no warning is given."). "When a suspect does not pose an immediate threat to the lives of officers or others, a warning is feasible." *Hulstedt*, 884 F. Supp. 2d at 998 (citing *Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010)).

In *Nelson*, the Ninth Circuit concluded that the officers' failure to issue audible warnings that force would be used weighed against the reasonableness of their decision to use force, including pepper balls. *Id*. Here, as in *Nelson*, there is no dispute that PPD failed to warn protestors that they would be showered with pepper balls, CS gas, and other less-lethal munitions if they did not stop shaking the fence, throwing items in the direction of the officers, or disperse. SSOF 61–63, 83, 86, 89, 90. PPD had ample time to warn the crowd before using force, and ample time to alert the crowd that troublemakers were in their midst. *Id.* at 36–55. They also had access to an LRAD, loudspeakers mounted on trucks, and a helicopter for precisely this purpose. *Id.* at 34, 62. Yet PPD issued no warnings or orders until long after police had already used force against the peaceful protesters. *Id.* at 61–63, 83, 86, 89, 90. In fact, PPD did not declare an unlawful assembly until about twenty minutes after their initial deployment of force. *Id.* at 60, 86. The undisputed facts demonstrate that there "was ample time to give that order or warning and no reason whatsoever not to do so." *Deorle*, 272 F.3d at 1284.

### C.   PPD's asserted interests did not justify the level of force used against Plaintiffs.

It is true that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. This case did *not* involve

such split-second decision-making. In that respect, this case is similar to *Deorle*. In that case, officers "were at the scene for over half an hour [before the use of force]," "had an opportunity to observe [the suspect] for a considerable period of time," and "had the opportunity to consult with . . . superiors concerning the tactics to be employed." *Deorle*, 272 F.3d at 1283. Here, PPD knew in advance that Antifa would attend the event, knew its tactics, and planned to address the very tactic at issue using pepper balls. SSOF 11–16, 22. Lieutenant Moore consulted with his commanding officer around 8:10 pm about his plan to use pepper balls and smoke and tear gas grenades. *Id.* at 45. And PPD was surveilling the Antifa group for almost a half hour before deploying pepper balls at 8:33 pm. *Id.* at 36–55. This was no split-second decision. It was "a calculated and deliberate decision" to use hundreds of rounds of chemical and impact munitions against a crowd of hundreds of people based on the unlawful conduct of a few people. *See Deorle*; *see also Headwaters I*, 240 F.3d at 1204 (no evidence that "decision to use pepper spray during each of the three protests at issue was a split-second judgment made in circumstances that were rapidly evolving") (internal citations and quotations omitted).

The interests asserted by PPD do not justify its attack on peaceful protesters, and PPD may not rely on the mere potential for disorder or the disorder they created themselves with their initial pepper ball deployment to justify their indiscriminate, sweeping uses of force against nonviolent protestors. *See, e.g., Nelson*, 685 F.3d at 881 (officers may not use "general disorder . . . to legitimize the use of pepperball projectiles against non-threatening individuals"); *Headwaters I*, 240 F.3d at 1203 ("[T]he proper focus of the analysis under *Graham* is on events *immediately* confronting the officers when they decided to use [force]. The fact that the defendants were increasingly frustrated by the protesters . . . is irrelevant under *Graham*.") (emphasis in original). "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281; *see also Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) ("[G]eneralized concerns, standing alone, cannot justify the use of force.").

"A desire to resolve quickly a potentially dangerous situation" is exactly what PPD claims justified its violent actions. At 8:33 pm, PPD used pepper balls in an attempt to control at most twenty people, and by 8:35 pm, PPD had decided to disperse the hundreds of people remaining in the Free-Speech Zone, first using smoke, then tear gas, and then a continuing barrage of chemical and impact weapons until most people had left the area about ten minutes later. PPD cannot justify this severe and indiscriminate intrusion on Plaintiffs' Fourth Amendment rights. Even construing the facts in Defendants' favor, no reasonable officer would have used the type and amount of force in the indiscriminate manner that PPD did.

## II.   As a matter of law, Defendants violated Plaintiffs' First Amendment rights of speech and assembly.

It is undisputed that Plaintiffs and others were engaged in the protected First Amendment activities of speech and assembly when the PPD began deploying chemical and other less-lethal munitions into the Free-Speech Zone. *See Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment.") (citations omitted); SSOF 6, 7, 29, 32, 52–54, 121. The undisputed facts establish as a matter of law that Defendants violated Plaintiffs' First Amendment rights in at least two ways. First, PPD ended the protected speech and lawful assembly of Plaintiffs and hundreds of peaceful demonstrators based on the unlawful conduct of a few people, which is not an adequate justification. *Id.* ("[E]njoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation."); *see Cantwell v. Connecticut*, 310 U.S. 296, 308–09 (1940). Second, even if PPD had an adequate justification to end the demonstration, PPD dispersed Plaintiffs using tear gas and other chemical and impact munitions without any notice or warning and without any dispersal instructions, which separately violates the First Amendment. *See, e.g.*, *Jones v. Parmley*, 465 F.3d 46, 60 (2d Cir. 2006).

## A. Defendants violated Plaintiffs' First Amendment rights by dispersing them without adequate justification.

It is undisputed that PPD's justification for its violent dispersal of hundreds of peaceful protesters on August 22, 2017, was the unlawful actions of *at most twenty* people in the first instance, and then the following disorder caused by PPD's own pepper ball deployment. SSOF 59, 60, 66, 67, 69–71, 73. PPD decided to disperse protesters no later than 8:35 pm, two minutes after that deployment. *Id.* at 69–79. As a matter of law, PPD's asserted justifications cannot support its decision to disperse hundreds of peaceful protesters.

Longstanding authority establishes that "the police may not interfere with demonstrations unless there is a 'clear and present danger' of riot, imminent violence, interference with traffic or other immediate threat to public safety." *Jones*, 465 F.3d at 57 (citing *Cantwell*, 310 U.S. at 308–09); *see Shenfield v. City of Tucson*, 443 P.2d 443, 448 (Ariz. 1968), ("[N]ot every meeting where violent, boisterous or tumultuous conduct occurs may be denominated an unlawful assembly."), *overruled on other grounds by Baca v. Don*, 635 P.2d 510 (Ariz. 1981). To justify ending lawful First Amendment activity, there must be "a clear and present danger of a serious substantive evil *that rises far above public inconvenience, annoyance, or unrest.*" *Edwards v. South Carolina*, 372 U.S. 229, 237–38 (1963) (emphasis added) (citation omitted). Moreover, the Supreme Court has held that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct . . . that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982). Rather, "courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence . . . and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins*, 110 F.3d at 1372–73. (citations omitted).

PPD has never asserted any clear and present danger of the type that would justify its violent dispersal of peaceful protesters on August 22, 2017. In the absence of such a justification, Defendants, as a matter of law, violated Plaintiffs' First Amendment rights.

The undisputed facts show that PPD began monitoring the small Antifa group that had gathered at the fence by 8:07 pm and knew the group was closely surrounded by hundreds of peaceful protesters. SSOF 39, 52–54. Only minutes after that, PPD planned to address any attempted breach of the fence by using pepper balls, smoke grenades, and tear gas grenades, munitions that are specifically designed and intended to disperse crowds. *Id.* at 23, 24, 45, 74–76, 79. When Antifa started pushing the fencing, PPD did deploy a round of pepper balls at 8:33 pm, which stopped the attempted breach, predictably sent Antifa deep into the crowd, and instigated some within the confused crowd (likely including some of the Antifa group) to throw water bottles, rocks, and a small gas grenade toward officers at 8:34 pm. *Id.* at 59, 60, 64–67. At 8:35 pm, two minutes after its initial deployment of pepper balls, PPD deployed smoke grenades in an indisputable effort to begin dispersing the protesters. *Id.* at 69, 79. That was quickly followed by tear gas, flash-bang grenades, and other rounds of chemical and impact weapons. *Id.* at 73, 78–82. By about 8:45 pm, most of the people in the Free-Speech Zone had left the area, and by 9:10 pm, PPD had cleared out the last remaining individuals. *Id.* at 83, 93.

PPD could have, but chose not to, properly respond to the perceived threat in different ways that would not have ended the First Amendment activity of the hundreds of peaceful protesters in the Free-Speech Zone. *Id.* at 56, 58. In the more than twenty-five minutes that PPD was observing Antifa before deploying their first pepper balls, the only measures they took to discourage any unlawful behavior were to approach the fence line, warn the group to protest peacefully, and retreat when they were met with expletives. *Id.* at 36–51. Even though PPD had intelligence that Antifa might attempt to breach the fence, they did not even consider using sustained officer presence near the group to deter their unlawful conduct, even when PPD observed Antifa hooking signposts into the fence at 8:25 pm. *Id.* at 49, 50, 56. Nor did PPD consider removing the group from the larger crowd, a tactic employed by law enforcement for hundreds of years. *Id.* at 19, 56, 58.

*Jones v. Parmley*, 465 F.3d 46, 58–59 (2d Cir. 2006) (Sotomayor, J.), is very close to this case. There, some protestors stepped into the highway, which the police claimed was

criminal conduct (although that conduct ended before the police actions at issue). *Id.* at 52, 53. The "defendants issued no dispersal order and instead stood in a 'skirmish line,' waited thirty-five seconds, and then charged into the crowd, arresting protesters indiscriminately." *Id.* at 60. The parties disputed whether crimes had been committed and whether dispersal of the crowd was justified. *Id.* at 59. Defendants conceded that most demonstrators did not enter the highway and that they could not identify those who had. *Id.* at 58. The court concluded that the plaintiffs had "an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law." *Id.* at 60. "[A]bsent imminent harm," defendants "could not simply disperse them without giving fair warning." *Id.*

The same thing is true here. PPD's decision to use pepper balls against the Antifa group indisputably neutralized the immediate threat of a potential breach. SSOF 64. PPD's deployment of pepper balls triggered disorder within the crowd, but the general disorder at 8:35 pm did not amount to a clear and present danger sufficient to justify dispersing Plaintiffs and hundreds of other peaceful protesters using smoke and other chemical and impact weapons. *Cf. Nelson*, 685 F.3d at 881 (officers may not use "general disorder . . . to legitimize the use of pepperball projectiles against non-threatening individuals"). Plaintiffs had "an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law," and PPD's unconstitutional actions violently ended an event where even PPD concedes that "[f]ree speech and expression were celebrated" and "the vast majority of participants were peaceful, organized and respectful." *Jones,* 465 F.3d at 60; SSOF 121. That violates the First Amendment as a matter of law.

**B. Defendants also violated Plaintiffs' First Amendment rights by dispersing their peaceful protest without proper notice.**

PPD's dispersal of Plaintiffs' peaceful and lawful activity without any warning separately violated Plaintiffs' rights. Even if PPD had an appropriate justification to disperse the crowd (which it did not), it could not do so constitutionally without giving Plaintiffs and

1   other peaceful protesters notice that they were required to leave and adequate opportunity to

2   do so.

3          The Supreme Court held decades ago that "police must give notice of revocation of

4   permission to demonstrate before they can begin arresting demonstrators." *Vodak v. City of*

5   *Chicago*, 639 F.3d 738, 746 (7th Cir. 2011) (Posner, J.) (citing *Cox v. Louisiana*, 379 U.S.

6   536, 571–73 (1965)). Courts have held repeatedly that not doing so violates the First

7   Amendment. *See, e.g.*, *id.* at 750-51 (concluding that First Amendment claim was "largely

8   duplicative" of Fourth Amendment claim); *Dellums v. Powell*, 566 F.2d 167, 183 (D.C. Cir.

9   1977) ("plaintiffs could not constitutionally have been arrested as a group . . . unless . . . orders

10  to disperse had been given which apprised the crowd as a whole that it was under an obligation

11  to leave; and . . . a reasonable opportunity had been given the plaintiffs to leave") (citations

12  omitted); *Barham v. Ramsey*, 338 F. Supp. 2d 48, 57-60 (D.D.C. 2004) (where protesters were

13  lawful, but police acted to "prevent possible future violence," police "order for a mass arrest

14  made without a previous order to disperse violated clearly established law and was not

15  objectively reasonable"), *aff'd in relevant part*, 434 F.3d 565, 576 (D.C. Cir. 2006) ("As a

16  prerequisite to instituting a mass arrest intended to defuse a volatile demonstration, police

17  must have a valid legal basis for clearing the area[]" and must "first issue[] an order to disperse

18  and then provide[] a reasonable period of time to comply with that order."); *see also Dinler*

19  *v. City of New York*, 2012 WL 4513352, at **10–11 (S.D.N.Y. Sept. 30, 2012) (granting

20  summary judgment to plaintiffs on state-law claim of mass false arrests where single

21  unamplified dispersal order could not have been heard by all demonstrators and, even if it had

22  been heard, police did not give demonstrators opportunity to comply with order).

23         Likewise, if police disperse protesters rather than arresting them, it is clearly

24  established law that doing so without a warning and an opportunity to comply, even when

25  some in the group are acting unlawfully, violates the First Amendment. *Jones*, 465 F.3d at

26  60–61; *see* Ariz. Rev. Stat. § 13-3804 ("Where any number of persons . . . are unlawfully or

27  riotously assembled, . . . peace officers . . . shall go among the persons assembled, or as near

28  to them as possible, and *command them*, in the name of the state, immediately to disperse.")

(emphasis added). Thus, in *Jones*, the Second Circuit concluded that despite some individuals in the group acting unlawfully, "[p]laintiffs still enjoyed First Amendment protection, and absent imminent harm, the [police] could not simply disperse them without giving fair warning. *Jones*, 465 F.3d at 60.

Here, it is undisputed that PPD began dispersing Plaintiffs and other peaceful protesters beginning at 8:35 pm but gave no order to disperse or other verbal warning until 8:52 pm, after most of the protesters had already left the Free-Speech Zone. SSOF 61–63, 83, 86.

When PPD eventually made unlawful-assembly announcements, they were entirely defective. *See Vodak*, 639 F.3d at 745 ("[E]ven if dispersal orders were given, there would have to be evidence that the police reasonably believed that the protesters who were arrested, or at least most of them, had heard the orders."). First, PPD's munition deployments created panic and loud chaos that made it difficult to hear instructions and reduced visibility, compromising protestors' ability to hear and comply with the orders. SSOF 88. Second, PPD failed to use the LRAD, its primary amplification device, to communicate the dispersal instructions; PPD did not even know the location of the LRAD at 8:30 pm and could not have used it after deploying tear gas anyway. *Id.* at 89, 90 . Third, PPD did not give any warning, including the late unlawful-assembly declaration, in Spanish, despite knowing that there would be a significant number of Spanish-speakers in attendance. *Id.* at 91, 92. Fourth, the dispersal order did not include any information about where protesters should go or how they should get there safely. *Id.* at 87.

PPD had no good excuse for failing to make any announcements to the peaceful demonstrators in the crowd that they were required to leave before dispersing them using chemical and impact munitions. Like in *Vodak*, 639 F.3d at 745, "[t]he police were numerous, in riot gear, and formidable" and the crowd was predominantly peaceful. SSOF 35, 52–54, 67. Plaintiffs are therefore entitled to summary judgment on their First Amendment claims.

## III.   **The City of Phoenix is liable for Defendants' unconstitutional conduct.**

The City of Phoenix is liable for constitutional violations caused by "action[s] pursuant to official municipal policy." *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 691

(1978). As a matter of law, the City is liable for Plaintiffs' injuries for at least two reasons. First, it is undisputed that Chief Williams was the final policymaker for the City with respect to the conduct at issue and that she delegated authority for the relevant decisions to Lieutenant Moore, who gave the orders for PPD to deploy force against the protesters and to disperse them. Second, it is undisputed that Chief Williams ratified PPD's unconstitutional actions. *See Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).

### A.   Chief Williams was the final policymaker for the City with respect to the conduct at issue.

Chief Williams has final policymaking authority for the City of Phoenix in the area of law enforcement. In particular, she is the final policymaker for the City with respect to police actions during mass demonstrations in Phoenix, including the August 22, 2017 event. SSOF 1. Chief Williams headed the chain of command for the rally and protest, and it is undisputed that all PPD's conduct at issue here came through the chain of command. *Id.* at 2, 106. In addition, Williams and her command staff were actively involved in the preparations for and the management of PPD's operations during the protest. *Id.* at 5. Thus, the City is liable for her conduct that caused Plaintiffs' injuries. *See McMillian v. Monroe Cty.*, 520 U.S. 781, 784–85 (1997); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (finding police chief's acts constitute official city policy); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (finding police chief may possess final policymaking authority).

### B.   Chief Williams delegated responsibility to Lieutenant Moore for the decisions at issue.

An official may have final policymaking authority by delegation where "the official's discretionary decision is [not] constrained by policies not of that official's making and . . . [not] subject to review by the municipality's authorized policymakers." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 986 (9th Cir. 2002) (internal citations and quotations omitted); *see Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) (defining final policymaker as an individual in a position of authority such that "a final decision by that person may appropriately be attributed to the [defendant public body]."). An individual may have "final

1   policymaking authority 'in a particular area, or on a particular issue.'" *Barone v. City of*
2   *Springfield*, 902 F.3d 1091, 1107 (9th Cir. 2018) (quoting *McMillian*, 520 U.S. at 785).

3       Chief Williams has the authority to "delegate functions of [her] department and
4   identify designees." SSOF 2. It is undisputed that Williams delegated to Lieutenant Moore,
5   the Field Force Commander for the event, the authority to order the use of chemical weapons
6   and to declare an unlawful assembly. *Id.* at 27. It is also undisputed that Moore, pursuant to
7   his delegated authority, ordered PPD's unconstitutional use of force and dispersal of Plaintiffs
8   and other peaceful protesters, resulting in egregious violations of Plaintiffs' constitutional
9   rights. *Id.* at 60, 67, 69. Because Moore was the final decision-maker with respect to firing
10  chemical and impact munitions and declaring an unlawful assembly on August 22, 2017, his
11  decisions that day constituted City policy and the City is liable for them. *See Barone*, 902
12  F.3d at 1108; *Trevino v. Lassen Mun. Util. Dist.*, 2009 WL 385792, at **15–16 (E.D. Cal.
13  Feb. 13, 2009) (granting plaintiffs summary adjudication on their *Monell* claim where there
14  was no dispute that employee was delegated final decision-making authority over the
15  plaintiff's disciplinary proceedings). Accordingly, the City is liable for those actions.

16      **C.**    **Chief Williams ratified PPD's unconstitutional conduct.**

17      A municipality is liable under *Monell* where an "official with final policy-making
18  authority ratified a subordinate's unconstitutional decision or action and the basis for it."
19  *Gillette*, 979 F.2d at 1346–47. A municipality is liable where the policymaker had "knowledge
20  of the constitutional violation and actually approve[d] of it." *Lytle*, 382 F.3d at 987 (jury could
21  infer *Monell* liability where policymaker "actively participated" in events giving rise to
22  constitutional violation). A police chief's failure to take remedial action after a constitutional
23  violation may form the basis for *Monell* liability. *See, e.g.*, *Larez*, 946 F.2d at 647 (police
24  chief's failure "to take any remedial steps after the violations" supported jury's finding of
25  *Monell* liability); *Schlossberg v. Solesbee*, 2011 WL 2222063, at *9 (D. Or. June 7, 2011) ("A
26  municipality may also be liable in cases where its police chief fails to take remedial action
27  and establish new procedures to prevent future incidents from happening.").

28

Chief Williams repeatedly and wholeheartedly applauded PPD's actions on August 22, 2017. After the smoke and gas cleared that night, Chief Williams and other City officials briefed the press and praised PPD's conduct, and the Chief indicated her belief to the world that PPD's use of force was appropriate. SSOF 103. Later, she stated publicly that "operationally, everything that happened was textbook perfect." *Id.* at 104. She also concluded that PPD acted within PPD policies in every respect during the August 22, 2017 event. *Id.* at 105. No PPD officer was disciplined in connection with the event. *Id.* at 107. And Chief Williams also failed to implement recommendations that PPD update its policies with respect to chemical weapons following the protest. *Id.* at 123, 125–128. Thus, the City is liable on this basis, as well. *Larez*, 946 F.2d at 647 ("statements, coming from a final policymaker on police matters, also properly could have been considered to represent the [PPD's] policy or custom of condonation of, and acquiescence in, the use of excessive force by its officers.").

Chief Williams also ratified PPD officers' violent dispersal of protesters by failing to reprimand officers, including Lieutenant Moore and Sergeant McBride, who created and distributed a logo and "challenge coin" celebrating their violence. SSOF 108, 110, 111, 116–119. Just a few days after the event, Sergeant McBride ███████████████████ ███████████████████████████ *Id.* at 111. On its front, the challenge coin says, "GOOD NIGHT LEFT NUT," and depicts a cartoon picture of a man wearing a black shirt, blue shorts, and a gas mask getting hit in the genitals. *Id.* at 112. On its back, the challenge coin says, "PHOENIX, AZ, AUGUST 22, 2017," and, "MAKING AMERICA GREAT AGAIN ONE NUT AT A TIME," a phrase that coopts President Trump's well-known campaign slogan. *Id.* at 113, 114. Four of the individual officers who were deposed admitted to possessing one of these challenge coins, and PPD officers sold and otherwise distributed the coins. *Id.* at 116, 117. Williams admitted that the creation of the coin does not represent appropriate police conduct, but neither she nor anyone else initiated an investigation or discipline related to it. *Id.* at 118, 119. This inaction by Chief Williams is further evidence that she "set a tone which condoned and encouraged the use of excessive force." *Larez*, 946 F.2d at 645.

1    For these reasons, Plaintiffs' are entitled to summary judgment that the City of Phoenix

2    is liable as a matter of law for each violation of Plaintiffs' constitutional rights.

3    **IV.**   **Plaintiffs are entitled to summary judgment on their claim for injunctive relief.**

4    To grant relief at the summary judgment stage, the Court need only find that at least

5    one plaintiff has standing for each type of relief sought. *See Mont. Shooting Sports Ass'n v.*

6    *Holder*, 727 F.3d 975, 981 (9th Cir. 2013) (noting that "the presence in a suit of even one

7    party with standing suffices to make a claim justiciable") (citation and internal quotations

8    omitted); *see also Lujan v. v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (describing

9    standing burden at various stages of a case). A permanent injunction is appropriate where

10   Plaintiffs can establish: (1) that they have and will suffer irreparable injury in the absence of

11   an injunction; (2) that remedies available at law, such as monetary damages, are inadequate;

12   (3) that, considering the balance of hardships, a remedy in equity is warranted; and (4) that

13   the public interest is not disserved by a permanent injunction. *See Monsanto Co. v. Geertson*

14   *Seed Farms*, 561 U.S. 139, 156 (2010); *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 977

15   (9th Cir. 2017).

16   The Court previously determined that Plaintiffs have standing to seek injunctive relief

17   after Plaintiffs presented evidence that (1) "PPD had no policy in place at the time of the

18   protest regarding the use of tear gas/chemical agents," and (2) "PPD did not change its

19   procedures or implement corrective actions after the protest, and indeed its Chief ratified

20   PPD's conduct after the event." Doc. 191 at 15. Based on this evidence, the Court inferred "a

21   realistic repetition of PPD's course of action sufficient for standing purposes." *Id.*

22   The facts on which the Court based its previous decision indisputably have not

23   changed. Plaintiffs now ask the Court to rule on their entitlement to a permanent injunction

24   to prohibit Defendants from violating the First and Fourth Amendments by repeating PPD's

25   violent conduct on August 22, 2017. Plaintiffs have satisfied each of the four factors for a

26   permanent injunction.

27

28

**A.    Plaintiffs have established they will suffer irreparable injury and have no adequate legal remedy.**

The first non-merits factor—that the injury complained of is "irreparable"—overlaps with the second factor—that there be no adequate legal remedy. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."); *see also E\*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029, 1036 (D. Ariz. 2018) (same).

Plaintiffs have established that they will suffer irreparable injury in the absence of an injunction. As described above, PPD's use of force and dispersal of a peaceful protest violated Plaintiffs' First and Fourth Amendment rights. Lieutenant Moore authorized PPD's unconstitutional misconduct, pursuant to authority delegated by Chief Williams, and Chief Williams later ratified it. SSOF 2, 27, 103–106. Those actions violently dispersing hundreds of peaceful protesters have understandably chilled Plaintiffs' expression, including the First Amendment activities of organizational Plaintiffs Puente and Poder in Action and their members. *Id.* at 102.

A permanent injunction is required to remedy that chill and to ensure that PPD never violently disperses peaceful protesters again. *Id.*; *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (holding that "ongoing harms to [organizations'] organizational missions" constituted irreparable harm for purposes of preliminary injunction). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Lavan v. City of Los Angeles*, 693 F.3d 1022, 1033 (9th Cir. 2012) (upholding district court's decision finding irreparable injury on the basis of a Fourth Amendment violation).

**B.**     **Plaintiffs have established that the balance of hardships and public interest support a permanent injunction.**

The balance of hardships and the public interest also support a permanent injunction in this case. Both "the public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'" *Ariz. Dream Act Coal.*, 757 F.3d at 1069 (citing *Melendres*, 695 F.3d at 1002). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (citations and internal quotations omitted). In particular, courts "have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (citing *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 967 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Because Plaintiffs have established a violation of their First and Fourth Amendment rights, they "have also established that both the public interest and the balance of the equities favor" an injunction. *See Ariz. Dream Act Coal.*, 757 F.3d at 1069.

Plaintiffs have satisfied all four factors and are entitled to summary judgment on their injunctive relief claim.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Partial Summary Judgment and find as a matter of law that Defendants are liable to Plaintiffs on their First and Fourth Amendment claims, the City of Phoenix is liable to Plaintiffs for Defendants' unconstitutional conduct, and Plaintiffs are entitled to injunctive relief.

Dated: May 8, 2020                              Respectfully submitted,


                                                */s/ Kathleen Brody*
                                                Kathleen E. Brody
                                                MITCHELL STEIN CAREY CHAPMAN,
                                                PC

                                                Dan Stormer (*pro hac vice*)
                                                Shaleen Ameeta Shanbhag (*pro hac vice*)
                                                HADSELL STORMER & RENICK LLP

- 31 -

Jared G. Keenan
ACLU Foundation of Arizona

Barrett S. Litt (*pro hac vice*)
KAYE, MCLANE, BEDNARSKI & LITT,
LLP

Paul Hoffman (*pro hac vice*)
John Washington (*pro hac vice*)
SCHONBRUN SEPLOW HARRIS &
HOFFMAN LLP

Neel Chatterjee (*pro hac vice*)
Alexis Coll-Very (*pro hac vice*)
Megan Bettles (*pro hac vice*)
Sean M. Galvin (*pro hac vice*)
Daniel R. Mello, Jr. (*pro hac vice*)
Stella Padilla (*pro hac vice*)
Hong-An Vu (*pro hac vice*)
GOODWIN PROCTER LLP

Cindy Pánuco (*pro hac vice*)
Nisha Kashyap (*pro hac vice*)
Joanna Adler (*pro hac vice*)
PUBLIC COUNSEL

*Attorneys for Plaintiffs*

1

## **CERTIFICATE OF SERVICE**

2     I hereby certify that on the 8th day of May, 2020, I electronically transmitted the

3 attached document to the Clerk's Office using the CM/ECF system for filing the transmittal

4 of a Notice of Electronic Filing.

5     I certify under penalty of perjury that the foregoing is true and correct.

6

7 Executed:  May 8, 2020                          /s/ *Kathleen Brody*

8                                                                   Kathleen E. Brody

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28