David B. Rosenbaum, 009819
Mary R. O'Grady, 011434
Joshua M. Whitaker, 032724
**OSBORN MALEDON, P.A.**
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
mogrady@omlaw.com
jwhitaker@omlaw.com

Mildred K. O'Linn (admitted *pro hac vice*)
Nishan J. Wilde, 031447
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER, LLP**
3636 North Central Avenue, 11th Floor
Phoenix, Arizona 85012
(602) 313-5469
mko@manningllp.com
njw@manningllp.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente, an Arizona nonprofit corporation; Poder in Action, an Arizona nonprofit corporation; Ira Yedlin; Janet Travis; Cynthia Guillen; Jacinta Gonzalez Goodman, individually and as class representatives,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix, a municipal corporation; Jeri L. Williams; Benjamin Moore; Douglas McBride; Robert Scott; Christopher Turiano; Glenn Neville; John Sticca; Lane White; Jeffrey Howell; George Herr, individually and in their official capacities; and Does 1-20.<br><br>Defendants. | No. CV-18-02778-PHX-JJT<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*Oral Argument Requested* |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................ 1

II.     FACTS ............................................................................... 1

     A.    PPD was well-prepared for the events of August 22, 2017. ....................... 1

     B.    Grenadiers deployed different munitions, at different times, for different reasons. ................................................................... 2

     C.    Officers gave warnings as circumstances evolved. ................................. 3

     D.    Chief Williams identified areas for improvement, and improvements were made. ...................................................................... 4

     E.    The "challenge coin" was made by an unknown person in reference to a video that went viral, and it is irrelevant. ..................................... 5

III.    NO CONSTITUTIONAL VIOLATION ................................................ 6

     A.    Governing Legal Principles ................................................ 6

          1.    The Fourth Amendment does not apply because class members were not "seized." ........................................ 6

          2.    Plaintiffs misconstrue Fourth Amendment principles. ................... 7

          3.    A necessary element of Plaintiffs' First Amendment claims is intent to chill speech, which they have not shown. ....................... 8

          4.    The First Amendment does not separately require "adequate justification" where unlawful actors trigger dispersal. ................... 9

          5.    The First Amendment does not require officers to issue a dispersal order before using force. ............................... 12

          6.    Individualized causation is required. ................................ 14

     B.    Analysis of Officers' Actions, Situation by Situation ............................. 15

          1.    Why a situation-by-situation approach is necessary ..................... 15

          2.    Before Antifa pushed the police fence (pre-8:32 p.m.) ................. 17

          3.    When Antifa was forcefully pushing the fence (8:32 p.m.) ........... 19

          4.    When unknown crowd members began throwing objects including gas canisters at officers (8:32 p.m. – 8:35 p.m.) ........................... 21

          5.    When unknown crowd members continued throwing objects including an incendiary device at officers (8:36 p.m. onward) ...... 22

     C.    Case Law Supports Judgment for Defendants, Not Plaintiffs .................. 24

IV.     NO MUNICIPAL LIABILITY .................................................... 25

      A.     No Unconstitutional Acts Were Committed by a Final Policymaker. ...... 26

      B.     No Unconstitutional Acts Were "Ratified" by a Final Policymaker. ........ 28

V.     NO INJUNCTIVE RELIEF ................................................................................. 30

VI.    CONCLUSION ................................................................................................. 32

The Court should deny Plaintiffs' motion for partial summary judgment. (Docs. 246, 257.) Plaintiffs rely on heated rhetoric and a misreading of the record and the law. Instead, the undisputed material facts require entry of judgment for Defendants, as shown in Defendants' pending motions. *See* Defendants' Motion for Summary Judgment No. 1 ("DMSJ No. 1"), Defendants' Motion for Summary Judgment No. 2 ("DMSJ No. 2"), and Defendants' Omnibus Statement of Facts ("DSOF"). (Docs. 271, 272, 273, 276, 277, 278.) This opposition is supported by those filings as well as Defendants' Controverting and Additional Statement of Facts ("DCASOF"), filed concurrently herewith.

## I.   INTRODUCTION

The record shows that Lt. Moore and the Grenadiers acted reasonably in response to evolving threats. They did not violate the constitutional rights of any class member, much less all of them. Nor did the City. An injunction would be not only unwarranted, but a dangerous restriction on the ability of officers to make situational judgment calls.

## II.   FACTS

The parties agree that the relevant events are well-documented, allowing this case to be resolved on summary judgment. When one examines the actual record and the timeline, not Plaintiffs' retelling of a story that ignores inconvenient facts and the timeline, it is Defendants who are entitled to summary judgment.

The following section highlights some of the ways in which Plaintiffs misread the record or omit key context. These and other instances are described throughout this opposition and in DCASOF ¶¶ 1–161.

### A.   PPD was well-prepared for the events of August 22, 2017.

As of August 22, 2017, PPD policies expressly governed chemical agents in civil disturbances. In addition, PPD policies limited the use of chemical agents to Grenadiers, a specially trained squad in the Tactical Response Unit ("TRU"). (DSOF ¶¶ 11–15.)

Grenadiers were required to undergo training each year, in addition to their TRU training and on-the-job experience. Training covered topics such as whether, when, and how to use each type of munition, as well as arrests. As a result, Grenadiers were prepared

for a wide variety of possible situations on August 22, 2017.  (*Id.* ¶¶ 16–23.)

Plaintiffs criticize PPD's preparations as incomplete.  They assert that PPD did not prepare for how to "deal with Antifa" or how to "isolate and remove a small group of individuals," did not prepare "rules of engagement" to guide officers on the use of munitions, did not have a policy for "the appropriate use of tear gas," and did not specify which "circumstances would trigger an unlawful-assembly declaration."  (Mot. at 3.)

The record contradicts these assertions.  PPD did, in fact, prepare for these issues, in both policies and training.  (DCASOF ¶¶ 17, 18, 21, 25, 26.)

**B.    Grenadiers deployed different munitions, at different times, for different reasons.**

The events of August 22, 2017 were dynamic.  Grenadiers deployed different munitions, at different times, in response to specific situations.  For example, at 8:32 p.m., an attempted breach of the police fence prompted a limited deployment of pepper balls near Antifa.  Only later did violence from within the crowd prompt deployment of smoke, then CS gas.  Even more distinct and varied were the situations in which individual Grenadiers deployed targeted munitions, such as OC muzzle blasts or pepper balls, at or near specific persons they deemed a threat.  The Court recognized these distinctions. (Doc. 191 at 3, 12.)  Details are explained elsewhere.  (DSOF ¶¶ 43–149.)

Plaintiffs overlook and blur these distinctions.  Ignoring what actually unfolded, Plaintiffs characterize the events as a single reaction to a single situation.  (*E.g.*, Mot. at 2 ("After a long, hot day of peaceful expression and assembly, PPD fired an arsenal of chemical and impact munitions into the crowd in response to the claimed threat . . . .").) That is a false oversimplification.

Plaintiffs also incorrectly assert that PPD decided to use pepper balls to stop Antifa without considering other options.  (*E.g.*, Mot. at 2 ("PPD planned all along that it would address that tactic with pepper balls, giving no thought to how such weapons would affect the thousands of other protestors expected to attend.").)  The record shows otherwise. While Grenadiers did plan for pepper balls to be a response option in some situations if

other de-escalation efforts did not work, *at the scene* Lt. Moore evaluated the situation with Antifa, saw that de-escalation efforts were not working, decided that pepper balls would be the best response if Antifa were to try to breach the fence, and ordered a limited deployment of pepper balls when, based on his observations, Antifa did try to breach the fence.  Indeed, one of the reasons he chose pepper balls was to both *prevent* the threat by Antifa and *minimize* harm to bystanders.  (DSOF ¶¶ 58–82; DCASOF ¶¶ 22, 56, 60.)

Plaintiffs also incorrectly assert that Lt. Moore decided to use smoke and CS gas, in addition to pepper balls, to stop Antifa's attempted breach.  (Mot. at 4.)  The record shows the opposite.  While Lt. Moore was certainly aware of all response options at his disposal, it was only after Antifa's attempted breach failed, and unknown crowd members threw objects such as gas canisters, that Lt. Moore decided to use inert smoke.  And only after that, when unknown crowd members continued to throw objects like an incendiary device, did he decide to use CS gas.  (DSOF ¶¶ 83–97; DCASOF ¶¶ 45, 69, 73.)

**C.    Officers gave warnings as circumstances evolved.**

Plaintiffs assert that PPD deployed munitions "without warning."  (Mot. at 2.)  That assertion contradicts the following undisputed facts.

Before Grenadiers deployed pepper balls near Antifa at 8:32 p.m.:

1)    Before the protests began, PPD warned the public that officers would respond "decisively" to unlawful acts, and protest organizers knew the event could be dangerous.  (DSOF ¶¶ 29–32.)

2)    After 7:00 p.m., Grenadiers used an LRAD to warn persons in the Free Speech Zone to remain peaceful and stop throwing objects, and TRU officers were sent to Monroe Street to increase officer presence.  (*Id.* ¶¶ 44–45.)

3)    After 8:00 p.m., Lt. Moore directed CRB officers to talk to the Antifa group, but the group refused to talk.  Lt. Moore then directed additional TRU officers to be nearby and directed a helicopter to fly over the group.  (*Id.* ¶¶ 62–65, 68–69.)

Before Grenadiers deployed CS gas at 8:36 p.m.:

4)    At 8:32 p.m., ████████████████████████████████████

███████. This prompted CRB officers to warn their civilian contacts. For example, Detective Brockman texted a police liaison for the Puente protest: "They are deploying pepper balls[;] keep everyone away." (*Id.* ¶¶ 83–84.)

5)   At 8:33 p.m., an officer requested a helicopter, but ██████████ ████████████████. (*Id.* ¶¶ 89(a), 90(a).)

6)   At 8:34 p.m., Lt. Moore directed TRU officers to don gas masks. Some protestors saw this as a warning. (*Id.* ¶¶ 89(b), 90(b).)

7)   At 8:34 p.m., Lt. Moore directed Grenadiers to deploy inert smoke as a warning to leave. Many protestors saw this as a warning and left. (*Id.* ¶¶ 89(c), 90(c).)

<u>Before skirmish line began moving north on 2nd St. at 9:05 p.m.</u>:

8)   At or after 8:36 p.m., Lt. Moore directed Grenadiers to use aerial flash bangs as an additional warning to leave. (*Id.* ¶ 100.)

9)   At 8:52 p.m., a helicopter began issuing warnings to leave. (*Id.* ¶ 115.)

10)   At 8:52 p.m., PPD published a tweet warning people to leave. (*Id.* ¶ 116.)

11)   At 9:02 p.m., a police Tahoe arrived, declared the remaining group an "unlawful assembly," and ordered them to leave. (*Id.* ¶ 118.)

**D.   Chief Williams identified areas for improvement, and improvements were made.**

After months of review, Chief Williams submitted an After-Action Report to the City Manager. She summarized not only "What Went Well," but also "Areas for Improvement" such as improving PPD's communications with the public during protests. The After-Action Report detailed these areas for improvement. (DSOF ¶¶ 196–99.)

Chief Williams said that PPD would "adjust those areas that need improvement." And PPD did adjust in several ways, including purchasing a more powerful LRAD, developing better ways to communicate with the public and among officers, and increasing Grenadier training. (*Id.* ¶¶ 200–03.)

PPD has implemented these improvements at protests. For example, at a protest in July 2019, Grenadiers used the new LRAD to warn protestors who were illegally on light

1   rail tracks.   And, in the days before President Trump's rally in February 2020, PPD
2   notified the public about what to expect, what to do if an unlawful assembly is declared,
3   and how to follow PPD's real-time updates on social media.  (*Id.* ¶¶ 204–11.)[1]

4       Plaintiffs' motion rests on the false notion that PPD made no improvements.
5   Instead they focus on Chief Williams' positive statements about officers, in an effort to
6   hold the City liable.  (*E.g.*, Mot. at 2 ("From the night of these events through today, Chief
7   Williams has insisted that 'operationally, everything that happened was textbook perfect'
8   . . . .").)  That is, at best, an incomplete and misleading characterization of the record.[2]

9       **E.    The "challenge coin" was made by an unknown person in reference to
10             a video that went viral, and it is irrelevant.**

11      Plaintiffs make a series of false statements about a "challenge coin" in an effort to
12   hold the City liable.  (*E.g.*, Mot. at 7.)  But the challenge coin is an irrelevant distraction.

13      The coin appears to depict one of the more violent persons who attended the protest,
14   named Joshua Cobin.  Mr. Cobin threw and kicked objects at officers starting at 8:35 p.m.
15   He remained in the vicinity, despite multiple orders to leave.  (DCASOF ¶¶ 129–131.)

16      At 9:07 p.m., Mr. Cobin kicked a smoke canister toward officers.  Seconds later,
17   he was struck by an impact munition in the lower abdomen.  A video of the incident went
18   viral overnight and received national attention, including a tweet from President Trump.
19   The next day, a news station described the video as the "shot seen around the world" that
20   "everyone is talking about."  (*Id.* ¶¶ 132–36.)

21      Mr. Cobin is not a class member.  He pled guilty to a misdemeanor, then brought
22   his own federal lawsuit against the City and officers, which Judge Logan dismissed with
23   prejudice.  (*Id.* ¶¶ 137–39.)

24      After video of the incident went viral, an unknown person made challenge coins

---

[1] Grenadiers have also been present for many large protests in Phoenix in the past several weeks.  At a few of them, Grenadiers used munitions in response to violence or other unlawful activity.  They made every reasonable effort to issue warnings first.  (*See* DCASOF ¶¶ 152–59.)

[2] Even Plaintiffs' quotation of Chief Williams is incorrect.  (DCASOF ¶ 104.)

- 5 -

1   depicting the incident.  Some of the Grenadiers eventually came to possess these coins.

2   Contrary to Plaintiffs' claims, there is no evidence that Lt. Moore, Sgt. McBride, or any

3   other Grenadier participated in the design or creation of these coins.  (*Id.* ¶¶ 140–49.)

4   Chief Williams did not know the challenge coins existed until preparing for her

5   deposition two years later.  During her deposition, she said she would need more

6   information to decide whether disciplinary action would be appropriate.  Contrary to

7   Plaintiffs' claims, there is no evidence that PPD decided not to discipline officers for a

8   known policy violation.  (*Id.* ¶¶ 150–51.)

9   At bottom, the challenge coin is a red herring.  Such evidence should be excluded

10   under Rule 403 and, in any event, does not suggest that the City is liable.

11   **III.   NO CONSTITUTIONAL VIOLATION**

12   The Court should deny Plaintiffs' motion to the extent it seeks summary judgment

13   on their Fourth and First Amendment claims.  (*See* Mot. at 10–25.)  In this section, Part A

14   identifies the governing legal principles and explains how Plaintiffs misconstrue them.

15   Part B explains why officers' actions, when analyzed situation by situation, were

16   constitutionally permissible.  Part C explains why analogous case law supports summary

17   judgment for Defendants, not Plaintiffs.

18   **A.   Governing Legal Principles**

19
20   **1.   The Fourth Amendment does not apply because class members were not "seized."**

21   The Fourth Amendment is limited to "searches and seizures."  U.S. Const. amend.

22   IV.  A "seizure" occurs only if a person believes that he or she is "not free to leave."

23   *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citation omitted).

24   Here, the class members were not seized.  At most, they were prevented from

25   remaining in a specific area.  Thus, the Fourth Amendment does not apply.  Cases on this

26   point were cited in DMSJ No. 1 (pgs. 7–8).  Here are some more examples:

27   ·   *Jackson-Moeser v. Davila*, 2017 WL 5665012, at *3 (C.D. Cal. Aug. 2, 2017)

28   (granting summary judgment on Fourth Amendment claim of protestor struck by baton

because there was no seizure, where officer did not use baton to detain her or stop her retreat), *aff'd sub nom. Jackson-Moeser v. Armstrong*, 765 Fed. Appx. 299, 299 (9th Cir. 2019) (agreeing there was no seizure because, after officer struck protestor, she ran away).

·     *Redd v. City of Evansville, Ind.*, 2014 WL 2439701, at *7 (S.D. Ind. May 30, 2014) (granting summary judgment on Fourth Amendment claim of bystander affected by pepper spray because there was no seizure, where officer used spray to disperse a crowd).

·     *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1260 n.6 (E.D. Wash. 2005) (granting summary judgment on Fourth Amendment claim of bystanders affected by pepper spray because there was no seizure, where bystanders merely alleged that the spray "made it difficult to get out of" a building).

Because the class members were not seized, the Court should deny Plaintiffs' motion to the extent it seeks summary judgment on their Fourth Amendment claims.

Understandably, Plaintiffs' motion does not seek summary judgment on their Fourteenth Amendment substantive due process claim.  That standard is more demanding: It asks whether officers' actions "shocked the conscience"—i.e., whether officers acted with a "purpose to harm for reasons unrelated to legitimate law enforcement objectives." (*See* DMSJ No. 1 at 8–9.)  Because Plaintiffs have not moved for summary judgment on that claim, this opposition does not address it.[3]

### 2.    Plaintiffs misconstrue Fourth Amendment principles.

If the Fourth Amendment applied (and it does not), the question would be whether officers acted "reasonably" under the circumstances.  Courts must balance "the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted).

But Plaintiffs' motion glosses over the most critical aspect of the government's interests: the threat that existed at the time.  Indeed, whether there was "an immediate threat to the safety of the officers or others" is the "most important" factor. *Felarca v.*

---

[3] Elsewhere, Defendants have explained why officers' actions did not shock the conscience.  (*See* DMSJ No. 1 at 8–9, 12, 16, 21.)

*Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018). Here, there were several immediate threats to the safety of officers and others at various times, as explained below.

Plaintiffs also suggest that the Fourth Amendment requires officers to take certain steps before using force, such as consider less intrusive alternatives and issue warnings. (Mot. at 14–16, 17–18.) Not so. Courts "may" consider the "availability of less intrusive alternatives" and "whether warnings were given," *Felarca*, 891 F.3d at 817, but the Fourth Amendment does not require them.

Plaintiffs also suggest that the Fourth Amendment prohibits officers from acting in ways that harm bystanders if officers do not "consider" the harm. (Mot. at 16–17.) That is wrong in two ways. First, officers often face situations where, unfortunately, harm is likely to occur no matter what. Officers may act in a way that results in harm, in order to avoid greater harm, as long as the choice is "reasonable." *Graham*, 490 U.S. at 396. Second, it does not matter under the Fourth Amendment what officers "consider." The inquiry is objective, "without regard to their underlying intent or motivation." *Id.* at 397.

### 3. A necessary element of Plaintiffs' First Amendment claims is intent to chill speech, which they have not shown.

The Ninth Circuit Model Civil Jury Instructions list the elements of a First Amendment claim by a private citizen under 42 U.S.C. § 1983. One element is whether the plaintiff's protected activity "was a substantial or motivating factor in the defendant's conduct." Model Instruction No. § 9.11.[4]

Plaintiffs have told the Court that this is an element of their claim. (Doc. 43 at 8.) This is because, "to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions the defendant deterred or chilled the plaintiff's political speech *and such deterrence was a substantial or motivating factor in the defendant's conduct*.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (emphasis added) (citations and alterations omitted).

---

[4] The Model Instructions are available at http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2019_12.pdf.

1   Courts in the Ninth Circuit regularly apply this element to First Amendment claims
2   of protestors.  Cases illustrating this point were cited in DMSJ No. 1 (pgs. 9, 17, 21–22).
3   Here are some more examples:

4   · *Jurkowski v. City of Seattle*, 2017 WL 4472859, at *12–13 (W.D. Wash. Oct. 5,
5   2017) (granting summary judgment on protestors' First Amendment claims because there
6   was no evidence that "deployment of blast balls was motivated by an improper animus").

7   · *Meggs v. City of Berkeley*, 2004 WL 3241926, at *2 (N.D. Cal. Apr. 28, 2004)
8   (granting summary judgment on protestors' First Amendment claims because there was
9   no evidence that "the defendants' motivation for their conduct was to deter exercise of the
10  plaintiffs' First Amendment rights"), *aff'd in relevant part sub nom. Salsbury v. City of*
11  *Berkeley*, 188 Fed. Appx. 613, 614 (9th Cir. 2006) (affirming because there was no
12  evidence that "defendants intended to interfere with plaintiffs' First Amendment rights").

13  · *Mims v. City of Eugene*, 2003 WL 23671157, at *1–2 (D. Or. Sept. 16, 2003)
14  (granting summary judgment on protestor's First Amendment claim because there was no
15  evidence that officer was "motivated by a desire to curtail her political speech"), *aff'd*,
16  145 Fed. Appx. 194, 195–96 (9th Cir. 2005) (affirming because there was no evidence
17  that officer was "motivated by hostility toward the views of the Mumia protestors").

18   In other words:  "Intent to inhibit speech" is "'an element of the claim.'"
19  *Mendocino Envtl. Ctr.*, 192 F.3d at 1300 (citation omitted).

20  Plaintiffs' motion does not even try to show that *any* defendant acted with intent to
21  chill the speech of *any* class member.  For this reason, the Court should deny Plaintiffs'
22  motion to the extent it seeks summary judgment on their First Amendment claims.[5]

### 4.   The First Amendment does not separately require "adequate justification" where unlawful actors trigger dispersal.

25  Plaintiffs argue that officers violated the First Amendment by dispersing class
26  members without "adequate justification."   (Mot. at 20–23.)   But the legal theory

---

28  [5] Elsewhere, Defendants have explained why officers were not motivated by a desire to chill class members' speech. (*See* DMSJ No. 1 at 9, 12, 16–17, 21–22.)

underlying this argument is misguided, as the First Amendment does not impose this separate requirement in these circumstances.

As just explained, the Ninth Circuit has listed the elements of a First Amendment claim under § 1983. Nowhere is "adequate justification" required. Such a requirement would be redundant in cases where officers use force in response to threats, given the protections that already exist under the Fourth and Fourteenth Amendments. *See Vodak v. City of Chicago*, 639 F.3d 738, 750–51 (7th Cir. 2011) (recommending that protestors "confine their claims to the Fourth Amendment" and forgo their "largely duplicative appeals to the First Amendment"); *Barney v. City of Eugene*, 20 Fed. Appx. 683, 685 (9th Cir. 2001) (unpub.) (finding persuasive, in evaluating protestor's First Amendment claim, the fact that "the deployment of tear gas did not raise an issue of excessive force").

Plaintiffs cite cases to support their legal theory (at 20–23), but those cases address a different issue. Start with *Cantwell v. Connecticut*, 310 U.S. 296 (1940). There, a group of Jehovah's witnesses going door to door were arrested and convicted under state law, for soliciting without state permission and breaching the peace. *Id.* at 300–03. The Supreme Court reversed the convictions, reasoning that the group was entirely peaceful and therefore the use of state law to arrest and convict them exceeded First Amendment limits on the state's power to regulate and punish speech. *Id.* at 303–311.[6]

Same with *Edwards v. South Carolina*, 372 U.S. 229 (1963). There, a group of students speaking in a public area were ordered to leave and then arrested and convicted under state law, for breaching the peace. *Id.* at 229–234. Once again, the Supreme Court reversed the convictions, reasoning that the group was peaceful and therefore the use of state law to arrest and convict them exceeded First Amendment limits on the state's power to regulate and punish speech. *Id.* at 235–38.[7]

---

[6] The Court noted that the state could "obviously" regulate and punish in other situations: "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Id.* at 308.

[7] Plaintiffs also cite *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), but that case is far afield. There, a group of black citizens participated in a years-long boycott

1      Notably, these cases do <u>not</u> address the question:  *When may an officer disperse a*

2  *group when some but not all of the group is violent or poses a threat?*

3      Instead the cases address a different question:  *When may a government ban speech*

4  *and arrest someone for engaging in speech?*

5      These questions raise different considerations.  For example, dispersing a group is

6  less of a restriction on liberty than making arrests.  And an officer's response to a dynamic

7  situation involves more situational judgment calls than a government ban.

8      It was the latter question that the Ninth Circuit addressed in *Collins v. Jordan*, 110

9  F.3d 1363 (9th Cir. 1996).  There, the City of San Francisco issued a citywide ban on

10  demonstrations, in response to recent violence.  *Id.* at 1367, 1370.  Groups were arrested

11  for violating the ban.  *Id.* at 1367–68.  The question on appeal was whether the City could

12  lawfully "prevent all demonstrations, peaceful or otherwise," based on the recent violence.

13  *Id.* at 1370–71.  The Court said no, because prior instances of violence do not justify a ban

14  on *all* demonstrations.  *Id.* at 1372.  The Court left open the question whether another

15  situation might warrant "the banning of a particular demonstration."  *Id.* at 1373.

16      The Ninth Circuit addressed that open question in *Menotti v. City of Seattle*, 409

17  F.3d 1113 (9th Cir. 2005).  There, the City of Seattle issued a ban on access to parts of the

18  city, in response to recent violence.  *Id.* at 1117, 1120–26.  Several protestors were arrested

19  for violating the ban.  *Id.* at 1117, 1126–27.  Distinguishing *Collins*, the Court held that

20  the order was a constitutional time, place, and manner restriction because it was content-

21  neutral, narrowly tailored to achieve a significant government interest, and left open other

22  means of communication.  *Id.* at 1128–37.

23      Again, neither case addressed the question here:  *When may an officer disperse a*

24

25  of white merchants.  *Id.* at 888–906.  A state court found the boycotters liable to the
merchants for business losses, under state law.  *Id.* at 889–96.  The Supreme Court

26  reversed the finding of blanket liability, reasoning that some parts of the boycott were
protected First Amendment activity even though other parts were violent.  *Id.* at 907–915,

27  933–34.  The Court explained:  "Civil liability may not be imposed merely because an
individual belonged to a group, some members of which committed acts of violence."  *Id.*

28  at 915–20.  Here, in contrast, no civil liability was imposed on protestors.

*group when some but not all of the group is violent or poses a threat?*  Indeed, the very fact that the *Menotti* court analyzed the City's ban as a time, place, and manner restriction confirms that both cases are inapposite.  *See Barney*, 20 Fed. Appx. at 684 n.1 (unpub.) (explaining that the analytical framework for time, place, and manner restrictions is "inappropriate" where "there was no prior restraint and the basis for the violation is the discretionary acts of the police"); *see also Buck v. City of Albuquerque*, 2007 WL 9734037, at *40 (D.N.M. Apr. 11, 2017) (following *Barney*).

Admittedly, the Second Circuit has described *Cantwell* and its progeny in a way that, on a superficial read, would seem to support Plaintiffs' legal theory.  *See Jones v. Parmley*, 465 F.3d 46, 56–60 (2d. Cir. 2006).  But the broad description in *Jones*, read literally, would overstate the law.  For example, *Cantwell* did not hold that police "may not interfere" with protests "unless there is a 'clear and present danger' of riot, imminent violence, interference with traffic or other immediate threat to public safety."  *Jones*, 465 F.3d at 57 (citing *Cantwell* and progeny).  Moreover, there is no indication that the Ninth Circuit has followed, or would follow, a broad reading of *Jones*.

For these reasons, the Court should deny Plaintiffs' motion to the extent it seeks summary judgment under a First Amendment "adequate justification" theory.  And in any event, here the officers *did* act with adequate justification, as explained below.

### 5. The First Amendment does not require officers to issue a dispersal order before using force.

Plaintiffs also argue that officers violated the First Amendment by dispersing class members without a dispersal order.  (Mot. at 23–25.)  This argument misunderstands the function of a dispersal order and misapplies the law on probable cause.  Although a dispersal order may be necessary *to make an arrest for failing to disperse*, here no class member was arrested, nor is there any claim for unlawful arrest.

To elaborate:  Under the Fourth Amendment, to make an arrest, an officer generally needs probable cause.  *See* Ninth Circuit Model Civil Jury Instruction § 9.23.  Probable cause means a fair probability that a crime has been committed.  *See id.*  If an officer

makes an arrest without probable cause, the arrestee can bring a § 1983 claim for "unlawful arrest," sometimes referred to as "false arrest." *See id.*, comment.[8]

Protesting is, of course, not a crime. But it can become one, depending on the situation. For example, if a protestor remains in an area where others are rioting and refuses to obey an "official order to disperse," that can be a crime. A.R.S. § 13-2902(A)(2). Likewise, if a protestor is near an emergency situation and refuses to obey a "lawful order to disperse," that can be a crime too. A.R.S. § 13-2904(A)(5).

Thus, in some situations, a dispersal order transforms otherwise lawful activity into a crime. So if a dispersal order is issued, an officer has probable cause to arrest persons who remain. But if no dispersal order is issued, there is no probable cause to arrest.

*That* is why some courts have deemed a dispersal order necessary, in *arrest* cases. Although not a prerequisite to using force, it *can* be a prerequisite to making an arrest, depending on the situation. *See, e.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir. 2011) ("[B]efore the police could start arresting peaceable demonstrators for defying their orders they had to communicate the orders to the demonstrators.").

This is why all the cases cited by Plaintiffs (Mot. at 24–25) involve claims by arrestees. *See Vodak*, 639 F.3d at 740; *Jones*, 465 F.3d at 53–54; *Dellums v. Powell*, 566 F.2d 167, 173 (D.C. Cir. 1977); *Dinler v. City of New York*, 2012 WL 4513352, at *1 (S.D.N.Y. Sept. 30, 2012); *Barham v. Ramsey*, 338 F. Supp. 2d 48, 51 (D.D.C. 2004).

Here, because class members were not arrested, Plaintiffs' cases about arrests simply do not apply.

Anticipating this problem, Plaintiffs try to pivot. They say that dispersal orders are required even "if police disperse protestors rather than arresting them." (Mot. at 24.) But that is not the law, in the Ninth Circuit or elsewhere.

In their pivot, Plaintiffs rely on a single paragraph in *Jones*. 465 F.3d at 60–61.

---

[8] Unlawful arrest claims are based on the second clause of the Fourth Amendment, which generally requires that arrests be based on "probable cause." U.S. Const. amend. IV. In contrast, excessive force claims are based on the first clause, which prohibits "unreasonable searches and seizures." *Id.*

- 13 -

But even that paragraph was about arrests.  The court was talking about officers who "issued no dispersal order" and then "charged into the crowd, *arresting protesters indiscriminately*."  *Id.* at 60 (emphasis added).  That was what the court had in mind when it said officers could not "disperse" protestors without warning.  *Id.*  The court meant that officers could not arrest an entirely peaceful group without a dispersal order, because otherwise there was no crime.[9]  The Second Circuit has confirmed this reading, clarifying that *Jones* held that officers could not indiscriminately "arrest" peaceful protestors without an "order to disperse."  *Garcia v. Does*, 779 F.3d 84, 94 n.11 (2d Cir. 2015).

Plaintiffs also cite A.R.S. § 13-3804, but that statute simply instructs officers to issue dispersal orders at unlawful assemblies and to arrest persons who do not disperse. At most, this law suggests that dispersal orders may be required for *arrests*, not for uses of force or other kinds of dispersals.

In sum, the rule that Plaintiffs urge is not the law.  Nor is it wise.  Dispersal orders and arrests take time and resources.  When an officer encounters a crowd some of whom are being violent, there may be no opportunity for dispersal orders or arrests.  A quick use of appropriate force to disperse, such as CS gas, may often be the safest option available.[10]

For these reasons, the Court should deny Plaintiffs' motion to the extent it seeks summary judgment under a First Amendment "lack of dispersal order" theory.

### 6.    Individualized causation is required.

In a § 1983 action, causation must be shown by each plaintiff, for each defendant.

---

[9] Indeed, the court went on to cite N.Y. Penal Law § 240.20(6).  Under that law, if a person refuses to obey a "lawful order of the police to disperse," that can be a crime.  So without the dispersal order, there was no crime.  The court's citation of that law confirms that the court was talking about requirements for arrests, not requirements for uses of force or other kinds of dispersals.

[10] Even cases about arrests recognize that a dispersal order is not required in such situations.  *See, e.g.*, *Bernini v. City of St. Paul*, 665 F.3d 997, 1002–05 (8th Cir. 2012) (affirming summary judgment for officers despite a dispute as to whether officers "ordered the crowd to disperse" before making arrests); *Carr v. District of Columbia*, 587 F.3d 401, 409–10 (D.C. Cir. 2009) (explaining that officers could lawfully "complete the mass arrest without first ordering the crowd to disperse"); *accord Jones*, 465 F.3d at 60 n.5 (leaving open whether a dispersal order would be necessary for "a crowd more akin to a mob").

A plaintiff must show that "the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

And causation requires proof of two elements:  "the plaintiff must establish both causation-in-fact and proximate causation." *Harper*, 533 F.3d at 1026.

Plaintiffs' motion does not show individualized causation at all.  Plaintiffs make no attempt to connect any specific officer, or any specific action, with any specific injury. This is another reason why the Court should deny Plaintiffs' motion.

### B.   Analysis of Officers' Actions, Situation by Situation

#### 1.   Why a situation-by-situation approach is necessary

In applying the law, the Court must take a situation-by-situation approach to analyzing officers' actions.  This is because of the nature of the legal inquiries.

Under the Fourth Amendment, to determine whether an officer acted "reasonably," one must judge from "the perspective of a reasonable officer on the scene," not "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Thus, the analysis "must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1547 (2017).[11]

Same with the First Amendment.  To determine whether an officer had "adequate justification" for a dispersal (to use Plaintiffs' term), one must judge whether the officer had reason to believe that, at that time, there was "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).[12]

---

[11] As explained above, the Fourth Amendment does not apply here, as there was no seizure.  This section assumes for the sake of argument that it applies.

[12] As explained above, the First Amendment does not separately impose this requirement in these circumstances.  This section assumes for the sake of argument that the "adequate justification" theory applies.

1        Plaintiffs do not take a situation-by-situation approach.  Instead they try to analyze

2  the overall response of "PPD," or "Defendants," over the course of the evening.  (Mot. at

3  10–25.)  That approach not only ignores the situational differences that prompted officers

4  to make different decisions at different times, but also results in other basic errors.

5        For example, the focus cannot be on what "PPD" did.  PPD is not a defendant, nor

6  could it be.  *See, e.g.*, *Joseph v. Dillard's Inc.*, 2009 WL 5185393, at *5 (D. Ariz. Dec. 24,

7  2009).  Likewise, the focus cannot be on what "Defendants" as a group did, since the

8  Defendants are distinct individuals and a municipality.  Even at the pleading stage, general

9  references to "Defendants" are not enough.  *See, e.g.*, *Roebuck v. Davis*, 2020 WL 703654,

10  at *3 (E.D. Pa. Feb. 11, 2020); *Dunsmore v. California*, 2012 WL 3809413, at *3 (C.D.

11  Cal. July 26, 2012).  A proper analysis must focus on what *specific officers* did, in specific

12  situations, as may be relevant to Plaintiffs' injuries.

13        Speaking of injuries, the focus cannot be on the overall number of munitions

14  deployed, nor the overall number of injuries.  Basic causation principles require Plaintiffs

15  to show a link between a munition and an injury.  *See Harper*, 533 F.3d at 1026; *Leer*,

16  844 F.2d at 633.  And, for most of the munitions deployed on August 22, 2017, Plaintiffs

17  have shown no link to *any injury at all*, much less a link to a specific injury.

18        To illustrate:  Plaintiffs emphasize the overall number of munitions deployed, but

19  the vast majority of those were targeted (like pepper balls), not diffuse (like CS gas).  For

20  example, Plaintiffs describe "hundreds of pepper ball rounds" but only "ten" CS gas

21  canisters.  (Mot. at 13.)  Even if one could assume that bystanders were affected by each

22  CS gas canister, one cannot make that same assumption for targeted munitions, since

23  Grenadiers deployed those munitions in a focused way, at or near specific individuals they

24  deemed a threat.  (*See, e.g.*, DSOF ¶¶ 80–82, 93, 98–99, 112–13, 124–25, 128–30, 131–

25  33, 135–37, 144–45, 146–47, 149; DCASOF ¶¶ 78, 94.)  Indeed, the Court denied

26  Plaintiffs' request to certify a class for targeted munitions.  (*See* Doc. 191 at 12.)

27        All this is to say:  A situation-by-situation analysis is necessary.  At the very least,

28  the Court should distinguish among the following four situations:

**(1)** The situation *before* Antifa pushed the police fence, in which Lt. Moore sent officers to investigate and prepared pepper balls as a potential response;

**(2)** The situation when Antifa *was* forcefully pushing the police fence, which prompted Lt. Moore to order pepper balls;

**(3)** The situation when unknown crowd members *began* throwing objects such as gas canisters at officers, which prompted Lt. Moore to order inert smoke; and

**(4)** The situation when unknown crowd members *continued* throwing objects such as an incendiary device at officers, which prompted Lt. Moore to order CS gas.[13]

As shown below, an analysis of each situation shows that Lt. Moore and the Grenadiers acted reasonably and with adequate justification.

### 2.   Before Antifa pushed the police fence (pre-8:32 p.m.)

In the minutes leading up to 8:32 p.m., Lt. Moore knew that Antifa was acting suspiciously. (DSOF ¶¶ 58–61, 66–67, 71–72.) So he took steps to investigate, including sending officers to stand near and talk to the group and directing an air unit to inspect the group, but the results were inconclusive. (*Id.* ¶¶ 62–65, 67–70, 72.)[14] Lt. Moore believed that the group might try to breach the police fence. (*Id.* ¶ 73.)[15] So he directed the Grenadiers to get ready to deploy pepper balls, in case that happened. (*Id.* ¶ 73.)[16]

Plaintiffs argue that Lt. Moore should have taken three more steps: (1) increase

---

[13] Lt. Moore also authorized Grenadiers to deploy targeted munitions to address specific threats. (DSOF ¶¶ 93, 98, 112, 124.) And Grenadiers did so, at or near specific persons. (*Id.* ¶¶ 80–82, 99, 112–13, 125, 128–30, 131–33, 135–37, 144–45, 146–47, 149.) Plaintiffs do not analyze these instances, so neither does this opposition.

[14] Plaintiffs say that "PPD saw one of the Antifa group shove another protestor." (Mot. at 15.) That overstates the record. Although a few officers later reported seeing this incident, there is no evidence that Lt. Moore saw it. (DCASOF ¶ 40.)

[15] Plaintiffs say that Lt. Moore believed the group "was going to" try to breach the fence. (Mot. at 5.) The record is mixed on this point. Lt. Moore testified that he believed there was a "possibility" of an attempted breach. (DCASOF ¶ 50.)

[16] Plaintiffs say that PPD planned, in advance, that pepper balls "would be followed by smoke and tear gas grenades." (Mot. at 16–17.) That misstates the record. Lt. Moore did not decide to use smoke or CS gas until after violence broke out several minutes later. (DCASOF ¶ 45.)

1   officer presence near Antifa, (2) arrest Antifa members, and (3) warn the crowd that

2   officers were going to deploy pepper balls.  (Mot. at 14–16, 17–18.)

3       First of all, **none** of this was constitutionally required.  *See Felarca v. Birgeneau*,

4   891 F.3d 809, 817 (9th Cir. 2018) (courts "may" consider "availability of less intrusive

5   alternatives" and "whether warnings were given").  Even Plaintiffs do not argue that Lt.

6   Moore's failure to take these steps before 8:32 p.m. was a constitutional violation.

7       Moreover, it was reasonable for Lt. Moore not to take these steps.  Consider each.

8       **Increase officer presence?**  Officer presence was already heavy on Monroe Street

9   because of water bottles thrown earlier.  (DSOF ¶ 44.)  Moreover, Lt. Moore made officer

10  presence known to Antifa in several ways, including by sending plainclothes CRB officers

11  to talk to them, sending uniformed TRU officers near them, and directing an air unit to fly

12  over them.  (*Id.* ¶¶ 62–65, 67–70.)

13      There were also manpower considerations.  Antifa was not the only problem that

14  required officer attention.  For example, at 8:30 p.m., an officer informed Lt. Moore of a

15  potential "large fight at Adams and 2nd Street" and requested assistance.  (*Id.* ¶¶ 55–57.)

16      Nor was there any guarantee that adding officers would help.  The Antifa group

17  had already refused to communicate with officers.  (*Id.* ¶ 64.)  While officer presence

18  "might be the solution in some cases," in other cases it "could lead to more intense

19  violence."  *Menotti v. City of Seattle*, 409 F.3d 1113, 1137 (9th Cir. 2005).

20      **Arrest Antifa members?**  Lt. Moore did not arrest Antifa members at that time

21  because: (a) the Antifa members appeared to be engaging in protected speech and had not

22  given cause for arrest; (b) sending officers into the crowd to make arrests could endanger

23  officers and nearby protestors and would likely require opening the police fence; and

24  (c) detentions and arrests would use manpower.  (DSOF ¶ 75.)[17]

25      Moreover, the Constitution does not require arrests.  (*See* DMSJ No. 1 at 10–11.)

26  Indeed, under the cases Plaintiffs cite, the Constitution may well have *prohibited* arrests

27  ────────────────

28      [17] Plaintiffs say that Lt. Moore did not "consider" making arrests, but at his
    deposition he explained in detail his reasons for not making arrests.  (DCASOF ¶ 56.)

of Antifa members at that time.  *See Jones v. Parmley*, 465 F.3d 46, 56–61 (2d Cir. 2006).

**Warn the crowd?**  Plaintiffs' argument that Lt. Moore should have warned the crowd *before* Antifa began pushing the fence ignores reality.  Even setting aside the fact that general warnings had been given earlier (DSOF ¶¶ 29–32, 44–45), what would the additional warning have been?  To whom would it have been made?  Should officers have frozen time and told each person near Antifa:  "We think the group next to you might try to breach the fence, and if they do, we plan to deploy pepper balls, which may affect you"?

Worse, if Antifa overheard the warning, would they not modify their plan of attack so that pepper balls would be less effective?  These and other considerations illustrate why it was reasonable for Lt. Moore not to issue warnings in the circumstances he then faced.

### 3.     When Antifa was forcefully pushing the fence (8:32 p.m.)

At 8:32 p.m., ███████████████████████, the Antifa group began forcefully pushing the police fence.  (DSOF ¶¶ 49, 74(a), 77.)  Lt. Moore concluded that they were trying to breach the fence and directed Grenadiers to deploy pepper balls.  (*Id.* ¶¶ 78–80.)  Grenadiers then deployed pepper balls at the ground in front of Antifa, releasing tiny clouds of PAVA powder that drove them back.  (*Id.* ¶ 80.)  Seconds later, Mr. Yedlin returned to the fence and forcefully pushed it again, while angrily yelling, with Antifa members nearby.  (*Id.* ¶¶ 81, 153–54.)  In response, Grenadiers deployed additional pepper balls, which struck him and caused him to walk away and go to another part of the fence.  (*Id.* ¶¶ 81, 155.)

The effects of the pepper balls were localized.  Although individuals in the immediate vicinity were affected, there was no widespread effect.  (*Id.* ¶ 82.)

The pepper balls did not violate constitutional rights for the following reasons.

**Whose rights?**  First we must clarify which Plaintiffs we are talking about.  As to the initial pepper balls at the ground which released PAVA powder, Plaintiffs identify no one who was injured.  As for the follow-up pepper balls which struck specific persons, Plaintiffs identify only Mr. Yedlin.  (DSOF ¶ 157.)  That is all.  The pepper balls did not cause widespread injury, nor did they cause the larger crowd to disperse.

Plaintiffs try to assign significance to the pepper balls by saying they "predictably" caused crowd members to engage in violence.  (Mot. at 5, 22.)  That is pure conjecture. The record shows the opposite:  Lt. Moore authorized pepper balls to *stop* the unlawful activity by Antifa so that protests could continue.  (DSOF ¶ 86.)  He could not have known that, minutes later, unidentified crowd members would then throw objects, including gas canisters, at officers over the next several minutes.  (*Id.* ¶ 87.)

Those later criminal acts sever any proximate cause between the initial pepper balls and subsequent uses of force.  (DMSJ No. 1 at 11–12, 14.)  Indeed, even but-for causation is lacking.   The fact that crowd members *secretly brought gas canisters* shows that violence was pre-planned, not merely a reaction to police conduct.  (DCASOF ¶ 66.)

**Fourth Amendment:**  The deployment of pepper balls was reasonable.

Level of Force:  Low to moderate.  The initial pepper balls at the ground released PAVA powder that temporarily irritated eyes of Antifa members and caused them to back up.  (DSOF ¶¶ 74(e), (f), 80.)  That was a low level of force.  Plaintiffs identify no injury.

The follow-up pepper balls struck Mr. Yedlin, but he then returned to another part of the fence.  (DSOF ¶¶ 153–56.)  That was only a moderate level of force.  *See Felarca*, 891 F.3d at 817 (court may consider "severity of injuries").

Government Interest:  Very high.  Had the police fence been breached, crowd members could have spilled onto Monroe Street.  This would have cut off the only roadway providing emergency services to the north of the Convention Center, and it could have led to confrontations with officers or persons exiting the President's rally—ten days after the violence in Charlottesville.  (DSOF ¶¶ 1, 40, 74(a).)  *See Felarca*, 891 F.3d at 817 ("most important" factor is whether there was "immediate threat to the safety of the officers or others").  And ███████████████████████, so stability was especially important.  (DSOF ¶¶ 49, 74(a).)  *See Wood v. Moss*, 134 S. Ct. 2056, 2061 (2014) (safeguarding the President is "of overwhelming importance").

Other alternatives:  Plaintiffs say that Lt. Moore should have increased officer presence and made arrests.  But even setting aside the problems with these alternatives

explained earlier, in *this* situation there was no time.  Once Antifa began pushing the fence, Lt. Moore reasonably determined that immediate action was necessary.  (DSOF ¶ 79.)

Warnings:  The same is true of warnings.  Again, even setting aside the fact that general warnings had been given earlier (DSOF ¶¶ 29–32, 44–45), in *this* situation there was no time.  Once Antifa began pushing the fence, Lt. Moore reasonably determined that immediate action was necessary.  (*Id.* ¶ 79.)

**First Amendment "adequate justification":**  The pepper balls did not disperse the larger crowd, so no "adequate justification" was required even under Plaintiffs' theory.

Regardless, there *was* adequate justification.  Antifa's attempt to breach the police fence threatened to cut off an emergency roadway and create confrontation with officers and others, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, in a politically charged atmosphere ten days after Charlottesville.  There was "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order."  *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).

### 4.  When unknown crowd members began throwing objects including gas canisters at officers (8:32 p.m. – 8:35 p.m.)

At  8:32  p.m., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, which prompted CRB officers to warn their civilian contacts in the crowd. (DSOF ¶¶ 83–84.)  Lt. Moore then told Grenadiers to "hold off" on further deployments, in the hopes that unlawful activity would stop and protests could continue.  (*Id.* ¶¶ 85–86.) But unknown crowd members began throwing objects, including rocks and at least two canisters of unknown gas, at officers.  (*Id.* ¶ 87.)  Lt. Moore also heard, at 8:33 p.m., that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  (*Id.* ¶ 88.)

Despite the urgency, Lt. Moore took steps to warn.  At 8:33 p.m. he requested a helicopter, in part to make announcements, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (*Id.* ¶¶ 89(a), 90(a).)  At 8:34 p.m. he instructed officers to put on gas masks, which some protestors understood as a warning.  (*Id.* ¶¶ 89(b), 90(b).)  And at 8:34 p.m. he directed Grenadiers to deploy canisters of inert smoke, and many protestors understood this as a

warning and left.  (*Id.* ¶¶ 89(c), 90(c).)

The smoke canisters did not violate constitutional rights for the following reasons.

**Fourth Amendment:**  The smoke was inert.  (DSOF ¶ 89(c).)  Plaintiffs identify no injury from the smoke.

**First Amendment "adequate justification":**  There was adequate justification for the inert smoke.  Unknown crowd members had been throwing dangerous objects, including rocks and at least two canisters of unknown gas, at officers for several minutes, ███████████████████████, in a politically charged atmosphere ten days after Charlottesville.  There was "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).

### 5. When unknown crowd members continued throwing objects including an incendiary device at officers (8:36 p.m. onward)

Despite the smoke, unknown crowd members kept throwing objects, including at least one incendiary device, at officers.  (DSOF ¶ 92.)  Some crowd members even tossed or kicked the smoke canisters back at officers.  (*Id.* ¶ 91.)  So, at 8:35 or 8:36 p.m.,[18] Lt. Moore directed Grenadiers to deploy CS gas.  (*Id.* ¶ 96.)  Grenadiers then tossed canisters of CS gas in Monroe Street, which generally traveled in the same direction as the smoke and caused most of the remaining crowd members to disperse.  (*Id.* ¶¶ 97, 101.)[19]

The CS gas did not violate constitutional rights for the following reasons.

**Fourth Amendment:**  The deployment of CS gas was reasonable.

Level of Force:  Low.  Releasing CS gas in an open area is "arguably the lowest level of force" that officers could have used.  *Ellsworth v. City of Lansing*, 34 F. Supp. 2d

---

[18] According to the radio transcript, Lt. Moore gave the order at 8:35 p.m.  Video indicates that CS gas was not deployed until 8:36 p.m.  This discrepancy may be due to a difference in time stamps. (*See* DSOF ¶ 96 n.3.)

[19] Lt. Moore also authorized Grenadiers to deploy additional targeted munitions to address specific threats.  (DSOF ¶¶ 93, 98, 112, 124.)  Grenadiers did so.  (*Id.* ¶¶ 99, 113, 125, 130, 133, 135–37, 145, 147, 149.)  Again, Plaintiffs do not analyze these instances, so neither does this opposition.

571, 581 (W.D. Mich. 1998).  Moreover, because officers had previously deployed smoke, many of the protestors had already left or were farther away by the time CS gas was used, and the CS gas generally traveled in the same direction as the smoke did.  (DSOF ¶¶ 91, 97.)  *See Felarca*, 891 F.3d at 817 ("even if the force used was of a type that is generally intrusive, the amount of force applied here was minimal").

Plaintiffs try to exaggerate the effects of CS gas by mentioning "chemical agents" in the same paragraph as other munitions courts have deemed "intermediate."  (Mot. at 12.)  But that is misleading.  None of the Ninth Circuit cases they cite were about CS gas, much less CS gas released in an open area.  And the Tenth Circuit case they cite was not directly about CS gas.  There, the court stated that officers used "considerable" force against a man when they (1) "hit [him] with a rifle-fired projectile," (2) "thrust him to the ground," (3) "forcibly escorted him through a cloud of tear gas" causing "an acute asthma attack," and (4) "put his wrist into a painful hyperflexion position" causing "a torn tendon."  *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008).  That is not this case.

Government Interest:  Very high.  Unknown crowd members had been throwing dangerous objects, including rocks, at least two unknown gas canisters, at least one incendiary device, and munitions that officers had deployed, at officers for the past several minutes.  (DSOF ¶¶ 87, 91–92.)  *See Felarca*, 891 F.3d at 817 ("most important" factor is whether there was "immediate threat to the safety of the officers or others").  And ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, so stability was especially important.  (DSOF ¶ 88.)  *See Wood*, 134 S. Ct. at 2061 (safeguarding the President is "of overwhelming importance").

Moreover, because of the diffuse nature of the violence, officers could not be sure how many of the remaining crowd members were involved.  Even if "violent protestors were less than one percent of the total protestors, this is not a small amount of violence given the activities in which the protestors engaged."  *Menotti v. City of Seattle*, 409 F.3d 1113, 1123 (9th Cir. 2005).

Other alternatives:  Plaintiffs say that Lt. Moore should have increased officer presence and made arrests.  But again, even setting aside the problems with these

- 23 -

1   alternatives explained earlier, in *this* situation there was neither time nor opportunity.  (*See*

2   DSOF ¶¶ 87, 91–92, 94(a), (b), (c).)  And the fact that unlawful activity was diffuse

3   rendered a more targeted approach insufficient.  (*See id.* ¶¶ 87, 91–92, 94(d).)

4         <u>Warnings:</u>   Plaintiffs ignore that Lt. Moore *did* take steps to issue warnings,

5   including (1) announcing that pepper balls had been deployed (which prompted CRB

6   officers to warn their civilian contacts), (2) requesting a helicopter (███████████████

7   ████████████), (3) directing TRU officers to put on gas masks (which some protestors

8   understood as a warning), and (4) deploying smoke (which many protestors understood as

9   a warning).  (DSOF ¶¶ 83–84, 89–90.)

10         Additional warnings were neither required nor practical.  For example, the LRAD

11   would not have been safe for officers.  (*Id.* ¶ 95(c).)  And the police Tahoe would have

12   needed to be driven closer, creating a separate risk of injury.  (*Id.* ¶ 95(d).)  And besides,

13   time was of the essence.  Lt. Moore reasonably determined that fast action was necessary,

14   without giving more warnings beyond what had been given.  (*Id.* ¶¶ 87, 91–92, 95(a).)

15         **First Amendment "adequate justification":**  There was adequate justification for

16   the CS gas.  Unknown crowd members had been throwing dangerous objects, including

17   rocks, at least two unknown gas canisters, at least one incendiary device, and munitions

18   that officers had deployed, for several minutes, ████████████████████, in a

19   politically charged atmosphere ten days after Charlottesville.  There was "clear and

20   present danger of riot, disorder, interference with traffic upon the public streets, or other

21   immediate threat to public safety, peace, or order."  *Cantwell v. Connecticut*, 310 U.S.

22   296, 308 (1940).

23         **C.   Case Law Supports Judgment for Defendants, Not Plaintiffs**

24         Courts regularly grant summary judgment to the defense in cases like this one.  *See,*

25   *e.g.*, *Bernini v. City of St. Paul.*, 665 F.3d 997, 1001–02, 1006–08 (8th Cir. 2012); *Barney*

26   *v. City of Eugene*, 20 Fed. Appx. 683, 684–85 (9th Cir. 2001) (unpub.); *Jurkowski v. City*

27   *of Seattle*, 2017 WL 4472859, at *1–5, *12–13 (W.D. Wash. Oct. 5, 2017); *Buck v. City*

28   *of Albuquerque*, 2007 WL 9734037, at *1–17, *29–42 (D.N.M. Apr. 11, 2007); *Buck v.*

*City of Albuquerque*, 2007 WL 9733722, at *1–4, *5–12 (D.N.M. June 15, 2007); *Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571, 574–75, 581–91 (W.D. Mich. 1998); *accord Felarca v. Birgeneau*, 891 F.3d 809, 816–23 (9th Cir. 2018).

Plaintiffs sprinkle case citations in their constitutional analysis (Mot. at 10–25), but the courts in those cases did not actually grant summary judgment to the plaintiffs.[20]

And in any event, Plaintiffs' cases are easily distinguishable, including the ones they rely on most. *See, e.g.*, *Boyd v. Benton County*, 374 F.3d 773, 776–78 (9th Cir. 2004) (deployment of flash bang in dark apartment at night when everyone was asleep); *Nelson v. City of Davis*, 685 F.3d 867, 872–75 (9th Cir. 2012) (deployment of pepper ball into college student's eye during party in apartment complex); *Deorle v. Rutherford*, 272 F.3d 1272, 1275–78 (9th Cir. 2001) (deployment of lead-filled beanbag round into man's face while he was alone on his own property, had not attacked anyone, and was generally following instructions); *Jones v. Parmley*, 465 F.3d 46, 52–53 (2d Cir. 2006) (arrests and assaults on entirely peaceful group of protestors who were on private property with owner's permission).

In sum, the parties agree that this case should be resolved on summary judgment, and other cases with similar facts counsel strongly for judgment for Defendants.

## IV.   NO MUNICIPAL LIABILITY

Regardless of the merits, the City cannot be liable because Plaintiffs identify no "official municipal policy" that "caused" their injury. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). PPD's policies are at least as protective of Plaintiffs' rights as the Constitution is. (*See* DMSJ No. 1 at 26–28.) Plaintiffs do not dispute this. Instead they advance two other theories of municipal liability. (Mot. at 25–29.) First, they say Lt. Moore committed unconstitutional acts as the City's "final policymaker." Second, they say Chief Williams

---

[20] There appear to be two exceptions, but each is far afield. *See Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 982–988, 989–1006 (D. Ariz. 2012) (partial summary judgment to plaintiff who was shot in the back three times while walking away from officers on his own property and carrying his two-year-old daughter); *Dinler v. City of New York*, 2012 WL 4513352, at *1–2, *3–12 (S.D.N.Y. Sept. 30, 2012) (partial summary judgment to plaintiffs who were arrested without probable cause).

"ratified" unconstitutional acts as the City's "final policymaker." Each theory fails.

### A.   No Unconstitutional Acts Were Committed by a Final Policymaker.

"Whether an official has final policymaking authority is a question for the court to decide based on state law." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). Plaintiffs bear the burden on this issue. *Drake v. City of Eloy*, 2015 WL 6168419, at *8 (D. Ariz. Oct. 21, 2015). They have failed to carry this burden in two ways.

**First**, Plaintiffs have not shown that Chief Williams is a "final policymaker" for municipal liability purposes. Under the City Charter, the final policymakers are the City Council and City Manager. (Phoenix City Charter, Ch. III, §§ 1, 2.)[21]

Citing the City Code, Plaintiffs claim that the City Manager delegated final policymaking authority to Chief Williams in law enforcement matters. (*See* Pls.' Statement of Facts ("PSOF") ¶ 1.) But there is a difference between delegating "final policymaking authority" and delegating "discretion to act." *Christie*, 176 F.3d at 1236. Discretion to act cannot be the same as final policymaking authority, because then "the result would be indistinguishable from *respondeat superior* liability." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)). To determine whether an official has final policymaking authority, courts consider whether his or her decisions are "constrained by policies not of that official's making" and "subject to review by the municipality's authorized policymakers." *Id.* at 1236–37 (quoting *Praprotnik*, 485 U.S. at 127).

Here, the very Code sections that Plaintiffs cite show that Chief Williams' discretion is constrained and subject to the City Manager's review. For example, Plaintiffs cite the Code section on "Department Director duties generally," but that section specifies that each department director "shall be responsible to the City Manager" and "shall report the activities of his department in writing to the City Manager." (PSOF Ex. 409, pg. 2 (citing Phoenix City Code, Ch. 2, Art. I, § 2-7).) Likewise, Plaintiffs cite the Code section on "Director of the Police Department," but that section makes clear that the police

---

[21] The City Charter is online at https://phoenix.municipal.codes/Charter. The City Code is online at https://phoenix.municipal.codes/CC.

1    director "shall at all times be subject to the supervision and control of the City Manager."

2    (PSOF Ex. 409, pg. 3 (citing Phoenix City Code, Ch. 2, Art. IV, § 2-119).)  Indeed, that

3    is why Chief Williams submitted to the City Manager a memorandum regarding what

4    happened on August 22, 2017.  (DSOF ¶¶ 196–99.)[22]

5         In similar circumstances, courts have held that the police chief was *not* the final

6    policymaker for municipal liability purposes.  *See, e.g.*, *Ellins v. City of Sierra Madre*,

7    710 F.3d 1049, 1066 (9th Cir. 2013); *Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir.

8    2010); *Feliciano v. City of Cleveland*, 988 F.2d 649, 655–56 (6th Cir. 1993); *Davila v. N.

9    Reg'l Joint Police Bd.*, 370 F. Supp. 3d 498, 536 (W.D. Pa. 2019); *Mosser v. Haney*, 2005

10   WL 1421440, at \*3–4 (N.D. Tex. June 17, 2005); *accord Delia v. City of Rialto*, 621 F.3d

11   1069, 1081–85 (9th Cir. 2010) (regarding fire chief), *rev'd on other grounds sub nom.*

12   *Filarsky v. Delia*, 566 U.S. 377 (2012).  So too here.  Plaintiffs have not met their burden.

13        **Second**, even if Chief Williams were the City's final policymaker, and even if she

14   delegated *decision-making* authority to Lt. Moore, that does not mean she delegated *final*

15   *policymaking* authority to him.  Lt. Moore's actions were "constrained" by other policies

16   and "subject to review" by others.  *Christie*, 176 F.3d at 1236.  This included, among other

17   things, express policies that limited the circumstances in which he could use chemical

18   agents.  (DSOF ¶ 14; *see also, e.g.*, DSOF ¶¶ 11–13, 15–21, 196.)

19        Courts regularly hold that officers in Lt. Moore's position are not "final

20   policymakers" for purposes of municipal liability, even though they make command

21   decisions.  *See, e.g.*, *Bernini v. City of St. Paul*, 665 F.3d 997, 1008 (8th Cir. 2012); *Valle

22   v. City of Houston*, 613 F.3d 536, 542–44 (5th Cir. 2010); *Gurevich v. City of New York*,

23   2008 WL 113775, at \*5 (S.D.N.Y. Jan. 10, 2008); *Buck v. City of Albuquerque*, 2007 WL

24   9733722, at \*6 (D.N.M. June 15, 2007); *Mar v. City of McKeesport*, 2007 WL 1556911,

25   at \*3 (W.D. Pa. May 25, 2007); *accord Los Angeles Police Protective League v. Gates*,

26   907 F.2d 879, 882–83, 890 (9th Cir. 1990) (finding "no evidence" that officers below level

27   ────────────────

28   [22] Chief Williams explained in her deposition that the City Manager and Assistant City Manager "are my bosses."  (PSOF Ex. 502 at 20:10-12.)

- 27 -

1   of chief, including commanding officer, had "authority to make policy"). So too here.

2   **B.    No Unconstitutional Acts Were "Ratified" by a Final Policymaker.**

3   Plaintiffs argue that, even if Lt. Moore was not a final policymaker, his actions still

4   render the City liable because Chief Williams "ratified" them as a final policymaker.

5   (Mot. at 27–28.) This argument fails for three reasons.

6   **First**, as just explained, Plaintiffs have not shown that Chief Williams was a final

7   policymaker for purposes of municipal liability.

8   **Second**, Plaintiffs' ratification theory relies on how Chief Williams reacted

9   *afterward*. There is no evidence that she ratified Lt. Moore's decisions before, or while,

10  they were carried out. Thus, Plaintiffs miss a key element of municipal liability: causation.

11  A municipality cannot be liable unless it was the "moving force" behind the alleged

12  injury. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). To

13  evaluate causation, courts "must carefully test the link between the policymaker's

14  inadequate decision and the particular injury alleged." *Id.* at 410. For this reason, after-

15  the-fact ratification by a final policymaker is not enough. A plaintiff "must *also* show that

16  the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional

17  deprivation." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (emphasis added).

18  This means that, even if Plaintiffs were right about how Chief Williams reacted

19  (and they are not), Plaintiffs have not shown that the City *caused* any injuries. *See, e.g.*,

20  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (rejecting ratification theory where

21  policymaker did not know of official's actions "before the alleged constitutional violations

22  ceased"); *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 985–86 (E.D. Cal. 2017) (rejecting

23  ratification theory based on police chief's after-the-fact reactions, for "lack of causation"

24  (citation omitted)); *Mueller v. Cruz*, 2015 WL 9455565, at *3–4 (C.D. Cal. Dec. 23, 2015)

25  (rejecting ratification theory based on sheriff's after-the-fact reactions, because reactions

26  did not "result in" the alleged violation); *Chavez v. City of Hayward*, 2015 WL 3833536,

27  at *8 (N.D. Cal. June 19, 2015) (rejecting ratification theory based on police chief's after-

28  the-fact reactions, because reactions did not "result in or cause" the alleged violation).

1    **Third**, Chief Williams did not "ratify" Lt. Moore's decisions in the relevant sense.

2    "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a

3    subordinate's decision and the basis for it.'"  *Christie*, 176 F.3d at 1239 (quoting

4    *Praprotnik*, 485 U.S. at 127)).  Here, Plaintiffs have not shown that Chief Williams

5    specifically approved Lt. Moore's decisions or the basis for them.

6        For example, although Chief Williams generally spoke approvingly of officers

7    after the events, she also implemented several improvements (DSOF ¶¶ 196–211),[23] and

8    in any event, none of this shows ratification for purposes of municipal liability.  *See, e.g.*,

9    *Brawley v. Punt*, 186 F. Supp. 3d 1102, 1116 (D. Mont. 2016) (rejecting ratification theory

10   based on police chief's statement that force "was justified"); *Buck v. City of Albuquerque*,

11   2007 WL 9733722, at *6–7 (D.N.M. June 15, 2007) (rejecting ratification theory based

12   on police chief's "generic affirmations of support"); *Kanae v. Hodson*, 294 F. Supp. 2d

13   1179, 1186–91 (D. Haw. 2003) (rejecting ratification theory based on county's

14   determination that officer "acted appropriately").

15       Likewise, although Chief Williams generally concluded that officers acted within

16   policy and did not discipline (DCASOF ¶¶ 105, 107),[24] this does not show ratification for

17   municipal liability purposes either.  *See, e.g.*, *Sheehan v. City & Cty. of San Francisco*,

18   743 F.3d 1211, 1231 (9th Cir. 2014) (rejecting ratification theory based on "mere failure

19   to discipline"); *Kong Meng Xiong v. City of Merced*, 2015 WL 4598861, at *28–29 (E.D.

20   Cal. July 29, 2015) (explaining that ratification requires more than "a single failure to

21   discipline or the fact that a policymaker concluded that the defendant officer's actions

22   were in keeping with the applicable policies and procedures"); *Buck*, 2007 WL 9733722,

23   at *7 (D.N.M. June 15, 2007) (rejecting ratification theory based on police chief's "failure

24   to take disciplinary action").

25

26       [23] Plaintiffs' assertion that Chief Williams said "everything that happened was
     textbook perfect" is misleading.  (DCASOF ¶ 104.)

27       [24] As explained above, Plaintiffs' assertions about the "challenge coin" are false
28   and irrelevant.  (*See* pgs. 5–6 above; *see also* DCASOF ¶¶ 129–51.)

In sum, Plaintiffs have not shown that Chief Williams was a final policymaker for the City; nor that the City caused the injuries that they allege; nor that Chief Williams ratified Lt. Moore's decisions or the basis for them.  The City cannot be held liable.

## V.     NO INJUNCTIVE RELIEF

As explained elsewhere, an injunction is inappropriate for three independent reasons:  (1) Plaintiffs have not shown a likelihood of irreparable harm in the future; (2) an injunction would not be supported by the equities, given federalism and separation of powers, and (3) an injunction would not serve the public interest, since officers must make quick decisions in tense situations.  (DMSJ No. 1 at 28–35.)  Rather than reiterate those points, this section explains why Plaintiffs' arguments are unpersuasive.  (Mot. at 29–31.)

**First**, Plaintiffs improperly rely on the Court's ruling on standing at the class certification stage.  (Mot. at 29.)  That ruling does not govern here for three reasons:  **(a)** Standing to seek an injunction is a different standard, and easier to satisfy, than entitlement to an injunction.  *See Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 849–51 (9th Cir. 2001).  **(b)** The evidentiary burden on Plaintiffs at the class certification stage was lower than it is now.  *Compare B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 973–74 (9th Cir. 2019), *with Quintanar v. ATSI Ahtena Tech. Servs.*, 2020 WL 1873480, at *1 (D. Ariz. Apr. 15, 2020).  **(c)** The record is more complete now.  Discovery has shown that PPD has clear policies limiting the use of chemical agents, and PPD has improved in several ways since August 22, 2017.  (DSOF ¶¶ 11–21, 196–211.)

**Second**, although Plaintiffs cite a different formulation of the four-factor injunction test than Defendants cite (*see* Mot. at 29), nothing turns on this distinction.  The tests are "essentially the same" except that a permanent injunction requires "actual success" on the merits.  *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

Under either formulation, an injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  And under either formulation, the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), governs whether a federal court may enjoin

1   law enforcement.  *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042–44 (9th Cir.

2   1999) (en banc) (applying *Lyons* to bar injunctive relief, even assuming standing); *see*

3   *also, e.g.*, *Raub v. Campbell*, 785 F.3d 876, 885–86 (4th Cir. 2015) (applying *Lyons* to bar

4   permanent injunction on Fourth and First Amendment claims).

5        **Third**, Plaintiffs' argument that they suffered irreparable injury because they have

6   no "adequate legal remedy" (Mot. at 30) contradicts Supreme Court precedent.  A person

7   who has "suffered an injury barred by the Federal Constitution" can pursue "a remedy for

8   damages under § 1983." *Lyons*, 461 U.S. at 112–13.  Here, Plaintiffs allege injury by

9   police use of force.  That is a classic damages claim, as in *Lyons*.

10        Recognizing this problem, Plaintiffs focus on their First Amendment claim instead

11   of their Fourth Amendment claim.  (Mot. at 30.)[25]  But limiting an injunction to half their

12   case does not solve the problem.  After all, the plaintiff in *Lyons* brought *both* a Fourth

13   and First Amendment claim, yet that did not change the Supreme Court's decision.  461

14   U.S. at 98, 111–13.  Likewise, the Ninth Circuit has indicated that a First Amendment

15   claim does *not* cause "irreparable injury" if it does not involve "government action which

16   was *intended* to suppress speech." *Goldie's Bookstore, Inc. v. Superior Court of State of*

17   *Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).  No such government action is present here.

18        **Fourth**, Plaintiffs' argument that they will continue to suffer irreparable harm

19   because their speech is "chilled" (Mot. at 30) is unpersuasive—even setting aside the fact

20   dispute over whether the chill is real (*see* DCASOF ¶ 102).  By "chilled," Plaintiffs mean

21   they are afraid police will deploy munitions at them at a future protest.  But again, the

22   Supreme Court rejected this argument.  The plaintiff in *Lyons* "feared he would be choked

23   in any future encounter by the police," but the Court explained that the "emotional

24   consequences of a prior act simply are not a sufficient basis for an injunction absent a real

25

26        [25] Plaintiffs assert (at 30) that the Ninth Circuit upheld a district court's finding of
    "irreparable injury" for a Fourth Amendment claim in *Lavan v. City of Los Angeles*, 693
27   F.3d 1022, 1033 (9th Cir. 2012).  That is a misrepresentation.  In *Laran*, the "only
    argument on appeal" was whether the district court abused its discretion in finding a
28   "likelihood of success on the merits." *Id.* at 1027.

1    and immediate threat of future injury." 461 U.S. at 107 n.8. So too here. As in *Lyons*,

2    Plaintiffs have not shown a sufficient likelihood of future harm. (DMSJ No. 1 at 29–33.)[26]

3       Moreover, Plaintiffs do not explain why fear is not part of their damages claim.

4    Fear can be "a relevant consideration in a damages action." *Lyons*, 461 U.S. at 107 n.8.

5       **Fifth**, Plaintiffs' argument on the balance of hardships and public interest is

6    inadequate. (Mot. at 31.) They argue, essentially, that if there was a constitutional

7    violation, then the balance of hardships and the public interest automatically support an

8    injunction. But that argument contradicts the Supreme Court's holding in *Lyons*. It

9    ignores principles of federalism, separation of powers, and the need for police flexibility.

10   (*See* DSMJ No. 1 at 33–35.) It ignores that the balance of hardships and public interest

11   are *different* factors from success on the merits. *See, e.g.*, *Winter*, 555 U.S. at 20, 26. And

12   it ignores the Supreme Court's repeated admonishment that an injunction is an

13   "extraordinary remedy." *Winter*, 555 U.S. at 24; *Monsanto*, 561 U.S. at 165.

14      **Sixth**, Plaintiffs' cases are readily distinguishable. For example, their cases dealt

15   with ongoing constitutional violations enshrined in official policies. *See, e.g.*, *Arizona*

16   *Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1057–58 (9th Cir. 2014) (challenge to state

17   policy that prevented DACA recipients from obtaining driver's licenses); *Valle del Sol*

18   *Inc. v. Whiting*, 732 F.3d 1006, 1012 (9th Cir. 2013) (challenge to state statute that

19   criminalized harboring unauthorized aliens); *Melendres v. Arpaio*, 695 F.3d 990, 994–96

20   (9th Cir. 2012) (challenge to Sheriff Arpaio's policy of racially profiling Latinos).

21      Here, there is no ongoing constitutional violation at all, much less an official policy

22   to that effect. An injunction is unavailable. *Lyons*, 461 U.S. at 97–101, 111–13.

23   **VI.    CONCLUSION**

24      The Court should deny Plaintiffs' motion for partial summary judgment.

25

26

27       [26] At a few of the many protests in recent weeks, Grenadiers have used munitions.
     Even then, munitions were in response to violence or other unlawful activity, and
28   Grenadiers made every reasonable effort to issue warnings first. (DCASOF ¶¶ 152–59.)

DATED this 2nd day of July, 2020.

OSBORN MALEDON, P.A.


By  s/Joshua M. Whitaker
     David B. Rosenbaum
     Mary R. O'Grady
     Joshua M. Whitaker
     2929 North Central Avenue, 21st Floor
     Phoenix, Arizona 85012-2793

     MANNING & KASS
     ELLROD, RAMIREZ, TRESTER, LLP
     Mildred K. O'Linn
     Nishan J. Wilde
     3636 North Central Avenue, 11th Floor
     Phoenix, Arizona 85012

     Attorneys for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

I hereby certify that on July 2, 2020, I served the attached document by first-class mail on the Honorable John J. Tuchi, United States District Court, Sandra Day O'Connor U.S. Courthouse, Suite 525, 401 West Washington Street, SPC 83, Phoenix, Arizona 85003-2161.



     s/Karen McClain

8562050

- 33 -