1
2

**WO**

3
4
5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

6
7
8
9
10
11
12

Puente, *et al.*,

                    Plaintiffs,

v.

City of Phoenix, *et al.*,

                    Defendants.

No. CV-18-02778-PHX-JJT

**ORDER**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

At issue are three Motions for Summary Judgment. First, Plaintiffs filed a Motion for Partial Summary Judgment (redacted Doc. 246, sealed Doc. 257, "PMSJ") along with a Statement of Facts (redacted Doc. 247, sealed Doc. 257-1, "PSOF"), to which Defendants filed a Response (redacted Doc. 285, sealed Doc. 289, "Defs.' Resp.") and Controverting Statement of Facts (redacted Doc. 286, sealed Doc. 290, "DCSOF"), and Plaintiffs filed a Reply (redacted Doc. 309, sealed Doc. 314, "Pls.' Reply"). Second, Defendants filed a Motion for Summary Judgment as to Plaintiffs' Classwide Claims (redacted Doc. 271, sealed Doc. 276, "DMSJ #1") along with a Statement of Facts (redacted Doc. 273, sealed Doc. 278, "DSOF"), to which Plaintiffs filed a Response (redacted Doc. 291, sealed Doc. 298, "Pls.' Resp. #1") and Controverting Statement of Facts (redacted Doc. 293, sealed Doc. 299, "PCSOF"), and Defendants filed a Reply (redacted Doc. 304, sealed Doc. 313, "Defs.' Reply #1"). Third, Defendants filed a Motion for Summary Judgment as to Plaintiffs' Individual Claims (redacted Doc. 272, sealed Doc. 277, "DMSJ #2"), to which Plaintiffs filed a Response (Doc. 292, "Pls.' Resp. #2"), and Defendants filed a Reply (Doc. 308, "Defs.' Reply #2").[1] The Court also considered Plaintiffs' Notice of

28

[1] The parties each filed an omnibus Statement of Facts (DSOF, PCSOF) in support of their arguments with respect to both of Defendants' Motions for Summary Judgment.

Supplemental Authority in Support of Opposition to Defendants' Motion for Summary Judgment (Doc. 321) and Defendants' Response thereto (Doc. 322). (*See* Doc. 334.) The Court elects to resolve the parties' cross motions for summary judgment without oral argument.[2] *See* LRCiv 7.2(f).

## I.   BACKGROUND

On August 22, 2017, President Donald Trump held a rally at the Phoenix Convention Center, and approximately 6,000 demonstrators—both pro-Trump and anti-Trump—gathered outside the Convention Center. The Phoenix Police Department ("PPD") had about a week's advance notice of the rally, during which it made preparations to try to ensure the safety of the downtown area and the public during the expected demonstrations. The preparations included setting up a "free speech zone" designated for anti-Trump demonstrators on the north side of the Convention Center, across Monroe Street. The free speech zone was bordered by 2nd Street to the west, 3rd Street to the east, and Monroe Street to the south, and demarcated by a three-foot high pedestrian fence and "Do Not Cross" tape. PPD anticipated that certain groups of demonstrators would be present, including Antifa—a national, militant political protest movement opposing fascism and right-wing ideology whose groups had disrupted several other demonstrations, including one in Charlottesville, Virginia, in the weeks preceding President Trump's Phoenix visit— as well as Plaintiff Puente—a Phoenix grassroots organization representing migrant communities through lobbying, advocacy, and activism—and Plaintiff Poder in Action ("Poder")—a Phoenix grassroots organization with a mission of empowering victims of injustice through leadership development, civic engagement, and policy advocacy.

In a Presidential Visit After-Action Report (Doc. 101-3 at 2–35, Bates Nos. COP014832–014865, "PPD Report"), Defendant PPD Chief Jeri Williams stated that, on the day of the rally, PPD deployed approximately 985 officers around the Convention Center. According to the report, large crowds of demonstrators began arriving by 11:00 a.m.

---

[2] Because the Court refrains from explicitly referring to sealed evidence in this Order, the Court enters the Order on the public docket.

and, although PPD officers observed minor altercations and a few water bottles being thrown at rally attendees lining up to enter the Convention Center, the demonstrations proceeded generally without incident during the day.

The rally inside the Convention Center began at 6:30 p.m. At approximately 8:15 p.m., after PPD officers around 2nd Street and Monroe reported that water bottles were being thrown at them, officers used a Long Range Acoustic Device ("LRAD") to make announcements instructing individuals to stop throwing objects. At 8:23 p.m., 15 to 20 individuals PPD had identified as Antifa put up large banners near the fence along Monroe, which concealed their activities from PPD officers. PPD deployed Tactical Response Unit ("TRU") personnel, including grenadiers trained in the deployment of chemical munitions, across from the area where Antifa had gathered. Just after 8:32 p.m., PPD officers observed Antifa pushing or shaking the fence in what appeared to be a breach.

On orders from Field Force Commander Lt. Benjamin Moore, PPD deployed its first munition in front of Antifa just before 8:33 p.m. in the form of pepper balls on the ground, which cleared most individuals from the immediate vicinity. Thereafter, PPD officers reported that rocks and bottles were being thrown and, at 8:34, officers reported that canisters of some kind of tear gas were thrown at them. At that point, PPD officers donned gas masks and, at 8:34 to 8:35, the grenadiers deployed inert smoke bombs. Large numbers of demonstrators began to clear the area.

After officers noted that smoke canisters were being kicked and thrown back and a spear-like object and an incendiary device were thrown at them, at 8:35 to 8:36, the grenadiers were ordered to deploy CS gas—a type of tear gas—in what they perceived to be focused locations. Plaintiff Jacinta Gonzalez Goodman alleges she inhaled gas. Plaintiff Ira Yedlin, who was standing near the area where Antifa had been, was hit five times by projectiles. The grenadiers also deployed aerial flash bangs intended to act as auditory warnings. Demonstrators began to run away and, by 8:39, the area where individuals had been throwing projectiles was mostly empty, although demonstrators remained to the east and west of the area.

From 8:36 to 8:45, PPD used additional smoke canisters and pepper balls to clear an area so that officers could form skirmish lines to disperse the remaining individuals. Helicopters from the PPD Air Unit began arriving at 8:40, and they started making announcements directing the crowd to disperse at 8:52. In this time period, the grenadiers deployed smoke canisters, pepper balls, muzzle blasts, and OC bullets—bullets filled with pepper spray—at remaining individuals, and a munition hit Plaintiff Cynthia Guillen. Lines of PPD officers with riot shields began marching to move the crowd at 8:56. At some point between 8:42 and 8:47, PPD had made the final determination that the crowd was unlawfully assembled, so at 9:02, an official unlawful assembly announcement was made via a public address system from a marked police vehicle on the ground.

Thereafter, the grenadiers deployed munitions in the form of pepper balls, OC bullets, muzzle blasts, and CS gas canisters at anyone who approached a police officer, and Plaintiff Janet Travis was hit in the back and pepper sprayed. PPD officers told the press to leave the area at 9:20. The crowd was dispersed and gone from the free speech area by 9:56 p.m.

Over the course of the evening, PPD documented eight Incident Reports—for criminal damage, disorderly conduct, aggravated assault on Police, and unlawful assembly—and made five arrests of individuals who are not named Plaintiffs in this action. After the rally, Chief Williams publicly acknowledged that she directed PPD's actions against the protestors and that the actions were appropriate.

On September 4, 2018, Plaintiffs filed suit against the City of Phoenix and certain PPD members—including Chief Williams, Lt. Moore, Grenadier Team Leader Sgt. Douglas McBride, and Grenadiers Robert Scott, Christopher Turiano, Glenn Neville, John Sticca, Lane White, Jeffrey Howell, and George Herr—raising four claims: (1) a claim under 42 U.S.C. § 1983 for excessive use of force during a search or seizure under the Fourth and Fourteenth Amendments; (2) a § 1983 claim for infringement of Plaintiffs' freedom of speech and association rights under the First and Fourteenth Amendments; (3) a § 1983 claim for due process violations under the Fourteenth Amendment; and (4) a § 1983

claim for equal protection violations under the First and Fourteenth Amendments. (Doc. 1, Compl.)

After Plaintiffs voluntarily dismissed certain claims—including the claims in their entirety against Defendants Neville, Sticca, and White—the six Plaintiffs' individual claims remain against Defendants the City, Chief Williams, Lt. Moore, and Sgt. McBride. (Compl.; Doc. 281.) Additionally, the individual Plaintiffs bring claims as follows: Travis against Turiano and Howell; Yedlin against Scott, Howell, and Herr; and Guillen against Scott, Turiano, Howell, and Herr. (Compl.; Doc. 281.)

Plaintiffs moved to certify their claims as a class action under Federal Rule of Civil Procedure 23, and the Court granted their Motion in part. (Doc. 191.) The Court certified a "damages class" consisting of

> those persons who were present on August 22, 2017, at the Trump Protest area north of the Convention Center which was designated as the "free-speech zone" (the area for anti-Trump protestors bounded to the south by Monroe Street, 2nd Street to the west, and 3rd street to the east) and forced by PPD onto adjacent streets at any point between 8:25 and 10:00 P.M., who neither threw objects nor attempted to breach the "free speech zone" barrier along Monroe Street, and who were subjected to the PPD's dispersal by the use of force, or other unlawful police activity arising from the police response to anti-Trump protestors.

(Compl. ¶ 112, as altered in Doc. 191.) The damages class consists of only one certified subclass: (a) "All persons who were unlawfully dispersed by the use of gas, pepper spray, pepper bullets, or other chemical agents." (Compl. ¶ 112.) Plaintiffs Travis, Guillen, and Gonzalez Goodman are class representatives for the damages class.

The Court also certified an "injunctive relief class" consisting of

> all persons who have in the past, including those present at the anti-Trump protest on August 22, 2017, between 8:25 and 10:00 P.M., or may in the future, participate in, or be present at, demonstrations within the City of Phoenix in the exercise of their rights of free speech and assembly without engaging in any conduct justifying the use of force.

- 5 -

(Compl. ¶ 113.) Plaintiffs Travis, Guillen, and Gonzalez Goodman as well as the two Plaintiff organizations, Puente and Poder, are class representatives for the injunctive relief class.

The Court now resolves the parties' cross-motions for summary judgment.

## II.   LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *United States v. Carter,* 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex,* 477 U.S. at 322).

## III.   ANALYSIS

### A.   Class Claims

The Court begins by determining whether a genuine dispute of material fact exists with regard to Plaintiffs' class claims. Plaintiffs bring class claims against individual PPD officers and the City under 42 U.S.C. § 1983, alleging that the use of chemical agents violated class members' First, Fourth, and Fourteenth Amendment rights.  "A plaintiff may bring an action under 42 U.S.C. § 1983 to redress violations of his 'rights, privileges, or immunities secured by the Constitution and [federal] laws' by a person or entity, including a municipality, acting under color of state law." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (citing *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 690–95 (1978)). To succeed in a claim against an officer, the class must prove that the officer's conduct "was the actionable cause of the claimed injury," which includes "both causation-in-fact and proximate causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).

#### 1.   Excessive Force

First, Plaintiffs, on behalf of the class, claim that PPD's use of chemical agents without sufficient warning on protestors who neither threw objects nor attempted to breach the free speech zone barrier along Monroe Street was an excessive use of force constituting a violation of the class members' Fourth and Fourteenth Amendment substantive due process rights. (Compl., Counts 1 and 3.)

##### a.   Class Claims Against Individual Defendants

"Qualified immunity shields an official from damages in a civil suit unless the plaintiff can make the showing that the official's actions violated a constitutional right, and that the right was 'clearly established' at the time of the violative conduct." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). "To survive the defendant's invocation of qualified immunity, the plaintiff must succeed on both prongs." *Id.*

### i.      Constitutional Right at Issue

With regard to whether individual PPD officers' use of force was unconstitutionally excessive, the parties dispute whether the Fourth or Fourteenth Amendment applies, the resolution of which turns on whether the officers seized the class members. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted). Any such seizure is unconstitutional only if it is unreasonable. *Nelson*, 685 F.3d at 878. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry is thus "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. To resolve this question, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396.

In contrast, the Fourteenth Amendment guarantee of substantive due process, which still applies to police action even if it did not occur "in the course of an arrest, investigatory stop, or other seizure," *id.* at 395, requires a court to determine whether officers' conduct "shocks the conscience," *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1988).

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even."

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (internal citations omitted).

At issue, then, is whether the officers seized class members by deploying inert smoke and CS gas to keep the crowd from entering Monroe Street and ultimately disperse the crowd, such that the Fourth Amendment standard applies to the officers' conduct. Defendants argue that the officers' use of chemical munitions was not a seizure because it did not result in class members' belief that they were "not free to leave," but rather that they were "not free to stay." (DMSJ #1 at 7 (citing *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (holding a seizure occurs if a person believes he or she is "not free to leave")).)

The cases Plaintiffs cite from the Supreme Court and within the Ninth Circuit in support of their argument that class members were seized by Defendants are distinguishable from the present one. In *Brendlin*, the Supreme Court held that seizure does not require a formal arrest, but rather a person is seized during a traffic stop if the person does not believe he or she is free to "terminate the encounter" with the police. 551 U.S. at 257. As Defendants argue, the opposite occurred here, and Plaintiffs present no evidence that class members did not feel free to terminate the encounter with Defendants.

In *Nelson*, police officers fired pepper balls at a group of confined partygoers, striking the plaintiff in the eye and causing him to collapse and lie on the ground for ten to fifteen minutes. 685 F.3d at 874. The Ninth Circuit made clear that the plaintiff was "hit by a projectile that [officers] intentionally fired towards a group of which [the plaintiff] was a member," which was "the application of physical force to [the plaintiff's] person as well as the termination of his movement," constituting a seizure. *Id.* at 877. The court relied on the facts that the officers acted intentionally in firing the shots *and* that the plaintiff was hit and thereby immobilized. *Id.* Contrary to Plaintiffs' insinuation in their brief (Pls.' Resp. #1 at 10), the *Nelson* court did not state that the plaintiff would have been seized had he not been hit and immobilized. Rather, the court emphasized the plaintiff *was* hit, through intentional conduct of the officers, even if they intended "to impact his body elsewhere" or "only to spray him with [the projectile's] contents." *Id.* But, in contrast to the present case, the result of that intentional use of force was a "termination of freedom of movement." *Id.* at 876. The Court finds the other cases cited by Plaintiffs no more applicable to the present

case. *E.g.*, *Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (finding an officer's action of shooting at a truck to *stop* its movement to be a Fourth Amendment seizure); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231 (W.D. Wash. 2009) (finding an officer's application of pepper spray to the plaintiff's face, temporarily blinding him, "terminated" the plaintiff's freedom of movement).

In further support of their Fourth Amendment argument, Plaintiffs cite a case from outside the Ninth Circuit in which the court concluded that the use of tear gas to attempt to get reporters covering a protest to disperse was a seizure. *Quraishi v. St. Charles Cnty., Mo.*, 2019 WL 2423321, at *9 (E.D. Mo. June 10, 2019). But on appeal, the Eighth Circuit recently reversed the District Court on this point because "the reporters' freedom to move was not terminated or restricted" by the deployment of tear gas in front of them such that they did not believe they were free to leave. *Quraishi v. St. Charles Cnty., Mo.*, 986 F.3d 831, 840 (8th Cir. 2021). That court also noted that, to the extent contrary case law from the Sixth Circuit exists, the Fourth Amendment law in this area was at minimum not clearly established, which itself entitled the officer to qualified immunity. *Id.* In an out-of-circuit case cited by Defendants, eleven plaintiffs encountered tear gas deployed by police officers that neither restrained nor prevented them from dispersing, and the court found the officers' use of tear gas did not constitute a seizure under the Fourth Amendment because the plaintiffs' freedom of movement was not terminated. *Buck v. City of Albuquerque*, 2007 WL 9734037, at *31 (D.N.M. Apr. 11, 2017). The Court finds this case akin to *Buck* and finds its reasoning persuasive as applied to the facts of this case and the class members' claims.

Here, no evidence demonstrates that a termination of freedom of movement occurred among class members resulting from the officers' use of chemical agents. The Court notes that, in certifying the class, it found that the claims of Plaintiffs hit and potentially immobilized by projectiles were too individualized, precluding class certification on those claims. Thus, to the extent Plaintiffs argue Defendants used force by way of hitting certain Plaintiffs with projectiles to terminate their freedom of movement—

more akin to *Nelson*—the claims predicated on that use of force are individual, not class, claims, which the Court will examine when it turns to Plaintiffs' individual claims below.

Accordingly, as urged by Defendants, the Court will apply the standard for a violation of the Fourteenth Amendment guarantee of substantive due process, and not for a seizure under the Fourth Amendment, in examining the officers' use of chemical agents as applied to the class members.[3] *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1190–91 (11th Cir. 2011) (finding that police officers' acts of forcing the plaintiff off Biscayne Boulevard and deploying tear gas to which the plaintiff was exposed was not a seizure under the Fourth Amendment because "she still had the ability to, and indeed did, walk away").

### ii.    Evidence of Purpose to Harm

As stated above, under the Fourteenth Amendment, "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554. Although Plaintiffs argue that the evidence shows—or at least that there is a genuine dispute of material fact—that the PPD officers had time to deliberate before they acted, subjecting the evaluation of their conduct to the less rigorous "deliberate indifference" standard, the Court finds that the evidence indisputably demonstrates a lack of time to deliberate in an escalating security situation.

To begin with, protestors and rally attendees began arriving at 11:00 a.m. on the morning of the rally, and thousands of people were present in the area by 6:30 p.m. Throughout the course of the day and while the rally was taking place inside the Convention Center, no breaches of the pedestrian fencing and "Do Not Cross" tape on Monroe Street occurred and the officers did not take any substantial action to limit the crowd's activity or expression. The series of events upon which the class members' claims are principally

---

[3] Because the Court finds there is insufficient evidence from which a reasonable jury could conclude the class members were seized, the Court need not and does not determine in the alternative whether Plaintiffs have raised a genuine dispute as to whether the officers' use of force by way of deployment of chemical agents on class members was unreasonable under the Fourth Amendment.

predicated took place in less than five minutes beginning at 8:32 p.m., when members of Antifa appeared to attempt to breach the pedestrian fencing and penetrate the "Do Not Cross" line. In response, Lt. Moore ordered the use of pepper balls targeted at a limited area where Antifa was located. The extensive video coverage of the protest provided as evidence by both sides—which the Court has viewed in its entirety several times—shows that protestors across a wide area of the crowd then began throwing a large variety of objects at the officers and, in response, Lt. Moore ordered the deployment of inert smoke at 8:34 p.m. When the crowd continued to shower objects on the officers—including a spear-like object, an incendiary device, rocks, and water bottles—as well as kick canisters at the officers, Lt. Moore ordered the deployment of CS gas at 8:35 or 8:36 p.m.

From the evidence, no reasonable jury could conclude that Lt. Moore had time to deliberate prior to acting in response to the sudden, violent turn of events. And he had to make his decisions keeping in mind not only the safety of the officers and the public but also the security of the President's motorcade. He thus was required to make "snap judgments" because of an "escalating situation." *Wilkinson*, 610 F.3d at 554. As Defendants point out, the facts here are quite similar to those in *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008), in which officers and a motorist had a "five-minute altercation" that presented "an evolving set of circumstances" requiring "fast actions" and consideration of "obligations that tend to tug against each other." *Id.*

Plaintiffs argue that PPD had a week to prepare for the rally, was familiar with Antifa's tactics before the rally, and deployed the TRU well before the situation escalated, all giving PPD time to deliberate. But there is unquestionably a distinct difference between preparation and contingency planning, on one hand, and split-second reactions to an escalating security situation, on the other. Simply because PPD tried to prepare in advance for any situation does not mean it had time to deliberate before making its decisions to react to a sudden escalation in crowd violence beginning at 8:32 p.m. *See id.* at 1140 (noting that "once [the driver's] evasive actions began the officers had to react quickly," and "whether [the defendant officer's] conduct shocks the conscience must be evaluated under

the purpose to harm standard of culpability"). The Court thus finds that Lt. Moore and the officers did not have time to deliberate before deploying chemical agents.

Accordingly, under the Fourteenth Amendment, the Court must determine if Plaintiffs have demonstrated a genuine issue of fact as to whether the officers acted "with a purpose to harm [class members] unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554. Plaintiffs argue that a jury could find that the officers' actions were "so grossly and unreasonably excessive" that they showed a purpose to harm, and that other evidence also points to a purpose to harm class members. (Pls.' Resp. #1 at 18 (citing *Nehad v. Browder*, 929 F.3d 1125, 1139–40 (9th Cir. 2019) (use of force that is "grossly and unreasonably excessive" can be evidence of purpose to harm); *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018) (finding a purpose to harm unrelated to legitimate law enforcement objectives when force was used against a clearly harmless suspect)).)

The Court disagrees that the evidence is sufficient for Plaintiffs to make such a showing. Beginning with Plaintiffs' "other" evidence, Plaintiffs first point to certain grenadiers' possession of a challenge coin—a coin "produced by different law enforcement agencies to commemorate events and collected by officers" (PSOF ¶ 109)—that was produced after the events of August 22, 2017. This particular challenge coin depicts one of the protestors—who by definition is not a class member here—who threw and kicked objects at police officers and who officers ultimately hit with a munition in the lower abdomen. The altercation was caught on live news video, which was broadcast by news outlets and instantly became popular on the internet. Multiple products were made for purchase as a result, including the challenge coin in question with a depiction of the protestor and the phrase "Good Night Left Nut" on the front of the coin and "Making America Great Again One Nut at a Time" and "Phoenix, AZ, August 22, 2017" on the back. (*See generally* DCSOF ¶¶ 129–151.) No evidence in the record suggests any Defendant participated in the creation of the coin, although four grenadiers in the PPD possess it and Sgt. McBride posted an image of it on Facebook. While possessing this coin

commemorating the injury of a protestor is unseemly at best, it is not sufficiently probative of purpose to harm class members at the time of the protest, particularly because the coin was produced and sold by a third party after the protest.

Plaintiffs also proffer a PowerPoint slide used in PPD TRU training that depicted a leader of one of the Plaintiff organizations in handcuffs, which Plaintiffs also suggest is probative of purpose to harm. But no corroborating evidence in the record suggests the image intentionally depicted the particular person or that the creator or viewers of the image even knew who the person in the image was. This, too, has little to no probative value in assessing whether Defendants had purpose to harm class members at the time of the protest. *Cf. Jurkowski v. City of Seattle*, 2017 WL 4472859, at *12 (W.D. Wash. Oct. 5, 2017) (noting the use of an image of young black men beating up a white person in a Powerpoint training presentation was of an anti-violence character and not sufficient proof of intent to inhibit speech of the defendants at a later protest).

The Court has reviewed the voluminous evidence proffered by the parties in its entirety and finds that no reasonable jury could conclude that the force Defendants used in response to Antifa's attempt to breach the "Do Not Cross" line and the subsequent, sudden escalation in violence by protestors was so grossly and unreasonably excessive that it shocks the conscience and shows a purpose to harm class members rather than a legitimate law enforcement purpose. Lt Moore's decision at 8:32 p.m. to deploy pepper balls in the limited area occupied by Antifa members after their attempted breach was unquestionably related to a legitimate law enforcement objective.[4]

As violence escalated—the protest was indisputably no longer "largely peaceful," as Plaintiffs contend—the evidence shows Lt. Moore directed officers to warn civilian contacts in the crowd to stop unlawful activity, and as objects continued to fly toward officers, Lt. Moore requested a helicopter, which was delayed for security reasons. At

---

[4] Moreover, the 8:32 p.m. deployment of pepper balls does not pertain to class members to the extent the deployment was limited to individuals who "attempted to breach the 'free speech zone' barrier along Monroe Street," which individuals are explicitly excluded from the class.

8:34 p.m., he directed the grenadiers to deploy inert smoke to act as an additional warning for protestors to stop unlawful activity. None of this evidence demonstrates a purpose to harm in the deployment of inert smoke, and Plaintiffs proffer no probative evidence to the contrary.

Finally, the evidence shows that individuals over a wide area in the crowd continued to hurl objects, including throwing and kicking canisters and throwing an incendiary device and spear-like object at the officers, and grenadiers deployed CS gas at 8:34 or 8:35 p.m. Again, no evidence points to a purpose to harm class members where the legitimate law enforcement objective was unquestionable. *See Meggs v. City of Berkeley*, 246 F. App'x 402, 403 (9th Cir. 2007) (affirming summary judgment dismissing claim that "use of force to repel [the plaintiffs] from the skirmish line" shocked the conscience); *Jurkowski*, 2017 WL 4472859, at *7–8 (granting summary judgment for police officers on claim that police officers' use of "blast ball deployment" shocked the conscience where the deployment was aimed at protestors blocking the street and throwing rocks, wrenches, traffic cones, and at least one incendiary device at officers).

In sum, because Plaintiffs have not met their burden to show a genuine issue of material fact as to whether the individual Defendants violated the class members' Fourth or Fourteenth Amendment substantive due process rights, the individual Defendants are entitled to qualified immunity for their actions with respect to class members on August 22, 2017.

### b.    Municipal Liability

The class also raises § 1983 claims against the City. In *Monell*, the Supreme Court held that a municipality is not liable for § 1983 claims under a theory of *respondeat superior*. 436 U.S. at 694. Instead, a plaintiff must show that the municipality has adopted an "official policy" or "custom" that caused the alleged constitutional violation, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that

municipal liability is limited to actions for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (quoting *Monell*, 436 U.S. at 694). As Plaintiffs cannot show the class members' Fourth or Fourteenth Amendment substantive due process rights were violated, the related class claims against the City fail as well.

Because no reasonable jury could conclude from the evidence that class members were seized under the Fourth Amendment, or that Defendants' use of force shocks the conscience in violation of class members' Fourteenth Amendment substantive due process rights, Defendants are entitled to summary judgment on the class claims of excessive use of force (Counts 1 and 3). This conclusion naturally leads to the further conclusion that the class requests for injunctive relief and punitive damages on the same basis also fail.

## 2. Free Speech

Plaintiffs on behalf of the class next claim that PPD's actions on August 22, 2017, violated their First Amendment rights of freedom of speech, assembly, and association, which were clearly established at the time, entitling the class to damages under § 1983. (Compl., Count 2.) The individual Defendants again claim they are entitled to qualified immunity on those claims, which again "shields an official from damages in a civil suit unless the plaintiff can make the showing that the official's actions violated a constitutional right, and that the right was 'clearly established' at the time of the violative conduct." *Nelson*, 685 F.3d at 875.

With regard to the standard the Court should apply in determining whether the officers violated class members' First Amendment rights, Defendants urge the Court to apply the following Ninth Circuit Model Civil Jury Instruction, a standard Plaintiffs also recited to the Court in their Case Management Report (Doc. 43 at 8):

> To prevail under the First Amendment against a particular defendant, the class must prove the following elements:
>
> (1) The class members were in engaged in constitutionally protected activity;

(2) The defendant took action that would chill a person of ordinary firmness from continuing to engage in the protected activity; and

(3) Chilling the class members' protected activity was a substantial or motivating factor in the defendant's conduct.

(DMSJ #1 at 9 (citing Ninth Circuit Civil Jury Instruction No. 9.11).) This is also the standard the Court applied in its class certification Order. (Doc. 191 at 10 (citing *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).)

Plaintiffs now dispute the use of this standard as applied to their claims because they "do not assert a retaliation claim." (Pls.' Resp. #1 at 19.) Instead, they rely on a Second Circuit case to urge the Court to focus not on whether evidence exists that chilling class members' First Amendment rights was a substantial or motivating factor causing the officers' conduct, but rather whether the officers had adequate justification for their conduct, which Plaintiffs contend can only arise from a "clear and present danger of riot, imminent violence, interference with traffic or other immediate threat to public safety." (PMSJ at 21 (quoting *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006)).)

The Court agrees with Defendants (Defs.' Resp. at 9–12) that Plaintiffs' reading of *Jones* is overly broad and inapplicable to the circumstances here. In *Cantwell v. Connecticut,* upon which the *Jones* court relied, the Supreme Court resolved the question of when a government may arrest someone for engaging in speech and effectively ban speech. 310 U.S. 296, 300–03 (1940) (holding that the arrest of peaceful Jehovah's witnesses going door-to-door exceeded the First Amendment limitations on the state's power to regulate speech). The very different question presented in this case, as well-formulated by Defendants, is when an officer may disperse a group when some but not all of the group is violent or poses a threat. (Defs.' Resp. at 11.) The Court concludes that, in instances such as this one, a plaintiff must demonstrate the defendant's intent to chill speech. *See Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001); *Jurkowski*, 2017 WL 4472859, at *12–13.

Under either formulation, Plaintiffs have not demonstrated a genuine issue of material fact going to whether the officers' conduct violated the class members' First

Amendment rights. As Defendants point out and the Court alluded to above in examining whether the officers exhibited a purpose to harm under the Fourteenth Amendment, Plaintiffs have not produced probative evidence that chilling class members' First Amendment rights was a substantial or motivating factor that caused the officers to take the actions they did. (DMSJ #1 at 9 (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900–01 (9th Cir. 2008)).) Indeed, the evidence shows that the demonstrations took place for many hours over the course of the day and officers took no substantial action to limit protestors' speech or assembly; only when violence erupted did officers deploy chemical agents. The facts thus do not support a finding of Defendants' intent to chill class members' First Amendment rights.

As for Plaintiffs' "clear and present danger" formulation, Plaintiffs first contend that the officers here are subject to First Amendment liability because, by deploying chemical agents, they prevented peaceful protestors from continuing to express themselves in reaction to the unprotected activities of a few protestors ("at most twenty people"). (PMSJ at 21; Pls.' Resp. #1 at 19.) Plaintiffs argue that this case lines up with the Ninth Circuit's decision in *Collins v. Jordan*, 110 F.3d 1363, 1372–73 (9th Cir. 1996), which addressed demonstrations that occurred in San Francisco after the Rodney King trial verdicts. But in stating that officials may not "suppress legitimate First Amendment conduct as a prophylactic measure," the Ninth Circuit was addressing a situation in which officials prevented demonstrations based on prior incidents of violence and the actions of demonstrators in a protest the day before. *Id.* That is not what occurred in this case.

Instead, as the Court stated in its Fourteenth Amendment analysis, the evidence— including hours of videotape—shows that Antifa members appeared to attempt to breach the pedestrian fence and "Do Not Cross" tape onto Monroe Street at 8:32 p.m., and the officers took a limited, targeted action against those members in response. Only after protestors from across the free speech zone showered officers with projectiles did Lt. Moore order deployment of, first, inert smoke as a warning to disperse, followed by CS gas a few minutes later, when no de-escalation of violence occurred. From the evidence, a

reasonable jury could only conclude under Plaintiffs' formulation that there was "a clear and present danger of riot, imminent violence, interference with traffic or other immediate threat to public safety." *See Jones*, 465 F.3d at 57.

Plaintiffs also argue that the First Amendment requires a dispersal order before police may disperse a crowd with chemical agents, and the officers' failure to effectively announce a dispersal order was itself a First Amendment violation. (PMSJ at 23–25; Pls.' Reply at 13.) The Court again agrees with Defendants that the applicable case law does not support that proposition. (Defs.' Resp. at 12–14.) All of the cases and the statute upon which Plaintiffs rely for the theory that a First Amendment violation occurs when a crowd is dispersed without a warning or dispersal order are in the context of arrests. *See Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir. 2011) (stating that "before the police could start *arresting* peaceable demonstrators for defying their orders they had to communicate the orders to the demonstrators" (emphasis added)); *Garcia v. Does*, 779 F.3d 84, 94 n.11 (2d Cir. 2015) (stating that *Jones*, upon which Plaintiffs rely here, held that officers could not indiscriminately *arrest* peaceful protestors without an order to disperse). No case provides that a failure to issue a dispersal order in the absence of arrests constitutes a *per se* First Amendment violation, and the Court will not so declare here.

In sum, Plaintiffs have failed to demonstrate a genuine issue of material fact as to whether chilling class members' First Amendment rights was a substantial or motivating factor that caused the officers to take the actions they did, and the Court also finds (in Plaintiffs' alternative formulation) that no reasonable jury could conclude from the evidence that the officers did not have adequate justification for their actions. As a result, the individual Defendants are entitled to qualified immunity for their actions with respect to class members on August 22, 2017. Because Plaintiffs cannot show the class members' First Amendment rights were violated, the related class claims against the City fail as well. Defendants are thus entitled to summary judgment on the class-wide § 1983 claim of violation of the rights of speech and association under the First Amendment (Count 2). In addition, although Plaintiffs did not explicitly request class certification on their claim of

an Equal Protection violation under the Fourteenth Amendment (Count 4), that claim fails with Plaintiffs' First Amendment claim. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012). For all these reasons, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiffs' Classwide Claims (redacted Doc. 271, sealed Doc. 276).

### B.    Individual Claims

The Court now turns to the claims brought by the six Plaintiffs on an individual basis. To begin with, the Court finds that Defendants are entitled to summary judgment on the claims of Gonzalez Goodman and the two organizations, Puente and Poder, because the evidence related to their claims does not go materially further than that pertaining to the class members, as limited by the class definitions, and the Court already found that evidence to be insufficient, above. With regard to Plaintiffs' argument that Puente and Poder have associational standing to bring claims on behalf of their members (Pls.' Resp. #2 at 12), Plaintiffs do not satisfy the third prong of the test announced in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). Although participation of individual members in this lawsuit may not be required by the injunctive relief requested, it is required in terms of the substance of the remaining claims that would be asserted by Puente and Poder. The Court thus examines whether the remaining Plaintiffs—Yedlin, Travis, and Guillen—have raised at least a genuine issue of material fact as to their claims.

### 1.    Excessive Force

Unlike the claims of the class members, discussed above, the evidence shows that the three remaining Plaintiffs all were seized within the meaning of the Fourth Amendment. After Yedlin inhaled PAVA powder from the grenadiers' initial deployment of pepper balls in the area where Antifa members were standing, he shook the fence and the grenadiers aimed pepper balls at him, hitting him five times—in the face, lower back, and three times on the legs. Travis stopped in front of a skirmish line of officers to take a photograph, and when she turned, a grenadier hit her with a muzzle blast and multiple officers barraged her

1    with pepper spray. As other protestors helped her away, a grenadier hit her with another

2    muzzle blast. Guillen made a video as protestors fled after grenadiers had deployed

3    chemical agents, and then remained in the area with other protestors until 8:50 p.m., when

4    she was hit by a muzzle blast. While Defendants contend all three Plaintiffs could still walk

5    after they were hit by munitions, their freedom of movement was affected by the officers'

6    intentional actions, which the Court finds constituted a seizure under the Fourth

7    Amendment. *Brendlin*, 551 U.S. at 254 ("A person is seized by the police and thus entitled

8    to challenge the government's action under the Fourth Amendment when the officer, by

9    means of physical force or show of authority, terminates or restrains his freedom of

10   movement through means intentionally applied."); *see also Nelson*, 685 F.3d at 877.

11       As the Court set forth above, the inquiry into whether the officers' use of force

12   during a Fourth Amendment seizure was excessive is subject to a reasonableness test. "The

13   'reasonableness' of a particular use of force must be judged from the perspective of a

14   reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*,

15   490 U.S. at 396. The inquiry is thus "whether the officers' actions are 'objectively

16   reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. To resolve

17   this question, a court must balance "the nature and quality of the intrusion on the

18   individual's Fourth Amendment interests against the countervailing governmental interests

19   at stake." *Id.* at 396.

20       Genuine issues of material fact preclude summary judgment on these Plaintiffs'

21   Fourth Amendment claims (Compl., Count 1). On one hand, the government had a stake

22   in ensuring, among other things, the safety of the public and the officers as well as the

23   security of transportation routes in the downtown area. On the other hand, the officers used

24   intermediate force in striking these Plaintiffs with pepper balls and muzzle blasts without

25   apparent provocation beyond a failure to immediately disperse (and, in the case of Yedlin,

26   shaking the pedestrian fencing). A jury must decide whether the officers used reasonable

27   force in the circumstances, or whether they could have employed less forceful or intrusive

28   means to accomplish the government goals in light of the circumstances they faced. *See*

1  *Nelson*, 685 F.3d at 883; *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir.

2  2011).

3  **2.    Free Speech**

4  It is a closer question whether a genuine dispute of material fact exists with regard

5  to the First Amendment claims of Yedlin, Travis, and Guillen. As the Court stated above,

6  the standard used in the Ninth Circuit to evaluate whether officers' conduct violated a

7  plaintiff's First Amendment rights in instances such as the one presented in this case

8  includes a showing that chilling those rights was a substantial or motivating factor that

9  caused the officers to take the actions they did. *See Nieves*, 139 S. Ct. at 1722; *Dietrich*,

10  548 F.3d at 900–01. To that end, Plaintiffs' argument, in its entirety, is that "[t]he additional

11  facts as to the named Plaintiffs outlined above also raise factual issues about Defendants'

12  desire to chill Plaintiffs' speech." (Pls.' Resp. #2 at 14.) In support, Plaintiffs cite facts

13  going to the number of times officers hit Yedlin with pepper balls even though he did not

14  appear to be part of Antifa; the number of protestors struck by pepper balls over the course

15  of the evening; and evidence that a grenadier celebrated hitting Travis, that other officers

16  then used pepper spray on her, and that they struck her again as she was helped away.

17  (PCSOF ¶¶ 11, 14, 17, 21, 35–37.)

18  All of these facts go to whether the officers' conduct was reasonable under the

19  Fourth Amendment, but they do not by themselves show that chilling Plaintiffs' First

20  Amendment rights was a substantial motivating factor for the officers' actions, let alone

21  that the officers' intent to chill was a but-for cause of their actions. Otherwise, Plaintiffs

22  have proffered evidence of the challenge coin and training slide, neither of which is

23  sufficiently probative to the question, as discussed above. For these reasons, and because

24  Plaintiffs' First Amendment claims as characterized are duplicative of their Fourth

25  Amendment claims, which will go to trial, the Court will grant summary judgment to

26  Defendants on these Plaintiffs' First Amendment claims (Compl., Count 2). *See Vodak*,

27  639 F.3d at 750–51 (characterizing protestors' First Amendment claims as "largely

28  duplicative" of the Fourth Amendment claims and advising they "confine their claims to

the Fourth Amendment"). Relatedly, the Court grants summary judgment to Defendants on these Plaintiffs' Equal Protection claims (Compl., Count 4). *See OSU Student Alliance*, 699 F.3d at 1067.

### 3. Qualified Immunity

As laid out above, qualified immunity shields an official from damages in a § 1983 action if the plaintiff shows that the official's conduct violated a constitutional right and that the right was "clearly established" at the time of the conduct. *Nelson*, 685 F.3d at 875. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although a case need not be "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). When factual disputes exist, summary judgment is appropriate only if the defendant is entitled to qualified immunity under the facts most favorable to the plaintiff. *Blankenhorn v. City of Orange*, 485 F.3d 463, 477–78 (9th Cir. 2007).

Because significant issues remain to be resolved at trial as to the reasonableness of the officers' use of force on Yedlin, Travis, and Guillen, the Court looks at Plaintiffs' claims regarding the officers' conduct in the light most favorable to these Plaintiffs to determine if the right allegedly violated was clearly established at the time. The Court finds that Plaintiffs' Fourth Amendment right not to be subjected to unreasonable force during a seizure—by way of the deployment pepper balls, muzzle blasts, and pepper spray—where less severe or intrusive means of applying force were available and sufficient in the circumstances was a clearly established right at the time of the officers' use of force. *See, e.g.*, *Nelson*, 685 F.3d at 875. Defendants are thus not entitled to summary judgment on the issue of qualified immunity for these Plaintiffs' Fourth Amendment claims.

### 4. Individual Officer Causation

Defendants argue that the individual Plaintiffs' claims fail against individual Defendant officers because these Plaintiffs cannot identify which officer caused which

injury, and to hold an officer liable, a plaintiff must show the officer's conduct "was the actionable cause of the claimed injury," including "both causation-in-fact and proximate cause." *Harper*, 533 F.3d at 1026. "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional violation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

Plaintiffs' theory of individual officer liability rests on the principle of "integral participation," which "does not require that each officer's actions themselves rise to the level of a constitutional violation" so long as the officer was aware of the decisions to use force and a participant in the concerted action to use it. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). That is, an officer can be liable for a constitutional violation "where there is a showing of integral participation or personal involvement in the unlawful conduct, as opposed to mere presence on the scene." *Bonivert v. City of Clarkston*, 883 F.3d 865, 879 (9th Cir. 2018) (internal quotations and citation omitted); *see also Blankenhorn*, 485 F.3d at 481 & n.12. For example, in *Boyd*, the Ninth Circuit "recognized that officers who provide armed backup, stand at the door with a gun while other officers conduct a search inside an apartment, and participate in the search operation are integral participants." *Id.* (citing *Boyd*, 374 F.3d at 780).

Plaintiffs have pointed to evidence that clearly shows that the individual grenadiers named as Defendants were not bystanders, but participated in a coordinated TRU effort to disperse the crowd. From the evidence demonstrating the chaotic nature of the dispersal action, there is at least a genuine issue of material fact as to whether the individual grenadiers named as Defendants in the remaining three Plaintiffs' Fourth Amendment claims either applied the force giving rise to Plaintiffs' claims—deployment of pepper balls, muzzle blasts, and pepper spray—or were aware of the decision to use that force and participated in a concerted action to use it. Specifically, Plaintiffs point to evidence that grenadiers Scott, Howell, and Herr participated in the deployment of pepper balls that hit

Yedlin.[5] (Pls.' Resp. #2 at 15.) Likewise, they point to evidence that Turiano and Howell participated in the use of force against Travis, and Scott, Turiano, Howell, and Herr participated in the use of force against Guillen. (Pls.' Resp. #2 at 15–16.) There remain genuine issues as to whether the grenadiers either deployed the particular munitions themselves that hit Plaintiffs or were simply aware of the decisions to use a particular munition or combination of munitions against Plaintiffs; indeed, the parties dispute what munitions actually hit Plaintiffs, let alone who deployed them. (*E.g.*, Pls.' Resp. #2 at 16 n.3; Defs.' Reply #2 at 9 n.6.) The Court thus will let stand these Plaintiffs' Fourth Amendment claims against the named Defendant grenadiers, and the issues surrounding causation and integral participation will be resolved at trial.

### 5.    Supervisor Liability

Next, Defendants contend that Plaintiffs' evidence is insufficient to hold Sgt. McBride, Lt. Moore, and Chief Williams liable for any Fourth Amendment violations arising from the grenadiers' acts in deploying munitions to disperse the crowd. In § 1983 actions, "each Government official, his or her title notwithstanding, is only liable for his or her own conduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Thus, a supervisor may only be liable

> if either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists between the supervisor's wrongful conduct and the constitutional violation. The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury. There is no *respondeat superior* liability under section 1983. Officers may not be held liable merely for being present at the scene of a constitutional violation or for being a member of the same operational unit as a wrongdoer.

*Felarca v. Birgeneau*, 891 F.3d 809, 819–20 (9th Cir. 2018) (internal quotations and citations omitted).

---

[5] The Court addresses Sgt. McBride's participation in examining supervisor liability below.

### a.    Sgt. McBride

Plaintiffs have proffered sufficient evidence from which a jury could conclude that Sgt. McBride "set in a motion a series of acts that [he] knew or reasonably should have known would cause the officers to inflict a constitutional injury." *Id.* at 820. First, the individual grenadiers were in the chain of command of Sgt. McBride, who was the grenadier team leader. Second, the evidence shows that Sgt. McBride briefed grenadiers in advance to deploy pepper balls to respond to an attempted breach of the Do Not Cross barrier and, along with other grenadiers, he deployed multiple rounds of pepper balls toward Yedlin. (Pls.' Resp. #1 at 26–27; Pls.' Resp. #2 at 14–16.) Third, Sgt. McBride directed "armed backup" to the skirmish line, instructing "the grenadiers to support the skirmish line as [they] moved the crowd." (Pls.' Resp. #2 at 16 (citing PCSOF ¶¶ 39–41).) Because the grenadiers' use of munitions for an attempted breach and to support the skirmish line is at issue in Plaintiffs' Fourth Amendment claims, and Sgt. Moore gave the orders to use that level of force, Sgt. Moore may be liable for his conduct under both theories of integral participation and supervisor liability. *See Blankenhorn*, 485 F.3d at 481 n.12, 485.

### b.    Lt. Moore

Likewise, sufficient evidence exists from which a jury could find Lt. Moore liable for his actions. The grenadiers were in Lt. Moore's chain of command and, like Sgt. McBride, Lt. Moore was on the ground authorizing the deployment of munitions that struck Plaintiffs, as Defendants acknowledge (DMSJ #1 at 24–25; DMSJ #2 at 13). The constitutionality of that deployment in the circumstances is at issue, and Lt. Moore may be liable for his conduct under both theories of integral participation and supervisor liability. *See id.*

### c.    Chief Williams

The same cannot be said for Chief Williams. Although the grenadiers, Lt. Moore, and Sgt. McBride were all in her chain of command, the evidence is not sufficient to demonstrate that she reasonably should have known that the actions she set in motion—by

way of delegating the decision as to what level of force to apply to protestors—would cause officers to inflict constitutional injuries. *See Felarca*, 891 F.3d at 820. Moreover, Plaintiffs proffer insufficient evidence to support a conclusion that Chief Williams failed to discipline the grenadiers in question for a prior excessive use of force, thereby condoning such use of force in the present circumstances, *see Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991), or that she failed to adequately train the grenadiers with knowledge that without training, they would likely violate constitutional rights, *see Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002). Finally, Plaintiffs' contentions that Chief Williams was "in the vicinity" and followed radio transmissions throughout the day but "did not intervene in the decisions to deploy force" are too tenuous to be sufficient. *See Felarca*, 891 F.3d at 820–21. Plaintiffs must show that Chief Williams knew or should have known that her general orders and delegation of decision-making would cause the grenadiers to use unconstitutionally excessive force against Plaintiffs in the particular circumstances the grenadiers were presented with on the ground, which Plaintiffs' evidence does not demonstrate. Chief Williams is thus entitled to summary judgment on the claims against her.

### 6.    Municipal Liability

The parties cross-move for summary judgment on Plaintiffs' § 1983 claims against the City. As the Court stated above, under *Monell*, a plaintiff must show that the municipality has adopted an "official policy" or "custom" that caused the alleged constitutional violation, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (1986) (quoting *Monell*, 436 U.S. at 694).

Official policy includes "decisions of a government's lawmakers," "acts of its policymaking officials," "practices so persistent and widespread as to practically have the

force of law," or a "decision not to train certain employees about their legal duty to avoid violating citizens' rights" where that decision amounted to "deliberate indifference" to citizens' rights. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted). An official policy must be the "moving force" behind the constitutional injuries alleged by a plaintiff for a municipality to be liable. *Bd. of Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405.

Plaintiffs assert five theories of the City's liability, which the Court now examines in turn.

### a.    Delegation of Policymaking Authority

First, relying on *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 986 (9th Cir. 2002), Plaintiffs contend that Chief Williams delegated final policymaking authority to Lt. Moore, so his decisions constituted City policy, making the City liable for them. (Pls.' Resp. #1 at 28.) The Court agrees with Defendants (Defs.' Resp. at 26–27) that this claim has no merit. Under the City Code, Phoenix City Charter, Ch. III §§ 1, 2, Chief Williams is not the final policymaker; the City Council and City Manager are. *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("Whether an official has final policymaking authority is a question for the court to decide based on state law.") This alone defeats Plaintiff's claim. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013). Moreover, even if Chief Williams had final policymaking authority to delegate, there is a distinct difference between delegating final policymaking authority and delegating "discretion to act," as she did. *Christie*, 176 F.3d at 1236. Otherwise, "the result would be indistinguishable from *respondeat superior* liability." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)). And even if Chief Williams delegated decision-making to Lt. Moore, he was constrained by policies, discussed further below, and subject to review by others. *Id.* For these reasons, Chief Williams did not delegate final

policymaking authority to Lt. Moore or any other officer and the City is not liable on this basis.

### b.    Ratification

Next, relying on *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992), Plaintiffs argue that Chief Williams as final policymaker ratified subordinates' unconstitutional actions by "applauding the officers' conduct on numerous occasions," failing "to discipline officers for any of their relevant conduct," and failing "to implement her own department's recommendations to update its policies on crowd control weapons." (Pls.' Resp. #1 at 28–29.) To begin with, Chief Williams is not the final policymaker, as the Court stated above, so this claim fails as well. Moreover, the actions Plaintiffs refer to occurred after the event, and thus could not have been the "moving force" behind the grenadiers' alleged unconstitutional acts. *Bd. of Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 404. To the extent Plaintiffs argue (Pls.' Reply at 17–18) that Chief Williams is liable for her own conduct—which goes to supervisor liability, not municipal liability—the Court already found Plaintiffs' evidence insufficient for such a conclusion, above. Plaintiffs' ratification theory thus fails.

### c.    Policies Related to Chemical Agent Deployment

Plaintiffs next contend that the City had "no tear gas policy" and insufficient protocols regarding the deployment of munitions, raising municipal liability against it. (Pls.' Resp. #1 at 29–30 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).) This theory fails for multiple reasons. First, in terms of the class claims, the Court found that the deployment of tear gas to control the sudden eruption of violence did not shock the conscience, and otherwise the deployment of tear gas does not appear to be at issue in the remaining individual Plaintiffs' claims. Second, the evidence shows that PPD does have policies for how and when to deploy chemical agents, of which tear gas is a part, and grenadiers are trained in their use. (DMSJ #1 at 27; Defs' Reply #1 at 18 (citing DSOF ¶¶ 14–15; 18–21).) Indeed, one portion of the policies states that chemical agents may be used only when "absolutely necessary" and "other passive means have failed to restore order." (DSOF

¶ 14(d).) And third, because PPD does have policies applicable to the circumstances here, Plaintiffs have no evidence that the *policies* were the but-for or proximate cause of their injury. *See Bd. of Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 404–05.

Plaintiffs argue, as their expert opined, that PPD should have addressed a post-protest recommendation that the TRU establish a protocol for munitions deployment based on the events of the protest. Post-incident evidence can be probative in evaluating a municipality's policy. *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *as amended*, 137 F.3d 1372 (9th Cir. 1998), (citing *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)). But because the City had a policy in place regarding the deployment of munitions, the particular post-protest evidence here—that the City chose not to add a *new* protocol—is not sufficiently probative to show that the existing PPD policy was insufficient, much less that the policy was the but-for or proximate cause of Plaintiffs' injuries. For these reasons, Plaintiffs' defective policy claim fails.

### d.    Practice or Custom

Plaintiffs also contend that the City is liable on account of a more recent incident in which, according to Plaintiffs, PPD turned a blind eye to constitutional violations by officers, "even after being sued" (in the present matter), implying a practice or custom of using excessive force. (Pls.' Resp. #1 at 30 (citing *Henry*, 132 F.3d at 519).) The time difference between the incidents Plaintiffs refer to, which occurred in May 2020 following the death of George Floyd, and the one underlying this lawsuit, which occurred on August 22, 2017, is nearly three years, which is not particularly probative to a finding of a practice or custom. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (noting "[l]iability for improper custom may not be predicated on isolated or sporadic incidents"). And at least at the time of the briefing in the present matter, no determination of an unconstitutional use of force by PPD had been made in conjunction with the May 2020 protests.[6] (*See* Defs.' Reply #1 Ex. 1.) The Court finds the connection between PPD's

---

[6] The complicated nature of any potential claims related to a separate incident between PPD and protestors does not lend itself to a straightforward conclusion about whether

actions in May 2020 and those in 2017 underlying the present matter to be too tenuous for a reasonable jury to conclude that the City had a practice or custom of using, or turning a blind eye to the use of, excessive force.

### e.     Failure to Train

Lastly, Plaintiffs argue that PPD provided no specific training to officers tailored to the event, even though it had advance notice of the event, and that the officers' lack of training demonstrated a deliberate indifference sufficient to raise municipal liability. (Pls.' Resp. #1 at 30–31 (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006)).) Plaintiffs' expert opined that PPD officers lacked sufficient training, but—to the extent that testimony adequately relied on the record and did not constitute legal conclusions (*see* Doc. 326)—Plaintiffs do not provide sufficient evidence from which a reasonable jury could find that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. For example, as Defendants point out, Plaintiffs identify no instance before August 22, 2017, of illegal conduct such as that alleged here that would have been probative to a finding that officer training was so obviously deficient. For their part, Defendants point to the extensive training grenadiers completed. (Defs.' Reply #1 at 19.) Plaintiffs have not raised a genuine issue of material fact sufficient to survive summary judgment on their failure to train theory. And because none of Plaintiffs' municipal liability theories survives, the City is entitled to summary judgment on the claims against it.

### 7.     Injunctive Relief

Next, the parties filed cross-motions for summary judgment on the issue of injunctive relief. In order to obtain a preliminary injunction, each Plaintiff must show that "(1) [he/she] is likely to succeed on the merits, (2) [he/she] is likely to suffer irreparable

---

excessive force was used in the separate incident, and of course this Court would not conduct a mini-trial on a separate matter.

harm in the absence of preliminary relief, (3) the balance of equities tips in [his/her] favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008)).

In the Complaint, Plaintiffs seek "[a] preliminary and permanent injunction prohibiting Defendants from engaging in any of the unconstitutional behaviors as described herein and to put into place safeguards sufficient to ensure that they do not continue in the future." (Compl. at 46 ¶ B.) In this Order, the Court concludes that Defendants are entitled to summary judgment on the class claims as well as the claims against the City and Chief Williams, but that certain individual Plaintiffs' Fourth Amendment claims against certain individual officers will proceed to trial.

To the extent these individual Plaintiffs can seek injunctive relief against individual officers, Plaintiffs' request for such relief fails the second prong of the *Winter* test. An injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (internal quotation and citation omitted). In *Lyons*, although a police officer used excessive force by way of a chokehold on the plaintiff during a traffic stop, the Supreme Court concluded the plaintiff was not entitled to injunctive relief because of an insufficient "likelihood of substantial and immediate irreparable injury" to the plaintiff. The Court concluded "even assuming" Lyons would be stopped again in the "reasonably near future," it is "untenable to assert" that officers apply chokeholds at every traffic stop. *Id.* at 108.

The Court agrees with Defendants that this case is similar to *Hernandez v. City of San Jose*, 2019 WL 4450930 (N.D. Cal. Sept. 17, 2019), in which the court examined whether the plaintiffs injured at an anti-Trump protest by the police officers' crowd control tactics could seek injunctive relief. There, Judge Koh stated that the plaintiffs' claim of substantial and irreparable injury rested on a "string of contingencies," the entire set of

which must be met, including whether the plaintiffs would attend another rally, a protest would break out, and police would react the same way. *Id.* at 21–23.

Here, because Plaintiffs have no remaining claims against the City, injunctive relief can only be obtained against the individual officers they are suing. That additional fact makes meeting the string of contingencies even more unlikely; even if Plaintiffs attended another protest, it is uncertain whether those officers would be present, whether Plaintiffs would encounter them, whether similar circumstances would arise, and whether those officers would act in the same way.[7] Plaintiffs' testimony that they intend to attend or have attended other protests, by itself, is not sufficient under *Winter* to show a likelihood of substantial and immediate irreparable injury entitling them to injunctive relief against individual officers.

### 8.    Punitive Damages

Finally, Defendants state that the evidence is insufficient for a reasonable jury to award Plaintiffs punitive damages. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Beyond their brief argument against punitive damages in the context of the class members' claims (DMSJ #1 at 35; Defs.' Reply #1 at 21), Defendants do not provide legal support for their contention that the individual Plaintiffs should be precluded from seeking punitive damages. There is some overlap between a finding of purpose to harm with regard to a Fourteenth Amendment claim—which the Court determined Plaintiffs could not prove with regard to the class claims—and the finding required for punitive damages of either evil motive or intent, or reckless or callous indifference to Plaintiffs' rights. But the individual Plaintiffs' punitive damages claim pertains to individual officers' actions beyond the conduct pertaining just to the class members' claims. The Court finds that the evidence is sufficient

---

[7] To the extent the Complaint alleges that Plaintiffs were targeted specifically because they were anti-Trump protestors (*e.g.*, Compl. ¶¶ 7, 9–11), the string of contingencies would be even more difficult to meet in the near future.

for a jury to find the individual Defendants' use of force involved a reckless or callous indifference to the rights of Yedlin, Travis, and Guillen. Accordingly, the Court denies Defendants' motion as it pertains to punitive damages on Plaintiffs' remaining claims. *See Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1021 (C.D. Cal. 2019).

**IT IS THEREFORE ORDERED** denying Plaintiffs' Motion for Partial Summary Judgment (redacted Doc. 246, sealed Doc. 257).

**IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgment as to Plaintiffs' Classwide Claims (redacted Doc. 271, sealed Doc. 276).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Motion for Summary Judgment as to Plaintiffs' Individual Claims (redacted Doc. 272, sealed Doc. 277). The Court will proceed to trial on the Fourth Amendment Excessive Force claims (Count 1) of individual Plaintiffs as follows:

- Plaintiff Ira Yedlin against Defendants Lt. Moore, Sgt. McBride, and Grenadiers Scott, Howell, and Herr;

- Plaintiff Janet Travis against Defendants Lt. Moore, Sgt. McBride, and Grenadiers Turiano and Howell; and

- Plaintiff Cynthia Guillen against Defendants Lt. Moore, Sgt. McBride, and Grenadiers Scott, Turiano, Howell, and Herr.

These Plaintiffs may seek damages, including punitive damages, but not injunctive relief against these Defendants. The Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' Individual Claims (redacted Doc. 272, sealed Doc. 277) in all other respects.

**IT IS FURTHER ORDERED** that the Court will set a pre-trial conference by separate Order.

Dated this 7th day of February, 2022.

Honorable John J. Tuchi
United States District Judge